UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| PUERTO RICO TELEPHONE COMPANY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 3:11-cv-02135-JAW |
| SAN JUAN CABLE COMPANY LLC d/b/a ONELINK COMMUNICATIONS, | ) ) ) ) | |
| Defendant. | ) ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S FIRST MOTION FOR SUMMARY JUDGMENT**

In this federal and state antitrust action, Puerto Rico Telephone Company, Inc. (PRTC) claims that San Juan Cable Company LLC d/b/a OneLink Communications (OneLink) violated antitrust laws by conducting "sham" litigation over a period of four years, which PRTC claims delayed its entry into the competitive market. In view of the record and Supreme Court caselaw, the Court concludes that under Federal Rule of Civil Procedure 56, OneLink is entitled to summary judgment for those events that fall within the scope of *Noerr-Pennington* immunity and for those time periods that otherwise do not raise a genuine dispute of material fact. The Court denies OneLink's motion for summary judgment for the remaining periods as there are genuine disputes of material fact that require jury resolution.

I.      STATEMENT OF FACTS

A.      **Procedural History**

On November 22, 2011, PRTC filed a complaint against OneLink, alleging in two counts that OneLink violated Sections 2 and 3 of the Sherman Act, 15 U.S.C. §§ 2-3, and two counts that OneLink violated the corresponding Puerto Rico Anti-Monopoly Act, P.R. LAWS ANN. 10, § 260. *Compl.* ¶¶ 7, 61-92 (ECF No. 1). On December 16, 2011, PRTC filed an amended complaint containing the same alleged violations of federal and state antitrust law. *Am. Compl.* ¶¶ 7, 64-95 (ECF No. 11). As pertains to this Order, PRTC alleges that OneLink "embarked on a course of conduct designed to thwart, or at a minimum delay, PRTC's entry into OneLink's markets" by "hijacking of Board proceedings, numerous unsuccessful motions to disqualify one of the commissioners, and the filing and vigorous prosecution of multiple objectively baseless lawsuits in both state and federal court – every one of which (with the exception of the most recent attack which has not yet been ruled upon by the court) was resolved against OneLink." *Id.* ¶ 4.

On January 24, 2012, OneLink filed a motion to dismiss PRTC's Amended Complaint. *Def.'s Mot. to Dismiss Pl.'s Am. Compl.* (ECF No. 22) (*Mot. to Dismiss*). PRTC filed its opposition to OneLink's motion to dismiss on February 24, 2012, and OneLink replied on March 9, 2012. *Pl.'s Opp'n to Def.'s Mot. to Dismiss Pl.'s Am. Compl.* (ECF No. 23); *Def.'s Reply in Further Support of Its Mot. to Dismiss Am. Compl.* (ECF No. 25). On August 10, 2012, Judge Gelpi denied OneLink's motion to dismiss, and subsequently affirmed his decision on OneLink's motion for reconsideration on September 13, 2012. *Opinion and Order* (ECF No. 30) (*First Opinion and Order*); *Opinion and Order* (ECF No. 45) (*Second Opinion and Order*).

Judge Gelpi also denied OneLink's request for interlocutory appeal to the First Circuit. *Second Opinion and Order*. On October 5, 2012, OneLink answered the Amended Complaint, denying its essential allegations and asserting nine affirmative defenses. *Answer to Am. Compl.* (ECF No. 50) (*Answer*).

After nearly a year of discovery, OneLink filed a motion for summary judgment with a supporting statement of material facts on October 11, 2013. *Def.'s Mot. for Summ. J.* (ECF No. 198) (*Def.'s Mot.*); *Def.'s Statement of Undisputed Material Facts in Support of Its Mot. for Summ. J.* (ECF No. 199) (DSMF). PRTC responded to OneLink's motion and its statement of material facts, and filed a statement of additional material facts on November 7, 2013. *Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 215) (*Pl.'s Opp'n*); *Pl.'s Opposing Statement of Material Facts* (ECF No. 216) (PRDSMF; PSAMF). On November 22, 2013, OneLink replied to PRTC's response and to its statement of additional material facts. *Def.'s Reply Br. in Support of Its Mot. for Summ J.* (ECF No. 226) (*Def.'s Reply*); *Reply to Pl.'s Opposing Statement of Material Facts and Statement of Additional Material Facts* (ECF No. 227) (DRPSAMF). On November 27, 2013, PRTC filed a surreply. *Pl.'s Surreply in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 231) (*Pl.'s Surreply*).

On December 4, 2014, Judge Gelpi recused himself from presiding over this case, and on January 26, 2015, the case was reassigned to this Judge. *Order* (ECF No. 305); *Notice of Judge Assignment* (ECF No. 307). The Court held oral argument on OneLink's motion for summary judgement on May 31, 2016. *Entry* (ECF No. 315); *Tr. of Proceedings* (ECF No. 319) (*Tr.*).

### B.   Factual Background[1]

#### 1.   PRTC's First Application for a Video Franchise in February 2008; Application Denied in October 2008

PRTC filed its first application for a video franchise in February 2008.  DSMF ¶ 1; PRDSMF ¶ 1.   PRTC's first application was unanimously denied by the Telecommunications Regulatory Board of Puerto Rico (TRB) on October 29, 2008.[2] DSMF ¶ 2; PRDSMF ¶ 2. In denying PRTC's first application for a video franchise, the TRB stated that it had based its decision on the application and on testimony submitted at a public hearing held in September and October 2008; the TRB made 22 separate determinations of findings of fact, including Number 3, which notes that OneLink submitted comments to the TRB as an interested party.[3]   DSMF ¶ 3; PRDSMF ¶ 3. During the interval between February 2008 and November 2008, OneLink filed no litigation against or relating to PRTC in any Puerto Rico or federal court.  DSMF ¶ 4; PRDSMF ¶ 4.

---

[1]      In accordance with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to PRTC's case theories consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  In compliance with this obligation, the Court recites supported facts as true even if OneLink disputes them.

[2]      OneLink stated that PRTC's first application was denied in November 2008, DSMF ¶ 2, but PRTC submitted a qualified response and clarified that the decision from the TRB was handed down on October 29, 2008.  PRDSMF ¶ 2 (citing *Decl. of Dylan M. Carson* (*Carson Decl.*) Attach. 1 *Ex.* 1, at 4, 10 (ECF No. 217) (*Resolution and Order*)).  The Court adjusted the date to October 29, 2008.

[3]      PRTC admitted OneLink's paragraph 3, but also interposed a qualified response, noting that the TRB also based its decision on "22 separate determinations of fact, including No. 3 which notes that OneLink submitted comments to the TRB objecting to the franchise application."  PRDSMF ¶ 3 (citing *Resolution and Order* at 4-7).  The Court reviewed the record citation and included the number of findings of fact and that OneLink submitted comments to the TRB as an interested party.  The Court did not include that OneLink in fact objected to the franchise application, as opposed to merely commenting on it, because Findings of Fact Number 3 does not support that assertion.  *See Resolution and Order* at 4.

> **2.      PRTC's Second Application for a Video Franchise in
> December 2008; OneLink's Litigation between January
> 2009 and November 2011; Application Granted in
> November 2011**

On December 11, 2008, PRTC submitted a second application for a video
franchise to the TRB.  DSMF ¶ 5; PRDSMF ¶ 5.  Commencing on January 13, 2009,
OneLink filed four motions with the TRB, three of which were unsuccessful, and one
complaint in this Court naming the TRB as a defendant: (1) Motion to Intervene
before the TRB (filed January 13, 2009, denied March 2, 2009); (2) Motion to Vacate
or Stay Confidentiality Determinations (filed January 30, 2009, denied March 2,
2009); (3) Urgent Motion for Extension of Time to file Comments (filed February 11,
2009, denied February 17, 2009); (4) Urgent Motion to Dismiss PRTC Application
(filed February 25, 2009); and (5) Cable Act Complaint (filed February 10, 2009 in
federal court, district court order on OneLink's motion for injunctive relief finding
that it has demonstrated a "strong likelihood of success on the merits" on February
18, 2009, and dismissed as moot on February 24, 2009).[4]  PSAMF ¶ 1; DRPSAMF ¶
1.  Based on the filing of the Motion to Intervene before the TRB by OneLink, and
motions for protection of confidential information filed by PRTC, the TRB vacated the

---

[4]      PRTC's paragraph 1 originally stated that OneLink's motions and complaint were
"unsuccessful."  PSAMF ¶ 1.  OneLink denied the paragraph to the extent it claims that the motions
and complaint were "unsuccessful," but OneLink otherwise admitted that they were filed on the dates
asserted by PRTC.  DRPSAMF ¶ 1.  For example, OneLink points out that PRTC has presented no
evidence that the Urgent Motion to Dismiss PRTC Application filed on February 25, 2009 was ever
ruled on by the TRB, and clarified that the Cable Act Complaint filed on February 10, 2009 resulted
in a ruling from Judge Gelpí that OneLink had demonstrated a strong likelihood of success on the
merits of its motion seeking a temporary restraining order and preliminary injunctive relief, and the
complaint was eventually dismissed on the basis of mootness.  *Id.* (citing *San Juan Cable LLC v.
Telecomms. Regulatory Bd. of P.R.*, 598 F. Supp. 2d 233 (D.P.R. 2009); *Carson Decl.* Attach. 6 *Ex.* 42).
The Court has clarified that three of the motions presented to the TRB were "unsuccessful" because
they were denied, included additional procedural history regarding the Cable Act Complaint, and
deems the paragraph, as altered, admitted.  D.P.R. LOC. R. 56(e).

previously scheduled February 11-13, 2009 hearing dates, and reset them for March

4-6, 2009.[5],[6]  PSAMF ¶ 2; DRPSAMF ¶ 2.

On March 3, 2009, before the TRB's scheduled hearing on PRTC's second

application for a video franchise and at the request of OneLink, the Puerto Rico Court

of Appeals issued an order staying the TRB's consideration thereof, and on April 24,

2009 extended the stay until March 31, 2009.[7]  DSMF ¶ 6; PRDSMF ¶ 6; PSAMF ¶

3; DRPSAMF ¶ 3.  As of the lifting of the stay by the Puerto Rico Court of Appeals on

March 31, 2009, the TRB had not ruled on the Urgent Motion to Dismiss PRTC

Application.[8]  PSAMF ¶ 5; DRPSAMF ¶ 5.

---

[5]     PRTC's paragraph 2 originally stated: "In response [to the filing of the Motion to Intervene before the TRB on January 13, 2009], on January 21, 2009, the TRB vacated the previously scheduled February 11-13, 2009 hearing dates, and reset them for March 4-6, 2009." PSAMF ¶ 2.  In response, OneLink denied the paragraph in its entirety, arguing that the hearing dates were reset for March as a result of PRTC's motions to restrict access to certain exhibits, and furthermore, that PRTC "has proffered no admissible evidence establishing or supporting a reasonable inference" that the hearing dates were moved "in response to any OneLink filing." DRPSAMF ¶ 2.  Both parties cite the same record evidence in support of their assertions. *Carson Decl.* Attach. 3 *Ex.* 16 (*Jan. 21, 2009 Resolution and Order*).
        A review of the January 21, 2009 Resolution and Order reveals that the hearing was postponed as a result of both PRTC's motions and OneLink's motion.  The TRB gave PRTC ten days to answer the Motion to Intervene, appeared to grant part or perhaps all of PRTC's motions for protection, and then declared, "[i]n consideration of the foregoing, it is necessary to update the docket," including rescheduling the hearing dates. *Id.* at 1-2.  The Court included that the filings of these motions impacted the hearing dates, and otherwise overrules OneLink's denial.

[6]     PRTC's paragraph 4 asserted, as fact, that "[h]ence, from January 13, 2009 through March 3, 2009, the TRB was forced to consider and respond to and/or deny no less than five objectively baseless filings by OneLink during the time it should have been considering the PRTC application." PSAMF ¶ 4. This "fact" is an argument, not properly presented in a statement of material facts. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("the nonmoving party [may not] rest[] merely upon conclusory allegations").  Furthermore, even if "fact," PRTC's record evidence does not support the assertion (citing the same record evidence it provided in its paragraphs 1 through 3).  The Court will consider in due course whether the facts, viewed in the light most favorable to PRTC, demonstrate that OneLink's filings may have been "objectively baseless."

[7]     PRTC admitted OneLink's paragraph 6, but also interposed a qualified response, noting that the Puerto Rico Court of Appeals' stay came at the request of OneLink, and the Court of Appeals lifted the stay per its April 24, 2009 Resolution.  PRDSMF ¶ 6 (citing *Carson Decl.* Attach. 1 *Ex.* 2 at 1, 23; *id.*, *Ex.* 3 at 7).  The Court added these additional facts to provide context.

[8]     PRTC's paragraph 5 originally stated: "When the appellate court lifted the stay on March 31, 2009, the TRB was faced with OneLink's still pending Urgent Motion to Dismiss PRTC Application." PSAMF ¶ 5.  In response, OneLink denied the paragraph in its entirety, contending that PRTC has

OneLink then filed additional motions and memoranda with the TRB: (1) Emergency Motion to Show Cause (filed April 7, 2009); (2) Opposition to PRTC's Motion to File Reply Comments (filed April 23, 2009, denied May 13, 2009); and (3) Motion to Set Aside Public Hearing (filed April 27, 2009, denied May 1, 2009).[9],[10] PSAMF ¶ 6; DRPSAMF ¶ 6. On May 20, 2009, before the TRB's rescheduled hearing on PRTC's second application for a video franchise and at the request of OneLink, the Puerto Rico Supreme Court issued an order staying the TRB's consideration thereof; the stay remained in effect until October 26, 2010.[11]  DSMF ¶ 7; PRDSMF ¶ 7. As of October 26, 2010, OneLink had no pending litigation against or relating to PRTC in any Puerto Rico or federal court. DSMF ¶ 8; PRDSMF ¶ 8.

On November 24, 2010, TRB proceedings on PRTC's franchise application resumed after the Supreme Court rejected OneLink's appeal; the TRB notified the

---

not provided any record evidence that would allow a reasonable inference that "the TRB ever ruled on (or even considered) OneLink's Urgent Motion to Dismiss PRTC Application, let alone that the TRB considered it during the period between March 31 and May 20, 2009." DRPSAMF ¶ 5. The Court adjusted the language of PRTC's paragraph 5 to reflect that the TRB had not reached a decision on the motion at the time the the stay was lifted, and otherwise overrules OneLink's denial.

[9]      OneLink admitted PRTC's paragraph 6 but noted that if "PRTC intends to imply that, as a matter of fact, these filings determined the pace of the TRB's consideration of PRTC's franchise application, PRTC has proffered no admissible evidence establishing or supporting any such inference." DRPSAMF ¶ 6. To the extent this assertion is intended as a qualified response, it is overruled.

[10]      PRTC's paragraph 7 stated: "Once again, rather than considering PRTC application, the TRB was stuck in a web of OneLink petitions until the Supreme Court of Puerto Rico issued its May 20, 2009 stay." PSAMF ¶ 7 (citing the same record evidence in its paragraphs 5 and 6). The record evidence provided by PRTC does not support its assertion that the TRB was "stuck in a web of OneLink petitions" until May 20, 2009, nor does it support a finding that these petitions somehow slowed down the application review process. The Court did not include PRTC's paragraph 7.

[11]      PRTC admitted OneLink's paragraph 7, but also interposed a qualified response, noting that the stay issued by the Puerto Rico Supreme Court came at the request of OneLink. PRDSMF ¶ 7 (citing *Carson Decl.* Attach. 1 *Ex.* 4). The Court added this additional fact to provide context.

parties named in the Resolution and Order on December 21, 2010.[12]  PSAMF ¶ 8;

DRPSAMF ¶ 8.  On January 3, 2011, PRTC supplemented its application given the

two years since its December 2008 submission. [13]  PSAMF ¶ 9; DRPSAMF ¶ 9.

Before the TRB could set a hearing date, on January 20, 2011, OneLink filed a

motion to recuse TRB President Sandra Torres from any further involvement in the

proceedings.[14]  PSAMF ¶ 10; DRPSAMF ¶ 10.  President Torres, in her capacity as

---

[12]     OneLink admitted PRTC's paragraph 8 but interposed a qualified response, explaining that the parties were not notified of the November 24, 2010 decision until December 21, 2010.  DRPSAMF ¶ 8 (citing *Carson Decl*. Attach. 1 *Ex*. 4).  The Court added this fact to PRTC's paragraph 8.

[13]     PRTC's paragraph 9 originally stated that it "supplemented its application given the two years *of delay* since its December 2008 submission."  PSAMF ¶ 9 (emphasis added).  OneLink denied PRTC's paragraph 9 in its entirety, asserting that the reason PRTC supplemented its application was because they were ordered to do so by the TRB.  DRPSAMF ¶ 9 (citing *Carson Decl*. Attach. 1 *Ex*. 4; *id*., Attach. 4 *Ex*. 23 at 1 (*Application Supplement*)).  OneLink also argued that PRTC submitted no evidence to support a claim that it supplemented its application as a result of delay, "or that OneLink was responsible for any such delay." *Id*.

         PRTC cited the same Application Supplement as OneLink in support of its paragraph 9.  In its opening paragraph of the Application Supplement, PRTC explained that "[i]n compliance with the Board's directives, and given that in the intervening two years since the application was filed certain facts in the original application have changed, PRTC is hereby supplementing its original application." *Application Supplement* at 1.  In addition, in the TRB's November 24, 2010 Resolution and Order, it instructed PRTC "to express itself on the matter" due to the stay being lifted. *Carson Decl*. Attach. 1 *Ex*. 4 at 1.

         Viewing the evidence in the light most favorable to PRTC, the Court agrees with OneLink that the evidence does not support a finding that PRTC supplemented its application as a result of delay, and therefore, removed the words "of delay" from PRTC's paragraph 9.  However, the record evidence supports the remainder of PRTC's paragraph 9.  The TRB instructed PRTC "to express itself on the matter" but that was not an order that PRTC needed to supplement its application; PRTC chose to supplement its application.

[14]     PRTC's paragraph 10 originally included that OneLink argued in its Motion to Recuse that "the TRB's consideration of PRTC's franchise must sit in abeyance until the TRB ruled on its Motion." PSAMF ¶ 10.  OneLink denied the paragraph in its entirety, arguing that PRTC provided no evidence that the TRB was unable to set a hearing date between November 24, 2010 and January 20, 2011, and noting that OneLink did not argue in its motion that consideration of the franchise application had to "sit in abeyance" until a ruling on the Motion to Recuse.  DRPSAMF ¶ 10 (citing *Carson Decl*. Attach. 4 *Ex*. 24 (*Mot. for Recusal*)).  The Court overrules the denial as it relates to the fact that the Motion to Recuse was filed before a hearing date had been set.  The Court does not interpret PRTC's assertion the same way OneLink does—PRTC was simply noting that a hearing date had not been set yet, not that the TRB was unable to do so.  However, the Court agrees that OneLink never argued in its motion that consideration of the franchise application could not occur until the TRB ruled on its motion; instead, OneLink requested that the TRB "expunge from the record any information relating to President Torres' involvement to date in the Second Franchise Proceeding." *Mot. for Recusal* at 8.  The Court removed this part of PRTC's paragraph 10.

President and Associate Member of the TRB, sought advice from the Office of Government Ethics of Puerto Rico (OGE) in a letter dated February 24, 2011, and on March 29, 2011, the OGE responded and concluded that there was no merit to OneLink's claims.[15]  PSAMF ¶ 11; DRPSAMF ¶ 11.  On April 6, 2011, the TRB scheduled a hearing on PRTC's franchise application for April 27, 2011.  PSAMF ¶ 12; DRPSAMF ¶ 12.  In total, ninety-seven days passed from the time OneLink filed its Motion for Recusal for the TRB's consideration, the time OGE responded to President Torres' inquiry, and April 27, 2011, the date the TRB held the hearing on PRTC's franchise application.[16]  PSAMF ¶ 13; DRPSAMF ¶ 13.

---

[15]    PRTC's paragraph 11 originally included that "[t]he TRB sought a formal ethics opinion from the [OGE]."  PSAMF ¶ 11.  OneLink denied the paragraph in its entirety, asserting that the inquiry arose from a February 24, 2011 letter sent by President Torres to the OGE, and that "[t]he OGE did not address any 'claims' raised by OneLink—it addressed President [Torres-] Lopez's inquiry."  DRPSAMF ¶ 11.  Both parties cite the OGE response in support of their assertions.  *Carson Decl.* Attach. 4 *Ex.* 25 (*Ethics Letter*).

    Viewing the evidence in the light most favorable to PRTC, the Court overrules the denial.  A reasonable inference can be drawn that President Torres' letter was written in her capacity as President and Associate Member of the TRB, and thus, the response from the OGE was directed at both her and the TRB.  The Court altered PRTC's paragraph 11 slightly to indicate that the letter originated with President Torres, and the Court removed the phrase, "formal ethics opinion."  In addition, the Ethics Letter establishes that, contrary to OneLink's assertion, the OGE did address OneLink's claims, and decided that President Torres could remain involved in the PRTC franchise application proceeding.  *Id.* at 2, 4 ("[A]s regards the possible conflict of interest noted by OneLink, we are of the opinion that you need not recuse yourself from intervening before the Board and any other venue, as President and Associate Member of the Board, in the case of Puerto Rico Telephone Company, Inc. h/n/c Claro TV, Case No. JRT-2008-CCG-0002, because you did not intervene or participate, directly or indirectly, in the case while you were employed by PRTC").

[16]    PRTC's paragraph 13 originally stated: "Ninety seven days passed while the TRB and [OGE] considered and rejected OneLink's motion to recuse."  PSAMF ¶ 13 (citing record support contained in its paragraphs 8 through 12).  OneLink denied the paragraph in its entirety, arguing that its Motion to Recuse was never before the OGE, and PRTC has presented no evidence establishing that the Motion to Recuse was being "considered" by the TRB during this ninety seven-day time period, or that it delayed consideration of the franchise application in any way.  DRPSAMF ¶ 13.  The Court agrees with OneLink that the record evidence does not support a finding that the OGE was considering the Motion to Recuse; it was considering an inquiry from President Torres in her capacity as President and Associate Member of the TRB.  However, the Court concludes that the evidence establishes, at the very least, that the motion was filed for the TRB's consideration, regardless of whether the TRB actually considered it.  The motion was filed with the TRB.  In addition, by the Court's count, ninety-seven days passed between the time that the Motion to Recuse was filed and the franchise application

The TRB did not grant PRTC's second application for a video franchise until November 2011. DSMF ¶ 9; PRDSMF ¶ 9. Between the lifting of the judicial stay on October 26, 2010, and the order granting PRTC's second application for a video franchise in November 2011, OneLink had no pending litigation against or relating to PRTC in any Puerto Rico or federal court.[17] DSMF ¶ 10; PRDSMF ¶ 10.

---

hearing was held. The Court adjusted PRTC's paragraph 13, and sustains in part and overrules in part OneLink's denial.

[17] In its opposing statement of material facts filed under seal, PRTC admitted OneLink's paragraph 10 but also interposed a qualified response, asserting that "OneLink paid for half of the costs of an October 27, 2011 complaint before the TRB filed by Puerto Rico Cable Acquisition Corp. d/b/a Choice Cable T.V. against PRTC." PRDSMF ¶ 10 (ECF No. 219) (Ex Parte) (citing *Carson Decl.* Attach. 1 *Ex.* 5; *id.*, *Ex.* 6). Exhibit 5 was filed under seal. *Notice of Filing Exs.* Attach. 2 *Ex.* 5 *Doc. Filed Under Seal* (ECF No. 220) (*Frix and Dorchester Email*). It is an email communication between Dana Frix—counsel for OneLink in this litigation—and Ron Dorchester of OneLink. *Id.* at 2. In relevant part, the communication states:

> Please recall that in October OneLink and Choice [Cable T.V.] agreed to split the cost of filing a complaint before the TRB. . . . Please note that the amount of that invoice reflects only the amount due by OneLink. The other half is being billed directly to Choice. For your convenience we are providing complete billing detail even though OneLink is responsible only for half.

> Please also recall that OneLink and Choice are both plaintiffs in a federal complaint against the TRB and that the companies have agreed to split charges for that complaint. . . . The amount shown on that invoice is due by OneLink. Please note that for your convenience we are providing complete billing detail even though OneLink is responsible only for half.

*Id.* Exhibit 6 is a verified complaint and request for emergency relief filed with the TRB by Choice Cable T.V. against PRTC and several other respondents. *Carson Decl.* Attach. 1 *Ex.* 6. The complaint was filed on October 27, 2011. *Id.*

The Court is required to draw all reasonable inferences and resolve all genuine factual disputes in favor of PRTC, *ATC Realty, LLC v. Town of Kingston, New Hampshire*, 303 F.3d 91, 94 (1st Cir. 2002), and having done so, the Court still overrules PRTC's qualified response because there is no evidence that the TRB is either a Puerto Rico or federal court; it is a regulatory board.

Even if the TRB were deemed a "court," the Court would still overrule PRTC's qualified response for several reasons. First, regarding the communication between Attorney Frix and Mr. Dorchester, although they agreed to split the cost of filing a complaint with the TRB, there is no indication that OneLink was a party in that litigation. Second, the October 27, 2011 complaint only lists Choice Cable T.V. as the "Complainant" and does not reference OneLink in the complaint. Third, it is unclear why OneLink and Choice would agree to split the cost if only one party were named in the filing; however, the remainder of the communication is telling. It appears that Attorney Frix is referring to two cases—the October complaint with the TRB, and a federal complaint whereby "OneLink and Choice are both plaintiffs" and, as with the October complaint, they agreed to split costs related to the filing. It seems odd that Attorney Frix would highlight the fact that the two companies

### 3. OneLink Files Suit in this Court against the TRB in November 2011; the TRB Agrees to Postpone Approval of PRTC's Franchise Agreement until January 31, 2012

On November 29, 2011, after the TRB approved PRTC's franchise application, OneLink filed suit against the TRB in federal court, alleging violations of 42 U.S.C. § 1983 and 47 U.S.C. § 521 (Cable Act).[18]  PSAMF ¶ 14; DRPSAMF ¶ 14. At the same time, OneLink filed a Motion for a Temporary Restraining Order (TRO) and Preliminary Injunction, requesting that the Order approving PRTC's franchise application be stayed.  PSAMF ¶ 15; DRPSAMF ¶ 15.

On December 2, 2011, the TRB agreed to postpone its approval of the franchise agreement with PRTC until January 31, 2012 in exchange for the agreement by OneLink and Choice Cable (Choice) to withdraw their request for a TRO in the federal lawsuit filed in late November 2011, and the TRB agreed to provide OneLink with no less than seven days' notice before taking any action with respect to approving a

---

are both plaintiffs in a case unless they are not in another.  Finally, the "Summary of Current Invoices" breaks down the charges as one for "Choice Complaint to TRB re PRTC Illegal Construction" and the other for "OneLink/Choice [v]. TRB (Fed District Court)."  *Frix and Dorchester Email* at 2.  For these reasons, the Court overrules PRTC's qualified response.

[18]     PRTC's paragraph 14 also originally included that OneLink filed suit in federal court while the TRB was considering the franchise agreement.  PSAMF ¶ 14.  OneLink denied only this part of PRTC's paragraph 14 on the basis that the evidence does not support the assertion.  DRPSAMF ¶ 14. The Court agrees with OneLink and has removed this part of PRTC's paragraph 14.

franchise agreement for PRTC.[19],[20]   DSMF ¶ 11; PRDSMF ¶ 11; PSAMF ¶ 16; DRPSAMF ¶ 16.

### 4.    The TRB Approves PRTC's Franchise Agreement on February 1, 2012

Subsequently, the TRB approved PRTC's video franchise agreement on February 1, 2012.  DSMF ¶ 12; PRDSMF ¶ 12; PSAMF ¶ 17; DRPSAMF ¶ 17.  By then, sixty-three days had passed since OneLink filed its lawsuit in federal court.[21] PSAMF ¶ 18; DRPSAMF ¶ 18.

### 5.    Events Subsequent to the TRB's Approval of PRTC's Franchise Agreement until April 4, 2012

---

[19]    PRTC admitted OneLink's paragraph 11, but interposed a qualified response.  First, it clarified that while OneLink stated that the TRB postponed approval of the franchise agreement until February 2012, DSMF ¶ 11, it was in fact postponed until January 31, 2012.  PRDSMF ¶ 11 (citing *Carson Decl.* Attach. 1 *Ex.* 7 (*Stipulation*)).  The Court adjusted the date to January 31, 2012.

Second, PRTC stated that "OneLink extorted from the TRB an agreement to delay approval of PRTC's Franchise Application until at least January 31, 2012 in exchange for OneLink withdrawing its TRO request.  The Stipulation also contemplated that after January 31, 2012, the TRB would provide OneLink "7 days['] notice before taking any action with respect to approving a franchise agreement for PRTC."  *Id.* (citing *Stipulation* ¶ 3).  The record evidence does not support PRTC's assertion that OneLink "extorted from the TRB an agreement to delay approval" of the franchise agreement, and OneLink's paragraph 11 adequately explained the circumstances surrounding the settlement agreement with record citation.  D.P.R. LOC. R. 56(e) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted").  However, regarding the notice requirement, the Court included this point under the rule of completeness.  FED. R. EVID. 106.

[20]    PRTC's paragraph 16 originally stated: "On December 2, 2011, OneLink extorted from the TRB an agreement to delay approval" of the franchise agreement "until at least January 31, 2012 in exchange for OneLink withdrawing its TRO request."  PSAMF ¶ 16 (citing *Stipulation* ¶ 3).  OneLink denied extorting any such agreement, noting that PRTC has presented no evidence to support its assertion.  DRPSAMF ¶ 16.  Besides including the date whereby the Stipulation was entered into, the Court does not include PRTC's paragraph 16 for reasons previously discussed.  *See* note 19, *supra*.

[21]    PRTC's paragraph 18 originally stated: "By then, sixty-three days passed."  PSAMF ¶ 18 (citing record evidence contained in its paragraphs 14 through 17).  OneLink denied the paragraph on the basis that it is "impossible to admit" without knowing when sixty-three days had passed.  DRPSAMF ¶ 18.  The Court overrules the denial.  It is obvious that, while not explicit, PRTC is referring to the period between November 29, 2011, when OneLink filed suit in federal court, and February 1, 2012, when the TRB approved the franchise agreement.  Even OneLink recognized this in its denial while simultaneously claiming that the paragraph was "impossible to admit."  *Id.*  The Court altered PRTC's paragraph 18 slightly to indicate the dates of the referenced time period.

After the TRB approved PRTC's franchise agreement on February 1, 2012, OneLink continued to file and prosecute three more unsuccessful motions and petitions, including a motion to stay the grant of PRTC's application and approval of its franchise agreement, and a petition for reconsideration and in further support of intervention.[22]  PSAMF ¶ 19; DRPSAMF ¶ 19.  Following this additional litigation initiated by OneLink with the TRB, the TRB ruled on OneLink's numerous motions relating to PRTC's franchise and declared on April 4, 2012 that PRTC "is authorized to operate its video service throughout the entire Island of Puerto Rico using an

---

[22]     PRTC's paragraph 19 originally began by stating that "[w]hile the TRB approved PRTC's franchise agreement on February 1, 2012 . . ."  PSAMF ¶ 19.  OneLink denied the paragraph in its entirety, first by arguing that if PRTC is intending to imply that the referenced filings had an effect on approval of the franchise application or agreement, or delayed PRTC's ability to start its video service business, PRTC has presented no evidence to support the assertion.  DRPSAMF ¶ 19.  The Court has not read in any such implication in its recitation of facts, and overrules this part of OneLink's denial.

Second, OneLink contends that, of the four filings referenced by PRTC, one of them was filed before approval of the franchise agreement, and the other three filings were made "in opposition to the TRB's approval of PRTC's franchise agreement, which by then had already been approved."  *Id.*  The Court agrees that the first referenced filing was made on November 15, 2011 (i.e., before the franchise agreement was approved), and thus, does not support PRTC's paragraph 19.  *See Carson Decl.* Attach. 4 *Ex.* 30.  However, the other three filings were made after approval of PRTC's franchise agreement, and OneLink does not dispute this.  At the same time, OneLink appears to agree with the Court's finding in its own denial.  The Court replaced the word "while" with "after" in the beginning of PRTC's paragraph 19 for clarity.

Internet Protocol technology platform known as 'Claro TV.'"[23],[24]   DSMF ¶ 12; PRDSMF ¶ 12; PSAMF ¶ 20; DRPSAMF ¶ 20.

From October 20, 2009 through August 17, 2012, in a number of TRB legal memoranda, the regulatory agency argued that OneLink engaged in a "prolonged campaign" of "abusing the judicial appeals process" in order to "preserve [its] regional monopoly over the sale of cable-TV services" and prevent PRTC from obtaining its cable franchise; in a April 4, 2012 order the TRB stated that it wanted to "formally list all [11] legal proceedings and other challenges that OneLink has lodged to no effect. . . . [OneLink's] theories have failed in a variety of forums where they have been filed because, simply, they are unsupported by law, from substantive and

---

[23]   OneLink's paragraph 12 originally stated: "Since February 8, 2012, PRTC has held a valid video franchise and been free to build and operate a video network in Puerto Rico." DSMF ¶ 12. PRTC denied this statement, asserting that although its franchise agreement was approved on February 1, 2012:

> OneLink continued to file and prosecute numerous motions and petitions related to PRTC's franchise after the February 2012 approval. Those motions were separately addressed and dismissed in the TRB's April 4, 2012 Order, declaring that "PRTC is authorized to operate its video service throughout the entire Island of Puerto Rico using an Internet Protocol technology platform known as "Claro TV."

PRDSMF ¶ 12 (citing *Carson Decl.* Attach. 2 *Ex.* 8 (*Decision and Order*)).
    Viewing the evidence in the light most favorable to PRTC, the Court included in the recitation of the facts that (1) the TRB approved the franchise agreement on February 1, 2012; (2) OneLink continued to argue motions and petitions after this date, *see Decision and Order* at 1-4 (which allows for a reasonable inference that, contrary to OneLink's assertion, PRTC was not "free to build and operate a video network in Puerto Rico" following approval of the franchise agreement); and (3) that the April 4, 2012 decision by the TRB declared PRTC's right to operate its video service using the name, "Claro TV." *Id.* at 18.
[24]   PRTC's paragraph 20 originally stated: "On April 4, 2012[,] the TRB ruled on OneLink's numerous motions relating to PRTC's franchise and found it necessary to clarify that 'PRTC is authorized to operate its video services through-out the Island of Puerto Rico.'" PSAMF ¶ 20. OneLink denied the paragraph to the extent it asserts that the TRB "found it necessary to clarify" any prior orders or decisions relating to PRTC's franchise application or agreement, arguing that PRTC has presented no evidence to support its assertion. DRPSAMF ¶ 20. The Court agrees with OneLink and removed this phrase from PRTC's paragraph 20, and deems the paragraph, as altered, admitted.

procedural points of view."[25]  PSAMF ¶¶ 21-27; DRPSAMF ¶¶ 21-27.   In total, PRTC

spent over $3.2 million to defend the petitions and lawsuits and incurred additional

---

[25]    PRTC's paragraphs 21 through 27 contain numerous quotations from legal memoranda and orders written by the TRB.  The Court has summarized PSAMF ¶¶ 21-27 in the record.  For example, in its paragraph 21, PRTC stated:

> On October 20, 2009, in its Response to OneLink's appeal on its Motion for Injunction and Declaration Judgment, the TRB stated to the Court of Appeals that: 'This case constitutes the most recent episode in a prolonged campaign abusing the judicial appeals process initiated by [OneLink] in order to prevent the [TRB] from exercising its statutory prerogative of evaluating a cable-TV franchise application and attempting to keep [PRTC] from submitting an application before the [TRB] for the concession of such a franchise.'

PSAMF ¶ 21 (citing and quoting *Carson Decl.* Attach. 5 *Ex.* 34).  PRTC provided additional quotations as statements of material fact from various legal memoranda filed by the TRB in its paragraphs 22, 23, 26, and 27.  *Id.* ¶¶ 22-23, 26-27.

Similarly, in its paragraph 24, PRTC stated:

> On April 4, 2012, in its Decision and Order, the TRB stated: "For the record, [the TRB] want[ed] to formally list all [11] legal proceedings and other challenges that OneLink has lodged to no effect. . . . [OneLink's] theories have failed in a variety of forums where they have been filed because, simply, they are unsupported by law, from substantive and procedural points of view."

*Id.* ¶ 24 (citing and quoting *Decision and Order*).  PRTC provided additional quotations as statements of material fact from the TRB's August 8, 2012 Resolution and Order in its paragraph 25.  *Id.* ¶ 25.

OneLink objected on a number of bases to these paragraphs.  First, it argues that "[t]o the extent these statements are intended to address legal causation, that is a legal issue, and none of these statements is relevant or material to it" or, in the alternative, if not intended to address legal causation, then they are irrelevant and immaterial.  DRPSAMF ¶ 21.  Second, it contends that the quotations in these paragraphs are all out-of-court statements being offered for the truth of the matter asserted, and thus, constitutes inadmissible hearsay for which there are no exceptions.  *Id.*

Rule 56 allows OneLink to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).  Thus, "inadmissible evidence may not be considered" for summary judgment.  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *see also Asociacion De Periodistas De P.R. v. Mueller*, 680 F.3d 70, 78-79 (1st Cir. 2012) (explaining that only admissible evidence and evidence that could be used at trial may be considered for summary judgment).

At oral argument OneLink agreed with the Court that the TRB's orders and decisions, as well as its reasoning in reaching those decisions, were admissible evidence.  *Tr.* at 81-82.  Additionally, OneLink agreed that findings and determinations by the TRB, such as that OneLink's status as an intervenor was a "tough" or "novel" legal issue, can be considered by this Court.  *Id.* at 83-84.  As applied to the TRB's order and the judicial opinions in this case, this is most certainly correct.  *See* FED. R. EVID. 803(8)(A); *Olsen v. Correiro*, 189 F.3d 52, 63 (1st Cir. 1999).

However, the Court agrees with OneLink that the statements made by the TRB quoted in PSAMF ¶¶ 21-23, 26-27 are inadmissible hearsay if offered for the truth of the matter asserted.  Once the TRB stepped out of its role as adjudicator and into a role as advocate, its written arguments are not admissible for their truth under Rule 803(8)(A).

costs in consultants, lawyers and management time during the approval process.[26]

PSAMF ¶ 28; DRPSAMF ¶ 28.

## II.   THE PARTIES' POSITIONS

### A.   Defendant's Motion

OneLink argues that summary judgment is proper because its "lawsuits simply did not cause the injury that PRTC has consistently alleged as the basis for its antitrust claim." *Def.'s Mot.* at 1. Instead, according to OneLink, any delays in approving PRTC's franchise application and agreement were the result of "governmental acts." *Id.* at 2. As a result, OneLink contends, antitrust liability may

---

Nevertheless, it is the Court's determination that these statements are admissible to show OneLink's knowledge that the TRB believed that OneLink's petitioning was abusing the judicial process with the intent to delay PRTC's franchise application approval in order to preserve its monopoly. *See* PSAMF ¶¶ 21-23, 26-27. But, as the TRB's statements are not admitted for the truth of the matter asserted, the statements are not relevant or material to the issue of causation, and the Court does not consider the statements when addressing causation.

Finally, as the Court observed, the TRB's agency findings and orders in PSAMF ¶¶ 24-25 are admissible for the truth of the matters under Federal Rule of Evidence 803(8)(A). *See Davignon v. Hodgson*, 524 F.3d 91, 112-13 (1st Cir. 2008) (affirming the trial court decision to admit a state labor commission's decision). Here, the TRB's adjudicatory view of the merits of OneLink's litigation is an appropriate factor for this Court to consider. *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 366 (4th Cir. 2013) (noting that "a state court's appraisal of the merits of litigation aids the sham exception inquiry"). But as the *Waugh Chapel* Court pointed out, the state resolution of the merits of litigation under state law is a different issue than the federal question of a litigant's First Amendment right to petition the courts and "[i]t would make little sense to cede that federal question to state law proceedings that involve issues that are distinct from our inquiry under *California Motor*." *Id.* Likewise, the TRB's conclusions that OneLink's actions constituted abuse of the judicial process and were unsupported by law are unpersuasive, as they were made without the guidance of *PRE* or *California Motor Transport*. *See* Section IV(C)(2), *infra*. The Court gives little weight to these statements when addressing causation. *See* Section IV(C)(3)(iv), *infra*.

[26] PRTC's paragraph 28 originally stated: "PRTC spent over $3.2 million to defend the sham petitions and lawsuits and incurred additional costs in consultants, lawyers and management time during the elongated approval process." PSAMF ¶ 28. OneLink admitted PRTC's paragraph 28 only as regards the total amount of money PRTC spent, but otherwise denied the paragraph. DRPSAMF ¶ 28. The Court sustains in part OneLink's denial as regards PRTC's use of the words "sham" and "elongated," as these key words are argument rather than fact, and the Court has not included them. The Court denies in part OneLink's denial as regards PRTC's additional costs during the approval process because the evidence cited by PRTC supports its assertion. *See Notice of Filing Exs.* Attach. 8 *Ex.* 41 at 3-4.

not follow because "[i]t is well established that the state is absolutely immune from antitrust liability for its own acts." *Id.*

Furthermore, it says that federal caselaw has "repeatedly held that private parties cannot be held liable for the anticompetitive effects of government action either—even if those parties asked for that action and even if their petitions for such action were 'shams' intended only to cause harm." *Id.* Citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), OneLink asserts that "litigation conduct is ordinarily protected from liability by the First Amendment, subject to a narrow exception that a litigant may be held liable for 'direct injury' caused by its 'sham' litigation." *Def.'s Mot.* at 3. Here, says OneLink, there is no direct injury because PRTC's theory is based on state actors (i.e., the Puerto Rico courts and the TRB), which, once again, "are *absolutely immune from any antitrust liability*, whether they were induced by 'sham' litigation or not." *Id.* (emphasis in original).

OneLink proceeds to give a chronology of events. *Id.* at 3-8. Notably, OneLink concedes that it "filed two federal suits relating to PRTC's illegal construction of its video network prior to receipt of a government franchise"; however, it argues that none of that litigation affected the ability of the TRB to consider PRTC's franchise application, rather, the TRB proceeding had previously been stayed by the Puerto Rico courts. *Id.* at 6. For example, "this second [federal] suit was resolved in its entirety *before* the Puerto Rico Supreme Court's stay was lifted and it therefore did not affect the TRB's schedule in acting on PRTC's application." *Id.* (emphasis in

original).  Similarly, OneLink concedes that it filed two state suits while the TRB proceeding was stayed, but once again, they note that these cases were fully resolved "while the Supreme Court's stay of the TRB proceeding was in effect, and therefore neither had any impact on that proceeding."  *Id.* at 7.  Once the stay was lifted, OneLink says, "the TRB was free to act on its own terms and its own schedule."  *Id.*

Next, OneLink contends that PRTC has failed to establish that its pursuit of litigation actually caused PRTC's alleged injury, and that alone is detrimental to its claim.  *Id.* at 10 (citing *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1103 (1st Cir. 1994)).  OneLink explains:

> [I]t is clear from the undisputed facts that any delay in approving PRTC's franchise stemmed from (i) *PRTC's* own failure to file a meritorious application in February 2008, leading the TRB to deny it; (ii) the *Puerto Rico courts'* decisions to stay TRB proceeding on PRTC's second application, effectively until October 2010; (iii) the *TRB's* timing of its own processing of PRTC's second application from November 2010 until November 2011; and (iv) the *TRB's* voluntary decision to postpone signing a franchise agreement from November 2011 until February 2012.  *None* of these delays is legally attributable to OneLink's litigation.

*Id.* (emphasis in original).

Addressing in more detail its contention that private parties are immune from liability for antitrust injury when it is caused by state action, OneLink explains that PRTC must show causation, but "[t]he action by the government is held to break the causal link between the private party's conduct and the antitrust injury.  To be sure, 'sham' petitioning may be penalized if it causes *direct market injury*, but no case or doctrine allows liability to be imposed for harm that flows from government action merely because the private party successfully requested that action."  *Id.* at 11

(emphasis in original) (citing *Parker v. Brown*, 317 U.S. 341 (1943); *Interface Grp., Inc. v. Mass. Port Auth.*, 816 F.2d 9, 12-13 (1st Cir. 1987); *Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379 (1991)).

OneLink next turns to what it refers to as "*Noerr* immunity" (or "*Noerr-Pennington* immunity"). *Id.* at 12. According to it, *Noerr* immunity is made up of "two distinct principles": (1) No violation of the Sherman Act may occur where it is the result of proper governmental action rather than private action; and (2) "Injuries caused *directly* by private petitioning are . . . potentially actionable only if the petitioning was a mere 'sham.' By contrast, injuries caused by *state action—that is, only *indirectly* by petitioning—are always absolutely immune." *Id.* (citing *Noerr*, 365 U.S. at 136, 142-44; *Omni*, 499 U.S. at 380-81) (emphasis in OneLink's original). Based on these principles, OneLink says the "sham exception is thus completely irrelevant where the alleged injury flows from governmental action, because private parties cannot be liable for those injuries under any circumstances." *Id.* at 13 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988)). Furthermore, OneLink argues that First Circuit precedent "bear[s] this rule out." *Id.* at 14 (citing *Sandy River Nursing Care v. Aetna Cas.*, 985 F.2d 1138 (1st Cir. 1993); *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 148 (1st Cir. 2000)).

OneLink argues that a "[r]eview of the chronology and the indisputable record facts shows that" any alleged injury suffered by PRTC was the result of state action, and thus, "OneLink therefore did not legally cause any harm to PRTC." *Id.* at 17.

19

According to OneLink, the relevant time periods for the Court's review (all of which it says proves it should not be held liable for any alleged antitrust injury) are:

(1) February 2008 – November 2008 (the TRB denied PRTC's first application on the merits and OneLink observes that PRTC does not dispute that it did not file any litigation relating to its application during this period);[27]

(2) December 2008 – October 2010 (the TRB proceeding on PRTC's second application was stayed twice by Puerto Rico courts, and therefore, OneLink says, "[a]ny delay during this interval was caused by the stays alone, as the TRB itself explained" in its November 16, 2011 Resolution and Order, and constitutes governmental action);

(3) November 2010 – November 2011 (the second stay is lifted by the Puerto Rico Supreme Court, OneLink had no pending litigation in any court during this period, and thus, OneLink contends, "[t]he TRB's scheduling during this period was entirely within its own control" as it explained in its November 16, 2011 Resolution and Order);

(4) November 16, 2011 – February 8, 2012 (the TRB grants PRTC's franchise application but agrees not to sign the franchise agreement until February 2012 in exchange for OneLink and Choice's

---

[27]     OneLink notes that PRTC alleged in its Amended Complaint that OneLink "literally hijacked" a September 2008 hearing by its attendance, and OneLink counters that "the allegation is not (and could not plausibly be) that OneLink's appearance at a single hearing . . . at the TRB's invitation . . . delayed any approval of PRTC's application."  *Def.'s Mot.* at 18 (internal citations omitted).

withdrawal of its federal lawsuit; OneLink argues it cannot be held liable for the TRB's "conscious, voluntary action . . . regarding the timing of the approval of the PRTC franchise"); and

(5) February 2012 – Present (OneLink says PRTC has held a valid video franchise since this time and "nothing subsequent to that point is relevant to PRTC's claim").

*Id.* at 18-23.

### B.   Plaintiff's Opposition

In response to OneLink's motion, PRTC counters that Judge Gelpí already rejected OneLink's argument on two occasions, and "OneLink's motion for summary judgment attempts to disguise this twice-rejected argument by cloaking it in new clothes, namely, the state action doctrine articulated in *Parker* . . . ." *Pl.'s Opp'n* at 1 (citing *First Opinion and Order* at 5; *Second Opinion and Order* at 2).   PRTC urges the Court not "to reopen what has already been decided" based on the law of the case doctrine. *Id.* at 2.   Alternatively, PRTC says that even if this defense is a "new" one, it should be deemed waived under Rule 8(c) because it was never raised in OneLink's Answer nor added by amendment in accordance with Rule 15(a).   *Id.*   PRTC states that while OneLink raised *Noerr* immunity and protection under the First Amendment in its Answer, neither "implicates the state action doctrine."   *Id.* at 12 (citing *Answer* ¶¶ 98-99).

Additionally, PRTC says that OneLink's interpretation of *Parker* is incorrect:

While *Noerr* immunity may be available even if the party *fails* to achieve the allegedly sought-after outcome, *Parker* only applies when a party is

> successful in achieving the desired outcome – typically, state action that impacts its competitors.   As the First Circuit has made clear: "an unsuccessful attempt to influence government action may fall within the *Noerr-Pennington* immunity, but not the *Parker* immunity."

*Id.* at 2 (quoting *George R. Whitten, Jr. Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 29 n.4 (1st Cir. 1970)), (emphasis in PRTC's original).  According to PRTC, "there were no successful outcomes" by OneLink's actions to "influence government action," and thus, *Noerr* immunity does not apply (i.e., stays do not represent successful outcomes).  *Id.*

PRTC also contends that aside from the question of immunity based on state action, "[t]here were significant periods of delay caused by OneLink's sham petitioning that OneLink does not and cannot tie to any alleged 'state action.'"  *Id.* at 4.  Criticizing OneLink's factual summary for omitting "almost a year of delay" where there was no state action, PRTC points to (1) the four motions and complaint filed by OneLink between January 13, 2009 and March 3, 2009, which it characterizes as having been "unsuccessful" and "objectively baseless," causing the TRB to resolve these filings rather than focus on the franchise application; (2) the two motions and opposition filed by OneLink between March 31, 2009 and May 20, 2009 following the lifting of the stay, which PRTC claims made the "TRB . . . stuck in a web of OneLink petitions until the Supreme Court of Puerto Rico issued its May 20, 2009 stay"; (3) the agreement reached between the TRB, OneLink and Choice, which PRTC characterizes as having been "extorted" to delay the approval of PRTC's franchise agreement; and (4) the fact that OneLink "continued to file and prosecute numerous unsuccessful motions and petitions, including a motion to stay the grant of PRTC's

application and approval of its franchise agreement" between February 1, 2012 and April 4, 2012, to which, according to PRTC, triggered the TRB to rule on the motions and "found it necessary to clarify that 'PRTC is authorized to operate its video services through-out the Island of Puerto Rico.'" *Id.* at 5-7.

Turning to OneLink's argument that *Parker* nullifies the "sham exception" under *Noerr*, PRTC rebuts that this is "a misreading of the law" as previously discussed by one Pennsylvania federal court. *Id.* at 13-14 (citing *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2012 WL 1657734, at *28-30 (E.D. Pa. May 11, 2012)). Furthermore, PRTC claims there is a difference between "process" and "outcome"; that is, "'*Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *Id.* at 14 (quoting *Omni*, 499 U.S. at 380) (emphasis in *Omni* original). It says "process" encompasses "delays caused by courts issuing stays while considering baseless lawsuits and appeals" and "delays caused by regulatory agencies taking time to consider and respond to sham petitions before ruling." *Id.* at 15-17 (citing an array of caselaw). Thus, PRTC argues, because its alleged injury was not caused by the outcome of any TRB decision, *Parker* does not apply. *Id.* at 15. In addition, it says that OneLink misreads the First Circuit decision in *Davric Maine*; OneLink maintains that *Davric Maine* does not say that resolution of a matter constitutes state action under *Parker*; rather, PRTC argues the First Circuit found the defendant in that case met the requirements for *Noerr* immunity. *Id.*

Next, PRTC says that for *Parker* to apply,

> [w]here the challenged restraint on competition flows from an action by
> an entity other than the state legislature or the state's highest court
> *acting in a legislative capacity*, then "the challenged restraint must be
> one clearly articulated and affirmatively expressed as state policy; [and]
> the policy must be actively supervised by the State itself."

*Id.* at 18 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 105 (1980)) (emphasis in PRTC's original).   According to PRTC, neither prong articulated under *Midcal* is satisfied by OneLink here.   *Id.* at 18-19.

Addressing OneLink's claim that PRTC has not shown causation, PRTC states that its burden "requires only that it show that OneLink's conduct was a material or substantial cause of its injury."   *Id.* at 20 (citing *Sullivan*, 34 F.3d at 1103). Furthermore, it says that caselaw supports that where "it was foreseeable that a court might stay a regulatory proceeding" based on the actions of a party such as OneLink, the causation link does not break.   *Id.* at 20-21.

Finally, PRTC argues that even if the Court accepts OneLink's "flawed interpretation of *Parker*," it would not fully resolve the case.   *Id.* at 23-24.   In its view, OneLink's "illegal conduct" caused PRTC to expend over $3.2 million in legal costs to defend "baseless petitions, lawsuits and appeals, as well as additional costs in consultants, lawyers and management time to continue the elongated franchise approval process."   *Id.*   PRTC says that "sham litigation" resulting in damages constitutes a valid antitrust injury, and it should be allowed to present such damages at a jury trial.   *Id.* at 24 (citing *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 858 (1st Cir. 1985)).

### C.    Defendant's Reply

In response to PRTC's claim that Judge Gelpi already resolved this issue in his previous orders denying OneLink's motion to dismiss, OneLink counters that while "PRTC was able to preserve its antitrust suit by alleging that OneLink's litigation conduct caused TRB proceedings to drag on for nearly four years," now that discovery has concluded and the factual record has become more fully developed, "PRTC has no evidence to support that allegation; the facts indisputably show that OneLink's conduct did not cause *any* of the alleged delays." *Def.'s Reply* at 1 (emphasis in original). Although Judge Gelpi agreed with PRTC that "its Complaint raised 'sufficient factual allegations that Defendant's conduct . . . delayed Plaintiff's entry,'" OneLink asserts that "rejection of an argument at the *motion-to-dismiss* stage based on *allegations assumed to be true* does not foreclose accepting it at the *summary judgment* stage based on *fully-developed facts*." *Id.* at 2 (quoting *P.R. Tel. Co. v. San Juan Cable, LLC*, 885 F. Supp. 2d 534, 538 (D.P.R. 2012); citing WRIGHT & MILLER § 2713; *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)) (emphasis in OneLink's original).

Addressing PRTC's argument that court-ordered stays are not final outcomes of successful suits, but rather, constitute "process," OneLink similarly accuses PRTC of "misunderstanding . . . the law." *Id.* at 3. Reiterating its formulation of the "two distinct principles" from *Noerr* contained in its motion, OneLink argues that judicial stays fall within the first category developed by *Noerr*—harms resulting from valid governmental action—and therefore, is entitled to absolute immunity. *Id.* It also

notes its view that *Noerr* does not distinguish between governmental acts that are final or interim; instead, it only distinguishes between governmental acts and private acts. *Id.* Furthermore, acknowledging that delay caused by a court or agency taking time to resolve the matter is not caused by state action because it is inaction, OneLink argues the situation here is different; "judicial stays are *affirmative governmental acts.* When agency action is stayed by court order, it is *that order* that causes delay, not the mere filing of the suit." *Id.* at 5-6 (citing *Knology, Inc. v. Insight Commc'ns Co.*, 393 F.3d 656 (6th Cir. 2004)) (emphasis in original).

In response to PRTC's argument that *Parker* does not apply unless the action is taken by legislative or executive officers or by courts acting in a legislative role, OneLink says this is "facially wrong." *Id.* at 6. Citing *Davric Maine Corp.*, 216 F.3d at 146-48, OneLink argues that "the First Circuit held the sham exception irrelevant where *courts* found liability in suits brought by the defendant." *Def.'s Reply* at 6 (emphasis in original). In sum then, OneLink says, judicial action translates to "state action." *Id.* at 7. Moreover, regarding *Midcal*'s requirement of a state policy subject to state supervision, OneLink asserts that *Midcal* is inapposite to "petitioning immunity" because that case involved harm caused by private actors purportedly acting as state agents, whereas here, says OneLink, the alleged harm is "caused by *state actors* purportedly acting at *private parties' behest*, and the private petitioners are therefore immune regardless of how the state action is characterized." *Id.* at 7-8 (emphasis in original).

Regarding PRTC's claim that a ruling in favor of OneLink would not resolve the case and it would still be entitled to its fees and costs, OneLink asserts that "absent any liability for allegedly delaying PRTC's market entry, PRTC's claim for legal fees fails; such costs *alone* neither threatened nor actually harmed competition." *Id.* at 1 (emphasis in original).  In other words, OneLink argues that these fees and costs, "standing alone, could not support an antitrust claim, because PRTC has never alleged independent injury to competition in any relevant market based merely on those costs." *Id.* at 12.  In OneLink's view, PRTC has not produced any evidence to support an argument "that it suffered antitrust injury solely by being forced to incur legal fees because such a claim here would be absurd." *Id.* at 13.  Although OneLink concedes that legal costs could cause antitrust injury if such costs left a "cash-strapped competitor unable to reduce its prices," it argues that PRTC is far from "cash-strapped" and was not authorized to operate its video business during the relevant period because its franchise agreement was not yet approved, and therefore, there were no prices to reduce. *Id.* at 13-14.

Finally, OneLink says it is entitled at the very least to partial summary judgment, and "granting even that limited relief would substantially serve the values of judicial economy and efficiency here." *Id.* at 14.  It also suggests the Court evaluate six time periods, two of which should be analyzed under *Noerr* and *Allied Tube*, and the remaining periods should be analyzed "on whether there exists a genuine factual dispute regarding whether OneLink's allegedly 'sham' conduct delayed the TRB proceedings . . . ." *Id.* at 14-15.  OneLink suggests the Court examine each time

27

period, and then grant summary judgment in its favor for all periods in which it concludes that the evidence is insufficient to hold OneLink liable.  *Id.* at 15.

### D.    Plaintiff's Surreply

PRTC reiterates its position that OneLink's motion should be denied under the law of the case doctrine, noting that "OneLink does not identify any new evidence or facts that have been discovered since its Rule 12 motion that merit revisiting the Court's prior rulings on antitrust injury."  *Pl.'s Surreply* at 1.  It also provides additional quotations from the Wright & Miller treatise to support its argument that OneLink is making the "same antitrust injury arguments [based on] the same factual record presented at the Rule 12 stage."  *Id.* at 3.

PRTC further asserts that this Court would be the "first ever" to hold "that delay caused by procedural rulings during sham litigation is actually an 'outcome' and protected state action under *Parker v. Brown*."  *Id.*  In addition, it argues that "OneLink's claim that all judicial action is 'obviously' state action ignores the Supreme Court's consistent precedent that judicial action is 'exempt from Sherman Act liability as state action' only when '<u>a state supreme court</u>, act[s] <u>legislatively rather than judicially</u>[.]"  *Id.* at 4 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984)) (emphasis in PRTC's original).  In sum, PRTC views OneLink's argument as "woven from whole cloth and unsupported by any law."  *Id.* at 5.

Finally, perhaps anticipating that the Court would not consider the legal memoranda and orders written by the TRB, PRTC suggests that the Court take judicial notice of these writings, as they "are the best evidence PRTC can present at

28

this stage regarding the TRB's repeated position that OneLink's pattern of petitioning was intended to" delay PRTC's entrance into the market as a competitor. *Id.* at 7 (citing an array of caselaw).

## III.   LEGAL PRINCIPLES ON SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).   In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31,

35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"  *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## IV.   DISCUSSION

### A.   Law of the Case Doctrine

PRTC asks the Court to deny OneLink's motion for summary judgment based on the law of the case doctrine.  Specifically, PRTC says that Judge Gelpi already ruled against OneLink on two occasions regarding these same arguments, and there is no need to interrupt sound rulings.  In contrast, OneLink argues that the more fully-developed record demonstrates that OneLink's conduct did not cause any delays in PRTC's ability to enter the market, and also asserts as a general proposition that a court that rejects arguments at the motion to dismiss stage does not foreclose its ability to accept those same arguments at the summary judgment stage by reviewing the more fully-developed record.

Although viewed as an "amorphous concept" by the Supreme Court, "'[a]s most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *Pepper v. United States*, 131 S. Ct. 1229, 1250 (2011) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  At the same time, "[t]his doctrine 'directs a court's discretion, it does not limit the tribunal's power.'"  *Id.* (quoting *Arizona*, 460

U.S. at 618). "This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal citations and quotation marks omitted). In addition, while the doctrine "is limited to those issues previously decided, it encompasses all things decided by necessary implication as well as those decided explicitly." *Guzman v. Villoldo*, 245 F. Supp. 2d 388, 392 (D.P.R. 2003) (internal citations and quotation marks omitted). Furthermore, although completely within the discretion of the Court, "as a rule courts should be loathe to [revisit prior decisions] in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817 (quoting *Arizona*, 460 U.S. at 618 n.8).

Even so, orders on motions to dismiss are interlocutory orders, and the First Circuit noted in *Perez-Ruiz* that "denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." 25 F.3d at 42; *see also Commerce Oil Refining Corp. v. Miner*, 303 F.2d 125, 128 (1st Cir. 1962) ("A ruling denying a motion to dismiss is not the law of the case, and is not final even in the district court"). That said, one of the leading treatises on civil procedure practice instructs:

> The ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint. On the other hand, a Rule 56 motion may not be made on the same grounds and with the same showing that led to the denial of a previous motion to dismiss.

WRIGHT & MILLER § 2713; *see also Conley v. United States*, 323 F.3d 7, 13 (1st Cir. 2003) (explaining that one ground for deviating from the law of the case is "where there is new evidence on the question at issue"); *PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 7 (D.D.C. 2004) ("Even if different language is used in a summary judgment motion than in a previous motion to dismiss, if the same legal theory supports both motions, the disposition of the motion to dismiss may serve as the law of the case and on these grounds, a court may similarly dispose of a motion for summary judgment"). PRTC relies heavily on the latter sentence of this Wright & Miller section, contending that "OneLink does not identify any new evidence or facts that have been discovered since its Rule 12 motion that merit revisiting the Court's prior rulings on antitrust injury." *Pl.'s Surreply* at 1.

With these guideposts in mind, particularly First Circuit authority, the Court summarizes the arguments and evidence that supported OneLink's motion to dismiss and Judge Gelpi's subsequent denial of the motion, and compares the evidence and arguments OneLink has brought forward on its pending motion for summary judgment with that used to support its motion to dismiss.

### 1.    OneLink's Motion to Dismiss

In its motion to dismiss, OneLink argued for dismissal on two bases: (1) that it was immune under the *Noerr-Pennington* doctrine; and (2) that PRTC did not properly plead an antitrust injury. *Mot. to Dismiss* at i. To support its positions, OneLink cited PRTC's Amended Complaint, which highlighted the proceedings that

PRTC claimed demonstrated a "pattern of baseless litigation and endless appeals." *Id.* at 4-6 (citing *Am. Compl.* ¶¶ 35-42, 44-46, 57-58).

Regarding immunity, it highlighted what the Amended Complaint did not allege, namely, "[i]t does not identify a single filing made by OneLink as not being reasonably calculated to elicit a favorable outcome." *Id.* at 6. Based on the allegations in the Amended Complaint, OneLink argued that it was protected under the *Noerr-Pennington* doctrine, especially because, in its view, "[t]he Amended Complaint pleads nothing more than classic *Noerr-Pennington* activity: the assertion of rights, claims, positions and defenses, in both administrative proceedings and in litigation in the courts." *Id.* at 10. In addition, OneLink contended that the "sham" exception to *Noerr-Pennington* immunity had not been properly pled. *Id.* at 11, 14-16. Finally, it observed there was a split of authority as to whether a "pattern" of repetitive litigation could be deemed "objectively baseless" to invoke the "sham" exception, and it argued to the Court that this line of cases should be rejected or, alternatively, even if the Court were to adopt the "pattern" line of cases, the Amended Complaint still did not plead sufficient facts to establish a "pattern" of litigation. *Id.* at 16. Specifically, it argued that the Amended Complaint did not allege a "sufficient volume of litigation activity." *Id.* at 20.

Regarding its view that PRTC did not properly plead antitrust injury, OneLink asserted that PRTC needed to "show that its injuries are not from the <u>outcome</u> of the petitioning, but from the <u>process</u> of petitioning itself." *Id.* at 23 (emphasis in original). OneLink acknowledged that the Amended Complaint alleged that "OneLink used the

legal process to 'impose cost and delay' on PRTC's entry into the market," but argued that the allegation was conclusory.  *Id.* (quoting *Am. Compl.* ¶ 31).  It also cited paragraphs 35, 38, 41, 44, 57, and 58 of the Amended Complaint in support.  *Id.* at 23-24.  In conclusion, OneLink claimed that PRTC only alleged injury "from the <u>outcome</u> of the petitioning process, rather than from the incidents of that process itself."  *Id.* at 24 (emphasis in original).

### 2.    Judge Gelpi's Orders

In rejecting OneLink's contention that it was immune under the *Noerr-Pennington* doctrine, Judge Gelpi held that PRTC "alleged a sufficient amount of proceedings to be deemed a pattern.  Defendant either initiated or intervened, in suits against Plaintiff or opposed Plaintiff at various administrative hearings."  *First Opinion and Order* at 4 (citing *Am. Compl.* ¶¶ 35-58).  Although he chose not to restate each hearing contained in PRTC's Amended Complaint, Judge Gelpi explicitly noted "January 13, February 10, April 2, June 15, and November 4 of 2009 along with all the various appeals filed regarding these actions as sufficient to meet the pattern requirement."  *Id.*  Judge Gelpi also observed that OneLink admitted "opposing Plaintiff in seven proceedings, but makes no mention of the amount of appeals sought in each case.  The court finds this activity sufficient to meet the standard for a pattern of litigation . . . ."  *Id.* at 5.

As regards OneLink's claim that PRTC did not properly plead an antitrust injury, Judge Gelpi rejected that argument as well, finding that PRTC's "complaint contains sufficient factual allegations that Defendant's conduct not only delayed

Plaintiff's entry into the market, but also protected Defendant's market share." *Id.* Furthermore, he noted "the complaint alleges Plaintiff[] [was] injured due to the process of these proceedings, not simply the outcome." *Id.*

OneLink then filed a motion for reconsideration, which Judge Gelpí denied. *Second Opinion and Order* at 6.

### 3. Evidence and Arguments Presented by OneLink in its Pending Motion

Even assuming that "a Rule 56 motion may not be made on the same grounds and with the same showing that led to the denial of a previous motion to dismiss," WRIGHT & MILLER § 2713, PRTC's law of the case argument fails. Essentially, OneLink is now arguing that it is entitled to summary judgment even if the "sham" exception to *Noerr-Pennington* applies, because the alleged delays were caused by government acts and private parties cannot be held liable for those acts under *Parker*. *See Def.'s Mot.* at 2. Judge Gelpí never ruled on this issue.

In addition, OneLink argues that it is immune under *Noerr-Pennington* now that discovery has been completed. Judge Gelpí was not presented with the full evidentiary record that the Court now has in front of it, and he limited his ruling to a finding of a sufficiently pleaded "pattern of litigation."

Similarly, OneLink is currently arguing that it is entitled to summary judgment even if PRTC can show cognizable antitrust injury because it is only traceable to state action. *See id.* at 17. Judge Gelpí never ruled on this argument either. As the law of the case doctrine "is limited to those issues previously decided,"

PRTC's law of the case argument would not succeed even if it applied in the First Circuit. *Guzman*, 245 F. Supp. 2d at 392.

It does not. In the First Circuit, "interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." *Perez-Ruiz,* 25 F.3d at 42; *Commerce Oil Refining Corp.*, 303 F.2d at 128 ("a ruling denying a motion to dismiss is not the law of the case, and is not final even in the district court").

The Court concludes that the law of the case doctrine is inapplicable to OneLink's motion for summary judgment.

### B.    Waiver Under Federal Rule of Civil Procedure 8(c)

The Court turns to PRTC's request that this "new" defense be deemed waived. PRTC argues that OneLink never raised the defense in its Answer, never added it by amendment in accordance with Rule 15(a), and never indicated during discovery that it planned on raising it; instead, of the nine affirmative defenses OneLink did raise in its Answer, it only raised *Noerr-Pennington* immunity and protection under the First Amendment, which, according to PRTC, does not implicate the state action doctrine. *Pl.'s Opp'n* at 2, 12.

"In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." FED. R. CIV. P. 8(c)(1). A party has the right to "amend its pleading" either as a matter of course, or "with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(1)-(2). Courts in this district have previously held that state action immunity is "in the nature of an affirmative

defense." *Ticket Center, Inc. v. Banco Popular de P.R.*, 441 F. Supp. 2d 354, 357 (D.P.R. 2006) (explaining that "state action immunity is in the nature of an affirmative defense"); *Ports Auth. of P.R. v. Compania Panamena de Aviacion (Copa), S.A.*, 77 F. Supp. 2d 227, 232 (D.P.R. 1999) ("State action immunity is in the nature of an affirmative defense; the party claiming immunity has the burden of proof").

As a general rule, "failure to plead an affirmative defense results in a waiver of the defense and the exclusion of all evidence relevant to it." *Conjugal P'ship v. Conjugal P'ship*, 22 F.3d 391, 400 (1st Cir. 1994). Such a penalty is intended to encourage disclosure by the defendant so that the opposing party receives "notice of the defense and a chance to develop evidence and offer arguments to controvert the defense." *Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 449 (1st Cir. 1995). At the same time, some exceptions exist, including "where (i) the defendant asserts it without undue delay and the plaintiff is not unfairly prejudiced by any delay, . . . or (ii) the circumstances necessary to establish entitlement to the affirmative defense did not obtain at the time the answer was filed." *Davignon v. Clemmey*, 322 F.3d 1, 15 (1st Cir. 2003); *see also Conjugal P'ship*, 22 F.3d at 400 (explaining "it is settled that '[w]hen there is no prejudice and when fairness dictates, the strictures of [the raise or waive] rule may be relaxed'") (quoting *Jakobsen v. Mass. Port Auth.*, 520 F.2d 810, 813 (1st Cir. 1975)).

Nearly one month after Judge Gelpi denied OneLink's motion for reconsideration, OneLink filed its Answer. *Answer*. As PRTC correctly points out, OneLink provided nine affirmative defenses. *Id.* at 14-16. PRTC is also correct that

OneLink asserted the affirmative defenses of, among others, *Noerr-Pennington* immunity and protection under the First Amendment. *Id.* ¶¶ 98-99. In addition, OneLink's "Theory of the Case" and "Applicable Law" in the Joint Initial Scheduling Memorandum makes no mention of *Parker* immunity or state action immunity, and only references the First Amendment and *Noerr-Pennington*. *Joint Initial Scheduling Mem.* at 1-3 (ECF No. 49).

Nevertheless, the Court will not invoke the doctrine of waiver in this instance for several reasons. First, it is not entirely clear that state action immunity is recognized as an affirmative defense in the First Circuit, which if not asserted is necessarily waived. The context of the earlier caselaw is that state action immunity is in the "nature of an affirmative defense" in which the burden of proof is on the party claiming the immunity. *Ticket Ctr.*, 441 F. Supp. 2d at 357; *Puerto Rico Ports Auth. v. Compania Panamena de Aviacion*, 77 F. Supp. 2d 227, 232 (P.R.D. 1999) (citing *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992)). Second, even if state action immunity is an affirmative defense, the Court would not invoke the doctrine of waiver. The Court views OneLink's defense of *Parker* immunity as a motion seeking leave to amend the pleadings. *See Wolf*, 71 F.3d at 449. The Court has discretion regarding whether to grant a motion for leave. *Id.* In the Court's view, OneLink raised *Parker* immunity without undue delay and without apparent prejudice to PRTC. This is not a case where an entirely new defense was raised days before trial. *See, e.g.*, *id.* at 450 (affirming the denial of leave to amend when an entirely new affirmative defense was raised "five days before trial, which would have forced Wolf

to conduct additional discovery, research, and preparation on the ERISA-related issues"). Instead, *Parker* immunity was raised during the course of summary judgment, and no additional discovery appears necessary. Furthermore, PRTC has demonstrated that it was not prejudiced by the *Parker* immunity defense as it has adequately submitted a detailed and thoughtful opposition and surreply for the Court's consideration. Finally, as fairness dictates allowing OneLink to raise *Parker* immunity here, the doctrine of waiver is relaxed. *Conjugal P'ship*, 22 F.3d at 400.

The Court concludes that the doctrine of waiver need not be invoked in this instance, and considers OneLink's argument that it is immune from antitrust liability under *Parker* and *Noerr-Pennington*.

### C. Antitrust Immunity: *Parker* and *Noerr-Pennington*

#### 1. *Parker v. Brown* and its Progeny

In *Parker*, the Supreme Court held that the Sherman Act was not intended "to restrain a state or its officers or agents from activities directed by its legislature." 317 U.S. at 350-51. This is because the Act "makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." *Id.* at 351. Instead, it applies to private parties, such as "persons and corporations," which are explicitly listed under the statute. *Id.* In other words, the Sherman Act does not prohibit "an act of government." *Id.* at 352; *see also Ticket Center*, 441 F. Supp. 2d at 356 ("Although the antitrust laws aim at competitive markets, the *Parker* Court recognized that governments often restrict competition for

public purposes.  The actions of state governments were deemed not to fall within the constraints of antitrust laws").

Following *Parker*, immunity was extended to municipalities, private parties, and state agencies regulating private parties' conduct.  *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56-57 (1985) ("Although *Parker* involved an action against a state official, the Court's reasoning extends to suits against private parties. . . . [A]nd to state agencies or officials regulating the conduct of private parties"); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1076 (1st Cir. 1993) ("After a certain amount of wobbling, it has become settled that municipalities enjoy the protection of the *Parker* doctrine if, but only if, the conduct in question is of a kind authorized or directed by state law"); *Mass. Furniture & Piano Movers v. FTC*, 773 F.2d 391, 394 (1st Cir. 1985).  However, the key to a successful "antitrust action should depend upon the nature of the activity challenged, rather than on the identity of the defendant."  *S. Motor Carriers Rate Conference*, 471 U.S. at 58-59.

In addition, for *Parker* immunity to extend "to private parties, and to state agencies or officials regulating the conduct of private parties," the Supreme Court has articulated a two-prong test.  *Id.* at 57.  First, the alleged restraint must be "'one clearly articulated and affirmatively expressed as state policy.'"  *Midcal*, 445 U.S. at 105 (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 410 (1978)).  A "clearly articulated policy" is one that has been authorized by a state legislature or state supreme court.  *S. Motor Carriers Rate Conference*, 471 U.S. at 63.  Second, "the

policy must be 'actively supervised' by the State itself." *Midcal*, 445 U.S. at 105

(quoting *La. Power & Light Co.*, 435 U.S. at 410). "This supervision requirement

prevents the State from frustrating the national policy in favor of competition by

casting a 'gauzy cloak of state involvement' over what is essentially private

anticompetitive conduct." *S. Motor Carriers Rate Conference*, 471 U.S. at 57 (quoting

*Midcal*, 445 U.S. at 106).

For example, under the facts of *Midcal*, the Supreme Court affirmed issuance

of a state-court injunction preventing officials from enforcing a law that required wine

producers and distributors to create resale price schedules. *Midcal*, 445 U.S. at 100-

02. In coming to its ruling, the *Midcal* Court explained that the first prong of the test

was satisfied because "[t]he legislative policy is forthrightly stated and clear in its

purpose to permit resale price maintenance." *Id.* at 105. However, the second prong

of the test had not been met because:

> [t]he State simply authorizes price setting and enforces the prices
> established by private parties. The State neither establishes prices nor
> reviews the reasonableness of the price schedules; nor does it regulate
> the terms of fair trade contracts. The State does not monitor market
> conditions or engage in any "pointed reexamination" of the program.
> The national policy in favor of competition cannot be thwarted by casting
> such a gauzy cloak of state involvement over what is essentially a
> private price-fixing arrangement. As *Parker* teaches, "a state does not
> give immunity to those who violate the Sherman Act by authorizing
> them to violate it, or by declaring that their action is lawful . . . ."

*Id.* at 105-06 (quoting *Parker*, 317 U.S. at 351).

Since *Midcal*, numerous courts have discussed and applied the two-prong test

to determine whether *Parker* immunity applies. *See, e.g.*, *S. Motor Carriers Rate

Conference*, 471 U.S. at 64-67 (concluding that intrastate rate-making activity of

41

private motor carrier conference was entitled to *Parker* immunity because the state statutes explicitly permitted collective rate-making by common carriers, and these states conceded the "actively supervised" prong); *Mass. Furniture & Piano Movers Ass'n*, 773 F.2d at 394-97 (discussing *Midcal* in detail and concluding that a furniture and piano movers association met its burden in establishing the first prong for *Parker* immunity because the state statute "clearly establishes the state's intent to countenance collective rate setting among motor carriers," and remanding for findings as to the second prong); *Cent. Telecomms., Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711, 725 (8th Cir. 1986) (although deeming the argument waived, explaining its skepticism that cable company satisfied the *Midcal* test where there was no "clearly and affirmatively expressed policy of the Missouri legislature directing the City to displace competition"); *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 71-72 (1st Cir. 2005) ("A state's general authority over or passive acceptance of a regulated firm's position does not confer *Parker* immunity").

### 2. "Sham" Petitioning Exception under *Noerr-Pennington*

In *Noerr*, the Supreme Court explained that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." 365 U.S. at 135. This is because "valid governmental action" does not fall within the purview of the Sherman Act, and "under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government" as long as it is constitutional. *Id.* at 136. Furthermore, the *Noerr* Court declared: "We

42

think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.*; *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose").

In 1972, the Supreme Court extended the *Noerr-Pennington* analysis to the judicial branch and state administrative agencies.[28]  *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  The scope of *Noerr-Pennington* immunity "depends . . . on the source, context, and nature of the anticompetitive restraint at issue."  *Allied* Tube, 486 U.S. at 499.  In the context of legislative or political activity, *Noerr-Pennington* sweeps broadly; however, "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."[29]  *California Motor*, 404 U.S. at 513.

*Noerr-Pennington* immunity is not absolute.  The *Noerr* Court cautioned that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a

---

[28]    "The same philosophy [of attempts to influence the legislative or executive branch of government] governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government.  Certainly the right to petition extends to all departments of the Government.  The right of access to the courts is indeed but one aspect of the right of petition."  *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

[29]    As described by one district court, "when a court of law is the object of the challenged petitioning, the sham exception is given a much broader compass."  *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 532 (M.D. La. 2001).

competitor and the application of the Sherman Act would be justified." *Noerr*, 365 U.S. at 144; *see also Allied Tube*, 486 U.S. at 500 n.4 (Regarding sham petitioning as "private action that is not genuinely aimed at procuring favorable government action," as opposed to "a valid effort to influence government action"). In his earlier opinion in this case, Judge Gelpi described a "sham" as "[e]ssentially . . . when an action is commenced without a genuine belief it will end with a favorable result, but rather with the intention of delaying or interfering with another." *First Opinion and Order* at 3.

A "sham" in the context of a single litigation proceeding carries a two-part, sequential definition set out in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60 (1993) (*PRE*). First, it must be a lawsuit that is:

> objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.

*PRE*, 508 U.S. at 60. The *PRE* Court found that "the existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation. . . . Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.* at 62-63 (internal citations and quotation marks omitted). Furthermore, "[a] winning lawsuit by definition [is] a reasonable effort at petitioning for redress and therefore not a sham." *Id.* at 60 n.5; *see also Allied Tube*, 486 U.S. at

502 (reasoning that a successful "effort to influence governmental action . . . certainly cannot be characterized as a sham").  However, when the antitrust defendant has lost the underlying litigation:

> a court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation.  The court must remember that even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*PRE*, 508 U.S. at 60 n.5 (internal punctuation omitted).  Moreover, "the legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is 'not at all affected by any anticompetitive purpose [the actor] may have had.'"  *Id.* at 59 (quoting *Noerr*, 365 U.S. at 140).

Second, if it is determined that a lawsuit was objectively baseless, a court must set out to "examine the litigant's subjective motivation" and examine whether "the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon . . . ."  *Id.* at 60-61 (emphasis in original) (internal citations and quotation marks omitted); *see also Omni*, 499 U.S. at 380 ("A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay").  Therefore, to defeat *Noerr* immunity for a single lawsuit, a plaintiff must establish "both the objective and the subjective components of a sham."  *PRE*, 508 U.S. at 61.

Sham litigation may also be "evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973). Said another way:

> [o]ne claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, viz., effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'

*California Motor Transport*, 404 U.S. at 513. The Fourth Circuit held that when applying *California Motor Transport* "[o]f course, the subjective motive of the litigant and the objective merits of the suits are relevant, but other signs of bad-faith litigation . . . may also be probative of an abuse of the adjudicatory process." *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 364 (4th Cir. 2013). In applying this "holistic review" to patterns of lawsuits, Circuit Courts have also looked at a defendant's filing success — i.e. win/loss percentage — as "circumstantial evidence of the defendant's subjective motivations." *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015). *Compare Waugh Chapel*, 728 F.3d at 365 (finding sham where only one of fourteen proceedings was successful), and *Hanover*, 806 F.3d at 182 (finding "[d]efendants' meager record on the merits [of four actions] supports . . . allegation that the filings were brought not to redress any grievances") with *USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL–CIO*, 31 F.3d 800, 811 (9th Cir. 1994) (finding no

sham where fifteen of twenty-nine lawsuits were successful), and *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) (finding no sham where defendant "won seven of the seventeen suits" and each of the ten remaining cases "had a plausible argument on which it could have prevailed"). Furthermore, the Third Circuit held "[i]f more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing 'willy-nilly without regard to success.' . . . A high percentage of meritless or objectively baseless proceedings, on the other hand, will tend to support a finding that the filings were not brought to redress any actual grievances." *Hanover*, 806 F.3d at 181 (internal citations omitted).

Four Circuit Courts have reconciled *California Motor Transport* and *PRE* by concluding that they apply to different situations: *PRE* to a single sham petition and *California Motor* to a series of sham petitions. *See Hanover*, 806 F.3d at 180; *Waugh Chapel*, 728 F.3d at 363-64; *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000); *USS–POSCO,* 31 F.3d at 811. In reconciling these two cases, Judge Kozinski explained:

> [*PRE*] provides a strict two-step analysis to assess whether a single action constitutes sham petitioning. This inquiry is essentially *retrospective*: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham.
>
> . . .
>
> *California Motor Transport* . . . recognized that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade. When dealing with a series

47

of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is *prospective*: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?

*USS–POSCO,* at 810–11 (emphasis added) (internal citations omitted).  The First Circuit has yet to interpret the principles of pattern sham petitioning under *California Motor Transport* and its interplay with *PRE*.  Absent direct guidance from the First Circuit, this Court adopts the Second, Third, Fourth, and Ninth Circuit approaches to reconciling *California Motor Transport* and *PRE*.[30]

### 3.   Analysis

With these principles in mind, the Court turns to the heart of OneLink's argument: that it cannot be held liable for its numerous filings and lawsuits over a period of four years, even if deemed to be "sham" filings, because any alleged harm to PRTC was caused by government acts (i.e., Puerto Rico courts and the TRB) and such acts are immune.  The argument is threefold: (1) "sham" petitioning does not apply under *Parker* as a matter of law where a government acts; (2) judicial stays by Puerto

---

[30]     In Judge Gelpi's August 10, 2012 Order, the Court observed that it "will follow the lead of the Second and Ninth Circuits that have also read these cases together and held the objectively baseless requirement not to apply to allegations of a pattern of proceedings.  *First Opinion and Order* at 4. Judge Gelpi made a similar comment in the Court's September 13, 2012 Order.  *Second Opinion and Order* at 3 ("The Second and Ninth Circuits have held [the *PRE* two-part definition of sham] applies when determining if one action constitutes a sham, but does not apply when the challenged proceedings constitute a pattern of repetitive litigation").  These Orders predate *Waugh Chapel*, 728 F.3d 354 (decided Aug. 26, 2013) and *Hanover*, 806 F.3d 162 (decided Nov. 12, 2015).  The *Waugh Chapel* and *Hanover* Courts held that when applying *California Motor Transport* that the subjective motive of the litigant and the objective merits of the suits are relevant to pattern sham litigation. *Waugh Chapel*, 728 F.3d at 364; *Hanover*, 806 F.3d at 180.  This Court adopts the approach of the Third and Fourth Circuits and incorporates the subjective motive of the litigant and the objective merits of the suits into its pattern sham litigation analysis.

Rico courts, and any other delays voluntarily imposed by the TRB, fall under *Noerr-Pennington* immunity; and (3) PRTC's claim must fail due to lack of causation. The Court discusses each in turn.

### i. "Sham" Petitioning and *Parker*

PRTC argues that OneLink must meet the *Midcal* two-prong test for *Parker* immunity to apply but has failed to do so. *Pl.'s Opp'n* at 18-19. According to PRTC, there is "no state policy to supplant competition or delay the entry of pay television service providers," and in fact, the state policy of Puerto Rico is just the opposite—to promote competition in the competitive market of cable television to ensure reasonable prices for the public. *Id.* at 18. In addition, PRTC argues that "OneLink has identified no active supervision of an anticompetitive state policy because there was none." *Id.* at 19. Finally, PRTC argues that the "sham" exception is not nullified under *Parker*. *Id.* at 13-14. Although OneLink admits that it has not analyzed its argument under *Midcal*, it contends that *Midcal* is inapposite to "petitioning immunity" because the alleged harm here was caused by state actors at the request of private parties, and therefore, private petitioners are immune regardless of how one characterizes the state action. *Def.'s Reply* at 7-8. Moreover, it argues that "[t]he sham exception is . . . completely irrelevant where the alleged injury flows from governmental action, because private parties cannot be liable for those injuries under any circumstances." *Def.'s Mot.* at 13.

The *Noerr* Court discussed *Parker* in two footnotes.  The first was in support of the proposition that valid governmental action does not implicate the Sherman Act. 365 U.S. at 136 n.15.  The second was in support of the statement that:

> [t]o hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.

*Id.* at 137 & n.17.  Neither reference to *Parker* supports OneLink's position that the "sham" exception is nullified.  Nevertheless, OneLink claims that subsequent caselaw does.

In *Omni*, the Supreme Court expanded on the situations the "sham" exception was intended to cover.  Reiterating the importance of showing that the defendant "use[d] the governmental *process* . . . as an anticompetitive weapon," it explained that "[a] classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay."  499 U.S. at 380 (emphasis in original).  This case hurts, rather than helps, OneLink's position.  By the Court's count, OneLink submitted a total of 11 filings between the TRB and Puerto Rico courts, six of which were denied.  *See* Section I.B, *supra*.  Although OneLink disputes that these filings were "objectively baseless," if the Court were to adopt OneLink's position, the mere denial of these filings could constitute "an act of government" under *Parker* and the "sham" exception would be inapplicable so long as the government through its courts

50

or agencies acted in any way without regard to the expense and delay imposed.  In short, the sham exception would itself become a sham.

OneLink also relies heavily on the Supreme Court's declaration in *Allied Tube* that "where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint."  486 U.S. at 499 (internal citations and punctuation omitted).  This means, according to OneLink, that the "sham exception is thus completely irrelevant where the alleged injury flows from governmental action, because private parties cannot be liable for those injuries under any circumstances."  *Def.'s Mot.* at 13.  This Court disagrees that *Allied Tube* somehow ties *Parker* immunity with *Noerr-Pennington* immunity.  *Allied Tube* was discussing the applicability of *Noerr-Pennington* immunity, not *Parker* immunity, and as explained by the First Circuit, although "often treated as one," *Noerr-Pennington* immunity and *Parker* immunity are distinct:

> The two are not coterminous.  For example, an unsuccessful attempt to influence government action may fall within the *Noerr-Pennington* immunity, but not the *Parker* immunity.  Conversely, a state regulatory agency may decide to restrain competition without prompting; the beneficiaries, not having solicited government action, would enjoy a *Parker* immunity but not one based on *Noerr-Pennington*.  Moreover, because of its First Amendment overtones, the *Noerr-Pennington* immunity is arguably broader than the *Parker* exemption.

*George R. Whitten, Jr.*, 424 F.2d at 29 n.4.  This makes sense.  As one example of the specificity required for *Parker* immunity, private parties and state agencies regulating private parties must meet the two-prong *Midcal* test, whereas *Noerr-Pennington* immunity requires no such test.  In fact, as OneLink points out, those

urging the governmental action enjoy "absolute immunity" for the subsequent restraint imposed. The point is that such broad protection comes under *Noerr-Pennington*, not *Parker*.

Finally, OneLink argues that legal precedents, both from the First and other Circuits, support its position. By way of example, in *Sandy River Nursing Care*, the plaintiff alleged harm resulting from "rate increases . . . authorized by the Maine Legislature, and adopted and implemented by the state's [regulatory body]." 985 F.2d at 1144. The First Circuit noted that "[w]hen the legislature enacted the 1987 statute . . . it also moved away from the state's previous pro-competitive policy toward ratesetting." *Id.* at 1146. Although *Sandy River* discusses and applies *Omni* in some detail, *id.* at 1144-47, it is distinguishable from the facts here. Here, there is no state statute or legislative action being challenged. In addition, OneLink already argued that *Midcal* is inapposite here, but much of the analysis in *Sandy River* involved application of the two-prong test, including its conclusion that the defendants had satisfied the test and were entitled to invoke *Parker* immunity. 985 F.2d at 1147.

OneLink cannot have it both ways. It says that the *Midcal* test does not apply here and that *Allied Tube* resolved this issue in its favor. *Def.'s Reply* at 8. Because *Allied Tube* was about *Noerr-Pennington* immunity—not *Parker* immunity—the Court, taking its lead from the First Circuit, discusses application of *Noerr* below, and concludes that OneLink has not made an adequate showing as to *Parker* immunity. The reason is simple: OneLink is a private party attempting to invoke *Parker* immunity, and *Midcal* clarifies that it must satisfy the two-prong test.

Because OneLink has not argued that it fits within the framework of *Midcal*, and because the Court is skeptical that it could have satisfied *Midcal*, the Court concludes that OneLink may not invoke *Parker* immunity protection.[31]

In sum, the Court concludes that OneLink has not proven it is entitled to immunity under *Parker*, and even if it was, the Court also concludes that "sham" petitioning is not nullified by *Parker* immunity as a matter of law.

### ii.    Judicial Stays as "Valid Government Action"

As previously noted, the *Allied Tube* Court explained that "where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint."   486 U.S. at 499 (internal citations and punctuation omitted).   OneLink points out that it advocated for the stays to issue, the Puerto Rico courts granted its requests, and as a result, it enjoys absolute immunity for any alleged harms caused by the stays.   PRTC counters that a judicial stay is not a "successful outcome" within the meaning of *Allied Tube*.

The Sixth Circuit discussed this question in some detail in 2004.   In *Knology*, a cable television provider (Provider Number 1) sued the city of Louisville, Kentucky in state court, alleging that another cable television provider (Provider Number 2) had received a more favorable franchise.   393 F.3d at 658.   Under a local ordinance, Provider Number 2's effective date for its franchise was suspended "until a final,

---

[31]    OneLink urged the Puerto Rican courts and regulatory board to take allegedly anticompetitive action.   As the First Circuit explained in *George R. Whitten*, this action is analyzed under *Noerr-Pennington*, not *Parker*.   *George R. Whitten*, 424 F.2d at 30-32.

nonappealable decision resolved the issue." *Id.* The Sixth Circuit held that Provider Number 1 was immune from liability once the stay issued. *Id.* at 658-59. Although the district court originally held that "[t]he stay was not subject to governmental review, nor was it intended to persuade the government of anything [because] . . . it was automatic," the Sixth Circuit articulated different reasoning:

> We analyze the issue differently; we see filing the lawsuit and invoking the suspension provision as a single petitioning activity protected by the First Amendment and *Noerr-Pennington*. That this petitioning caused an anticompetitive result is irrelevant to *Noerr-Pennington* analysis. Insight did not stay anything—only the government prevented Knology from moving forward in the face of Insight's suit. Insight simply spurred the City to comply with its own ordinances, by filing its complaint-action immunized by *Noerr-Pennington* and the First Amendment.

*Id.* at 659; *see also Livingston Downs Racing Ass'n*, 192 F. Supp. 2d at 539, n.20 (reasoning that "those suits in which the Defendants prevailed do not support a finding that the judicial process was abused" under *Noerr-Pennington*, which included a "suit seeking a stay of the Commission's decision to grant [plaintiff] a racing license").

The Court agrees with OneLink that when the Puerto Rico courts issued stays at its request, those events triggered immunity for OneLink under *Noerr-Pennington*. Although PRTC maintains that *Knology* is distinguishable because the stay was issued in the face of a suspension provision within a local ordinance, the Court does not view this distinction as one that requires a different outcome here. As in *Knology*, OneLink "did not stay anything"—only the Puerto Rico courts prevented PRTC from moving forward, and the courts could have just as easily denied OneLink's requests. Furthermore, to PRTC's complaint that the stays were mere procedural rulings,

54

*Noerr* only distinguishes between private and governmental acts, not procedural and substantive orders.

In *Noerr*, the Supreme Court explained that "[i]t is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed," but that does not mean that the campaign is itself illegal, even when "those conducting the campaign would be aware of, and possibly even pleased by, the prospect of such injury." 365 U.S. at 143-44. The same logic applies here. OneLink's subjective intent is irrelevant because the Court does not find the motions to stay to have been "objectively baseless." As explained by the Supreme Court, "[a] winning lawsuit by definition [is] a reasonable effort at petitioning for redress and therefore not a sham." *PRE*, 508 U.S. at 60 n.5; *see also Allied Tube*, 486 U.S. at 502 (reasoning that a successful "effort to influence governmental action . . . certainly cannot be characterized as a sham"). In this case, OneLink was successful in its efforts to influence valid government action (i.e., by the filing of and subsequent granting of its motions to stay), and therefore, it is entitled to immunity as a matter of law.

The evidence demonstrates that on: (1) March 3, 2009, the Puerto Rico Court of Appeals issued an order staying the TRB's consideration of PRTC's franchise application until March 31, 2009; and (2) May 20, 2009, the Puerto Rico Supreme Court issued an order staying the TRB's consideration of PRTC's franchise application until October 26, 2010. *See* Section I.B.2, *supra*. *Noerr-Pennington* bars

all of PRTC's claims for damages arising from these stays, and may not present any evidence at trial of harm that resulted from these stays, including any incidental effects.

### iii.      Other Successful Litigation

The Court also concludes with equal force that *Noerr-Pennington* bars all of PRTC's claims for damages arising from OneLink's Cable Act Complaint and motion for a TRO filed on February 10, 2009 in federal court, as Judge Gelpí found that OneLink had demonstrated a "strong likelihood of success on the merits" in its motion on February 18, 2009, and the case was dismissed as moot on February 24, 2009. *See id.* In other words, OneLink was successful in its efforts to influence the Court. PRTC may not present any evidence at trial of harm that resulted from this complaint or motion (namely, from February 10, 2009 to February 24, 2009), including any incidental effects.

### iv.      Causation and Remaining Evidence

OneLink also asserts that PRTC has failed to establish causation because PRTC cannot prove that OneLink's pursuit of litigation actually caused PRTC's alleged injury, and that in and of itself is detrimental to its claim. *Def.'s Mot.* at 10. According to OneLink:

> [I]t is clear from the undisputed facts that any delay in approving PRTC's franchise stemmed from (i) *PRTC's* own failure to file a meritorious application in February 2008, leading the TRB to deny it; (ii) the *Puerto Rico courts'* decisions to stay TRB proceeding on PRTC*'s* second application, effectively until October 2010; (iii) the *TRB's* timing of its own processing of PRTC's second application from November 2010 until November 2011; and (iv) the *TRB's* voluntary decision to postpone

signing a franchise agreement from November 2011 until February 2012. *None* of these delays is legally attributable to OneLink's litigation.

*Id.* (emphasis in original).

"An antitrust plaintiff must prove that he or she suffered damages from an antitrust violation and that there is a causal connection between the illegal practice and the injury." *Sullivan*, 34 F.3d at 1103. Nevertheless, "'[p]laintiffs need not prove that the antitrust violation was the sole cause of their injury, but only that it was a material cause.'" *Id.* (quoting *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 13 (1st Cir. 1979), *cert. denied*, 446 U.S. 983 (1980)).

The Court views the causation element as inherently intertwined with whether OneLink is entitled to *Noerr-Pennington* immunity. The Court will review six periods of time, between February 2008 and April 4, 2012, to determine whether during any of them there is a genuine dispute of material fact as to whether OneLink engaged in "sham" litigation (not including the time periods previously discussed regarding the motions to stay—March 3, 2009 to March 31, 2009, and May 20, 2009 to October 26, 2010—and Judge Gelpi's TRO ruling—February 10, 2009 to February 24, 2009). In doing so, the Court views the events within these time periods collectively, as PRTC "can survive summary judgment by merely establishing a pattern of repetitive claims that were filed without regard to the merits." *Livingston Downs Racing Ass'n*, 192 F. Supp. at 538. This may include evidence that OneLink "pursued the same claim on several occasions." *Id.* at 540.

First, addressing the time period between February 2008 and November 2008, when PRTC submitted its first application for a video franchise and was subsequently

denied by the TRB, the Court concludes that PRTC has not presented evidence to establish a trialworthy issue that OneLink initiated any "sham" litigation during this period that delayed the process in any way.  Although OneLink submitted comments to the TRB as an interested party, this act was within its right and is not sufficient to show any objectively baseless litigation on the part of OneLink.  *See* Section I.B.1, *supra*.

Second, regarding the time period between December 11, 2008 and March 3, 2009, when PRTC submitted its second application for a video franchise and OneLink subsequently filed four motions with the TRB (three of which were denied and the other was never ruled upon), the Court concludes that a reasonable jury could find that these filings, in conjunction with the additional filings discussed below, were intended to stall and delay PRTC's entrance into the market, rather than to seek a favorable outcome from the TRB.  *See* Section I.B.2, *supra*; *see also Omni*, 499 U.S. at 381 ("But the purpose of delaying a competitor's entry into the market does not render lobbying activity a 'sham,' unless . . . the delay is sought to be achieved only by the lobbying process itself, and not by the governmental action that the lobbying seeks").  For example, among those filings was a "Motion to Intervene" filed on January 13, 2009 that was subsequently denied on March 2, 2009, and an "Urgent Motion to Dismiss PRTC Application" filed on February 25, 2009, which according to the facts, was never ruled upon by the TRB.  After the TRB approved PRTC's franchise agreement on February 1, 2012, OneLink filed numerous other motions, including two similar to motions filed several years earlier—a petition for reconsideration and

in further support of intervention, and a motion to stay the grant of PRTC's application and approval of its franchise agreement.  *See* Section I.B.5, *supra*.  A reasonable jury could find that OneLink was attempting to "use process—as opposed to the outcome of that process—as an anticompetitive weapon" by these repetitive filings. *Omni*, 499 U.S. at 380.

Third, addressing the time period between April 7, 2009 and May 1, 2009, when OneLink filed three motions with the TRB (two of which were denied and the other was never ruled upon), the Court concludes with equal force that a reasonable jury could find that these filings, in conjunction with the additional filings discussed above and below, were intended to stall and delay PRTC's entrance into the market, rather than seeking a favorable outcome from the TRB.  *See* Section I.B.2, *supra*.

Fourth, regarding the time period between January 20, 2011 and April 6, 2011, when OneLink filed a Motion to Recuse President Torres, the OGE responded and concluded there was no merit to OneLink's claims, and the TRB scheduled a hearing on PRTC's franchise application, the Court concludes that PRTC has not presented sufficient evidence to establish a trialworthy issue that OneLink initiated any "sham" litigation during this period that delayed the process in any way.  It would be different had PRTC presented evidence that the TRB had delayed scheduling the hearing until it had received a response from the OGE, or that OneLink advocated for such a position, but that is only pure speculation. The Court already concluded in its recitation of the facts that, contrary to PRTC's assertion, OneLink never argued that

the TRB should "sit in abeyance" while awaiting a decision from the OGE.  *See* footnote 14, *supra*.

Fifth, regarding the time period between November 29, 2011 and January 31, 2012, when OneLink filed a different suit in federal court against the TRB, the TRB agreed to postpone approval of PRTC's franchise agreement in exchange for the agreement by OneLink and Choice to withdraw their request for a TRO, and all the way up until the day before the franchise agreement was approved, the Court concludes that a reasonable jury could find that this suit was filed with the intent to stall and delay PRTC's entrance into the market, rather than seeking a favorable outcome from the federal court.  This is evidenced particularly by the terms of the settlement agreement OneLink reached with the TRB (i.e., the TRB's agreement to delay its approval of PRTC's franchise agreement for nearly two months and to provide at least seven days' notice to OneLink before acting on the franchise agreement).  A reasonable inference could be drawn  that PRTC's purpose in filing the suit in federal court was not to win its lawsuit, but instead to use the process of filing suit to further delay PRTC's entrance into the market (after all, the settlement agreement was entered into just three days after OneLink filed suit).  In addition, for reasons previously discussed, OneLink has not made out a case for *Parker* immunity in this instance.  *See* Section I.B.3, *supra*; Section IV.C.3.i, *supra*.

Finally, addressing the time period between February 1, 2012 and April 4, 2012, when the TRB approved PRTC's franchise agreement, OneLink filed three more motions, including a petition for reconsideration and in further support of

60

intervention, and a motion to stay the grant of PRTC's application and approval of its franchise agreement, and subsequent denial of these motions, the Court concludes that a reasonable jury could find that these filings, in conjunction with the additional filings discussed above, were intended to stall and delay PRTC's entrance into the market, rather than seeking a favorable outcome from the TRB.  For example, a reasonable inference is raised that OneLink, knowing that the TRB was not only going to review PRTC's franchise agreement sometime after January 31, 2012 in accordance with the settlement agreement but also going to approve it, filed its petition for reconsideration for intervention (the motion for intervention was denied in November 2011 and the petition for reconsideration was filed in February 2012) and motion to stay subsequent to the TRB's approval merely to further delay PRTC's entrance into the market.  *See* Section I.B.5, *supra*.

Furthermore, a reasonable jury could find that the filings the Court has concluded raise a genuine dispute of being "sham" ones were intended to impose the type of enormous expense that PRTC claims it has accrued as a result (over $3.2 million), some of which were filed even after the franchise agreement was approved by the TRB.[32]  *See id.*, *supra*; *see also Omni*, 499 U.S. at 380 (explaining "[a] classic example [of using government process as an anticompetitive weapon]  is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay").

---

[32]     The Court recognizes that the $3.2 million figure is a total, including the period during which the matters were stayed.  The Court also acknowledges that the two parties before the Court are arms of successful parent corporations.  Nevertheless, there is no gainsaying that the litigation OneLink generated in this matter has been inordinately expensive for PRTC by any measure.

In sum, the Court concludes that some, but not all time periods present a genuine dispute as to whether OneLink's filings constitute "sham" litigation that were repetitive and meritless, and intended to delay PRTC's entrance into the market, and thus, were a "material cause" to its alleged injury. *Sullivan*, 34 F.3d at 1103; *see In re Wellbutrin SR Antitrust Litig.*, No. CIV.A. 04-5525, 2010 WL 8425190, at *13-14 (E.D. Pa. Mar. 31, 2010) (when the predicate facts in a sham litigation suit are in dispute, questions regarding *Noerr-Pennington* immunity should proceed to the jury) (collecting cases); *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 816 (1st Cir. 1988) (in the anti-trust context, proof from which a jury could make a just and reasonable inference of causation is sufficient to withstand judgment as a matter of law); *cf.* DAMAGES IN TORT ACTIONS § 3.04 PROVING THE DAMAGES TO BE COMPENSATED (Matthew Bender 2015) (causation is usually a mixed question of law and fact).

### D.    Judicial Notice

Finally, the Court considers PRTC's request that it take judicial notice of the legal memoranda and orders written by the TRB.    According to PRTC, these documents "are the best evidence PRTC can present at this stage regarding the TRB's repeated position that OneLink's pattern of petitioning was intended to" delay PRTC's entrance into the market. *Pl.'s Surreply* at 7.

The Court declines to take judicial notice of these filings for the purpose PRTC seeks to admit them.    While it is true that a court may take judicial notice of public records, for example, to establish that they exist or to prove that litigation occurred,

PRTC asks for much more.  As previously discussed, certain statements of the TRB may not be admitted for their truth because they constitute inadmissible hearsay. *See foot*note 25, *supra*; *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 278 (S.D.N.Y. 2013) (taking judicial notice of numerous judicial opinions and orders as well as a F.C.C. amicus brief filed in a different suit only "for the fact that they exist and for what is in them, but not for their truth"); *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings").

## V.   CONCLUSION

The Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment (ECF No. 198). The Court GRANTS Defendant's Motion for Summary Judgment to the extent Puerto Rico Telephone Co. is making claims for the following periods:

(1) February, 2008 through November, 2008;

(2) February 10, 2009 through February 24, 2009;

(3) March 3, 3009 through March 31, 2009;

(4) May 20, 2009 through October 26, 2010; and

(5) January 20, 2011 through April 6, 2011.

For all remaining periods, the Court DENIES Defendant's Motion for Summary Judgment.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 25th day of July, 2016