UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| PUERTO RICO TELEPHONE COMPANY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 3:11-cv-02135-JAW |
| SAN JUAN CABLE COMPANY LLC d/b/a ONELINK COMMUNICATIONS, | ) ) ) ) | |
| Defendant. | ) ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY
JUDGMENT**

In this federal and state antitrust action, Puerto Rico Telephone Company, Inc.

(PRTC) claims that San Juan Cable Company LLC d/b/a OneLink Communications

(OneLink) violated antitrust laws by conducting "sham" litigation over a period of

four years, which PRTC contends delayed its entry into the competitive market.  In

view of the record and Supreme Court caselaw, the Court concludes that under

Federal Rule of Civil Procedure 56, OneLink's cross-motion for summary judgment is

granted, and PRTC's partial motion for summary judgment is denied on *Noerr-*

*Pennington* immunity.

I.    **BACKGROUND**

    A.    **Procedural History**

On November 22, 2011, PRTC filed a complaint against OneLink, alleging in two counts that OneLink violated Sections 2 and 3 of the Sherman Act, 15 U.S.C. §§ 2-3, and in two counts that OneLink violated the corresponding Puerto Rico Anti-Monopoly Act, P.R. LAWS ANN. 10, § 260.  *Compl.* ¶¶ 7, 61-92 (ECF No. 1).   On December 16, 2011, PRTC filed an amended complaint containing the same alleged violations of federal and state antitrust law.  *Am. Compl.* ¶¶ 7, 64-95 (ECF No. 11). As pertains to this Order, PRTC alleges that OneLink "embarked on a course of conduct designed to thwart, or at a minimum delay, PRTC's entry into OneLink's markets" by "hijacking of Board proceedings, numerous unsuccessful motions to disqualify one of the commissioners, and the filing and vigorous prosecution of multiple objectively baseless lawsuits in both state and federal court – every one of which (with the exception of the most recent attack which has not yet been ruled upon by the court) was resolved against OneLink."  *Id.* ¶ 4.

On January 24, 2012, OneLink filed a motion to dismiss PRTC's Amended Complaint.  *Def.'s Mot. to Dismiss Pl.'s Am. Compl.*  (ECF No. 22) (*Mot. to Dismiss*). PRTC filed its opposition to OneLink's motion to dismiss on February 24, 2012, and OneLink replied on March 9, 2012.  *Pl.'s Opp'n to Def.'s Mot. to Dismiss Pl.'s Am. Compl.* (ECF No. 23); *Def.'s Reply in Further Support of Its Mot. to Dismiss Am. Compl.* (ECF No. 25).  On August 10, 2012, Judge Gelpi denied OneLink's motion to dismiss, and subsequently affirmed his decision on OneLink's motion for reconsideration on September 13, 2012.  *Opinion and Order* (ECF No. 30) (*First Opinion and Order)*; *Opinion and Order* (ECF No. 45) (*Second Opinion and Order*).

Judge Gelpi also denied OneLink's request for interlocutory appeal to the First Circuit. *Second Opinion and Order*. On October 5, 2012, OneLink answered the Amended Complaint, denying its essential allegations and asserting nine affirmative defenses. *Answer to Am. Compl.* (ECF No. 50) (*Answer*).

After nearly a year of discovery, OneLink filed a motion for summary judgment, asserting that as a matter of law that it did not cause the injury that PRTC alleged as the basis for its antitrust claim. *Def.'s Mot. for Summ. J.* (ECF No. 198). The Court ruled on this motion, concluding that OneLink was entitled in part to summary judgment for the events that fell within the scope of *Noerr-Pennington* immunity, and for the time periods that did not raise a genuine dispute of material fact. *Order Granting in Part and Den. in Part Def.'s First Mot. for Summ. J.* (ECF No. 323) (*First Order on Summ. J.*). The Court otherwise denied OneLink's motion for summary judgment. *Id.*

PRTC filed a motion for partial summary judgment with supporting statement of material facts on December 23, 2013. *Pl.'s Mot. for Partial Summ. J. on Def.'s Affirmative Defense under the Noerr-Pennington Doctrine* (ECF No. 246) (*Pl.'s Mot.*); *Pl.'s Supporting Statement of Material Facts* (ECF No. 247) (PSMF). On December 24, 2013, PRTC filed unredacted versions of the motion for summary judgment, supporting statement of material facts, and exhibits. (ECF No. 250). On February 14, 2014, OneLink responded to PRTC by filing an opposition to PRTC's summary judgment motion, a cross-motion for summary judgment, a response to PRTC's statement of material facts, and a cross-statement of material facts in support of its

cross-motion for summary judgment. *Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. and Def.'s Cross Mot. for Summary J.* (ECF No. 261) (*Def.'s Opp'n and Cross Mot.*); *Def.'s Response to Pl.'s Statement of Material Facts supporting Pl.'s Mot. for Partial Summ. J.* (ECF No. 262) (DRPSMF); *Def.'s Cross-Statement of Undisputed Material Facts in support of Def.'s Cross-Mot. for Summ. J.* (ECF No. 263) (DSMF). OneLink also filed unredacted versions of its opposition to PRTC's summary judgment motion, cross-motion for summary judgment, response to PRTC's statement of material facts, and cross-statement of material facts in support of its cross-motion for summary judgment. (ECF No. 267).

On March 14, 2014, PRTC filed its opposition to OneLink's cross-motion for summary judgment, as well as its reply in support of its motion for partial summary judgment. *Pl.'s Opp'n to Def.'s Cross Mot. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Partial Summ. J. on Def.'s Affirmative Defense under the Noerr-Pennington Doctrine* (ECF No. 272) (*Pl.'s Opp'n and Reply*). PRTC also filed an opposition to OneLink's cross-statement of material facts, additional facts in support of PRTC's initial statement of material facts, and a reply to OneLink's response to PRTC's statement of material facts supporting their motion for partial summary judgment. *Pl.'s Opposing Statement of Material Facts* (ECF No. 273) (PRDSMF; PSAMF); *Pl.'s Reply to Def.'s Resp. to Pl.'s Statement of Material Facts Supp. Pl.'s Mot. for Partial Summ. J.* (ECF No. 274) (*Pl.'s Reply*). In addition, PRTC filed an unredacted version of its motions and statement of material facts. (ECF No. 276).

4

On March 28, 2014, OneLink filed a reply brief in support of its cross-motion for summary judgment and a reply to PRTC's statement of additional facts in support of its opposition to OneLink's cross motion for summary judgment. *Def.'s Reply Br. in Supp. of its Cross-Mot. for Summ. J.* (ECF No. 282) (*Def.'s Reply*); *Def.'s Reply to Pl.'s Statement of Additional Facts in Supp. of Pl.'s Opp'n to Def.'s Cross Mot. for Summ. J.* (ECF No. 283) (DRPSAMF).   OneLink also filed unredacted versions of these memoranda on March 28, 2014.  (ECF No. 286).  On April 7, 2014, PRTC filed a redacted and unredacted surreply.  *Pl.'s Surreply to Def.'s Cross-Mot. for Summ. J.* (ECF No. 294) (*Pl.'s Surreply*); (ECF No. 296).[1]

On December 4, 2014, Judge Gelpi recused himself from presiding over this case, and, in accordance with a directive from Chief Judge Aida M. Delgado-Colon, the case was to be reassigned to a visiting judge.  *Order* (ECF No. 305).   *Notice of Judge Assignment* (ECF No. 307).  On January 26, 2015, the case was reassigned to this Judge.  *Notice of Judge Assignment* (ECF No. 307).  The Court held oral argument on the cross-motions for summary judgment on May 31, 2016.  *Entry* (ECF No. 315); *Tr. of Proceedings* (ECF No. 319) (*Tr.*).

---

[1]      In this Order when citing to the record the Court refers to the redacted version of all filings.

## B.     Factual Background[2,3]

### 1.     PRTC's First Franchise Application

In February 2008, a PRTC affiliate (Coqui.net) filed a video franchise application, instituting a franchise proceeding in the Telecommunications Regulatory Board of Puerto Rico (TRB or the Board).  DSMF ¶ 1; PRDSMF ¶ 1.  On May 12, 2008, OneLink filed a motion with the TRB requesting intervention in and a stay of PRTC's first franchise proceedings; OneLink's motion stated:

> We know that this is not an adversary proceeding and that section 8.7 of the Board's Regulations on Practice and Procedure do not apply, however we believe the use of the term "intervention" is appropriate since OneLink could be adversely affected by this proceeding and it can help the Board develop a more complete record.[4]

---

[2]     Where, as here, the parties filed cross-motions for summary judgment, the Court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  *Matusevich v. Middlesex Mut. Assur. Co.,* 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N A.,* 370 F.3d 164, 170 (1st Cir. 2004)).  For cross-motions for summary judgment the standard of review is applied to each motion separately. *Libertarian Party of New Hampshire v. Gardner,* 759 F. Supp. 2d 215, 221 (D.N.H. 2010) *aff'd,* 638 F.3d 6 (1st Cir. 2011).  Thus, in accordance with "the conventional summary judgment praxis," in regards to PRTC's motion for summary judgment (ECF No. 246) and its supporting facts (ECF No. 247), the Court recounts the facts in the light most hospitable to OneLink's case theories consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  In compliance with this obligation, the Court recites supported facts as true even if PRTC disputes them. *Id.*  Likewise, with OneLink's cross-motion for summary judgment (ECF No. 261) and its supporting facts (ECF No. 263), the Court recounts the facts in the light most hospitable to PRTC's case theories consistent with record support and recites supported facts as true even if OneLink disputes them.  *Id.*

[3]     PRTC's statements of material fact 40 and 63, and additional statement of material fact 34, are statements based on expert opinions of Puerto Rico law.  PSMF ¶¶ 40, 63; PSAMF ¶ 34. The First Circuit has explicitly held that such testimony is prohibited, subject to exceptions not applicable here. *Nieves-Villanueva v. Soto-Rivera,* 133 F.3d 92, 99 (1st Cir. 1997) (citing *United States v. Newman,* 49 F.3d 1, 7) (1st Cir. 1995)).  "[I]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge."  *Id.*  "[T]he judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial."  *Id.* at 100.  Moreover, "inadmissible evidence may not be considered" for summary judgment. *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir. 1993); *see also Asociacion De Periodistas De P.R. v. Mueller,* 680 F.3d 70, 78-79 (1st Cir. 2012) (explaining that only admissible evidence and evidence that could be used at trial may be considered for summary judgment).  As such, PSMF ¶¶ 40, 63 and PSAMF ¶ 34 are inadmissible and excluded from the record.

[4]     PRTC's paragraph 33 initially prefaced its statement with "Here, OneLink admitted to the TRB that it lacked standing to intervene."  PSMF ¶ 33.  OneLink objected to this language, maintaining that the statement was an argument and legal conclusion, not a fact.  DRPSMF ¶33.  The Court agrees that the first sentence of paragraph 33 is conclusory argument not properly presented in

PSMF ¶¶ 33, 41, 43, 69; DRPSMF ¶¶ 33, 41, 43, 69; DSMF ¶ 2; PRDSMF ¶ 2.

OneLink did not know whether intervenor status would have given it the right to

view confidential business documents PRTC submitted to the TRB.[5],[6]   PSAMF ¶ 33;

---

a statement of material facts.  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("the nonmoving party [may not] rest[] merely upon conclusory allegations").  The Court alters the record to present only uncontested fact.  Likewise, PRTC's paragraphs 43 and 69 are arguments not properly presented in a statement of material facts and are also excluded from the record.  PSMF ¶¶ 43, 69.

[5]     In his deposition, when asked "You don't know whether you would have gotten access or not [to confidential documents] as a result of being an intervenor?" Mr. Khoury, OneLink's Rule 30(b)(6) witness, replied "No, I don't."  *Khoury Dep*. Attach. 4, 19:15-18 (*Carson Decl.* Ex. 41) (ECF No. 250) (*Khoury Dep.*).  OneLink denied this statement as unsupported.  DRPSAMF ¶ 33.  Citing the record evidence, OneLink argues that Mr. Khoury stated that access to those records was a motivational factor for requesting intervenor status, and also refers to TRB regulations regarding service of process of documents to support that OneLink would have received those documents had it been an party.  *Khoury Dep*. 19:1-5 (*Carson Decl.* Ex. 41); TRB Regulation 5664, § 5.3(a) (eff. prior to Nov. 2010) (*Carson Decl.* Ex. 12) (ECF No. 248); TRB Regulation 7848, § 7.3 (eff. Nov. 2010) (*Carson Decl.* Ex. 13) (ECF No. 248).  Viewing the evidence in the light most favorable to OneLink, the Court determines that OneLink did not know whether it would receive confidential documents submitted by PRTC had OneLink been afforded intervenor status.

[6]     PRTC's paragraph 26 stated: "OneLink admits that had it succeeded in its efforts to intervene, it would have gained no rights vis-à-vis the franchise proceedings that it did not enjoy without intervenor status."  PSFM ¶ 26.  OneLink objected to this statement, contenting it is "an argument and legal conclusion, not a fact."  DRPSMF ¶ 26.  The Court agrees.  *Medina*, 896 F.2d at 8 ("the nonmoving party [may not] rest[] merely upon conclusory allegations").  Furthermore, even if "fact," PRTC's record evidence does not support the assertion.  While in his deposition Mr. Khoury could not identify all procedural rights afforded to an intervener before the TRB, he did testify to certain rights OneLink would have gained from intervener status.  *Khoury Dep*. at 18:19-21:13; 39:18-42:2 (*Carson Decl.* Ex. 41); *Khoury Dep*. Attach 3, 19:1-5; 20:18-21:35; 38:1-14; 103:10-14 (*Grube Decl.* Ex. 35) (ECF No. 264).  As such, the Court excludes paragraph 26 from the record.  Likewise, regarding the issue of intervener status and OneLink's ability to participate in the franchise proceedings, PRTC's statement of material fact paragraphs 27, 29-30, 65-67, and 71-72, and statement of additional material fact paragraphs 19, 21 and 32, are arguments not properly presented in a statement of material facts, *Medina*, 896 F.2d at 8, and are excluded from the record.  *See* PSFM ¶¶ 27, 29-30, 65-67, 71-72; PSAMF ¶¶ 19, 21, 32.

Moreover, viewing the evidence in the light most favorable to OneLink, OneLink identifies a number of rights it would have been afforded had it participated in the franchise proceedings as an intervenor, including: (1) the right to notice of the TRB's orders or proceedings; (2) the ability to immediately file a motion to reconsider if the franchise was approved; (3) the right to cross-examine PRTC's witnesses; and (4) the obligation for the TRB to act on OneLink's motions as a formal party.  DRPSMF ¶ 26-27; *see Khoury Dep*. 19:1-5; 20:18-21:35; 38:1-14; 103:10-14 (*Grube Decl.* Ex. 35); *see also In re Application of Coqui.net*, JRT-2008-CCG-001, Hr'g Tr. at 16, 57-59, Sept. 26, 2008 (*Grube Decl.* Ex. 2) (ECF No. 264); *In re Application of Coqui.net*, JRT-2008-CCG-001, Hr'g Tr. at 10, Oct. 10, 2008 (*Grube Decl.* Ex. 3) (ECF No. 264); Uniform Administrative Procedure Act, 3 L.P.R.A § 2165 (*Carson Decl.* Ex. 5) (ECF No. 248); *San Juan Cable LLC, h/n/c OneLink Commc'ns v. TRB, et al.*, KLRA-2012-536, Op. at 9-11, Aug. 30, 2012 (*Carson Decl.* Ex. 124) (ECF No. 248).  The right of access to confidential documents as an intervenor is addressed in footnote 5, *supra*.

DRPSAMF ¶ 33.  On May 21, 2008, the TRB denied OneLink's request to intervene and stay the proceeding.  PSMF ¶ 44; DRPSMF ¶ 44.  OneLink's existing cable franchises were not at issue and were expressly nonexclusive (i.e., the granting of a competing franchise was clearly contemplated in OneLink's own franchise agreements).[7]  PSMF ¶ 42; DRPSMF ¶ 42.

OneLink submitted comments and information to the TRB before its hearing on September 26, 2008 regarding PRTC's franchise application, and OneLink cross-examined witnesses at the hearing.[8]  PSMF ¶ 45; DRPSMF ¶ 45.  At that hearing TRB Commissioner Aguirre stated: "We cannot guarantee here to the other companies that are not, strictly speaking, a party . . . that there will be a second opportunity to examine [witnesses] as [OneLink] requests."  DSMF ¶ 3; PRDSMF ¶ 3.  At the October 10, 2008 hearing in the first franchise proceeding, TRB Commissioner Aguirre stated: "[PRTC's] petition is presumed to have been submitted in good faith . . . not contrary to the public interest . . . not against the interests of the

---

[7]    OneLink denied paragraph 42, contending it is an argument, not a fact.  DRPSMF ¶ 42.  Also, OneLink admitted that its cable franchise was non-exclusive, but denied its franchises were "not at issue," arguing that "OneLink, like the public at large, had a legitimate interest in 'fair competition.'" *Id.*  The Court overrules OneLink's denial.  The Court does not read PRTC's sentence to make the broad assertion that OneLink had no interest in the outcome of the proceedings, but rather that OneLink's franchise agreements themselves were not at issue in PRTC's franchise proceedings, and that OneLink's franchise agreements were nonexclusive.

[8]    PRTC's paragraph 45 originally stated: "[OneLink] submitted comments and information and cross-examined witnesses at the TRB hearing on Sept. 26, 2008 regarding PRTC's franchise application."  PSMF ¶ 45.  OneLink denied this paragraph, arguing that it did not submit any comments at the September 26, 2008 hearing, and that it was given only a limited opportunity to cross-examine two TRB witnesses, "subject to limitations imposed by the TRB due to OneLink's status as a non-party whose petition to intervene had been denied."  DRPSMF ¶ 45.  Viewing the record in the light most favorable to OneLink, the Court concludes that OneLink provided comments, before, not at the September 26, 2008 hearing, and adjusts the record accordingly.  However, paragraph 46 only states that OneLink crossed-examined witnesses, and though this cross-examination may have been only a "limited opportunity," this objection does not contradict PRTC's statement, and as such is overruled.

consumer. . . . All of these assumptions, to this date, have been defeated or violated by the facts." DSMF ¶ 4; PRDSMF ¶ 4; PSMF ¶ 32; DRPSMF ¶ 32. The TRB denied PRTC's February 2008 video franchise application on October 29, 2008, and published its opinion on November 12, 2008.[9] PSMF ¶ 47; DRPSMF ¶ 47; DSMF ¶ 9; PRDSMF ¶ 9. The TRB unanimously found:

> The record shows inconsistencies and partialities in the documents submitted in the Application, as became apparent in the hearing process. . . . The Forum expressed its concern in the hearing room in view of acts by the corporation, parent company and affiliates of petitioner, that seem to cast doubt on the independence of each one and can suggest hints of cross subsidies, prohibited by the applicable federal and local regulation. . . . From the facts it is apparent that petitioner began the construction of the plant without this Board's permission, as required by Act 213, Chap. III, Art. 9(a)1.

DSMF ¶ 5; PRDSMF ¶ 5. The TRB also stated:

> Once the comment process was completed, through a Resolution and Order issued on August 21, 2008, we cited petitioner to a public hearing to be held on September 26, 2008. The purpose thereof was to allow petitioner, through evidence from testimony and documents, to clarify certain assertions of an economic, technical and operational nature raised by the companies providing similar services. The need for this hearing arises due to the inadequate nature of the information submitted by petitioner by not explaining adequately aspects challenged by the companies.
>
> . . . .
>
> On October 10, 2008, the testimony of the rest of the witnesses announced was not taken because the Board stated their decision on that occasion, given in court, to deny the petitioner's request for franchise as filed. This Board believed that, in accordance with the

---

[9]     PRTC's paragraph 31 originally stated: "Misdirected by OneLink's baseless interference, TRB denied PRTC's first application on Oct. 29, 2008." PSMF ¶ 47. OneLink denied this statement, arguing that there is no evidence that any of its actions or representations before the TRB were misleading or baseless, and lists a number of reasons the TRB stated for denying PRTC's application. DRPSMF ¶ 47. The Court affirms OneLink's denial and alters the record to include the TRB's reasoning for denying PRTC's first franchise application.

testimony taken during the course of the hearing, the request submitted suffered from irreparable defects, such as information that was incomplete or inconsistent with what had been submitted during the course of the hearing.

. . . .

During the process, petitioner seemed reluctant to reveal information requested by the Board, as well as vital details of its operation.

DSMF ¶¶ 6-8; PRDSMF ¶¶ 6-8.

## 2.    PRTC's Second Franchise Application

On December 11, 2008, PRTC filed a second franchise application.  PSMF ¶ 48; DRPSMF ¶ 48; DSMF ¶ 10; PRDSMF ¶ 10.  PRTC applied on December 11, 2008, for a Special Temporary Authority (STA) to "provide a pre-release version of Claro TV to PRTC employees who elect to participate in a temporary, beta-testing phase of this service."  DSMF ¶ 11; PRDSMF ¶ 11.  On December 17, 2008, the TRB granted PRTC's request for a STA.  DSMF ¶ 12; PRDSMF ¶ 12.  The TRB did not seek public comment or serve notice on OneLink of its order granting PRTC the STA.[10]  DSMF ¶

---

[10]     PRTC admitted that the TRB did not seek public comment of its order granting PRTC the STA, but denied that the TRB did not provide public notice of this Order and cites OneLink's January 13, 2009 Motion for Intervention in support of its denial.  PRDSMF ¶ 13; *Jan. 13, 2009 OneLink Motion to Intervene and Request for Proceedings* at 2 (*Carson Decl.* Ex. 61) (ECF No. 248).  OneLink cited the TRB's December 17, 2008 Resolution and Order to support its contention.  DSMF ¶ 13; *In re: PRTC h/n/c ClaroTV*, JRT-2008-CCG-0002, Dec. 17, 2008 Resolution & Order (*Grube Decl.* Ex. 4) (ECF No. 264).  Considering the evidence in the light most hospitable to PRTC, the Court finds that PRTC has proffered no evidence that the TRB provided public notice on its December 17, 2008 Resolution and Order.  Indeed, the Order makes no reference to public notice, and lists only PRTC's counsel in its service notice.  *Id.*  Additionally, OneLink's January 13, 2009 Motion for Intervention argues that the TRB issued its Resolution and Order "without providing an opportunity for public notice or comment or holding public hearings on any of the documents submitted by PRTC."  *Jan. 13, 2009 OneLink Motion to Intervene and Request for Proceedings* at 2 (*Carson Decl.* Ex. 61) (ECF No. 248).  However, OneLink has provided no evidence that the TRB did not provide public notice; it only illustrated that it was not served notice with the issuance of the December 17, 2008 Resolution and Order.  The Court adjusts the record to show that OneLink was not served notice of the Order and Resolution, but removes the contention that no public notice was given.

13; PRDSMF ¶ 13.  On December 30, 2008, the Board accepted PRTC's franchise application and scheduled a public hearing for February 11-13, 2009.  PSMF ¶ 48; DRPSMF ¶ 48.  Without public comment or service of notice on OneLink, on January 9, 2009, the TRB issued a Resolution and Order granting expedited review of PRTC's December 2008 application.[11]  DSMF ¶ 14; PRDSMF ¶ 14.

On January 13, 2009, OneLink again filed a Motion to Intervene.[12,13]  PSMF ¶ 49; DRPSMF ¶ 49.  Based on the filing of the Motion to Intervene before the TRB by OneLink, and motions for protection of confidential information filed by PRTC, the TRB vacated the previously scheduled February 11-13, 2009 hearing dates, and reset

---

[11]    PRTC admitted that the TRB did not seek public comment of the order granting expedited review of PRTC's December 2008 application but denied that the TRB did not provide public notice of this order.  DRPSMF ¶ 14; *Feb. 25, 2009 Request for Mandamus* at 6 (*Carson Decl.* Ex. 63) (ECF No. 248).  Again, as in footnote 10, *supra*, PRTC has proffered no evidence that the TRB provided public notice, but also again OneLink has provided no evidence that the TRB did not provide public notice; OneLink only showed that it was not served notice.  *See In re: PRTC h/n/c ClaroTV*, JRT-2008-CCG-0002, Dec. 30, 2008 Resolution & Order (*Grube Decl.* in Supp. of Def. Mot. for Summ. J. Ex. J) (ECF No. 200-4).  Again, the Court adjusts the record to show that OneLink was not served notice of the Order and Resolution, but removes the contention that no public notice was given.

[12]    PRTC's paragraph 49 originally stated: "Despite OneLink's belief that it would be accorded the same rights to participate as it had been in the first proceeding without intervenor status, on January 13, 2009, OneLink again filed a Motion to Intervene."  PSMF ¶ 49.  OneLink admitted that it filed a motion to intervene on January 13, 2009, but it denied the rest of the statement, contending it is "an argument and legal conclusion, not a fact."  DRPSMF ¶ 49.  The Court agrees.  *Medina*, 896 F.2d at 8. For the same reasons in denying PSMF ¶ 26, footnote 6, *supra*, the Court admits in part and excludes in part paragraph 49.

[13]    Regarding OneLink's January 13, 2009 motion to intervene, PRTC's paragraph 70 originally stated:

> Rather, OneLink attempted to end-run the confessedly clear language of the APA by purporting to rely on a case decided long before even its first intervention petition. OneLink mischaracterized the holding in *San Antonio Maritime* as supporting its assertion that intervention was appropriate during franchise proceedings even though, as OneLink itself noted, the intervention section in the Adjudicative Procedures subchapter of the APA "makes explicit reference only to adjudicative proceedings."

PSMF ¶ 70.  OneLink denied the paragraph, asserting the statement is an argument and legal conclusion, not a fact, and improper under District of Puerto Rico Local Rule 56(b).  The Court agrees, *Medina*, 896 F.2d at 8, and excludes paragraph 70 from the record.

them for March 4-6, 2009.[14]   PSMF ¶ 50; DRPSMF ¶ 50; DSMF ¶ 15; PRDSMF ¶ 15.

On January 21, 2009, the TRB issued an order requesting that PRTC respond to

OneLink's Motion to Intervene, and PRTC submitted a motion in opposition to

OneLink's Motion to Intervene on January 23, 2009.[15]   PSMF ¶ 154; DRPSMF ¶ 154.

On February 19, 2009, the TRB issued another order inviting OneLink to argue its

intervention motion at the March 4, 2009 public hearing.   PSMF ¶ 155; DRPSMF ¶

155.   When the TRB did not rule on its intervention request, on February 25, 2009 –

one week prior to the scheduled public hearing on PRTC's franchise application –

OneLink sued the TRB in the Court of First Instance for mandamus; in its petition

OneLink claimed it had not gained access to certain confidential documents before

the scheduled March 4-6, 2009 franchise application hearings and requested that the

---

[14]      PRTC's paragraph 50 originally stated: "In reaction to OneLink's Motion to Intervene, on January 21, 2009, the Board vacated the February 11-13, 2009 hearing dates, and reset them for March 4-6, 2009."  PSMF ¶ 50.  In response, OneLink denied the paragraph in its entirety, arguing that the hearing dates were reset for March as a result of PRTC's motions to restrict access to certain exhibits, and furthermore, that PRTC "has proffered no admissible evidence establishing or supporting a reasonable inference" that the hearing dates were moved "in response or reaction to any OneLink filing."  DRPSMF ¶ 50.  Both parties cite the same record evidence in support of their assertions.  Jan. 21, 2009 Resolution & Order at 1-2, *P.R. Tel. Co. d/b/a Claro TV, JRT-2008-CCG-0002* (*Carson Decl.* Ex. 62) (ECF No. 248).
         A review of the January 21, 2009 Resolution and Order reveals that the hearing was postponed as a result of both PRTC's motions and OneLink's motion.  The TRB gave PRTC ten days to answer the Motion to Intervene, appeared to grant part or perhaps all of PRTC's motions for protection, and then declared, "[i]n consideration of the foregoing, it is necessary to update the docket," including rescheduling the hearing dates.  *Id.* at 1-2.  The Court included in the record that the filings of these motions impacted the hearing dates, and it otherwise overrules OneLink's denial.
[15]      PRTC's paragraph 154 originally stated: "The TRB had, in fact, taken action on OneLink's intervention motion. On January 21, 2009, for instance, the TRB issued an order requesting that PRTC respond to OneLink's."  PSMF ¶ 154.  OneLink denied this paragraph, arguing that "the TRB did not take up OneLink's intervention motion until March 2, 2009, and in doing so, on that date, the TRB stated that it had planned to wait longer before denying OneLink's motion, but was forced to act because of OneLink's mandamus petition."  DRPSMF ¶ 154.  Reviewing this evidence in the light most favorable to OneLink, the Court sustains its denial and adjusts the record to reflect PRTC's and the TRB's actual response to OneLink's January 13, 2009 Motion to Intervene.  *See* Mar. 2, 2009 Resolution & Order at 2, *P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 64) (ECF 248).

court order the TRB to resolve its January 13, 2009 Motion to Intervene, as it had

"not taken any action regarding" its intervention motion and had "refused to consider"

its motion.[16]  PSMF ¶¶ 51, 152; DRPSMF ¶¶ 51, 152.

---

[16]      PRTC's paragraph 51 originally stated: "When the TRB did not rule on its intervention request, OneLink sued the TRB in the Court of First Instance for mandamus on February 25, 2009."  PSMF ¶ 51.  OneLink provided a qualified admission to paragraph 51, stating:

>      OneLink admits that, on February 25, 2009—<u>one week prior to a scheduled public hearing on PRTC submitted its second franchise application</u>—OneLink brought a mandamus action in the Puerto Rico Court of First Instance seeking to compel the TRB to rule—either way—on the motion to intervene that OneLink had filed with the TRB on January 13, 2009, shortly after PRTC submitted the application.

DRPSMF ¶ 51 (emphasis provided).  The underlined portion of this paragraph as proposed is garbled. The Court has revised the paragraph as follows:

>      OneLink admits that, on February 25, 2009—one week prior to a scheduled public hearing on PRTC's second franchise application—OneLink brought a mandamus action in the Puerto Rico Court of First Instance seeking to compel the TRB to rule— either way—on the motion to intervene that OneLink had filed with the TRB on January 13, 2009, shortly after PRTC submitted the application.

Similar to paragraph 51, PRTC's paragraph 152 originally stated:

>      On February 25, 2009, OneLink filed a mandamus petition with the Puerto Rico Court of First Instance, requesting that the court order the TRB to resolve its January 13, 2009 Motion to Intervene. OneLink based this request on the fact that the TRB had "not taken any action regarding" its intervention motion and had "refused to consider" its motion.

PSMF ¶152.  OneLink denied paragraph 152, explaining:

>      [OneLink] denies PRTC's characterization of OneLink's bases for that petition. OneLink's petition was necessary to respond to the TRB's statement that it would decide OneLink's intervention motion on the same day as the hearing that the TRB had scheduled on PRTC's franchise application, which would have afforded OneLink no ability to access documents and adequately prepare to participate in the hearing.

DRPSMF ¶ 152.  Reviewing the evidence in the light most favorable to OneLink, the Court affirms OneLink's qualification to PRTC's paragraph 51 and sustains its denial of paragraph 152.  The record indicates that the TRB had not yet ruled on OneLink's Motion to Intervene as of one week before the scheduled franchise application hearings, as well that OneLink's purported reasoning for seeking mandamus was based on more than just the fact that the TRB had "not taken any action regarding" its intervention motion and had "refused to consider" its motion. Feb. 25, 2009 Req. for Mandamus at 4-6, *San Juan Cable LLC d/b/a OneLink Commc'ns v. TRB*, KPE- 09-0600 (904) (*Carson Decl.* Ex. 63) (ECF 248); Feb. 19, 2009 Resolution & Order at 1, *P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 116) (ECF 248).  The Court expands the record to support OneLink's qualification and denial.

On March 2, 2009, TRB issued an order denying intervention.[17]  PSMF ¶ 52;

DRPSMF ¶ 52.  In that order, the TRB noted:

> we decided to postpone the intervention decision until the date set for
> the hearing.  This would allow the parties to be more thoroughly
> prepared to answer the questions of this Board and to determine the
> course to be followed with regard to the proceeding before our
> consideration.  Given the circumstance that OneLink went before the
> Honorable Trial Court, San Juan Superior Division, through a petition
> for a writ of mandamus, we are forced to decide this issue within a
> limited period of time, without the benefit of arguments or case law that
> may help the parties to expand, rectify and improve their respective
> positions.
>
> . . . .
>
> [I]ntervention of OneLink or other companies is not necessary for [the
> TRB] to determine whether or not it is appropriate to grant a second
> franchise, particularly because in a matter of the proposal for a franchise
> with new technology (IPTV), none of the companies appearing herein
> are in a position to offer expert information or specialized knowledge
> that would not be otherwise available in the proceeding.  Nevertheless,
> the appearing party has been allowed to participate actively in the prior
> proceeding, without having the title of intervener, and its comments,
> under this proceeding, will be sufficient for the Board.[18]

---

[17]   PRTC's paragraph 52 originally stated: "On March 2, 2009, TRB issued an order denying
intervention, and explaining that OneLink had been "mendacious" (i.e., repeatedly lying) in its
representations to the Puerto Rico court."  PSMF ¶ 52.  OneLink denied paragraph 52 as "vague,
conclusory and an unsupported opinion, not a fact, and should be disregarded."  DRPSMF ¶ 52.  The
Court addresses the statement by the TRB that OneLink had been "mendacious" in footnote 115, *infra*.
[18]   Onelink denied PRTC's original paragraph 53, arguing OneLink was not allowed to participate
in the TRB proceedings on PRTC's first franchise application to the same extent that a party would
have been able to participate, and denying that it did not offer "expert information or specialized
knowledge" that aided the TRB in PRTC's first franchise application.  DRPSMF ¶53.

   These objections do not respond directly to PRTC's paragraph 53.  However, to provide better
context for the TRB's reasoning for denying OneLink's intervention request, the Court provides the
full statement cited by PRTC.  Mar. 2, 2009 Resolution & Order at 2, *P.R. Tel. Co. d/b/a Claro TV*,
JRT-2008-CCG-0002 (*Carson Decl.* Ex. 64) (ECF No. 248).

   Additionally, this expansion of the record in part addresses OneLink's denial of PRTC's
paragraph 154, *see* footnote 15, *supra*, while also addressing PRTC's objection to OneLink's paragraph
16.  DSMF ¶ 16.  Specifically, OneLink's paragraph 16 stated:  "The TRB did not rule on OneLink's
'Motion to Intervene and Request for Proceedings' until after OneLink filed an action in Puerto Rico
state court, seeking a writ of mandamus to compel the TRB to address that motion."  *Id.*  PRTC denied
the statement, arguing that the TRB "did 'rule' on OneLink's intervention motion, setting a hearing
date for this motion and inviting PRTC to respond to the motion."  PRDSMF ¶ 16.  PRTC's functional
definition of "rule" – setting a hearing date for this motion and inviting PRTC to respond to the motion

PSMF ¶¶ 53; DRPSMF ¶¶ 53; DSMF ¶ 17; PRDSMF ¶ 17.   During the PRTC's franchise proceedings, the TRB never rejected any submission that OneLink sought to provide, though the TRB did not respond to all of OneLink's submissions.[19],[20] PSMF ¶¶ 28, 46; DRPSMF ¶¶ 28, 46.

On March 3, 2009, OneLink appealed the TRB's rejection of their second request for intervention to the Puerto Rico Court of Appeals.[21]  PSMF ¶ 54; DRPSMF ¶ 54.  On that same day OneLink secured a stay pending appeal from the Puerto Rico Court of Appeals that prevented the TRB from considering the franchise

---

– is unpersuasive.  When viewing the evidence in the light most favorable to PRTC, the Court overrules PRTC's denial for reasons similar to those discussed in this footnote and footnote 15, *supra*.

[19]     OneLink admits that during the franchise proceedings that the TRB never rejected any OneLink submission, but denies that the TRB timely responded (or responded at all) to all of its submissions.  DRPSMF ¶ 34.  For example, OneLink contends the TRB failed to rule on its January 13, 2009 motion to intervene in the proceedings on PRTC's second franchise application for over a month.  *Id.*  OneLink asserts it was thus forced to file a mandamus action in the Puerto Rico Court of First Instance to compel the TRB to rule on OneLink's request for intervention.  *Id.*  OneLink also notes that it filed a motion for an order to show cause with the TRB on April 7, 2009, alleging that PRTC had engaged in unlawful pre-franchise construction of its cable network, but contend the TRB never addressed OneLink's motion.  *Id.*; Jan. 13, 2009 OneLink Motion to Intervene and Request for Proceedings, *In re: P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 61) (ECF No. 248); Feb. 25, 2009 Req. for Mandamus at 7, *San Juan Cable LLC d/b/a OneLink Commc'ns v. TRB*, KPE-09-0600 (*Carson Decl.* Ex. 63) (ECF No. 248); Apr. 7, 2009 Em. Mot. For Order to Show Cause, *In re: Investigation into P.R. Tel. Co.'s Development, Construction and Operation of a Cable System in Violation of Law 213*, JRT-2009-CCG-0001 (*Carson Decl.* Ex. 68) (ECF No. 248).
        Viewing the evidence in the light most favorable to OneLink, the Court accepts OneLink's qualification to paragraph 28 and alters the record to reflect that the TRB did not respond to all of OneLink's submissions.

[20]     PRTC's paragraph 46 states: "OneLink admits that the TRB never refused to accept any OneLink submission and that it was able to voice all of its concerns to the TRB."  PSMF ¶ 46.  OneLink qualified paragraph 46 using the same arguments it provided for paragraphs 26, footnote 6, *supra,* and 28, footnote 19, *supra*.  For the reasons provided in footnotes 6 and 19, the Court affirms in part and denies in part paragraph 46, as outlined in the amended record for PSMF ¶ 28.

[21]     PRTC's paragraph 54 originally stated: "Despite having nothing to gain (but delay), OneLink appealed the TRB's second rejection of OneLink's second request for intervention to the Puerto Rico Court of Appeals, on no basis – according to OneLink's (30)(b)(6) witness on sham litigation – other than that it "was the next forum available."  PSMF ¶ 54.  OneLink denied paragraph as argument and legal conclusion, not fact, and therefore improper under D.P.R. LOC. R. 56(b).  DRPSMF ¶ 54.
        The Court agrees and amends the record accordingly.  The Court also amends the record to reflect OneLink's objection to PRTC's assertion that the March 2, 2009 order was a "second rejection" of OneLink's January 13, 2009 motion to intervene.  *Id.*

application.[22]  PSMF ¶55; DRPSMF ¶ 55; DSMF ¶ 21; PRDSMF ¶ 21.  PRTC and the

TRB opposed OneLink's request for a stay of the second franchise proceeding from

the Puerto Rico Court of Appeals.  DSMF ¶ 20; PRDSMF ¶ 20.  On March 11, 2009,

the TRB stated in an emergency motion to the Puerto Rico Court of Appeals for oral

argument that the case presented "a dispute of a highly technical nature that involves

important principles of federal and state public policy that have never been taken up

by the courts in this country."  DSMF ¶ 18; PRDSMF ¶ 18.  The Puerto Rico Court of

Appeals granted oral argument on the appeal of the TRB's denial of OneLink's

intervention petition.  DSMF ¶ 19; PRDSMF ¶ 19.  On March 31, 2009, the Puerto

Rico Court of Appeals denied the appeal, holding that OneLink had no right to

intervene, stating:

> we are convinced that after the permits or franchises are issued, the
> right of OneLink to intervene arises . . . .  Therefore, it is at said stage
> that it is proper to apply the rules relative to the request for intervention
> contained in the L.P.A.U. and in the administrative regulations about
> adjudicative of the agencies concerned in the matter.
>
> To render a different opinion would reduce speed and efficiency in the
> procedure established by the [TRB] to evaluate the franchise
> applications that are presented before them and would go against . . .
> the clear public policy established by virtue of the 1996
> Telecommunications Act.[23]

PSMF ¶ 56; DRPSMF ¶ 56.

---

[22]    OneLink objected to the use of the term "at the same time" as being vague, and denied that
paragraph 55 had a discernable relationship to those that preceded it.  DRPSMF ¶ 55.  The Court
adjusted the record slightly to accommodate this objection.
[23]    OneLink denied PRTC's original paragraph 56 on grounds that PRTC was not providing the
full context of the TRB decision.  DRPSMF ¶ 56.  The Court has expanded on the record to address
OneLink's concerns.

In addition to the following four motions filed by OneLink with the TRB between January 30, 2009 and March 2, 2009 – (1) Motion to Vacate or Stay Confidentiality Determinations and Enforce Board Confidentiality Procedures (filed January 30, 2009, denied March 2, 2009); (2) Urgent Motion to Dismiss PRTC's Application (filed Feb. 25, 2009, no decision by TRB), (3) Urgent Motion of OneLink for an Extension of Time to File Comments, for the Establishment of a Reply Comment Cycle, and for a Revised Hearing Schedule (filed February 11, 2009, denied Mar. 2, 2009); and (4) Motion of OneLink for an Order Requiring PRTC to Report the Results of the Beta-Testing it Conducted Pursuant to the Board's 12/17/08 Resolution and Order (March 2, 2009, no decision by TRB) – OneLink also filed three motions and memoranda with the TRB after the Puerto Rico Court of Appeals denied its appeal on March 31, 2009: (1) Emergency Motion to Show Cause (filed April 7, 2009); (2) Opposition to PRTC's Motion to File Reply Comments (filed April 23, 2009, denied May 13, 2003); and (3) Motion to Set Aside Public Hearing (filed April 27, 2009, denied May 1, 2009). [24],[25]   PSMF ¶ 57; DRPSMF ¶ 57; PSAMF ¶ 6; DRPSAMF ¶ 6.

---

[24]     OneLink denied PRTC's original paragraph 57, objecting to its connotations that its motions "delayed or otherwise affected the pace of the TRB's consideration of PRTC's franchise application." DRPSMF ¶ 57.  Reviewing the evidence in the light most hospitable to OneLink, the record does not support a finding that these petitions slowed down the application review process.  The Court adjusts the record accordingly.

[25]     PRTC's paragraph 6 originally stated: "In addition to the eighteen petitions identified in PRTC's motion for partial summary judgment, OneLink also sought to impose costs and delay on PRTC's application process with six additional requests for relief, all of which were either rejected or ignored by the TRB."  PSAMF ¶ 6.  OneLink denied the paragraph as unsupported.  DRPSAMF ¶ 6. The Court finds that PRTC's contention that OneLink "also sought to impose cost and delay" is argument not appropriate for summary judgment.  D.P.R. LOC. R. 56(b).  As such, the Court combines PSAMF ¶ 6 with PSMF ¶ 57, and adds those petitions cited by PRTC that are not already referenced in PSMF ¶ 57.  The sixth petition cited by PRTC is added to the appropriate section of the record. PSAMF ¶ 6, footnote 41, *infra*.  *August 1, 2011 Urgent Mot. of OneLink Requesting Access to Docs. and Opportunity to Prepare for Hr'g* (*Eloranto Decl*. Ex. 4) (ECF No. 272).

On May 20, 2009, the Supreme Court of Puerto Rico granted certiorari for OneLink's appeal of the TRB's order denying OneLink's motion to intervene in PRTC's second franchise application proceedings, as well as issuing a stay of the proceedings pending resolution of OneLink's appeal.[26]  PSMF ¶ 59; DRPSMF ¶ 59; DSMF ¶¶ 22, 28; PRDSMF ¶¶ 22, 28.  PRTC and the TRB opposed OneLink's request for a stay of the second franchise proceeding from the Puerto Rico Supreme Court. DSMF ¶ 27; PRDSMF ¶ 27.  OneLink quickly celebrated the stay, proclaiming "We Win"; Gov. George Pataki, a OneLink Board member and partner at the firm representing OneLink in the litigation, responded that securing the stay was "fantastic," and OneLink CEO Mr. Dorchester responded that "it'll be OK for you to speak up in the Chadbourne partners meeting about a 'volume discount' for anything over a million!!!!!!!!!"[27]  PSMF ¶¶ 31, 60; DRPSMF ¶¶ 31, 60.

---

[26]     PRTC's paragraph 58 stated:

> Based on nothing more than an alleged belief that the TRB "might not" address OneLink's concerns ruling on the franchise application, and with no explanation of how intervenor status might effect that, OneLink appealed the Appellate Court's rejection of its claimed intervention to the "the next forum available," this time the Puerto Rico Supreme Court.

PSMF ¶ 58.  OneLink denied this paragraph, asserting the statement is an argument and legal conclusion, not a fact, and is therefore improper and should be disregarded under D.P.R. LOC. R. 56(b). The Court agrees, *Medina*, 896 F.2d at 8, and paragraph 58 is excluded from the record.

[27]     PRTC's paragraph 31 originally stated: "The lack of a genuine interest in redressing grievance was vividly demonstrated when OneLink's owners and management celebrated – proclaiming "We Win" and "this is fantastic" – after the Puerto Rico Supreme Court issued a procedural stay of the TRB's consideration of PRTC's franchise application in May 2009." PSMF ¶ 31.  OneLink denied this paragraph, insisting the statement is not fact but instead argument and legal conclusion.  DRPSMF ¶ 31.  The Court agrees the majority of the statement is argument, not properly presented in a statement of material facts, *Medina*, 896 F.2d at 8, and adjusts the record to present only uncontested facts.

Additionally, PRTC's paragraph 60 cited to the same email relied upon in paragraph 31. PSMF ¶ 60.  Responding to OneLink's objections, DRPSMF ¶ 60, the Court excludes any argument and adjusts the record to include only undisputed facts.

On August 21, 2009, in an emergency application to the Puerto Rico Supreme Court seeking oral argument, the TRB stated: "This is a novel case with significant repercussions for the referenced industry and for administrative practices in this Country." DSMF ¶ 23; PRDSMF ¶ 23.  Similarly, on August 21, 2009, in a request to the Puerto Rico Supreme Court seeking oral argument, PRTC stated that the case "raises fundamental questions" and that it raised "a highly technical matter of considerable public interest that for the first time has been submitted before this Honorable Court."  DSMF ¶ 24; PRDSMF ¶ 24.  PRTC also stated: "Oral argument is particularly useful" where "there remains 'a gray area that needs to be analyzed and that is brought out in oral argument by the litigants.'"  DSMF ¶ 25; PRDSMF ¶ 25. The Puerto Rico Supreme Court permitted the parties oral argument on OneLink's appeal of the Court of Appeals' March 31, 2009 decision denying OneLink's intervention petition.  DSMF ¶ 26; PRDSMF ¶ 26.  The Puerto Rico Supreme Court denied the TRB's and PRTC's request that the Puerto Rico Supreme Court conduct an expedited review of OneLink's appeal of the Court of Appeals' March 31, 2009 decision denying OneLink's intervention petition.  DSMF ¶ 29; PRDSMF ¶ 29.

On June 9, 2010, more than a year after granting review, the Supreme Court of Puerto Rico affirmed the judgment issued by the Court of Appeals denying OneLink's request for intervention; in its decision the Puerto Rico Supreme Court wrote:

> [w]e must determine whether a competitor has the right to intervene in a proceeding to evaluate a cable television franchise application submitted by another company or if, on the contrary, this right only arises when an adjudicative proceeding is commenced to challenge the

approval or denial of the franchise, or if a complaint is filed. To do this analysis, it is necessary to examine and study the public policy that exists in Puerto Rico and at the federal level regarding cable television system telecommunications, and to analyze Chapter V of Law No. 170 of August 12, 1988, which is known as [the LPAU], which concerns the Procedure for Granting Licenses, Franchises, Permits and Similar Actions. Furthermore, we must similarly clarify the rule that this Court established in the case of *San Antonio Maritime v. Puerto Rican Cement Co.*

. . . .

As is evident, the right to intervene can only exist within an adjudicative proceeding. If this type of process does not exist, this right is nonexistent. This Court has only issued a declaration for the purpose of establishing that there is in effect an adjudicative proceeding when the regulatory entity, in this case the Regulatory Board, decides to grant or deny the franchise, license or permit and this decision is questioned or challenged. Never before have we made a declaration as to whether the nature of the adjudicative proceeding, and thus, the right to intervene is also present at the initial point when it is explained whether or not the requested franchise or license has been granted. In order to analyze this dispute, it is necessary to assess the legislative intention.[28],[29]

---

[28]     PRTC's paragraph 61 originally stated: "The Supreme Court held that "obvious[ly]" OneLink had no right to intervene because the franchise application was not an adjudicatory proceeding." PSMF ¶ 61. OneLink denied paragraph 61, arguing the court "never so held or stated" and clarified the court's holding by citing the language used in the opinion. DRPSMF ¶ 61. Moreover, OneLink asserted that the translation of the July 9, 2010 opinion from Spanish to English was "incomplete and imprecise," submitted its own certified translation, and indicated that the word "obvious" should instead be the word "evident." *Id.* (citing June 9, 2010 Op. at 36-39, *P.R. Tel. Co. d/b/a Claro TV, Telecomm. Regulatory Bd. of P.R. v. San Juan Cable LLC d/b/a OneLink Commc'ns,* CC-09-380 (*Grube Decl.* Ex. 15) (ECF No. 264-2).

        Viewing the evidence in the light most favorable to OneLink, the Court adopts the certified translation offered by OneLink and sustains OneLink's denial, altering the record to reflect the actual language from the Supreme Court of Puerto Rico's holding. Additionally, the Court excludes PRTC's paragraph 68 from the record, for the reasons discussed in this footnote and that the statement is an argument, not a fact, and is therefore improper under D.P.R. LOC. R. 56(b). *Medina,* 896 F.2d at 8.

        Additionally, in response to OneLink's cross-motion for summary judgment paragraph 32, PRTC asserts the translation reads: "As is obvious, the right to intervene may exist only in an adjudicative proceeding." PRDSMF ¶ 32. In doing so, however, PRTC makes no assertion that their translation is more complete or precise than OneLink's. Moreover, "evident" is defined as "clear to the vision or understanding." *Evident*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). "Obvious" is defined as "easily discovered, seen, or understood." *Id.* "Evident" is listed as the synonym for "obvious." *Id.* The Court finds no obvious or evident significance to this quibbling and overrules PRTC's denial of OneLink's paragraph 32.

[29]     PRTC's paragraph 62 originally stated: "The Court confirmed that intervention in a franchise proceeding before approval of the franchise is contrary to the law and the policy of the Puerto Rico Telecommunications Act." PSMF ¶ 62. OneLink denied this paragraph, contending the statement

PSMF ¶¶ 61-62; DRPSMF ¶¶ 61-62; DSMF ¶¶ 30, 32; PRDSMF ¶¶ 30, 32 (internal citations omitted).  The Puerto Rico Supreme Court's opinion was 46 pages long. DSMF ¶ 31; PRDSMF ¶ 31.  On June 30, 2010, and again on September 13, 2010, OneLink requested reconsideration by the Supreme Court, and on both occasions its request was denied.[30]  PSMF ¶ 64; DRPSMF ¶ 64.  On November 24, 2010, Board proceedings on PRTC's franchise application resumed after OneLink's Supreme Court appeal was rejected.[31]  PSMF ¶ 140; DRPSMF ¶ 140.  On January 3, 2011, PRTC supplemented its application "[i]n compliance with the Board's directives, and

---

was an argument and legal conclusion, not fact.  DRPSMF ¶ 62.  Additionally, OneLink denied PRTC's assertion, claiming that this issue was a matter of first impression before the Puerto Rico Supreme Court and only after "construing precedent, policy and legislative history" did it hold that OneLink had no right to intervene.  *Id.*

    Viewing the evidence in the light most hospitable to OneLink, the Court finds this statement is in part conclusory and alters PRTC's paragraph 62 to reflect the actual language used in the opinion to describe the court's analysis of the telecommunication laws and policies governing Puerto Rico and this analysis's subsequent impact on its holding.  This record evidence was supplied by OneLink's paragraph 32.  DSMF ¶ 32.

[30]    PRTC's paragraph 64 originally stated: "Based on nothing other than a procedural right to request reconsideration, OneLink twice requested reconsideration by the Supreme Court and was twice rebuffed.  PSMF ¶ 64.  OneLink denied the paragraph, contending the statement was an argument, as well as denying that it had no basis to twice request reconsideration.  DRPSMF ¶ 64. The Court agrees the assertion that the requests for reconsideration were based on "nothing other than a procedural right" is argument – not supported by the record cited by PRTC – and accordingly adjusts the record.

[31]    OneLink denied PRTC's paragraph 140.  DPRSMF ¶ 140.  In its denial, OneLink admitted that the proceedings on PRTC's franchise application resumed on November 24, 2010, and then provided background regarding the nature and substance of the Puerto Rico Supreme Court's decision while also asserting that OneLink was not notified by the TRB until December 21, 2010 that the application process had resumed.  *Id.*  The denial is unresponsive and is overruled.  Moreover, the TRB's November 24, 2010 Resolution and Order states that OneLink shall be served with notice, Nov. 24, 2010 Resolution & Order at 1, *P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 126) (ECF No. 248), and OneLink has provided no evidence that it was not served with the order until December 21, 2010.

given that in the intervening two years since the application was filed certain facts contained in the original application [had] changed."[32]  PSMF ¶ 141; DRPSMF ¶ 141.

### 3.      Motions to Recuse TRB President Sandra Torres

Before the TRB could set a hearing date, on January 20, 2011, OneLink filed a Motion to Recuse TRB President Sandra Torres from further involvement in the proceedings.[33]  PSMF ¶ 142; DRPSMF ¶ 142; DSMF ¶ 33; PRDSMF ¶ 33.  Sandra Torres was a former, over 30-year employee with PRTC before she became a TRB Commissioner, and had served as Secretary of PRTC's Board of Directors.  DSMF ¶ 35; PRDSMF ¶ 35.  While a TRB Commissioner, Ms. Torres and her husband have held pensions with PRTC.  DSMF ¶¶ 36-37; PRDSMF ¶¶ 36-37. The Senate of Puerto Rico Report on Appointment of Ms. Sandra E. Torres Lopez as Chair of the

---

[32]     PRTC's paragraph 141 originally stated: "On January 3, 2011, PRTC supplemented its application given the two years of delay since its December 2008 submission."  PSMF ¶ 141.  OneLink denied the statement, contending "PRTC has proffered no evidence . . . that PRTC supplemented its application in response to any delay, that there in fact had been any delay, or that OneLink was responsible for any such delay. PRTC supplemented its application on January 3, 2011, because the TRB ordered it to do so."  DRPSMF ¶ 141.  Reviewing the evidence in the light most favorable to OneLink, the Court affirms OneLink's denial, and adjusts the record using PRTC's own language as to why it supplemented its franchise application.  Jan. 3, 2011 Supp. to Application for Authorization to Provide Video Service at 1, *P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 127) (ECF No. 248).

[33]     PRTC's paragraph 142 originally contended that OneLink argued in its Motion to Recuse that "the TRB's consideration of PRTC's franchise must sit in abeyance until the TRB ruled on its Motion."  PSMF ¶ 142.  OneLink denied the paragraph in its entirety, arguing that PRTC provided no evidence that the TRB was unable to set a hearing date between November 24, 2010 and January 20, 2011, and noting that OneLink did not argue in its motion that consideration of the franchise application had to "sit in abeyance" until a ruling on the Motion to Recuse.  DRPSMF ¶ 142 (citing Jan. 20, 2011 OneLink Motion for Recusal of President Torres at 3-8, *In re: P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 128) (ECF No. 248)).  The Court overrules the denial as it pertains to the impact of the Motion to Recuse on the hearing date.  The Court interprets PRTC's assertion to mean that a hearing date had not been set by January 20, 2011, not that the TRB was unable to set a date due to the Motion to Recuse.  However, the Court agrees that OneLink never argued in its motion that consideration of the franchise application could not occur until the TRB ruled on its motion; instead, OneLink requested that the TRB "expunge from the record any information relating to President Torres' involvement to date in the Second Franchise Proceeding."  *Id.* at 8.  The Court removed this section of PRTC's paragraph 142.

22

Telecommunications Regulatory Board reported that "[t]he nominee was asked about how matters related to the PRTC would be addressed within the Board. The nominee emphatically indicated that she would refrain from these matters . . . ."[34]  DSMF ¶ 34; PRDSMF ¶ 34.  OneLink argued that Commissioner Torres must recuse herself from PRTC's franchise proceeding because, inter alia, she had been a former employee of PRTC and was receiving a pension from PRTC.[35]  PSMF ¶ 143; DRPSMF ¶ 143.

President Torres submitted the matter to the Puerto Rico Governmental Ethics Office.  PSMF ¶ 144; DRPSMF ¶ 144.  On March 29, 2011, the Ethics Office issued an opinion finding that President Torres "need not recuse [herself] from intervening before the Board and any other venue, as President and Associate Member of the Board, in [PRTC's franchise proceeding]" because the pension did not constitute a "monetary interest in PRTC" and because she "did not intervene or participate, directly, or indirectly, in [PRTC's IPTV project] while [she] was employed by PRTC."[36]

---

[34]     OneLink's paragraph 38 stated:

> While the second franchise application was pending, the media reported that Commissioner Torres was "the only one who has spoken openly in favor of granting the franchise to Claro" and that "Torres reaffirmed her intention to endorse the granting of the cable franchise once she has confirmed that it is a decision that will benefit consumers."

DSMF ¶ 38.  PRTC objected to the statement, arguing the news article is unauthenticated hearsay under FED. R. EVID. 802.  PRDSMF ¶ 38.  The Court agrees and excludes that statement from the record as an out-of-court declaration offered to prove the truth of the matter asserted.  FED. R. EVID. 801(c).

[35]     OneLink admitted PRTC's paragraph 143 with the qualification that "Commissioner Torres' former employment by, and receipt of a pension from, PRTC were not the only reasons that OneLink argued required her recusal from PRTC's franchise proceeding."  DRPSMF ¶ 143.  Having reviewed the record, the Court affirms OneLink's qualification and adjusts the record to note there were other grounds it argued for Commissioner Torres' recusal.

[36]     OneLink denied PRTC's paragraph 145.  DRPSMF ¶ 145.  Specifically, OneLink admitted the language cited by PRTC was accurate, but also noted that the "Ethics Office advised that President

PSMF ¶ 145; DRPSMF ¶ 145.  On April 6, 2011, seventy-six days after OneLink filed the Motion to Recuse with the Board for its consideration, the TRB scheduled a hearing on PRTC's Franchise Application for April 27, 2011.[37]  PSMF ¶ 146; DRPSMF ¶ 146.

According to OneLink Board Member former Governor Pataki, OneLink "felt that the TRB was unduly influenced by PRTC."  PSMF ¶ 147; DRPSMF ¶ 147.  In particular, OneLink thought the TRB was unfair because "the new chair of the TRB [Sanda Torres] had worked . . . for PRTC" and OneLink "felt that she would be unduly siding with PRTC regardless of the merits of [OneLink's intervention] application."  PSMF ¶ 148; DRPSMF ¶ 148.  "[O]utraged that someone who had worked at PRT[C] . . . could be in a position of making decision[s] and regulating PRTC," Governor

---

Torres 'must recuse [herself] from participating . . . in those cases . . . in which the PRTC appears as a party and [she] participated, directly or indirectly, while [she] w[as] an employee,'" and that the Ethics Office "did not address the statement made by Commissioner Torres to the Puerto Rico Senate during her confirmation proceedings that she would recuse herself from all PRTC matters."  *Id.* (citing *Mar. 29, 2011 Ethics Op. at 4,* OPC-11- 165 (*Carson Decl.* Ex. 129) (ECF No. 248)).  This denial is unresponsive and is overruled.

[37]      PRTC's paragraph 146 originally stated: "After the delay caused by OneLink's recusal motion, the Board scheduled a hearing on PRTC's Franchise Application for April 27, 2011."  PSMF ¶ 146.  OneLink denied the statement, arguing that PRTC has proffered no evidence that the TRB spent time between January 20, 2011 and April 27, 2011 "considering OneLink's motion or that OneLink's motion in any way delayed or otherwise affected the pace of the TRB's consideration of PRTC's franchise application during that period or that the TRB was unable to set a hearing during that period."  DRPSMF ¶ 146.  Viewing the evidence in the light most favorable to OneLink, the Court agrees that PRTC has proffered no evidence that OneLink's motion delayed the TRB's consideration of PRTC's franchise application.  However, the Court concludes that the evidence establishes, at the very least, that the motion was filed for the TRB's consideration, regardless of whether the TRB actually considered it.  In addition, by the Court's count, seventy-six days passed between the filing of the Motion to Recuse and the setting of the franchise application hearing.  As such, the Court adjusts the record to show that the Motion to Recuse was filed for the TRB's consideration and that seventy-six days passed between the filing of the Motion and the Resolution and Order setting the hearing date on PRTC's franchise application.  *See* Jan. 20, 2011 OneLink Motion for Recusal of President Torres at 3-8, *In re: P.R. Tel. Co. d/b/a Claro TV,* JRT-2008-CCG-0002 (*Carson Decl.* Ex. 128) (ECF 248); Apr. 6, 2011 Resolution & Order, at 1, *P.R. Tel. Co. d/b/a Claro TV,* JRT-2008-CCG-0002 (*Carson Decl.* Ex. 130) (ECF No. 248).

Pataki met with Puerto Rico Governor Fortuno in August 2011 to tell him that OneLink "didn't think it's fair to have someone who worked for PRTC in the position of making decisions and regulating PRTC."[38],[39]  PSMF ¶ 149; DRPSMF ¶ 149.  On November 16, 2011, after the TRB granted PRTC's franchise application, OneLink renewed its request to recuse Commission Torres by filing a Motion for Vote of No Confidence and Disqualification of Commissioner Sandra Torres.[40]  PSMF ¶ 151; DRPSMF ¶ 151.

---

[38]    OneLink denied PRTC's paragraph 149, asserting that Governor Pataki did not meet with Governor Fortuno for the purpose of "tell[ing] him" about OneLink's concerns regarding the TRB,  but rather that the meeting was to address "a lot of issues."  DRPSMF ¶ 149 (citing *Pataki Dep.* at 44:4-46:10 (*Carson Decl.* Ex. 114) (ECF No. 248) (*Pataki Dep.*).  Viewing the evidence in the light most favorable to OneLink, the Court overrules its denial.  The record demonstrates that Governor Pataki went to Puerto Rico for the "urgent matter" of discussing the appointment of Sandra Torres.  *Id.* at 47:9-48:16.

[39]    PRTC's paragraph 150 states: "In response, Governor Fortuno 'laughed, and … said anybody who knows anything about telecommunications in Puerto Rico has worked for PRTC. If I didn't have anybody from PRTC working at the TRB there wouldn't be anybody at the TRB.'"  PSMF ¶ 150.  OneLink objected to the paragraph, arguing that "Governor Pataki's hearsay recollection of Governor Fortuno's statements constitutes admissible evidence to the extent that it is being offered for the truth of the matter asserted."  The Court sustains the objection and excludes as hearsay paragraph 150 from the record.  FED. R. EVID. 802

[40]    PRTC's paragraph 151 originally stated: "Despite the Ethics Opinion and the clear message from Puerto Rico's Governor, OneLink still renewed its request to recuse Commission Torres even after the TRB granted PRTC's franchise application."  PSMF ¶ 151.  OneLink denied the statement, arguing its motion for a vote of no confidence and disqualification was based on different grounds than OneLink's earlier recusal motion, as well that there was no "clear message from Puerto Rico's Governor" on the subject.  DRPSMF ¶ 151.  The Court excludes any reference to Governor Fortuno's comments for the reasons stated footnote 39, *supra*.  Moreover, in reviewing the evidence in the light most hospitable to OneLink, the Court determines that OneLink's November 16, 2011 motion was filed on different grounds than its January 20, 2011 motion to recuse, and accordingly adjusts the record.  Nov. 16, 2011 Mot. for Vote of No Confidence and Disqualification of Comm'r Sandra Torres, *In re: P.R. Tel. Co. h/n/c/ Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 132) (ECF 248); Jan. 20, 2011 OneLink Mot. for Recusal of President Torres at 3-8, *In re: P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 128) (ECF 248).

### 4.      Approval of PRTC's Franchise Application

On August 1, 2011, OneLink filed an Urgent Motion Requesting Access to Documents and Opportunity to Prepare for Hearing.[41]  PSAMF ¶ 6; DRPSAMF ¶ 6. During the August 8, 2011 public hearing in the second franchise proceeding, the TRB did not allow OneLink to cross-examine witnesses, and no interested party – including OneLink – was allowed to observe any of PRTC's testimony deemed confidential.[42]  DSMF ¶ 40; PRDSMF ¶ 40.  On August 19, 2011, the TRB approved a Resolution and Order approving PRTC's franchise application, and a notification of the decision was published on November 2, 2011; in her dissenting opinion published on November 3, 2011, Commissioner Torres asserted that the November 2, 2011 notification was "null and contrary to law," elaborating:

> Mr. Vicente Aguirre Iturrino officially ended his term of office as Associate Member of the Board on September 12, 2011. Nevertheless, said term was extended until October 3, 2011, until the appointment of the new associate member.
>
> On October 4, 2011, Mrs. Gloria Escudero Morales began to perform her duties as Associate Member of the Board.

---

[41]      *August 1, 2011 Urgent Mot. of OneLink Requesting Access to Docs. and Opportunity to Prepare for Hr'g* (*Eloranto Decl.* Ex. 4) (ECF No. 272).  *See* footnote 25, *supra*.

[42]      OneLink's paragraph 40 originally stated: "The TRB did not allow OneLink to cross-examine witnesses or to hear all of PRTC's testimony, during the August 8, 2011 public hearing in the second franchise proceeding."  DSMF ¶ 40.  PRTC denied this statement, contending that OneLink was allowed to hear all of PRTC's testimony, but that during the confidential portion of the hearing the public was not permitted to attend.  PRDSMF ¶ 40.  PRTC also admits that OneLink was not allowed to cross-examine witnesses.  *Id.*  Both parties cite the same portion of the record.  *Feb. 14, 2014 Decl. of Omar E. Martinez Vazquez*, at ¶ 3 (ECF No. 265).  PRTC also cited Nov. 8, 2011 Resolution & Order at 9, *In re: PRTC h/n/c ClaroTV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 77) (ECF No. 248); however, this portion of the record is unresponsive and not relevant to OneLink's paragraph 40.

Viewing the evidence in the light most favorable to PTRC, the Court concludes that the TRB permitted OneLink (along with all other interested parties) to hear PRTC's testimony during the hearing, but did not permit it to hear any testimony during confidential portions of the hearing.  The Court affirms PRTC's denial in part and overrules its denial in part and adjusts the record to reflect the Court's findings.

. . .

On October 20, 2011, a Board Session was held; on that occasion, the [August 19, 2011] Decision and Order pending approval was not discussed. Nevertheless, on that same day of October 20, with the Session still being held, Mrs. Santini Hernández and Mr. Aguirre Iturrino, who was in the Board facilities, in the office occupied by Mrs. Santini, proceeded to sign a Decision and Order, prepared by both of them and which is substantially different from the one that was submitted by the Official Examiner, the terms and conditions of which were approved in sessions held on August 11 and 19, 2011.

Said Draft Decision and Order signed by Mrs. Santini Hernández and the former Associate Member, Mr. Aguirre, was sent to the Secretary´s Office in order to have it certified and notification made. On November 2, 2011, notification was made of the Decision and Order prepared and signed by Mrs. Santini and former Associate Member Aguirre.

The notification made on November 2 of the Decision and Order is null and contrary to law, since it is not strictly what was approved in the sessions of August 11 and 19, 2011. Mrs. Santini Hernández and Mr. Aguirre Iturrino carried out an ultra vires action, i.e., without authority under law that would support such an action.[43]

DSMF ¶¶ 41-44; PRDSMF ¶¶ 41-44.  The November 2, 2011 TRB Resolution and

Order stated:

---

[43]     OneLink's paragraph 41 originally stated: "On August 19, 2011, the TRB approved a Resolution and Order approving PRTC's franchise application."   DSMF ¶ 41.  PRTC denied this statement, contending "the November 2, 2011 Resolution and Order was not a valid order because one signatory, Aguirre Iturrino, was not a commissioner of the TRB on October 20, 2011, when the order was signed."  PRDSMF ¶ 41.  PRTC's denial is based on a dissenting opinion by Commissioner Torres published on November 3, 2011.  Nov. 3, 2011 Dissenting Op. of Comm'r Sandra Torres Lopez at 4, *In re: PRTC h/n/c ClaroTV*, JRT-2008-CCG-0002 (*Grube Decl.* Ex. 22) (ECF No. 264).
        Reviewing the evidence in the light most hospitable to PRTC, the Court determines that TRB published a Resolution and Order on November 2, 2011, and that on November 3, 2011 Commissioner Torres issued a dissent asserting that the order was null and contrary to law.  The evidence relied upon by PRTC does not establish that order was "not valid," only that Commissioner Torres dissented to the order, contending that it was not valid.  To clarify this point, the Court expands the record to provide a section of Commissioner Torres' reasoning for her dissent.  This expansion of the record also incorporates the content cited in OneLink's paragraphs 43-44.  *See* DSMF ¶¶ 43-44.
        Finally, PRTC raises the same or substantially the same objection to OneLink's paragraphs 41-48.  PRDSMF ¶¶ 41-48.  By addressing the objection to OneLink paragraph 41 here, the Court also responds to PRTC's denials to OneLink's paragraphs 42-48.

> PRTC has been building the IPTV network that would be used to provide
> the proposed service since approximately March 2007.  On that date and
> as of today, PRTC does not have a cable TV franchise issued by the
> Board.
>
> Chapter III, Article 9, section (7) of Act 213 provides: 'No cable company
> may construct or operate a cable system, in whole or in part, in Puerto
> Rico without having previously had a franchise under this article for
> said construction or operation.'

DSMF ¶ 45; PRDSMF ¶ 45.   The TRB also wrote in the Resolution and Order that

"[u]pon examining the documents and the evidence submitted by PRTC in relation to

the costs that it will have to incur or that are charged in providing IPTV service, it

was established that it will incur cross subsidies."  DSMF ¶ 46; PRDSMF ¶ 46.  The

TRB further held in its November 2, 2011 Resolution and Order:

> [t]he Board has grounds to conclude that PRTC illegally built its IPTV
> network in violation of Act 213, Chapter III, Section 9(a)(1) of Act 213,
> which prohibits the construction and operation of a cable system and
> public easements without first obtaining the franchise (see 47 [U].S.C.
> Sections 541(a)(2) and (b)(1)).
>
> PRTC continued to build the IPTV network even after February 29,
> 2009, which is when PRTC withdrew its request for 'Special Temporary
> Authority' before the Board.
>
> . . .
>
> It is because of the above that the Board will begin an Order process to
> show cause for illegal construction of the system.

DSMF ¶ 47; PRDSMF ¶ 47.   The TRB concluded in its November 2, 2011 TRB

Resolution and Order:

> All the adjustments and requirements contained in this order are
> intended to put the petitioner on an equal footing with respect to the
> rest of the cable TV industry, protecting the development of competition
> both in the cable TV market and in the telecommunications market,

since it will be paying a fair price for the infrastructure used in compliance with federal provisions.

. . .

We conclude that it is beneficial to the public interest to grant the requested franchise in favor of Puerto Rico Telephone Company, Inc. d/b/a Claro TV, with the conditions detailed below:

(1) Comply with the adjustments to the Local Loop UNE cost, as required in this order as an essential condition. Comply with submitting the 'true-up' report explained in the Resolution and Order and obtain approval of the same by the Board.

(2) Submit all the information requested for the Board's evaluation.

(3) Make the necessary adjustments to comply with local and federal laws if the Board finds that, based on the analysis of the requested information, these are indispensable to make feasible the issuance of the franchise.

(4) Prepare and submit, as an attachment, a Code to protect the consumer, including aspects such as: penalties for early termination, charges for late payment, automatic renewal, etc. This code will be a working draft that the Board will use and that, when the Board finally approves it, will apply to the entire cable TV industry.

(5) Submit an expansion plan and technical details related to service quality, improvements in areas without service or poorly served areas.

(6) Three percent (3%) of its income is set as payment for franchise.

(7) To be able to start offering service to the public, it must have the Board's approval with regard to safeguards established as essential in this Resolution and Order and with those that may arise in response to the additional information being requested.

(8) Once the setup plan submitted by the petitioner is approved, the latter will submit a contract draft using existing ones as a basis, including the technical details of the network and all those essential conditions that are established in this Resolution and Order.

DSMF ¶ 48; PRDSMF ¶ 48.

On November 8, 2011, the TRB approved PRTC's franchise application but did not approve the franchise agreement necessary to PRTC's ability to offer IPTV service.[44]  PSMF ¶ 73; DRPSMF ¶ 73.  In its  November 8, 2011 Resolution and Order (published on November 16, 2011), the TRB reconsidered, revoked, and replaced the TRB Resolution and Order dated November 2, 2011.[45]  DSMF ¶ 49; PRDSMF ¶ 49. Sandra Torres and Gloria Escudero Morales represented the majority in the November 8, 2011 TRB decision.  DSMF ¶ 52; PRDSMF ¶ 52.  Prior to her service on the TRB, Gloria Escudero Morales was employed by PRTC for over 30 years.  DSMF ¶ 53; PRDSMF ¶ 53.  While a TRB member, Gloria Escudero Morales held a pension with PRTC.  DSMF ¶ 54; PRDSMF ¶ 54.  The TRB's November 8, 2011 Resolution and Order stated that "any party adversely affected by this Resolution and Order

---

[44]    OneLink admitted PRTC's paragraph 73 with qualification, noting:

> On November 2, 2011, the TRB issued an order granting PRTC's second video franchise application and imposing conditions on PRTC's franchise. Then, on November 8, 2011, the TRB under a new majority consisting of Commissioner Torres (who had dissented from the November 2 Order) and newly-appointed Commissioner Escudero (who had not participated in any hearings on the application or the November 2 Order)—both long-time former PRTC employees receiving PRTC pensions—rescinded the November 2 Order, including its conditions, and issued a new order granting PRTC's franchise. Neither of those orders approved or addressed the actual franchise agreement that was necessary for PRTC to operate its IPTV system. That agreement was subsequently negotiated between PRTC and the TRB.

DRPSMF ¶ 73. This issue is addressed footnote 45, *infra*.

[45]    PRTC denied OneLink's paragraph 49, asserting that the TRB "reconsider[ed]" the November 2, 2011 Resolution and Order, not that it "revoked and replaced" it.  PRDSMF ¶ 49.  In support of this argument, PRTC cites the TRB's November 8, 2011 resolution and order.  Nov. 8, 2011 Resolution & Order at 1, *In re: PRTC h/n/c ClaroTV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 77) (ECF No. 248). The order does state that it proceeds to "reconsider the *Resolution and Order*." *Id.*  However, OneLink provided testimony on the matter where PRTC admitted that the November 8, 2011 resolution and order "revoked and replaced" the November 2, 2011 resolution and order.  DSMF ¶ 49 (citing *Pl.'s Resp. & Obj. to Def.'s Req. for Admis., Interrog., and Req. for Produc. of Docs., Resp. to Req. for Admis. Nos.* 177 & 178 (*Grube Decl.* Ex. 38) (ECF No. 264)).

Viewing the evidence in the light most favorable to PRTC, the Court determines that the TRB "reconsidered" the November 2, 2011 Resolution and Order, but it also "revoked and replaced" it with the November 8, 2011 Resolution and Order, and accordingly adjusts the record.

may file a motion for reconsideration in the Secretary's Office of the [TRB], within the term of twenty (20) days, starting from the filing of the notice of this order in the case file." DSMF ¶ 50; PRDSMF ¶ 50. On November 15, 2011, however, before PRTC's franchise agreement was approved, OneLink again moved to intervene.[46] PSMF ¶ 75; DRPSMF ¶ 75; DSMF ¶ 51; PRDSMF ¶ 51.

It was not until February 1, 2012 that the TRB finally approved PRTC's franchise agreement, granting PRTC "a nonexclusive franchise to construct, install, maintain, extend and operate a closed system where subscription video service will be delivered using Internet Protocol over a broadband network, within the Franchise Area designated in the Franchise Agreement."[47] PSMF ¶ 74; DRPSMF ¶ 74. The February 1, 2012 Resolution and Order was served on February 8, 2012, and the TRB wrote that:

> the Board DETERMINES AND ORDERS that the Franchise Agreement between the Board and PRTC is APPROVED. . . . [P]arties wishing to oppose the grant of this franchise can use the recourse of reconsideration before the Board, by filing their petition within 20 days of the notification of this Resolution and Order. . . . '[T]his petition must be in writing, be duly motivated and demonstrate the legitimate and substantial capacity and interest of the person in the procedure.

DSMF ¶ 55; PRDSMF ¶ 55.

On February 13, 2012, OneLink filed a Notice of Automatic Stay of the Franchise Order and Agreement, claiming that the franchise proceeding and franchise agreement "is automatically stayed and without effect until after

---

[46]   OneLink provided an unresponsive, qualified admission to PRTC's paragraph 75 that the Court overrules.  DRPSMF ¶ 75.

[47]   OneLink provided an unresponsive, qualified admission to PRTC's paragraph 74 that the Court overrules.  DRPSMF ¶ 74.

termination of the adjudicative process and resolution of all filings opposing the Franchise, including the [petition in opposition to the franchise] filed on February 10, 2012 by OneLink." PSMF ¶ 127; DRPSMF ¶ 127. On April 4, 2012, the TRB issued a Resolution and Order concluding "that there is no legal provision supporting OneLink's position," and that a "simple reading of the beginning of the [very opinion cited by OneLink in support of its automatic stay position] . . . leaves no doubt that the decision has to do with a procedural aspect of the auction process, specifically petitions for reconsideration of awards at auctions." PSMF ¶ 128; DRPSMF ¶ 128.

On February 10, 2012, OneLink also filed a "Petition in Opposition to Franchise and in Further Support of 'Legitimate and Substantial Interest,' and Request for Immediate Access to the Administrative Record" in "further support of OneLink's 'legitimate and substantial interest' in this proceeding."[48]  DSMF ¶ 56; PRDSMF ¶ 56; PSMF ¶ 126; DRPSMF ¶ 126. On February 28, 2012, OneLink filed a "Petition for Reconsideration and in Further Support of Intervention" and stated that "[t]his petition supplements OneLink's February 10, 2012 Petition in Opposition to Franchise and in Further Support of 'Legitimate and Substantial Interest,' and Request for Immediate Access to the Administrative Record ("Initial Petition") that challenges the Board's grant of a 'franchise' to PRTC." PSMF ¶ 133; DRPSMF ¶ 133; DSMF ¶ 57; PRDSMF ¶ 57. The TRB stated in a March 9, 2012 Ruling and Order:

---

[48]     OneLink stated this petition was filed on February 13, 2012, but the record evidence shows it was filed on February 10, 2012.  Feb. 10, 2012 OneLink Pet. in Opp. to Franchise and in Further Support of "Legitimate and Substantial Interest," and Req. for Immediate Access to the Admin. Record, *In re: P.R. Tel. Co. d/b/a Claro TV*, JRT- 2008-CCG-0002 (*Carson Decl.* Ex. 117) (ECF No. 248).  This error is corrected for the record.

"The [TRB] will issue a definitive Ruling and Order on said Motion for Reconsideration within ninety (90) days of the date of its filing. In the event the [TRB] fails to take any action with regard to the Motion for Reconsideration within said ninety-day (90) period, it shall lose jurisdiction over the same, and a period of thirty (30) days in which to request a review shall begin to run upon the expiration of said ninety-day (90) day period."  DSMF ¶ 58; PRDSMF ¶ 58.  The TRB did not rule on OneLink's reconsideration motion within 90 days of March 9, 2012.  DSMF ¶ 59; PRDSMF ¶ 59.

In its April 4, 2012 Resolution and Order, the TRB held that it is only when the franchise agreement is final that "a person not originally considered a party by the Board can file a motion for intervention requesting the agency's decision be reconsidered, as long as: this request is written, well founded, and shows the legal capacity and substantial and legitimate interest that the petitioner has in the proceedings, [citing *Puerto Rico Tel. Co. v Telecommunications Regulatory Board of Puerto Rico*, 2010 TSPR 89, 179 D.P.R. 177 (2010)]."[49] PSMF ¶¶ 76, 134; DRPSMF ¶¶ 76, 134 (emphasis in TRB order).  The TRB appointed an Official Examiner to

---

[49]     OneLink denied PRTC's paragraph 76 as argumentative, not fact, and improper under D.P.R. LOC. R. 56(b).  DRPSMF ¶ 76.  OneLink admitted that PRTC accurately cited the TRB decision, but denies that "the TRB's legal conclusion, as stated therein, is correct, let alone that it was compelled at that time by the Puerto Rico Supreme Court's decision."  *Id.*  Regardless whether the TRB's legal conclusion is "correct," OneLink admitted the statement accurately quotes the TRB's order.  The Court denies OneLink's objection.
        Additionally, PRTC's paragraph 134 originally stated: "In its April 4, 2012 Resolution and Order, the TRB affirmed that OneLink could only file a motion "requesting the agency's decision be reconsidered" once the TRB determined that OneLink had a "substantial and legitimate interest" in PRTC's franchise proceeding."  PSMF ¶ 134.  OneLink denied this paragraph as incomplete and provided the full quote cited by PRTC.  DRPSMF ¶ 134.  The Court upholds the denial and incorporates the entirety of the sentence cited by PRTC into the record through PSMF ¶ 76.  *See* Apr. 4, 2012 Decision & Order at 7, *P.R. Tel. Co. h/n/c Claro TV*, FC-100 (*Carson Decl.* Ex. 1) (ECF No. 248).

determine whether OneLink had such an interest.  PSMF ¶ 135; DRPSMF ¶ 135.

The TRB also held in its April 4, 2012 Resolution and Order:

> This is why [OneLink's] premature motion to intervene dated November 15, 2011 (OneLink Motion to Intervene) was not admissible, because the starting point to request reconsideration of this Board's decision had not yet procedurally begun when PRTC filed the Franchise Request, nor when this Board ruled that the PRTC application complied with the legal requirements for awarding it, i.e. dating from November 8, 2011, but rather only after our ruling issued on February 1, 2012.  In other words, only when PRTC had complied with the preliminary conditions for negotiating a franchise contract and when the parties had effectively reached an agreement giving rise to the franchise contract FC-100.  Bear in mind that if PRTC had not complied with its conditions, there would have been no franchise; just as if the parties had not reached an agreement in the negotiations, there would have been nothing to challenge. Due to the aforementioned, the Decision and Order dated February 1, 2012, bore the necessary notice to comply with ruling [*Puerto Rico Tel. Co. v Telecommunications Regulatory Board of Puerto Rico*, 2010 TSPR 89, 179 D.P.R. 177 (2010)].[50]

PSMF ¶ 77; DRPSMF ¶ 77.

On July 9, 2012, the TRB set OneLink's intervention motion for a hearing on August 9, 2012.  DSMF ¶ 60; PRDSMF ¶ 60; PSAMF ¶ 11; DRPSAMF ¶ 11.  OneLink appeared at the August 9, 2012 intervention hearing, as did representatives of PRTC. PSAMF ¶ 12; DRPSAMF ¶ 12.  OneLink was given "the opportunity to present the evidence and arguments that it deemed appropriate for its claim for intervention" at

---

[50]       PRTC's paragraph 77 originally stated: "As the TRB noted, the time to intervene arises at this point because "if PRTC had not complied with its conditions [that were listed in the TRB's order approving the franchise application], there would have been no franchise."  PSMF ¶ 77.  OneLink denied PRTC's paragraph 77 as being argument, not fact, and improper under D.P.R. LOC. R. 56(b).  DRPSMF ¶ 77.  OneLink admitted that PRTC accurately cited the TRB decision, but denied that "the TRB's legal conclusion, as stated therein, is correct, let alone that it was compelled at that time by the Puerto Rico Supreme Court's decision."  *Id.*  Again, regardless of whether the TRB's legal conclusion is "correct," OneLink admitted that the statement accurately quotes the TRB's order.  The Court overrules OneLink's denial, but adds the full text of the paragraph of the TRB order cited by PRTC to better understand PRTC's paragraph 77.

the August 9, 2012 intervention hearing, but opted not to do so on the bases that, inter alia, they did not recognize the TRB's jurisdiction because it did not rule on OneLink's reconsideration motion within 90 days of March 9, 2012.[51]  PSAMF ¶ 13; DRPSAMF ¶ 13.

On May 9, 2012, the Court of Appeals issued a decision stating that it did not have jurisdiction to review the TRB's order because OneLink had not exhausted its administrative remedies, noting that the adjudicative process (through which OneLink could file a petition for reconsideration regarding PRTC's franchise) had not begun because the TRB had not yet decided whether OneLink had the right to

---

[51]    PRTC's paragraph 13 originally stated: "OneLink was given "the opportunity to present the evidence and arguments that it deemed appropriate for its claim for intervention" at the August 9, 2012 intervention hearing."  PSAMF ¶ 13.  OneLink denied this statement as unsupported, arguing that:

> By the time of the August 9, 2012 hearing, OneLink had filed an appeal to the Puerto Rico Court of Appeals seeking an order that (i) the TRB had lost jurisdiction for failing to resolve OneLink's motion for reconsideration in 90 days; (ii) OneLink should be allowed to intervene into PRTC's franchise proceeding in accordance with the OneLink v. Claro Supreme Court decision. . . .  OneLink also had pending at the time of the August 9, 2012 hearing a petition for certiorari to the Puerto Rico Supreme Court in which OneLink requested that the Court issue an order to the TRB to not permit PRTC to construct or operate its franchise until after OneLink's then pending motion for reconsideration was resolved.

> Given these pending appeals, OneLink could not participate (and therefore did not have the opportunity to present evidence and arguments) in the August 9 hearing (a point it made to the TRB in a letter on August 6, 2012), without jeopardizing its appellate position and losing the opportunity for appellate court assistance to ensure that Puerto Rico law was followed.  Accordingly, OneLink made a special, limited appearance at the August 9, 2012 hearing to make clear its view that the TRB had lost jurisdiction over the proceedings.

DRPSAMF ¶ 13.  Reviewing the evidence in the light most hospitable to OneLink, the record supports the conclusion that the TRB gave OneLink the opportunity to address its claim for intervention at the August 9, 2012 hearing, but also that OneLink declined to do so because, inter alia, it did not recognize the TRB's jurisdiction over the matter.  *Aug. 9, 2012 Minutes* at 1-2 (*Eloranto Decl.* Ex. 14) (ECF 272); *Aug. 6, 2012 Special Appearance Letter to TRB* (*Grube Decl.* 2 Ex. 6) (ECF No. 284).  The Court adjusts the record to incorporate why, as supported by the record evidence, OneLink declined to argue the intervention issue at the August 9, 2012 hearing before the TRB.

intervene in PRTC's franchise proceeding (i.e., the TRB had not yet decided whether OneLink had a "legitimate and substantial interest" in PRTC's franchise proceeding). PSMF ¶ 130; DRPSMF ¶ 130.  OneLink filed a motion for reconsideration of this decision on May 25, 2012, and the Court of Appeals denied it on May 30, 2012.[52] PSMF ¶ 131; DRPSMF ¶ 131.  On July 2, 2012, OneLink appealed the Court of Appeals' decision to the Puerto Rico Supreme Court.  PSMF ¶ 132; DRPSMF ¶ 132. The Supreme Court denied OneLink's certiorari petition on October 11, 2012.  *Id.*

OneLink filed a petition for review before the Puerto Rico Court of Appeals on June 27, 2012, regarding its petition for reconsideration of PRTC's franchise.[53]  PSMF ¶ 136; DRPSMF ¶ 136.  OneLink argued the TRB lost jurisdiction when it let ninety days pass without taking action on OneLink's petition for reconsideration.[54]  PSMF

---

[52]      PRTC's paragraph 131 originally stated: "As usual, OneLink filed a motion for reconsideration of this decision on May 25, 2012 and the court denied it on May 30, 2012."  PSMF ¶ 131.  OneLink objected to PRTC's use of the term "as usual" as argumentative and not a statement of fact to which any response is required.  DRPSMF ¶ 131.  The Court agrees and affirms OneLink's objection, removing the term "as usual" from the record.

[53]      PRTC's paragraph 136 originally stated: "Before the Official Examiner had time to determine whether OneLink had a 'legitimate and substantial interest' in PRTC's franchise proceeding, OneLink filed a petition for review before the Puerto Rico Court of Appeals on June 27, 2012 regarding its petition for reconsideration of PRTC's franchise."  PSMF ¶ 136.  OneLink denied this paragraph; this denial is addressed in part by and resolved through the admission of paragraph 137.  DRPSMF ¶ 136; *see also* PRTC ¶ 137; DRPSMF ¶ 137.  Moreover, PRTC submitted the original Spanish version of OneLink's June 27, 2012 Petition for Review in *San Juan Cable LLC, h/n/c OneLink Commc'ns v. TRB, et al.*, KLRA-2012-536 (*Carson Decl.* Ex. 123) (ECF No. 248), but failed to submit a certified translation of that petition as required by D.P.R. Loc. R. 5(g).  Having reviewed the record in the light most favorable to OneLink, the Court determines that OneLink filed a petition for review before the Puerto Rico Court of Appeals on June 27, 2012 regarding its petition for reconsideration of PRTC's franchise, Aug. 30, 2012 Op. at 4, *San Juan Cable LLC, h/n/c OneLink Commc'ns v. TRB, et al.*, KLRA-2012- 536 (*Carson Decl.* Ex. 124) (ECF No. 248), and affirms OneLink's objection as to whether the Official Examiner had time to determine whether OneLink had a "legitimate and substantial interest" in PRTC's franchise proceeding.  *See* March 9, 2012 Resolution & Order, *In re: PRTC h/n/c Claro TV*, JRT-2008-CCG-0002 (*Grube Decl.* Ex. 23) (ECF No. 264); Jul. 9, 2012 Resolution & Order at 2, *In re: P.R. Tel. Co. d/b/a Claro TV*, JRT-2008-CCG-0002 (Grube Decl. Ex. 25) (ECF No. 264).

[54]      OneLink admitted PRTC's paragraph 138, but qualified its admission in stating that "OneLink avers that the Puerto Rico Court of Appeals also noted in its decision that there are a number of exceptions to the exhaustion doctrine, including irreparable harm."  DRPSMF ¶ 138.  This qualification is unresponsive and is overruled.

¶ 137; DRPSMF ¶ 137.  On August 30, 2012, the Court of Appeals issued an opinion denying OneLink's request, stating it did not have jurisdiction to review OneLink's petition for reconsideration because OneLink had not exhausted its administrative remedies.  PSMF ¶ 138; DRPSMF ¶ 138.  The Court of Appeals noted that, as it had indicated in its May 9, 2012 Opinion regarding OneLink's automatic stay request, the adjudicative process (through which OneLink could file its petition for reconsideration) had not yet started because the TRB had not decided whether OneLink had the right to intervene in PRTC's franchise proceeding (i.e., the TRB had not decided whether OneLink had a "legitimate and substantial interest" in PRTC's franchise proceeding).  PSMF ¶ 139; DRPSMF ¶ 139.

### 5.   Cross-Subsidization Rulemaking Petitions

In its December 11, 2008 Franchise Application, PRTC stated that it would "comply[] with the applicable FCC rules on accounting, cost allocation and affiliate transactions" to "ensure that regulated rate-payers do not bear the burden of [PRTC's] provisions of video services and that the costs of the video service are kept separate from the costs of [PRTC's] regulated activities."[55]  PSMF ¶ 78; DRPSMF ¶ 78.  On July 22, 2009, OneLink filed a Petition for Rulemaking Regarding Cross-Subsidization, stating that "the [TRB] first should adopt rules to prohibit cross-subsidization" and that "only after those rules have been adopted should the [TRB]

---

[55]    OneLink admitted that PRTC used the quoted language in paragraph 78, but denied that these representations "constituted sufficient assurances to address the TRB's and OneLink's concerns regarding cross-subsidization . . . ."  DRPSMF ¶ 78.  This denial regarding the sufficiency of these representations is argument, not fact, is improper under D.P.R. Loc. R. 56(b), and is overruled.  *Medina*, 896 F.2d at 8.

further process [PRTC's] IPTV application."   PSMF ¶ 79; DRPSMF ¶ 79.   In its

Petition for Rulemaking, OneLink stated:

> the representation that PRTC will comply with the FCC rules is insufficient to protect OneLink and other competitors from unlawful cross-subsidization.   The FCC rules apply only to interstate telecommunications while the Board is charged with regulation of intrastate telecommunications. Thus, the FCC rules fail to address the relevant market. Despite the representation in the IPTV application, PRTC would be within its rights to later claim that the FCC rules are inapplicable or only partially applicable.
>
> In any case, the Board should not rely on and should not require OneLink and other competitors to rely upon petitioning the FCC to obtain relief against PRTC.   The Statement of Public Policy in Law 213 provides that it is the policy of Puerto Rico to 'concentrate the primary jurisdiction with regarding to the regulation of the telecommunications field in a single agency of the Commonwealth of Puerto Rico.   Doing so will be far more effect [sic] than relying upon the FCC to enforce rules that PRTC may later argue are not applicable to intrastate ILEC and IPTV services.
>
> The Board will recall that the Board found it difficult to obtain from [PRTC's corporate parent] America Movil specific and verifiable information with regard to the investment commitment.   Likewise, PRTC fails to explain how compliance with FCC rules would provide the Board with specific and verifiable information necessary to prevent cross-subsidization.[56],[57]

---

[56]      PRTC's paragraph 80 originally stated: "Obviously aware of PRTC's representation to its regulator that it 'will comply with the FCC rules on separate accounting,' OneLink stated that it 'should not be require[d] . . . to rely upon petitioning the FCC to obtain relief against PRTC [for cross-subsidy violations].'"  PSMF ¶ 80.  OneLink denied this statement, admitting that it was aware of PRTC's representations to the TRB regarding compliance with FCC rules on separate accounting, but denied PRTC's "highly selective quotation" accurately reflected OneLink's statement in its July 22, 2009 petition.   DRPSMF ¶ 80.   The Court affirms OneLink's denial and provides OneLink's full statement for context.

         Also, OneLink again denied that PRTC's representations in the second franchise application constituted sufficient assurances to address the TRB and OneLink's cross-subsidization concerns, as evidenced by the TRB's November 2, 2011 Resolution and Order and especially in light of the TRB's earlier November 2008 order rejecting PRTC's first franchise application.   *Id.*   Again, this denial regarding the sufficiency of these representations is argument, not fact, is improper under D.P.R. LOC. R. 56(b), and is overruled.   *Medina*, 896 F.2d at 8.

[57]      PRTC's paragraphs 111 and 116 stated: "On July 22, 2009, OneLink represented to the TRB that it understood that "The Statement of Public Policy in Law 213 provides that it is the policy of Puerto Rico to 'concentrate the primary jurisdiction with regarding to the regulation of the

PSMF ¶¶ 80, 111, 116; DRPSMF ¶¶ 80, 111, 116.  When the TRB did not take action on its Petition for Rulemaking, OneLink filed a mandamus petition in the Court of First Instance on November 4, 2009, and filed an amended mandamus petition on December 10, 2009.  PSMF ¶ 81; DRPSMF ¶ 81.

On January 13, 2010, the Puerto Rico Court of First Instance issued an opinion denying OneLink's mandamus request, holding that the TRB did not have the administrative duty to promulgate cross-subsidy rules.  PSMF ¶ 82; DRPSMF ¶ 82.  On June 30, 2010, the Puerto Rico Court of Appeals affirmed the Court of First Instance's opinion, stating "we do not find any principle in the law that imposes an administrative duty on the Board to regulate the prohibition of cross-subsidies.  On the contrary . . . the full analysis . . . and the legislative intent underlying [the telecommunications laws] suggest without a doubt that the regulation of the matter in dispute falls within the discretion of the Board."  PSMF ¶ 83; DRPSMF ¶ 83.  On July 23, 2010, OneLink filed a motion for reconsideration, which was denied by the Court of Appeals on August 5, 2010.[58]  PSMF ¶ 84; DRPSMF ¶ 84.

Regarding OneLink's cross-subsidy concerns, the TRB stated in its November 8, 2011 Resolution and Order approving PRTC's franchise application that "[f]rom

---

telecommunications field in a single agency of the Commonwealth of Puerto Rico.'"  PSMF ¶¶ 111, 116.  OneLink admitted the paragraph but qualified it by providing the context of the entire section of its July 22, 2009 petition to the TRB.  DRPSMF ¶¶ 111, 116.  This section was already provided in response to OneLink's objections to PRTC's paragraph 80, footnote 56, *supra*, and thus OneLink's qualifications to paragraphs 111 and 116 have been addressed.

[58]    PRTC's paragraph 84 originally stated: "On July 23, 2010, OneLink filed its inevitable motion for reconsideration. This motion was denied by the appeals court on August 5, 2010."  PSMF ¶ 84.  OneLink objected to the use of the term "inevitable" as argumentative and lacking any support in the record.  DRPSMF ¶ 84.  The Court affirms the objection and has removed "inevitable" from the record.

our review and analysis, we do not find any evidence whatsoever that leads us to conclude that the PRTC is not in compliance with the requirements imposed by . . . the FCC rules on crossed subsidies. We find no evidence that there is a crossed subsidy at present. . . . We conclude that the FCC rules, combined with the supervisory role of the Board, are measures for protecting the Puerto Rican consumer form the negative effects of a crossed subsidy."[59]  PSMF ¶ 85; DRPSMF ¶ 85.  In its February 1, 2012 Resolution and Order approving PRTC's franchise agreement, the TRB further stated that "no cross-subsidization is currently occurring because PRTC is not providing any IPTV service."  PSMF ¶ 86; DRPSMF ¶ 86.  In the context of the PRTC's second franchise application, the TRB – through its November 8, 2011 and February 1, 2012 Resolution and Orders – addressed cross-subsidization by noting that the FCC already has in place a comprehensive cross-subsidy regulatory scheme under parts 32 and 64 of the FCC rules and imposing requirements to insure compliance with this federal regulatory scheme; the TRB noted that cross-subsidization was a key issue in the denial of PRTC's first franchise application, and in its November 2, 2011 Resolution and Order the TRB found deficiencies in PRTC's

---

[59]      OneLink denied the first sentence of PRTC's paragraph 85 ("Regarding OneLink's alleged cross-subsidy 'concerns'"), and to support its concerns regarding cross-subsidization, cited the TRB's November 2, 2011 Resolution and Order and the TRB's earlier November 2008 order rejecting PRTC's first franchise.  DRPSMF ¶ 85 (citing Oct. 29, 2008 Resolution & Order at 7-8, *In re: Coqui.Net Corp. h/n/c Claro TV*, JRT-2008-CCG-0001 (*Carson Decl.* Ex. 59) (ECF No. 248); Nov. 2, 2011 Resolution & Order at 6, *In re: PRTC h/n/c Claro TV*, JRT-2008-CCG- 0002 (*Grube Decl.* Ex. 21) (ECF No. 264); Nov. 8, 2011 Resolution & Order, *In re: PRTC h/n/c Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 77) (ECF No. 248)).  The Court affirms OneLink's denial and accordingly adjusts the record.  See footnote 60, *infra*.

40

second franchise application regarding cross-subsidization.[60]  PSMF ¶ 87; DRPSMF
¶ 87.

### 6.    Illegal Buildout Complaints

In December 2008 PRTC requested and was given authority by the TRB to
conduct a test of IPTV related capabilities.  PSMF ¶ 34; DRPSMF ¶ 34.  The proposed
test involved the provision of certain services to 200 PRTC employees' homes.  *Id.*  On
January 13, 2009, OneLink, which was not an intervenor, challenged the grant of the
Special Temporary Authority (STA) by the TRB.   PSMF ¶ 88; DRPSMF ¶ 88.
OneLink filed a complaint in this Court on February 10, 2009, and another on April
2, 2009, both requesting an injunction against PRTC's construction of its IPTV
network under the STA that had been approved by the TRB.[61]  PSMF ¶ 17; DRPSMF

---

[60]      PRTC's paragraph 87 originally stated: "In the context of the PRTC application, the TRB
addressed cross-subsidization by noting that the FCC already has in place a comprehensive cross-
subsidy regulatory scheme under parts 32 and 64 of the FCC rules and imposing requirements to
insure compliance with this federal regulatory scheme."  PSMF ¶ 87.  OneLink denied PRTC's
paragraph 87 as incomplete, noting that the TRB had previously addressed OneLink's concerns
respecting cross-subsidies.  DRPSMF ¶ 87 (citing Nov. 8, 2011 Resolution & Order at 5, *In re: PRTC
h/n/c Claro TV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 77) (ECF No. 248); Feb. 8, 2012 Resolution &
Order at 2, *In re: PRTC h/n/c Claro TV*, JRT-2008-CCG-0002 (Carson Decl. Ex. 78) (ECF No. 248);
Nov. 2, 2011 Resolution & Order at 6, 9-10, *In re: PRTC h/n/c Claro TV*, JRT-2008-CCG-0002 (*Grube
Decl.* Ex. 21) (EC; Oct. 29, 2008 Resolution & Order at 5, *In re: Coqui.Net Corp. h/n/c Claro TV*, JRT-
2008-CCG-0001 (*Carson Decl.* Ex. 59) (ECF No. 248).
          The Court recounts the facts in the light most hospitable to OneLink's case theories consistent
with record support.  *Gillen*, 283 F.3d at 17.  The Court affirms OneLink's denial and adjusts the
record to reflect the full progression of the TRB's consideration of cross-subsidization.
[61]      PRTC's paragraph 17 originally stated: "In addition to its federal court lawsuits, on July 15,
2009, OneLink filed a state court lawsuit alleging that PRTC violated the Puerto Rico
Telecommunications Act by illegally building a cable system, and requested a preliminary injunction."
PSMF ¶ 17.  OneLink objected to the "vague references to 'federal court lawsuits,'" arguing:

> On February 10, 2009, OneLink filed a complaint requesting an injunction against
> PRTC's operation and construction of its IPTV network under a 'Special Temporary
> Authority' or "STA" that had been approved by the TRB. This Court found a likelihood
> of success on the merits on OneLink's claim and, in response, PRTC and the TRB
> agreed to dissolve the STA. After OneLink discovered that PRTC was continuing to
> illegally build its network, it sought to reopen the first action, but this Court suggested
> that OneLink file a new complaint so that the parties could go directly to the merits.

¶ 17. On July 15, 2009, OneLink filed a state court lawsuit alleging that PRTC violated the Puerto Rico Telecommunications Act by illegally building a cable system, and requesting a preliminary injunction. *Id.*

OneLink admitted that it probably would not have been harmed by the STA "if you look[ed] at it independently," and regarding the surrounding circumstances of the STA and their challenge to the IPTV testing, OneLink submitted:

> we had concerns that we shared that were not acted upon. [PRTC's second franchise application] was suddenly an expedited process, that we had asked the [TRB] to address certain issues, certain elements that were not addressed. Suddenly, now it's going on a fast tract. Something smelled fishy. You know, we needed to get to the bottom of it.
>
> . . . .
>
> [A]dvice of counsel is one component of the entire decision. There were the fact on the streets. There were the environments in which they were operating. There were [PRTC] who – we all know what [PRTC] is. All these components made it to believe that we needed to continue down that path.[62]

---

OneLink did so on April 2, 2009. As this indicates, both "federal court lawsuits" actually related to the same issue, i.e., PRTC's continuing illegal construction and operation of its IPTV network.

OneLink admits that after this Court found that OneLink did not have a private cause of action under the specific Cable Act provisions alleged in the federal action filed on April 2, 2009, OneLink filed a state court lawsuit on July 15, 2009, alleging that PRTC violated the Puerto Rico Telecommunications Act by illegally building a cable system and requested a preliminary injunction, among other relief.

DRPSMF ¶ 17. Reviewing the evidence in the light most hospitable to OneLink, the Court expands on paragraph 17 to provide background regarding the two 47 U.S.C. § 521 (Cable Act) lawsuits filed in this Court. *See* Feb. 10, 2009 Verified Compl., *San Juan Cable LLC d/b/a OneLink Commc'ns v. TRB, et al.*, 3:09-cv-01119-GAG (*Carson Decl.* Ex. 90) (ECF No. 248); Apr. 2, 2009 Compl., *San Juan Cable d/b/a OneLink Commc'ns v. P.R. Tel. Co.*, 3:09- cv-1322-GAG (*Carson Decl.* Ex. 97) (ECF 248).

[62]      PRTC's paragraph 35 originally stated:

Well aware that the TRB's STA was for a limited test and did not amount to general permission to market IPTV services, and despite acknowledging that the test would have caused no harm to OneLink, OneLink still challenged the approval of the test by the TRB in federal district court. OneLink's basis? As explained by its 30(b)(6) witness

PSMF ¶¶ 35, 94; DRPSMF ¶¶ 35, 94; PSAMF ¶¶ 27-28; DRPSAMF ¶¶ 27-28. OneLink Board member Barrett Gilmer, one of the individuals responsible for approving the filing of the OneLink petitions at issue, testified that in his view the construction of a head end facility by PRTC prior to obtaining a franchise would be illegal; however, he could not recall OneLink's Cable Act claims.[63]  PSAMF ¶¶ 7, 25; DRPSAMF ¶¶ 7, 25.  OneLink CEO Ron Dorchester, whose deposition was taken after Mr. Gilmer's, did not believe that construction of a head end prior to receiving a cable franchise was illegal.  PSAMF ¶ 26; DRPSAMF ¶ 26.  Mr. Dorchester, one of

_____

on the sham litigation: "Something smelled fishy. You know, we needed to get to the bottom of it."

PSMF ¶ 35. OneLink denied this paragraph, submitting that the statement is an argument and legal conclusion, not a fact, and improper under D.P.R. Loc. R 56(b).  DRPSMF ¶ 35.  Reviewing the record in the light favorable to OneLink, the Court agrees that a significant portion of paragraph 35 is argument, not fact, excludes the arguments, and expands upon the record to provide greater context on the issue of harm and the STA.  *Khoury Dep.* at 48:3-20 (*Carson Dec*. Ex. 41) (ECF No. 248).

Additionally, PRTC's statement of material facts paragraph 94 and statement of additional material facts paragraph 27 are substantially similar to PSMF ¶ 35, and OneLink raised similar objections to each.  DRPSMF ¶ 94; DRPSAMF ¶27.  As such, PRTC's paragraphs 94 and 27 and OneLink's objections are incorporated into paragraph 35.

Finally, PRTC's statement of additional material fact paragraph 28 relies on the same or related testimony as PSMF ¶¶ 35, 94 and PSAMF ¶ 27.  PSAMF ¶ 28.  OneLink denied the statement as unsupported.  DRPSAMF ¶ 28.  For the reasons discussed in this footnote, the Court expands on the record cited by PRTC to provide greater context on why OneLink filed its Cable Act complaints.

[63] OneLink denied PRTC's paragraph 7 as unsupported, asserting that Mr. Gilmer did not know whether PRTC constructed a head end prior to receiving franchise approval, and that he was only "generally aware" that constructing video-related components of the plant before receiving a franchise was illegal.  DRPSAMF ¶ 7.  Having reviewed the evidence in the light most favorable to OneLink, the Court concludes that Mr. Gilmer did not know whether PRTC built a head end facility prior to receiving franchise approval but finds that Mr. Gilmer testified that if PRTC did build a head end prior to receiving franchise approval that it "would certainly be . . . illegal."  *Gilmer Dep*. 79:6-80:14 (*Eloranto Decl.* Ex. 8) (ECF No. 276).  The Court adjusts the end of PRTC's paragraph 7 to read "would be illegal" instead of "was illegal."

Additionally, PRTC's paragraph 25 originally stated: "OneLink Board member Barrett Gilmer could not recall OneLink's Cable Act claims but was certain that PRTC's conduct was illegal, including its construction of a head end prior to receiving a cable franchise."  PSAMF ¶ 25.  OneLink admitted that Mr. Gilmer could not recall the Cable Act claims, but, as in paragraph 7, denied that Mr. Gilmer knew the head end construction was illegal.  *Id.*  The Court includes in the record that Mr. Gilmer could not recall OneLink's Cable Act claims.

the individuals responsible for approving the filing of the OneLink petitions at issue, including OneLink's illegal construction petitions, testified that two of the reasons he believed PRTC was engaged in illegal construction included that he drove by some construction and that he saw a photograph in a newspaper article.[64]  PSAMF ¶¶ 8, 24; DRPSAMF ¶¶ 8, 24.  Russell Skinner, a technology consultant hired by OneLink, submitted a declaration in OneLink's first federal illegal construction suit supporting OneLink's claim that PRTC was engaged in illegal construction.[65]   PSAMF ¶ 9; DRPSAMF ¶ 9.  Jeffrey Marcus, a member of OneLink's Board of Directors testified regarding OneLink's federal filings after April 2, 2009: "I wanted to find a forum where our arguments could be heard without being blocked by technicalities, because I believed we were right."  DSFM ¶ 64; PRDSMF ¶ 64.

### a.   First and Second Cable Act Complaints

The February 10, 2009 federal lawsuit against the TRB and PRTC alleged violations of the Cable Act, 47 U.S.C. §§ 521-573.  PSMF ¶ 89; DRPSMF ¶ 89. OneLink requested a temporary restraining order.  PSMF ¶ 90; DRPSMF ¶ 90.  On

---

[64]      OneLink gave a qualified admission to PRTC's paragraph 8, noting that Mr. Dorchester was constrained by the requirements of not disclosing his knowledge of the alleged illegal build out that came from his legal counsel and was protected by attorney-client privilege, and as such provided only the two reasons stated in paragraph 8.  DRPSAMF ¶ 8.  After reviewing the record the Court agrees with this qualification and adjusts the record to reflect the constraints of attorney-client privilege by noting that there were two reasons Mr. Dorchester believed PRTC was engaged in illegal pre-franchise construction.  Mr. Dorchester may have had additional reasons.  These adjustments also address OneLink's denial of PRTC's paragraph 24.  PSAMF ¶ 24; DRPSAMF ¶ 24.  The Court does not include the additional testimony provided by OneLink from other members of OneLink's Board.

[65]      PRTC's paragraph 9 originally stated: "OneLink Chief Technology Officer Russell Skinner submitted a declaration in OneLink's first federal illegal construction suit supporting OneLink's claim that PRTC was engaged in illegal construction."  PSAMF ¶ 9.  OneLink denied that Mr. Skinner was their "Chief Technology Officer," contended that instead he was a technology consultant; OneLink admitted that Mr. Skinner signed a declaration that was submitted to this Court during the first Cable Act complaint.  *Id.*  The record supports OneLink's denial and is adjusted accordingly.

February 18, 2009, the Court issued an order to show cause.  PSMF ¶ 91; DRPSMF

¶ 91.  On February 20, 2009, after PRTC agreed to withdraw its request to test its

IPTV system through the STA, PRTC and the TRB submitted a joint response to

dismiss OneLink's case.  PSMF ¶ 92; DRPSMF ¶ 92.  Neither PRTC nor the TRB

argued that OneLink lacked standing to bring its claims; this Court and the First

Circuit, however, later concluded that OneLink lacked standing to bring its claims.[66]

DSMF ¶ 61; PRDSMF ¶ 61.  On February 24, 2009, the United States District Court

for the District of Puerto Rico issued an "ORDER DISMISSING CASE on mootness

grounds. The Regulatory Board's issuance of an order granting PRTC's request to

discontinue the beta test has rendered OneLink's request for relief moot."  DSMF ¶

62; PRDSMF ¶ 62; PSMF ¶ 93; DRPSMF ¶ 93.

On March 25, 2009, OneLink moved to re-open its Cable Act case, but instead,

the Court requested that OneLink file a new case challenging PRTC's alleged illegal

---

[66]     PRTC admitted OneLink's paragraph 61 but qualified it, observing that this Court and the
First Circuit concluded that OneLink lacked standing to bring its claims.  PRDSMF ¶ 61; *San Juan
Cable LLC v. P.R. Tel. Co.*, 623 F.Supp.2d 189, 195 (D.P.R. 2009); *San Juan Cable LLC v. P.R. Tel.
Co.*, 612 F.3d 25, 29, 32 (1st Cir. 2010). The Court adjusts the record to incorporate PRTC's qualified
admission. Additionally, PRTC's statement of additional material fact paragraph 10 asserted:

> Mr. Skinner testified that an "IPTV trial . . . with a group of 250 homes" performed by
> another of his clients, Hawaiian Telephone, a year before this client received a cable
> franchise was legal. This pre-franchise test by Mr. Skinner's client occurred before or
> during the time that OneLink filed its § 1983 claim and funded Choice's October 27,
> 2011 Complaint.

PSAMF ¶ 10.  OneLink denied this statement as unsupported, noting that Mr. Skinner was not an
attorney, but instead a technology consultant whose work was "exclusive to a laboratory environment
and assembling . . . brand-new technology that had never really been integrated before."  DRPSAMF
¶ 10; *Skinner Dep.* 134:9-14 (*Eloranto Decl.* Ex. 11) (ECF No. 276). The Court agrees that there is no
foundation for Mr. Skinner to give a legal opinion as to whether PRTC's actions were compliant with
federal law.  Moreover, as OneLink notes, "there is no foundational evidence that establishes that
whatever testing occurred in Hawaii was similar to what PRTC was doing."  DRPSAMF ¶ 10. The
Court excludes PRTC's paragraph 10 from the record.

pre-franchise construction.[67]  PSMF ¶ 95; DRPSMF ¶ 95.  On April 2, 2009, at the Court's suggestion, OneLink filed another complaint under the Cable Act alleging an illegal construction and operation of a cable system.[68]  PSMF ¶ 96; DRPSMF ¶ 96. On April 6, 2009, OneLink sought injunctive relief.  PSMF ¶ 97; DRPSMF ¶ 97.  On April 16, 2009, OneLink filed an amended complaint under the Cable Act, raising the same illegal construction and operation claims under 47 U.S.C. §§ 541(a)(2) and (b)(1), as well as new claims to address a private right of action under the Cable Act provisions alleged in the initial complaint.[69]  PSMF ¶ 98; DRPSMF ¶ 98.

On May 27, 2009, this Court dismissed OneLink's complaint for lack of standing.[70]  DSMF ¶ 61; PRDSMF ¶ 61.  On June 11, 2009, OneLink sent a letter to the U.S. Attorney for the District of Puerto Rico stating that "Judge Gelpí issued a decision finding that a private right of action to enforce the law does not exist. Therefore under the circumstances discussed [in the letter] the U.S. Attorney[']s

---

[67]     PRTC's paragraph 35 originally stated: "On March 25, 2009, OneLink moved to re-open its Cable Act case, but the Court declined."  PSMF ¶ 95.  OneLink denied this paragraph, citing *San Juan Cable LLC v. P.R. Telephone Co.*, 623 F.Supp.2d 189, 194 (D. P. R. 2009), to support its contention that OneLink did move on March 25, 2009, to re-open its original federal lawsuit challenging the STA, and instead of re-opening the case, the Court requested that OneLink file a new case challenging PRTC's alleged illegal pre-franchise construction.  DRPSMF ¶ 95.  The record supports OneLink's denial and is adjusted to reflect that the Court requested OneLink to refill its complaint.

[68]     OneLink admitted that it filed a second complaint under the Cable Act on April, 2, 2009, but qualified that it did so at the invitation of the Court and denied any suggestion that the new complaint was repetitive or frivolous.  DRPSMF ¶ 96.  The record supports OneLink's contention, footnote 67, *supra*, and the Court has included this qualification.

[69]     OneLink admitted paragraph 98 but qualified that its amended complaint also included new claims to address PRTC's new assertion that OneLink did not have a private right of action under the Cable Act provisions alleged in the initial complaint.  DRPSMF ¶ 98; Apr. 16, 2009 Am. Compl. at ¶ 58, *San Juan Cable d/b/a OneLink Commc'ns v. P.R. Tel. Co.*, 3:09- cv-1322-GAG (*Carson Decl.* Ex. 99) (ECF No. 248).  The record supports this qualification and is adjusted accordingly.

[70]     In its qualified admission to OneLink's paragraph 61, PRTC provided the record evidence that this Court dismissed OneLink's first Cable Act complaint on May 27, 2009.  PRDSMF ¶ 61.

Office is the only entity capable of enforcing the law."[71]  PSMF ¶ 99; DRPSMF ¶ 99.

Six days later, on June 17, 2009, OneLink appealed to the First Circuit, arguing there

was a private right of action to enforce § 541(b)(1) of the Cable Act.  PSMF ¶ 100;

DRPSMF ¶ 100.  On July 15, 2010, the First Circuit affirmed this Court's decision,

concluding as a matter of first impression that OneLink lacked standing to bring its

claim under the Cable Act.[72]  DSMF ¶ 61; PRDSMF ¶ 61.

> ### b.   Section 1983 and Cable Act Suit

On November 29, 2011, OneLink, with Choice Cable (Choice) as a co-plaintiff,

filed another federal lawsuit against PRTC, alleging violations of 42 U.S.C. § 1983

and the Cable Act.[73,74]  PSMF ¶¶ 101, 102, 123; DRPSMF ¶¶ 101; 102, 123.  OneLink

---

[71]     OneLink admitted that it sent a letter to the U.S. Attorney for the District of Puerto Rico containing the language quoted by PRTC but objected to OneLink's use of the word "confirmed" and denied there was any conflict between asking for executive relief given the law as the Court stated it, while also appealing the Court's judgment.  DRPSMF ¶ 99.  The Court replaced "confirmed" with "sent a letter" and inserted more of the quoted portion of the letter to expand the record and provide context, addressing OneLink's concerns about PRTC ¶ 99 and ¶ 100.  DRPSMF ¶¶ 99, 100.

[72]     In its qualified admission to OneLink's paragraph 61, PRTC provided record evidence for the date the First Circuit Court of Appeals affirmed this Court's dismissal of OneLink's first Cable Act complaint, as well as the fact that the First Circuit affirmed this Court's decision.  PRDSMF ¶ 61.

[73]     PRTC's paragraph 101 originally stated: "Despite several clear decisions that OneLink had no standing to assert a claim under the Cable Act, OneLink filed another federal lawsuit alleging that PRTC violated the Cable Act in November 2011."  PSMF ¶ 101.  OneLink objected to this statement as argument, not fact, and improper under D.P.R. Loc. R. 56(b).  DRPSMF ¶ 101.  The Court agrees and removes this language from paragraph 101.  Moreover, the record evidence does not support PRTC's assertion that "[d]espite several clear decisions that OneLink had no standing to assert a claim under the Cable Act of the franchise agreement."  D.P.R. LOC. R. 56(e) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted").  Additionally, in the record the Court includes that Choice Cable was a co-plaintiff in the action against the TRB.  *See* Nov. 29, 2011 Compl. for Inj. and Other Relief at 1, *San Juan Cable LLC d/b/a OneLink Commc'ns and P.R. Cable Acquisition Corp. d/b/a Choice Cable T.V. v. TRB et al.*, 3:11-cv-2152-DRD (*Carson Decl.* Ex. 103) (ECF No. 248).

[74]     PRTC's paragraph 102 originally stated: "On November 29, 2011, after the TRB approved PRTC's Franchise Application and was considering the Franchise Agreement, OneLink filed suit against the TRB in federal court alleging violations of Ku Klux Klan Act and, once again, the Cable Act."  PSMF ¶ 102.  OneLink admitted that it filed the federal lawsuit on November 29, 2011 but denied paragraph 102 on two grounds: (1) that the PRTC proffered no evidence that the TRB was "considering" PRTC's franchise agreement on or about November 29, 2011; and (2) that a 28 U.S.C. §

filed its § 1983 action because, in its view, PRTC was constructing a cable plant illegally using cross-subsidized funds; OneLink's complaint asserted as an additional basis the TRB's November 8, 2011 decision to, "at Defendant Torres' urging, suddenly and without explanation vote[] to eliminate the November 2, [2011] Order and grant PRTC a radically different franchise."[75]  PSAMF ¶ 29; DRPSAMF ¶ 29.  OneLink argued the TRB's November 2011 Order granting PRTC's franchise application "depriv[ed] Plaintiffs [OneLink and Choice] of their federally protected property rights, thus violating Plaintiffs' due process rights under the U.S. Constitution."[76] PSMF ¶ 125; DRPSMF ¶ 125.  At the same time, OneLink filed a Motion for a

---

1983, an action commonly referred to as an action under the Ku Klux Klan Act, suggests that OneLink engaged in "sham" conduct, as section 1983 is not limited to claims against members of the Ku Klux Klan or similar organizations.  DRPSMF ¶ 102.  After reviewing the record, the Court agrees that PRTC proffered no evidence that the TRB was considering PRTC's franchise agreement when the law suit was filed.  The Court alters the record to refer only to § 1983, not the KKK Act.

     Additionally, PRTC's paragraph 123 is nearly identical to paragraph 102.  PSMF ¶ 123. OneLink raised the same objections to paragraph 123 as to paragraph 102, DRPSMF ¶ 123, and the Court alters paragraph 123 as it did for paragraph 102.

[75]    PRTC's paragraph 20 originally stated: "OneLink filed its § 1983 action because, in its view, PRTC was constructing a cable plant illegally using cross-subsidized funds."  PSAMF ¶ 29.  OneLink admitted that Mr. Zachem's deposition identified illegal pre-franchise construction and cross-subsidization as two of the reasons for filing its November 29, 2011 complaint against the TRB but also argues "any suggestion that these were the only reasons is denied as unsupported," citing the complaint itself and providing other bases for filing, such as the actions of the TRB in rescinding its November 2, 2011 order.  DRPSAMF ¶ 29; *Zachem Dep.* 177:20-178:10 (*Eloranto Decl.* Ex. 9) (ECF 276); November 29, 2011 Complaint, *San Juan Cable d/b/a/ OneLink v. Telecom. Regulatory Bd. of P.R.*, No. 11-cv-02152 (D.P.R.) (Carson Decl. Ex. 103) (ECF 248).  Viewing the evidence in the light most hospitable to OneLink, the Court affirms its denial and provides additional record evidence regarding OneLink's stated reasons for filing its November 29, 2011 Section 1983 and Cable Act Complaint.

[76]    PRTC's paragraph 30 asserted that "OneLink Board member Brian Cassidy could not recall the § 1983 action."  PSAMF ¶ 30.  OneLink denied this statement as unsupported, contending that Mr. Cassidy recalled that OneLink filed the action, but he could not specifically recall the complaint itself.  DRPSAMF ¶ 30.  Viewing the evidence in the light most favorable to OneLink, the Court affirms its denial and excludes paragraph 30 from the record.  OneLink provides record evidence of other Board members' approval of the filing, and regarding the filing of the November 29, 2011 complaint Mr. Cassidy himself stated "I'm sure the Board was updated."  *Cassidy Dep.* 116:8 (*Eloranto Decl.* Ex. 5) (ECF No. 276); *Zachem Dep.* 169:19-171:24, 173:3-175:23 (*Grube Decl.* 2 Ex. 12) (ECF No. 284).

Temporary Restraining Order (TRO) and Preliminary Injunction asking to stay the Order approving PRTC's Franchise Application.  PSMF ¶ 103; DRPSMF ¶ 103.

On December 2, 2011, the TRB agreed (i) not to approve a franchise agreement with PRTC until January 31, 2012, and (ii) "to provide Plaintiffs with no less tha[n] seven (7) days notice before they take any action with respect to approving a franchise agreement for PRTC" in exchange for the agreement by OneLink and Choice to withdraw their request for a TRO.[77]  PSMF ¶ 103; DRPSMF ¶ 103; DSMF ¶ 63; PRDSMF ¶ 63.  On February 1, 2012, the TRB approved PRTC's Franchise Agreement.[78]  PSMF ¶ 105; DRPSMF ¶ 105.  On February 2, 2012, the Court dismissed OneLink's and Choice's lawsuit under the Cable Act based on the *Younger* abstention and ripeness doctrines.[79]  PSFM ¶¶ 106, 124; DRPSMF ¶¶ 106, 124.

---

[77]     PRTC's paragraph 104 originally stated: "On December 2, 2011, with the holiday season approaching, OneLink extorted from the TRB an agreement to delay approval of PRTC's Franchise Agreement until at least January 31, 2012 in exchange for OneLink withdrawing its TRO request." PSMF ¶ 104.  OneLink denied paragraph 104, arguing that PRTC had proffered no evidence establishing or supporting a reasonable inference that OneLink engaged in any extortion to resolve an action pending before this Court.  DRPSMF ¶ 104.  The Court agrees.  The record evidence does not support PRTC's assertion that OneLink "extorted from the TRB an agreement to delay approval" of the franchise agreement, and OneLink's objection adequately explained the circumstances surrounding the settlement agreement with record citation.  D.P.R. LOC. R. 56(e) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted").  The Court excludes PRTC's reference to the "holiday season" as irrelevant.  FED. R. EVID. 402.
        Additionally, PRTC provided a qualified response to OneLink's paragraph 63 that it admitted "that the TRB acquiesced to OneLink's extortion."  PRDSMF ¶ 63.  For the reasons discussed in this footnote, the Court denies PRTC's qualification.
[78]     PRTC's paragraph 105 originally stated: "On February 1, 2012, after the extorted period of delay lapsed, the TRB approved PRTC's Franchise Agreement."  PSMF ¶ 105.  OneLink denied PRTC's paragraph 105, submitting that PRTC had proffered no evidence establishing or supporting a reasonable inference that OneLink engaged in any extortion to resolve an action pending before this Court.  DRPSMF ¶ 105.  For the same reasons discussed in the previous footnote 77, *supra,* the assertion of extortion is removed from the record.
[79]     OneLink admitted paragraph 106, but denied any suggestion that any dismissal was based on the Cable Act, asserting that rather the Court's dismissal was based on the *Younger* abstention and ripeness doctrines.  DRPSMF ¶ 106; Feb. 2, 2012 Op. & Order at 2, *San Juan Cable LLC d/b/a OneLink Commc'ns and P.R. Cable Acquisition Corp. d/b/a Choice Cable T.V. v. TRB et al.*, 3:11- cv-

c.       **Puerto Rico Telecommunications Act Complaint**

On July 15, 2009, OneLink filed a state court lawsuit alleging that PRTC violated the Puerto Rico Telecommunications Act by illegally building a cable system, and requested a preliminary injunction.[80]   PSMF ¶ 17; DRPSMF ¶ 17.   On August 26, 2009, the Puerto Rico Court of First Instance dismissed OneLink's lawsuit for lack of jurisdiction and failure to exhaust its administrative remedies.   PSMF ¶ 107; DRPSMF ¶ 107.   On September 4, 2009, OneLink appealed to the Puerto Rico Court of Appeals.[81]   PSMF ¶ 108; DRPSMF ¶ 108.   On January 28, 2010, the Court of Appeals affirmed the decision of the Court of First Instance, agreeing that OneLink failed to exhaust its administrative remedies and before filing its lawsuit "should have initially requested the Board to put into effect the cease and desist order." PSMF ¶ 109; DRPSMF ¶ 109.   On February 25, 2010, OneLink petitioned for certiorari to the Supreme Court; on August 20, 2010, the Supreme Court denied the petition for certiorari.   PSMF ¶ 110; DRPSMF ¶ 110.

---

2152-DRD (*Carson Decl.* Ex. 106) (ECF No. 248).   The record supports OneLink's denial and is amended to note the dismissal was based on the *Younger* abstention and ripeness doctrines.

[80]      *See* footnote 61, *supra*.

[81]      PRTC's paragraph 108 originally stated:

> On September 4, 2009, OneLink appealed to the Puerto Rico Court of Appeals.   On October, 20, 2009, the TRB opposed the appeal, explaining that: "This case constitutes the most recent episode in a prolonged campaign abusing the judicial appeals process initiated by [OneLink] in order to prevent the [TRB] from exercising its statutory prerogative of evaluating a cable-TV franchise application and attempting to keep [PRTC] from submitting an application before the [TRB] for the concession of such a franchise."

PSMF ¶ 108. OneLink denied this statement as an out-of-court statement by the TRB, excerpted from a legal brief by a non-party in a different litigation whose interests were aligned with PRTC and against OneLink, and asserts it is inadmissible hearsay to the extent that it is being offered to prove the truth of the matter asserted. FED. R. EVID. 802. This objection is addressed in footnote 115, *infra*.

### 7.    Administrative Agency Actions

After OneLink lost its second federal Cable Act case before this Court, on June 11, 2009, and on July 13, 2009, OneLink petitioned the United States Attorney for the District of Puerto Rico (U.S. Attorney) and the Federal Communications Commission (FCC), respectively, claiming that PRTC's construction of a cable system without a franchise was a violation of the federal Cable Act; sometime on or before October 29, 2009, OneLink petitioned the Puerto Rico Department of Justice Office of Monopolistic Affairs (OMA) to initiate proceedings regarding unfair competition and PRTC's alleged illegal deployment of a video network.[82]   PSMF ¶¶ 39, 112; DPRSMF ¶¶ 39, 112.

---

[82]     PRTC's paragraph 39 originally stated: "Here, in June and July 2009, OneLink submitted complaints regarding PRTC's alleged illegal deployment of a video network to the U.S. Department of Justice and the Puerto Rico Office of Monopolistic Affairs."  PSMF ¶ 39.  OneLink objected to the term "complaints" to describe their communications with the U.S. Attorney's Office and OMA.  DRPSMF ¶ 39.  For reasons similar to those discussed in footnote 88, *infra*, regarding the term "adverse action," the Court sustains OneLink's objection and substitutes "complaint" for "petitioned."  Also, the Court adjusts the record to accurately reflect the dates of the communications cited in the record.  *See* June 11, 2009 Letter to United States Attorney's Office at Puerto Rico Telephone Company, Inc.'s Violations of Federal Law (*Carson Decl.* Ex. 49) (ECF No. 248); Feb. 12, 2010 Letter to Assistant Secretary for Monopolistic Affairs, Department of Justice of the Commonwealth of Puerto Rico at 4, *re OneLink v. PRTC*, QLM-2010-0010 (*Carson Decl.* Ex. 50) (ECF No. 248); July 13, 2009 email to FCC (*Carson Decl.* Ex. 111) (ECF No. 248).  Finally, for consistency and accuracy, the Court adjusts the record to refer to the United States Attorney for the District of Puerto Rico (U.S. Attorney) instead of the Department of Justice (DOJ).
     PRTC's paragraph 112 originally stated: "After OneLink lost its federal Cable Act case before this Court, it petitioned two different federal agencies and the Puerto Rico Office of Monopolistic Affairs, claiming that PRTC was competing illegally years before PRTC ever received a franchise to offer IPTV."  PSMF ¶ 112.  OneLink denied paragraph 112, contending that its communications with the DOJ and the FCC "asserted that PRTC's construction of a cable system without a franchise was a violation of the federal Cable Act.  OneLink's communications with the Puerto Rico Office of Monopolistic Affairs asserted unfair competition."  DRPSMF ¶ 112.  The Court incorporated this clarifying language into the record, and in addition merged PRTC's paragraph 112 with paragraph 39, as they address the same set of facts.  Also, the Court provided further clarification regarding what agencies were contacted and on what dates.
     Additionally, it is unclear from the record evidence on what date OneLink contacted the OMA.  The February 12, 2010 letter from OneLink to the OMA does not state on which date OneLink initially contacted the OMA regarding PRTC's alleged anti-competative behavior.  Feb. 12, 2010 Ltr. to Asst. Secretary for Monopolistic Affairs, Dept. of Justice of the Commonwealth of Puerto Rico at 4, *OneLink*

First, two weeks after this Court dismissed OneLink's initial Cable Act case, on June 11, 2009, OneLink petitioned the United States Attorney for the District of Puerto Rico, contending that PRTC had committed "serious, repeated and longstanding violations of federal law. . . .  We therefore write to urge your office to investigate PRTC's violations [of § 541 of the Cable Act] and take quick action to address them."[83]   PSMF ¶ 113; DRPSMF ¶ 113.   After a meeting with the U.S. Attorney's Office on June 12, 2009, and in response to a request from the U.S. Attorney, on June 22, 2009, OneLink sent another letter to further explain and supply evidence of PRTC's alleged illegal construction activities; in the letter OneLink asked the U.S. Attorney's Office to "utilize its greater resources and authority both to prevent any further illegal construction by PRTC."[84]   PSMF ¶ 114; DRPSMF ¶ 114. On July 13, 2009, OneLink forwarded, inter alia, its June 11, 2009 and June 22, 2009 letters to the U.S. Attorney's Office to the FCC.[85]   PSMF ¶ 115; DRPSMF ¶ 115.

---

*v. PRTC*, QLM-2010-0010 (Carson Decl. Ex. 50) (ECF No. 248).  In that letter, the earliest date mentioned by OneLink was the OMA's October 29, 2009 subpoena of the PRTC.  Using that date, the Court establishes that OneLink contacted the OMA on some date on or before October 29, 2009.

[83]     OneLink admitted PRTC's paragraph 113, but qualified its response by providing additional language from the quoted letter.  DRPSMF ¶ 113.  The Court incorporated this language into the record.

[84]     PRTC's paragraph 114 originally stated: "First, two weeks after this Court dismissed OneLink's case, on June 11, 2009, OneLink petitioned the United States Attorney for the District of Puerto Rico, contending that PRTC had committed 'serious, repeated and longstanding violations of federal law.'"  PSMF ¶ 114.  OneLink denied this paragraph, arguing the letter was not "another petition" but rather a continuation of OneLink's prior communications with the U.S. Attorney's Office regarding PRTC's unlawful pre-franchise construction.  DRPSMF ¶ 114.  After reviewing the evidence in the light most favorable to OneLink, the Court agrees this was not "another petition" and adjusts the record to clarify this point.

[85]     PRTC's paragraph 115 originally stated: "OneLink also forwarded the same petition to the Federal Communications Commission claiming unfair competition by PRTC."  PSMF ¶ 115.  OneLink admitted it forwarded its June, 22 2009 letter to the U.S. Attorney, in addition to other information regarding PRTC's alleged illegal pre-franchise construction, but denied the letter specifically claimed "unfair competition" by PRTC.  DRPSMF ¶ 115.  The Court agrees with OneLink and alters the record to better reflect the nature and substance of the July 13, 2009 email sent to the FCC.

Sometime on or before October 29, 2009, OneLink's representatives asked the OMA to investigate PRTC for violation of the Puerto Rico Telecommunications Act.[86] PSMF ¶ 117; DRPSMF ¶ 117.  The OMA initiated an investigation into PRTC's possible violations of the Puerto Rico Telecommunications Act and served a subpoena on PRTC.[87]  DSMF ¶ 66; PRDSMF ¶ 66.  The OMA never pursued an administrative

---

[86]    PRTC's paragraph 117 originally stated: "Despite this statement to the TRB, OneLink's representatives asked the Puerto Rico Department of Justice Office of Monopolistic Affairs ("OMA") to investigate PRTC for violation of the Puerto Rico Telecommunications Act."  PSMF ¶ 117.  OneLink denied the statement as argument, not fact, and argued it should be disregarded under D.P.R. LOC. R. 56(b).  DRPSMF ¶ 117.  OneLink additionally denied that its communication with OMA was in anyway at odds with PSMF ¶¶ 111, 116.  *Id.*  Reviewing the evidence in the light most hospitable to OneLink, the Court sustains OneLink's objection and denial, and accordingly adjusts the record.

[87]    OneLink's paragraph 66 originally stated: "The OMA initiated an investigation into PRTC's misconduct and served a subpoena on it."  DSMF ¶ 66.  PRTC denied the statement, asserting the OMA did not investigate "misconduct" by the PRTC.  PRDSMF ¶ 66.  The Court agrees the use of the term "misconduct" is improper and alters the record using the language of the OMA's October 29, 2009 subpoena.  *See* Oct. 29, 2009 Summons & Req. for Info., *In re: QLM-2010-0010*, P.R. Dept. of Justice Ofc. of Monopolistic Affairs (*Grube Decl.* Ex. 13) (ECF No. 264).

proceeding in response to OneLink's petitioning of it to investigate PRTC.[88],[89]  PSMF ¶¶ 23, 118; DRPSMF ¶¶ 23, 118.

_____

[88]     PRTC's paragraph 23 originally stated:

> Nor did the Federal Communications Commission, U.S. Department of Justice, or Puerto Rico Department of Justice Office of Monopolistic Affairs ever pursue any adverse action in response to OneLink's complaints.

PSMF ¶ 23.  OneLink raised two objections to this paragraph.  DRPSMF ¶ 23.  First, OneLink objected that the term "adverse action" is "vague and undefined" and went on to state:

> [t]o the extent that "adverse action" means the initiation of a judicial proceeding, OneLink admits that [OMA] never initiated such a proceeding in response to OneLink's petitioning OMA to investigate "whether PRTC has engaged in unfair competition by building its Cable TV system without first having obtained a franchise from the [TRB], and thus, in violation of law."  OMA did issue a subpoena to PRTC requesting information regarding its illegal pre-franchise construction activities, but as Mr. Khoury testified, OneLink is not aware that OMA ever "issued any finding or issued any adverse ruling."

*Id.*  Second, OneLink claims PRTC "does not possess information sufficient to admit or deny whether the FCC or the U.S. Department of Justice ever pursued any 'adverse action' against PRTC.  Accordingly, Mr. Khoury's lack of knowledge cannot be used as evidence of the lack of agency action."  *Id.*
          Viewing the evidence in the light most favorable to OneLink, the Court includes OneLink's qualification as to what is meant by an "adverse action" and substitutes the language with the term "administrative proceedings."  Moreover, the Court agrees that a deponent's lack of knowledge cannot be used as evidence that the FCC and the U.S. Attorney's Office did not take any "adverse actions," and that PRTC has not offered any additional evidences that the agencies did take any action.  *See Khoury Dep.,* at 88:25-91:8 (*Carson Decl.* Ex. 41) (ECF No. 248).  The Court modifies the statement to incorporate OneLink's objections.
          Mirroring PRTC's paragraph 23, paragraph 118 stated: "Despite espousing a general lack of awareness of even having submitted these complaints to the FCC, DOJ, and OMA, OneLink was unable to identify any adverse action taken by any of the agencies in response to its complaints, because none ever occurred."  PSMF ¶ 118.  OneLink denied paragraph 118 on similar grounds as it did to paragraph 23.  DRPSMF ¶ 118.  As with paragraph 23, the Court upholds OneLink's denial and objection to paragraph 118.

[89]     PRTC's paragraph 31 stated:

> No OneLink Director or Officer, including its Rule 30(b)(6) witness on the topic of OneLink's sham litigation, Naji Khoury, could explain why OneLink filed complaints with the USDOJ, FCC, or OMA, or were unaware that such complaints had been submitted or, in the case of the OMA, that the organization even existed.

PSAMF ¶ 31.  OneLink denied the paragraph as unsupported.  DRPSAMF ¶ 31.  The Court agrees.  The testimony cited by PRTC largely does not relate to why the petitions to these agencies were filed, but highlights that the Board members could not recall the specifics of those filings.  The Board members' lack of memory or knowledge regarding the specifics of the filings or the filings themselves is not material.  Moreover, there is sufficient record evidence introduced by both parties addressing

### 8.    OneLink's Subjective Motive and Intent

After PRTC filed its 2008 franchise application, OneLink contracted with
Alvaro Pilar – who provided consulting services to OneLink relating to the marketing,
sale, and provision of Video Services – for an overview of IPTV, how it works, and to
better understand what PRTC may or may not do regarding IPTV.[90]  PSMF ¶ 2;
DRPSMF ¶ 2.  In his overview, Mr. Pilar informed OneLink that "[c]ustomers find a
single source for both high-speed data and digital video services very attractive" and
that telephone companies "suffer because they have not been able to offer an
equivalent triple play alternative," while also informing OneLink that the TRB
"supports competition in the cable market."[91]   PSMF ¶ 3; DRPSMF ¶ 3.  Mr. Pilar's
overview concluded:

---

why OneLink petitioned the agencies.  *See* Section I(B)(7), *supra*.  PRTC's paragraph 31 is excluded
from the record.

[90]        PRTC's paragraph 2 originally stated that "[w]hen PRTC filed its 2008 franchise application,
OneLink's management turned to their consulting telecommunications expert, Alvaro Pilar, to assess
the competitive threat IPTV posed to OneLink."  PSMF ¶ 2.  OneLink denied paragraph 2, contending
it is "neither relevant nor material to PRTC's motion for summary judgment" nor does the purported
statement find any support in the cited materials and is improper under D.P.R. LOC. R. 56(b) and
should be disregarded.  DRPSMF ¶ 2.  OneLink argues that there is no evidence that Mr. Pilar was
serving as a "consulting telecommunications expert" when he prepared the cited memorandum, or that
OneLink's management "turned to" Mr. Pilar "when PRTC filed its 2008 franchise application" for the
purpose of "assess[ing] the competitive threat IPTV posed to OneLink."  *Id.*  OneLink asserts that the
document was prepared a few months after PRTC filed its first franchise application to provide "an
overview of IPTV and [a] guess of what PRTC may do or may not do on IPTV and an analysis of how
IPTV works."  *Id.* (citing *Pilar Dep.* 38:14-39:20 (*Carson Decl.* Ex. 22.) (ECF No. 248) (*Pilar Dep.*)).
        Viewing the evidence in the light most favorable to OneLink, the Court finds that PRTC's
paragraph 2 mischaracterizes the record and alters the statement to better reflect the record.  The
Court determines, however, that the information is relevant to understanding OneLink's knowledge
regarding IPTV and PRTC's entry into the Cable television market.

[91]        PRTC's paragraph 3 originally stated:

        After cautioning that the TRB "supports competition in the cable market," Mr. Pilar
        shared his expert opinion with OneLink that "[c]ustomers find a single source for both
        high-speed data and digital video services very attractive" but that telephone
        companies like PRTC "suffer because they have not been able to offer an equivalent
        triple play alternative."

the "so-called 'triple play' of voice, video and data should be the 'holy grail' for PRTC, who need to compete with the cable companies, which already [offer] all three services. . . .   Either way, under normal conditions, IPTV should spark a price war between the cable operators and PRTC.   Under a competitive market scenario, service providers, including, cable, satellite, and telcos will be getting very aggressive about the pricing game. In their quest to increase their customer base, service providers will offer triple play packages with a very thin profit margin.  Although this strategy may be successful in gaining customer traction, it will not be profitable in the long run.

Based on the technical requirements, capital outlay and economies of scale, PRTC cannot launch a competitive IPTV product in the island. They will probably spend a considerable amount of time and money trying to become cable moguls, until they figure out that it does not make sense. The only upside for them is that they should be able to upgrade their data network for higher internet speeds.[92],[93]

---

PSMF ¶ 3.  OneLink denied paragraph 9, arguing the statement of fact was neither relevant nor material for summary judgment.  DRPSMF ¶ 3. Specifically, OneLink again argued that there is no evidence that Mr. Pilar was a "consulting telecommunications expert," footnote 90, *supra*, while also asserting that "[n]or did Mr. Pilar anywhere in the memorandum "caution" OneLink that the TRB "supports competition in the cable market."  *Id.*  OneLink admits that the memorandum PRTC selectively quotes contains the quoted text but denies that the quotes  appear in the order or in the context PRTC represents.  *Id.*
    Viewing the evidence in the light most favorable to OneLink, the Court alters the record to address PRTC's mischaracterizations but also determines that the information is relevant to understand OneLink's knowledge regarding IPTV and PRTC's entry into the Cable television market.
[92]    OneLink denied PRTC's paragraph 4 as being "neither relevant nor material," and asserted that the statement mischaracterized the cited memorandum as a "report."  DRPSMF ¶ 4.  However, OneLink admitted that the memorandum does contain the quoted text but denied the passage is complete as it failed to include Mr. Pilar's conclusion.  *Id.*
    The Court altered the statement to characterize it as an "overview" and not a "report" and also included the section of Mr. Pilar's conclusion omitted by PRTC.  The Court overrules OneLink's objection that the statement of fact is neither relevant nor material, as it illuminates OneLink's knowledge regarding IPTV and PRTC's entry into the Cable television market.
[93]    PRTC's paragraph 5 stated: "Faced with a looming "price war," OneLink worked with the two other Puerto Rico cable companies, Liberty Cablevision and Choice Cable, to compose a white paper for potential submission to the TRB."  PSMF ¶ 5.  OneLink denied paragraph 6 in its entirety, arguing the statement was neither relevant nor material, and denied that:

    there is any evidence that OneLink expected that PRTC's launch of IPTV would precipitate a "price war," that any such war was "looming," or that any "price war" occurred when PRTC did launch IPTV. Nor is there any evidence that OneLink "compose[d]" the draft white paper, let alone that it did so "for potential submission to the TRB." . . .

DRPSMF ¶ 5.  Viewing the evidence in the light most hospitable to OneLink, the Court agrees with OneLink that there is no evidence that OneLink expected a "looming 'price war'" or that OneLink took

PSMF ¶ 4; DRPSMF ¶ 4.

On February 9, 2008, Ron Dorchester, CEO of OneLink, ordered his CFO and General Manager to prepare an analysis for the Board of Directors of the potential impact of PRTC's entry into IPTV on OneLink.[94]   PSMF ¶ 10; DRPSMF ¶ 10.   Mr. Dorchester instructed his CFO and General Manager to presume: (i) PRTC will "take 10,000 video subs from us between June and December," (ii) "we reduce our prices [by $20 per month] to compete against the IPTV Claro offerings, and (iii) the "Doomsday" scenario wherein "despite reducing our prices and ARPU by $20 a month per sub we still lose the subs."[95]   PSMF ¶ 11; DRPSMF ¶ 11.   Mr. Dorchester then requested that

---

any part in composing the draft white paper, agreed with its views, or had knowledge of the document's content.  *Carrosquilla Dep.* 25:10-27:15 (*Carson Decl.* Ex. 23) (ECF No. 248).

     Additionally, the Court grants OneLink's denials of PRTC's paragraphs 6-9.  PSMF ¶¶ 6-9; DRPSMF ¶¶ 6-9.  As with PRTC's paragraph 5, paragraphs 6-9 are direct quotes from the draft white paper.  *Id.*  Thus, for the reasons discussed in this footnote, the Court grants OneLink's objections and excludes PRTC's paragraphs 6-9.

[94]    PRTC's paragraph 10 originally stated: "At the same time, Ron Dorchester, CEO of OneLink, ordered his CFO and General Manager to prepare an analysis for the Board of Directors of the potential impact of PRTC's entry into IPTV on OneLink."  PSMF ¶ 10.  OneLink denied the paragraph, arguing that there is no evidence that Mr. Dorchester "ordered" OneLink's CFO, Jorge Hernandez, or General Manager, Bill Chain, do anything.  DRPSMF ¶ 10.  OneLink contends that — three days after the PRTC submitted its second TRB franchise application — it sought Mr. Hernandez to "assume three different, hypothetical scenarios in which PRTC were to make IPTV available between June and December 2008 and to calculate OneLink's cash flow assuming each of those scenarios."  *Id.*  OneLink further contends that "t[]here is no evidence . . . that OneLink believed those scenarios were anything but hypothetical . . . or that Mr. Dorchester sought an "analysis" of "the potential impact of PRTC's entry.  Nor is there any basis to support PRTC's obviously incorrect assertion that Mr. Dorchester's February 2008 email was sent "[a]t the same time" that Liberty (not OneLink) prepared the draft white paper referenced in ¶¶ 5-9 (December 2008, based on its cover email)—they clearly were not."  *Id.*

     Viewing the evidence in the light most favorable to OneLink, the Court agrees with OneLink that there is no basis to support the contention that Mr. Dorchester's February 2008 email was sent during the same time that the draft white paper was prepared.  The Court adjusts the record accordingly.  However, the Court finds that OneLink is quibbling over the distinction between "ordered" and "asked" or the difference between "an analysis of potential impacts" and "assuming hypothetical scenarios," and thus does not alter the remainder of PRTC's statement.  *See Hernandez Dep.* at 36:10-37:2 (*Carson Decl.* Ex. 26) (ECF No. 248).

[95]    OneLink admitted the quoted language appears in the document, but denied that Mr. Dorchester "instructed" his CFO and General Manager to do anything (asserting that he instead

his CFO test the potential impact of PRTC entry "against our covenants." *Id.* In May of 2008, a OneLink Board member advised Mr. Dorchester that he had received an inquiry from someone that may have represented a OneLink lender or investor regarding how PRTC's provision of IPTV "will impact our business"; after learning that PRTC's had filed a franchise application, Mr. Dorchester replied to the OneLink Board member "[w]ell [PRTC's franchise application] is no surprise is it! I'll provide a general response that can be used as a form for all these inquiries which doubtless will be forthcoming."[96],[97] PSMF ¶ 15; DRPSMF ¶15.

---

"asked") or requested his CFO to "test" PRTC's potential entry against OneLink's debt covenants. DRPSMF ¶ 11. Further, OneLink contends that "[t]here is no evidence, however, that OneLink believed that those scenarios were anything but hypothetical and assumed for purposes of the requested exercise." *Id.*

    Viewing the evidence in the light most favorable to OneLink, the Court finds that OneLink believed that "those scenarios were anything but hypothetical" and substituted PRTC's use of the word "assume" with "presume," the actual language used in the February 2008 email. *February 9, 2008 Dorchester Email* (*Carson Decl.* Ex. 26) (ECF No. 248). OneLink's remaining objections are overruled. OneLink is again quibbling over the distinction between "instructing" and "asking." Moreover, the February 9, 2008 email specifically asked OneLink's CFO to "Test [models] 1-2-3 against our covenants for 2008" and to "Test against our cash needs for interest payments." *Id.*

[96]    PRTC's paragraph 15 originally stated:

> In May 2008, a OneLink Board member advised Mr. Dorchester that he had received an inquiry from a OneLink investor regarding how PRTC's provision of IPTV "will impact our business." Mr. Dorchester replied, "Well that is no surprise is it! I'll provide a general response that can be used as a form for all these inquiries which doubtless will be forthcoming."

PSMF ¶ 15. OneLink denied paragraph 15 on grounds that (1) there is no evidence OneLink had received an inquiry from any entity that was an investor, and (2) that Mr. Dorchester's response that "it is no surprise" referenced PRTC's having filed its franchise application. DRPSMF ¶ 15.

    Viewing the evidence in the light most favorable to OneLink, the Court adjusts the record to reflect OneLink's qualifications. *See Dorchester Dep.* at 71:18-22; 73:8-14 (*Carson Decl.* Ex. 30) (ECF No. 248).

[97]    PRTC's paragraph 16 stated:

> It was "no surprise" because ratings agencies, such as Moody's, based their earlier 2007 ratings of the "highly leveraged" OneLink in part on the fact that "San Juan faces competition that is less aggressive than in most stateside US markets … [since] PRTC [is] unlikely to undertake a competitive video offering in San Juan over the next several years . . . given its combined ownership by the government and Verizon."

On June 3, 2008, Mr. Dorchester reported to his Board regarding PRTC's 2008 franchise application:

> Both Liberty and Choice seem oddly unresponsive on the Coqui/PRTC front. We have made clear to them what is going on just in case they are asleep on this. Tonight and tomorrow we will advise them again that a filing is due on 9 June and that we think they should at least 'throw in' a statement in support of the notion that the current application by Coqui/PRTC is incomplete and nonresponsive to the requirements of the franchising process in Puerto Rico and the FCC.[98]

PSMF ¶ 18; DRPSMF ¶ 18.  On October 15, 2008, during OneLink's participation in PRTC's first franchise proceeding before the TRB, OneLink viewed its legal costs as "[a] good investment!!"[99]  PSMF ¶ 32; DRPSMF ¶ 32.  Sometime before October 31, 2011, OneLink was prepared to pay, but did not end up paying for, either half or all of Choice's legal fees for their October 27, 2011 Complaint before the TRB against

---

PSMF ¶ 16.  OneLink denied this statement, arguing that it is "inadmissible hearsay to the extent that it is being offered to prove the truth of the matter asserted (Fed. R. Evid. 802). Inadmissible evidence may not be considered on summary judgment." DRPSMF ¶ 16.  The Court sustains the denial and excludes PRTC's paragraph 16 from the record as hearsay, FED. R. EVID. 802; in addition, it is argument, not fact, and improper under D.P.R. LOC. R. 56(e).

[98]     OneLink admitted the statement supplied by PTRC regarding the June 3, 2008 email but provided the complete language of the paragraph cited by PTRC.  DRPSMF ¶ 18.  This additional language provided context for the statement and the Court expanded on PRTC's submission.  *See June 3, 2008 Dorchester Email* (*Carson Decl.* Ex. 34) (ECF No. 248).

[99]     PRTC's paragraph 32 originally stated: "To OneLink, its expensive pattern of lawsuits against PRTC and the TRB were "A good investment!!"" PSMF ¶ 32.  OneLink objected to the statement as argument not fact and not supported in the materials as required by D.P.R. LOC. R. 56(b).  DRPSMF ¶ 33.  The Court agrees, as the cited October 15, 2008 email makes no reference to any "pattern of lawsuits."  *October 15, 2008 Marcus Email* (*Carson Exhibit* No. 44) (ECF No. 248).  Indeed, as of October, 2008, OneLink had only been involved with PRTC's first franchise application.  The Court alters the record accordingly.

PRTC for their second franchise application.[100],[101],[102]   PSMF ¶¶ 19, 119, 120;

DRPSMF ¶¶ 19, 119, 120; PSAMF ¶¶ 3-5; DRPSAMF ¶¶ 3-5.  Michael Carrosquilla

---

[100]     PRTC's paragraph 19 originally stated:

> At the height of its frustration with its fellow incumbents' refusal to participate in OneLink's sham petitioning, OneLink went so far as to finance a lawsuit that it convinced Choice to file in which OneLink was neither a party nor had any interest in the outcome.

PSMF ¶ 19.  OneLink denied paragraph 19 its entirety and listed myriad objections.  DRPSMF ¶ 19.  OneLink stated "[n]one of the cited materials state or suggest that OneLink was frustrated or that it was engaged in any sham petitioning, which OneLink denies.  Nor is there any evidence of any link between what is addressed in ¶ 18 (June 2008, regarding PRTC's first franchise application) and this paragraph (October 2011, regarding PRTC's second franchise application)."  *Id.*  The Court agrees and finds that PRTC provided no evidence that OneLink was "frustrated" or that there is a link between what is addressed in PSMF ¶ 18 and PSMF ¶ 19.  *Id.*  Regarding "sham petitioning," the Court will consider in due course whether the facts demonstrate that OneLink's filings may have been "objectively baseless."

Moreover, PRTC's record evidence does not show that OneLink "convinced" Choice to file a lawsuit.  PRTC cites the depositional testimony of OneLink's Chief Financial Officer, Jorge Herandez, and billing statements from the law firm of Chadbourne & Park LLP sent to Mr. Hernandez for legal services provided to OneLink.  *Hernandez Dep.* at 257:20-259:7 (*Carson Decl.* Ex. 35) (ECF No. 248); *Exhibit 62 Billing Statements and Email* (*Carson Decl.* Ex. 36) (ECF No. 248); *Exhibit 63 Billing Statements and Email* (*Carson Decl.* Ex. 37) (ECF No. 248).  Nowhere is there any indication that OneLink attempted to or was successful in encouraging Choice to seek legal action against PRTC.

At the same time, the record is less clear as to whether OneLink financed a lawsuit filed by Choice against PRTC.  Specifically, the Chadbourne & Park LLP billing statements indicate that OneLink and Choice split legal costs for filing a complaint before the TRB and for a federal complaint against the TRB.  *Exhibit 62 Billing Statements and Email* (*Carson Decl.* Ex. 36); *Exhibit 63 Billing Statements and Email* (*Carson Decl.* Ex. 37).  In a billing statement dated December 16, 2011, Attorney Dana Frix of Chadbourne & Park emailed Mr. Dorchester an invoice for professional services rendered through December 16, 2011.  The email stated:

> Please recall that in October OneLink and Choice agreed to split the cost of filing a complaint before the TRB.  For convenience, we have segregated our charges for the complaint onto our Matter 008 (entitled: Choice Complaint to TRB re PRTC Illegal Construction).  Please note that the amount of that invoice reflects only the amount due by OneLink.  The other half is being billed directly to Choice. . . .
>
> Please also recall that OneLink and Choice are both plaintiffs in a federal complaint against the TRB, and that the companies have agreed to split charges for that complaint.  We have segregated charges for the complaint onto our Matter 010 (entitled: OneLink/Choice V. TRB).

*Id.*  PRTC also cited the deposition testimony of Mr. Khoury:

> Q:     Did OneLink pay for part of the cost of filing this complaint?
> A:     My understanding is yes, there was.  I don't know exactly the circumstances on which it happened, but, yes, it was.
> Q:     Do you know why they agreed to pay for part of the cost?

A:      No, I do not know why.

*Khoury Dep.* at 95:10-18 (*Eloranto Decl.* Ex. 6) (ECF No. 286).  In addition, PRTC provides the deposition testimony of OneLink Senior Vice President Sandra Perry:

Q:      And were you aware that OneLink paid legal fees for proceedings filed by Choice objecting to the franchise application for PRTC?
A:      Yes.
Q:      How – how did you become aware of that?
A:      It came up in a meeting, in an operations meeting, in an operations meeting.
Q:      Who was – who was at that meeting?
A:      To the best of my memory, it was Ron Dorchester, Bill Chain, Jorge Hernandez.

*Perry Dep.* at 85:9-20 (*Carson Decl.* Ex. 48) (ECF No. 250).  Yet, later in her deposition Ms. Perry gave conflicting testimony:

Q:      From your experience in the industry, is – isn't it highly unusual for a company like OneLink to agree to pay legal fees for a company like Choice to oppose the application of a third party?
A:      I don't know that OneLink did, and I have no experience of that occurring.

*Id.* at 87:2-21; *see also id.* at 83:11-17, 84:14-21.  Also supporting OneLink's contention that it did not pay for Choice's legal fees against PRTC is an October 31, 2011 email sent by Mr. Dorchester to OneLink Board members that states:

Originally we were prepared to pay for the legal in order to not lose the opportunity to let people know about the continued bad behavior on the part of [PRTC].  Fortunately the local Choice/GM appeared interested and was able to gain permission from "high powers" to pay for the legal themselves.  A nicer outcome!"

*October 31, 2011 Dorchester Email* (*Grube Decl.* Ex. 20) (ECF No. 264).  Moreover, OneLink provides the following deposition testimony:

Q:      And, again, there was never any agreement between Choice and OneLink to fund any filings or litigation with respect to [PRTC's] franchise application?
A:      There was never an agreement for OneLink to fund any Choice applications or filings or petitions.
Q:      So Choice and OneLink never entered into any agreement whereby OneLink would pay for a portion of the expense for Choice to file any – its complaint to the TRB, for example?
A:      That is correct.  OneLink has never offered to pay half or any portion of Choice Cable TV's charges for filing.

*Carrosquilla Dep.* at 132:16-133: 4 (*Grube Decl.* Ex. 36) (ECF No. 264).

Q:      Do you know whether OneLink paid for any legal filings made by Choice in opposition to the PRTC application?
A:      No, I'm not aware of such.  No.

*Hernandez Dep.* at 65:23-66:1 (*Grube Decl.* Ex. 33) (ECF No. 264).

> Q:      Do you recall that OneLink paid for the lawsuit that Choice filed against
>         [PRTC] alleging illegal build-out?
>
> . . .
>
> A:      I don't – I don't believe we did.

*Dorchester Dep.* at 88:20-25 (*Carson Decl.* Ex. 20) (ECF No. 248).

The Court is required to draw all reasonable inferences and resolve all genuine factual disputes in favor of OneLink, *ATC Realty, LLC v. Town of Kingston, New Hampshire*, 303 F.3d 91, 94 (1st Cir. 2002), and having done so, finds that OneLink did not fund Choice's complaint against PRTC. Though it appears they were invoiced for Choice's complaint after agreeing to split the cost in October of 2011, the October 31, 2011 email sent by Mr. Dorchester to OneLink Board members indicates that Choice eventually agreed to pay its own legal fees. *October 31, 2011 Dorchester Email* (*Grube Decl.* Ex. 20). However, this email does indicate that OneLink was prepared to pay for Choice's legal fees against the PRTC. *Id.* This statement in the email contradicts the testimony provided by Mr. Khoury, as well as some of the testimony provided by Ms. Perry. Considering the conflicting statements given by Ms. Perry, the testimony from Messrs. Carrosquilla, Hernandez, and Dorchester, that the invoice sent to OneLink from its counsel split the bill between OneLink and Choice, and the October 31, 2011 email from Mr. Dorchester, the Court finds that OneLink was prepared to pay for part or all of Choice's action against PRTC before the TRB but did not eventually make a payment, and amends the record accordingly.

Additionally, for reasons similar to those discussed in this footnote, the Court affirms OneLink's objections to PRTC's statement of material fact paragraphs 119 and 120, PSMF ¶¶ 119-120, as well as PRTC's statements of additional material fact paragraphs 3-5. PSAMF ¶¶ 3-5.

[101]     PRTC's paragraph 20 states: "When Choice ultimately withdrew the OneLink funded action, Dorchester reported to his Board, "We are advised that Choice Cable has declined to continue its legal case against Claro/PRTC/TRB. This will and has absolutely no impact on our circumstances." PSMF ¶ 20. OneLink denied this paragraph in its entirety. DRPSMF ¶ 20. First, OneLink denies that they funded Choice's lawsuit. For the reasons discussed in footnote 100, *supra* the Court upholds OneLink's denial. Second, OneLink further contends:

> And while OneLink admits that PRTC accurately quoted the cited email of March 21,
> 2012, OneLink denies that email or the quoted language has anything to do with any
> decision by Choice regarding the administrative complaint Choice had filed in the TRB
> challenging PRTC's pre-franchise construction—much less that it reflects a report on
> the withdrawal of that complaint.

Viewing the evidence in the light most hospitable to OneLink, the Court sustains OneLink's denial. First, Mr. Dorchester references a "legal case against Claro/PRT/TRB." *Id.* However, the TRB was not a defendant in Choice's administrative complaint; it was the tribunal. *See* Oct 27, 2011 Compl. and Request for Emergency Relief, *P.R. Cable Acquisition Corp. d/b/a Choice Cable T.V. v. P. R. Tel. Co., et al.*, JRT-2011-Q-0886 (*Carson Decl.* Ex. 47) (ECF No. 248). Second, Choice did not file a motion to withdraw its administrative complaint until October 9, 2012 – nearly six months after Mr. Dorchester sent the referenced email – as part of a settlement of an unrelated dispute with PRTC. *Carrosquilla Dep.* at 133:5 -135:14 (*Grube Dec.* Ex. 36) (ECF No. 264); Oct. 9, 2012 Mot. Requesting Voluntary Dismissal with Prejudice, *P.R. Cable Acquisition Corp. d/b/a Choice Cable T.V. v. P. R. Tel. Co., et al.*, JRT-2011-Q-0886 (*Grube Decl.* Ex. 26) (ECF No. 264). For these reasons, the Court excludes paragraph 20, and the Court also excludes PRTC's paragraphs 37, 38, and 122. PSMF ¶¶ 37-38, 122.

[102]     PRTC's paragraph 21 states: "Begging the obvious question, then why did OneLink pay over $25,000 to have it filed?" PSMF ¶ 21. OneLink denied this statement, claiming it is a "rhetorical question" and "is not a fact and therefore is improper under" D.P.R. LOC. R. 56(b). DRPSMF ¶ 21. The Court agrees; this "fact" is an argument, not properly presented in a statement of material facts.

testified that the TRB "never took action at all" on the complaint Choice filed with the TRB; on January 25, 2012, the TRB issued a Resolution and Order in which it designated Luz M. Rios as Official Examiner to oversee Choice's case.[103]   DSMF ¶ 67; PRDSMF ¶ 67.

In 2010, Barry Volpert and Jeffrey Marcus – Managing Partners of Crestview Partners and owners of OneLink – recognized that PRTC's entry into video could negatively impact the sales price of OneLink.[104]   PSMF ¶ 12; DRPSMF ¶ 12.   On

_____

*Medina-Munoz*, 896 F.2d at 8 ("the nonmoving party [may not] rest[] merely upon conclusory allegations").  Furthermore, even if it were a "fact," PRTC's record evidence does not support the assertion.  *See supra*, footnotes 100-01.  The Court excludes this statement from the record.

　　　Moreover, PRTC's paragraph 22 – which relates back to paragraph 21 – states: "Mr. Dorchester answered that question to his own Board: 'It was just TOO important an opportunity to miss and they would have.'"  PSMF ¶ 22 (capitalized in the original).  As with paragraph 21, this "fact" is an argument, not properly presented in a statement of material facts.  *Medina*-Munoz, 896 F.2d at 8.  Also, the quoted language does not support PRTC's assertion.  It is unclear what was "just TOO important an opportunity to miss."  OneLink contends that this quoted language does not refer to OneLink's claimed funding of Choice's administrative complaint but to a public relations effort by OneLink to report on PRTC's continued pre-franchise construction of its cable system.  DRPSMF ¶ 22; *see October 31, 2011 Dorchester Email (Grube Decl.* Ex. 20); *Hernandez Dep.* at 65:23-66:1 (*Grube Decl.* Ex. 33) (ECF No. 264).  Viewing this evidence in the light most favorable to OneLink, the Court excludes this statement from the record.

　　　Additionally, for the reasons discussed in this footnote, the Court also excludes PRTC's paragraphs 36 and 121.  PSMF ¶¶ 36, 121.

[103]　　　PRTC admitted OneLink's paragraph 67 but qualified that the TRB took action on the Choice complaint; specifically on January 25, 2012, the TRB issued a Resolution and Order in which it designated Luz M. Rios as Official Examiner to oversee the Choice compliant.  PRDSMF ¶ 67;  Jan. 25, 2012 Resolution and Order at 2, *Puerto Rico Cable Acquisition Corp. d/b/a Choice Cable TV v. Puerto Rico Telephone Company, Inc.*, JRT-2011-Q-0886 (*Eloranto Decl.* Ex. 22) (ECF No. 272).

　　　Reviewing the evidence in the light most favorable to PRTC, the Court affirms PRTC's qualification and adjusts the record accordingly.

[104]　　　PRTC's paragraph 12 originally stated: "OneLink and its owners recognized that PRTC's entry into video would reduce OneLink's market share, revenues, and monopoly profits, causing OneLink to fetch a lower price."  PSMF ¶ 12.  OneLink denied paragraph 12 on grounds that:

> [t]here is no evidence that OneLink was a monopolist . . . or that PRTC's entry into IPTV video would have any effect on OneLink's business. . . .  OneLink did believe that because of many years of underinvestment by PRTC . . . [it would] not be capable of providing a [sic] Internet Protocol Television service or high speed Internet service that would seriously compete with OneLink's service.

DRPSMF ¶ 11.  Viewing the evidence in the light most favorable to OneLink, the Court agrees that the August 19, 2010 emails cited by PRTC do not support the proposition that "OneLink and its owners

January 26, 2012, Eric Zinterhofer, one of the lead negotiators for the eventual buyers of OneLink, explained that a reduction in their offer price was driven partially by "quality of earnings, a miss in the 2011 budget, [PRTC's] timing of entering the market, some challenges around execution of the digitization of your network, an immediate need to upgrade your network . . . a likely tough to achieve 2012 budget and uncompetitive market pricing"; Mr. Zinterhofer advised the sellers: "don't look a gift horse in the mouth."[105,106]  PSMF ¶ 13; DRPSMF ¶ 13.

---

recognized that PRTC's entry into video would reduce OneLink's market share, revenues, and monopoly profits." *August 9, 2010 Marcus and Volpert Emails* (*Carson. Decl.* Ex. 27) (ECF No. 248). However, upon review of the 2010 emails, the Court determines that the evidence does support the assertion that Barry Volpert and Jeffrey Marcus – Managing Partners of Crestview Partners and owners of OneLink – perceived that PRTC posed a potential risk to OneLink's sales price. *Id.* As such, the Court alters the language of paragraph 12 to better reflect the record evidence.

[105]    PRTC's paragraph 13 originally stated:

> Eric Zinterhofer, one of the lead negotiators for the buyers, explained to a frustrated OneLink that the offer reduction was based upon questions around representations OneLink had made early on regarding "performance, the situation with Claro, and the state of your network." The lower price, Mr. Zinterhofer explained, was driven by "Claro's timing of entering the market" and the fact that OneLink's budget projections were based on "uncompetitive pricing" – which could not be sustained in the face of PRTC's entry into the market. Mr. Zinterhofer advised the sellers: "don't look a gift horse in the mouth.

PSMF ¶ 13.  OneLink denied this statement, first arguing that "[t]here is no evidence that OneLink was frustrated; instead, it is Mr. Zinterhofer, not OneLink, who in the quoted email is frustrated." DPRSMF ¶ 13.  The Court agrees with OneLink, and removed the use of "frustrated" from the statement.  *Jan. 26, 2012 Zinterhofer Email (Carson Decl.* Ex. 28) (ECF No. 248).  OneLink further argues "[a]s Mr. Zinterhofer testified, he was trying to negotiate a lower purchase price for OneLink in early 2012 . . . .  There is no evidence that he did so based on any 'representations' that OneLink had made about [PRTC].  Rather . . . he presented a number of 'arguments,' for why the price should be lower . . . ."  DPRSMF ¶ 13; *Zinterhofer Dep.* at 67:20-72:3 (*Grube Decl.* Ex. 32) (ECF No. 264).  The Court agrees and adjusts the record to reflect that (1) there is no evidence that OneLink made any representations about PRTC and (2) Mr. Zinterhofer made a number of arguments as to why OneLink's purchase price should be lower.

[106]    PRTC's paragraph 14 stated:

> A potential buyer would certainly reduce its offer price to compensate for the added risk of acquiring a company that had breached its debt covenants, or worse, could wait until the covenants were breached in the hopes of securing a lower price from the target's debt holders as opposed to equity holders once the property transferred back.

All five members of OneLink's Board of Directors testified that: (i) they believed that PRTC had failed to comply with the law, specifically by constructing its network without a franchise and in engaging in conduct that suggested it would illegally cross-subsidize its video business with its regulated phone business; (ii) they wanted a fair and level playing field; and (iii) PRTC's application contained multiple deficiencies.[107] DSMF ¶ 65; PRDSMF ¶ 65. When asked "do you understand that the

PSMF ¶ 14. OneLink denied the statement, asserting that it is "vague and generalized . . . opinion, not a fact . . . and therefore improper. . . . It is supported by only an out-of-court statement made in an unverified expert report, which is inadmissible hearsay to the extent that it is being offered to prove the truth of the matter asserted." DRPSMF ¶ 14. The Court affirms OneLink's denial and removes PRTC's paragraph 14 from the record. FED. R. EVID. 802; D.P.R. LOC. R. 56(e).

[107]   PRTC denied OneLink's paragraph 65, citing PSAMF ¶¶ 15, 16, and 18. PRDSMF ¶ 65. PRTC's paragraph 15, 16, and 18 state:

> All of the Board members who OneLink identified as having knowledge about its history of petitioning – CEO Ron Dorchester, Gov. George Pataki, Tyler Zachem and Barrett Gilmer of MidOcean Partners, and Jeffrey Marcus and Brian Cassidy of Crestview Partners – had little to no recollection of OneLink's petitioning history, let alone the bases for OneLink's filings.

PSAMF ¶ 15.

> The OneLink Board members allegedly responsible for authorizing the filing of OneLink's intervention petitions, including CEO Ron Dorchester, Gov. George Pataki, Barrett Gilmer, and Brian Cassidy, could not recall whether OneLink had filed intervention requests and appeals, who approved these filings, what benefits or rights OneLink would have gained had it succeeded, or the basis for the intervention requests.

PSAMF ¶ 16.

> Naji Khoury, OneLink's Rule 30(b)(6) witness on the topic of OneLink's sham litigation, could not identify the basis for OneLink's belief that it had the right to intervene in a TRB franchise proceeding other than OneLink's inchoate desire for a "forum" to hear its "concerns" about cross-subsidization and illegal construction – concerns which the TRB was already aware of and had specifically discussed in its October 2008 order denying the first franchise application.

PSAMF ¶ 18. OneLink denied all three paragraphs as unsupported, asserting numerous objections and arguments. DRPSAMF ¶¶ 15-16, 18.

First, addressing PRTC's objection to OneLink's paragraph 65, even when viewing the evidence in the light most favorable to PRTC, the Court overrules PRTC's denial. OneLink provided myriad examples from its Board of Directors' testimony that: (1) they believed PRTC had engaged in illegal pre-franchise construction and intended to employ cross-subsidization, (2) they sought a fair

fact that OneLink was concerned about something does not necessarily give it a right to file a complaint?" Mr. Khoury, OneLink's Rule 30(b)(6) witness, answered "I understand . . . I don't necessarily agree."[108]  PSAMF ¶ 20; DRPSAMF ¶ 20.

OneLink Board member Brian Cassidy testified that the Board's basis for authorizing the intervention petitions and appeals was that they had concerns and wanted to preserve OneLink's rights, and that these concerns gave OneLink the

---

and level playing field, and (3) they believed PRTC's application had multiple deficiencies.  *See* DSMF ¶ 65.  Moreover, the statements PRTC provides in support of its denial – PSAMF ¶¶ 15-16, 18 – either are unresponsive to OneLink's paragraph 65 (e.g., "All of the Board members . . . had little to no recollection of OneLink's petitioning history" (PSAMF ¶ 15)) or are refuted by the testimony provided in support of paragraph 65 (e.g., "The OneLink Board members . . . could not recall . . . the basis for the intervention requests" (PSAMF ¶ 16)).

Second, regarding PRTC's paragraphs 15, 16, and 18, OneLink broadly denies all three statements on the grounds that:

> PRTC responds, not with contrary evidence as required by Rule 56, but by relying on what it characterizes as the OneLink (non-lawyer) Board members' failure to recall certain details about OneLink's legal arguments from years earlier. Specifically, unable to dispute the positions summarized in OneLink's Material Fact No. 65 or the testimony supporting that fact, PRTC in this purported statement [PSAMF ¶ 15], as well as in [PSAMF ¶¶ 16, 18], points to the inability of individual directors, at certain points in their depositions (and often in response to vague or otherwise objectionable questions), to recall the precise details of specific petitions. None of PRTC's claims regarding the Board members' memories is material, nor provides any affirmative evidence of sham, which it is after all PRTC's burden to prove.

DRPSAMF ¶ 15.  Reviewing the record in the light most hospitable to OneLink, the Court affirms OneLink's denials to PRTC's paragraphs 15, 16, and 18.  In addition to finding merit in the issues raised by OneLink in the above quote, the Court finds ample support in the record evidence for OneLink's arguments, including: (1) that the mere lack of recollection does not create an issue of disputed fact for summary judgment purposes, (2) not answering a question on advice of counsel on the basis of privileged attorney-client communications does not indicate a lack of recall, (3) PRTC selectively excerpts questions and answers while ignoring surrounding testimony, and (4) PRTC's claims regarding the inability of the Board members to recall specific issues are often incorrect and unsupported by record evidence.  *See* DRPSAMF ¶¶ 15-16, 18.  As such, PRTC's statements of additional material fact 15, 16, and 18 are excluded from the record.

[108]     PRTC's paragraph 20 originally stated: "OneLink understood that having a concern about something did not necessarily give a party the right to file a complaint." PSAMF ¶ 20. OneLink denied this statement as unsupported, arguing that "PRTC grossly misstates Mr. Khoury's testimony." DRPSAMF ¶ 20. The Court modifies the record by providing the verbatim language cited by PRTC.

"right" to intervene.[109]  PSAMF ¶ 17; DRPSAMF ¶ 17.  Specifically, when asked what

he did personally (aside from discussions with counsel) to satisfy himself that

OneLink had a right to intervene, Mr. Cassidy answered:

> we reviewed legal strategy with the management team, we discussed
> that [PRTC] was proposing—we were very concerned that they were
> going to use their monopoly on the telephone side, and we were
> concerned about cross-subsidization issues, and our management team
> had learned that the [PRTC] had . . . begun to build their video plant
> illegally before granting a franchise.

*Id.*  Additionally, regarding the execution of OneLink's Board of Directors fiduciary

duties, Mr. Cassidy stated:

> We had discussions at the Board level about all the filings we made,
> including all intervenor filings. We got input from management team.
> We got input from legal counsel that we had hired that we had been
> working with for years. And we also knew that the [PRTC] was illegally
> constructing a franchise, and the TRB had found that there was cross-

---

[109]    OneLink admitted PRTC's paragraph 17, but qualified it as incomplete, providing record
evidence from depositions of Mr. Cassidy that went "beyond generalities in explaining how OneLink
pursued its petitioning activities, including intervention, as well as the bases for those actions."
DRPSAMF ¶ 17.  Reviewing the evidence in the light most favorable to OneLink, the Court includes
this additional record evidence to provide adequate context for PRTC's paragraph 17, including
depositional testimony from Mr. Cassidy regarding OneLink's concerns and legal strategy.

subsidization issues, so all these factors then led us to believe that we were pursuing a sound legal strategy.[110],[111],[112]

*Id.* OneLink Board member and former New York Governor George Pataki testified

regarding OneLink's opposition to PRTC's franchise application, stating:

> The goal [in pursuing intervention] was very simple and that was to make PRTC play by the rules. And we had that discussion a number of times and it was always that we understand that ultimately [PRTC was] entitled to a license but we are not going to allow them to shortcut the

---

[110]   PRTC's paragraph 22 stated: "OneLink's Board of Directors never discussed whether OneLink needed to be an intervenor in order to participate in the franchise proceeding." PSAMF ¶ 22. OneLink denied this statement as unsupported, citing record evidence that supports the contention that the OneLink Board discussed the issue of whether to file to seek intervenor status. DRPSAMF ¶ 22; *Dorchester Dep.* at 56:24-57:5 (*Grube Decl.* 2 Ex. 5) (ECF No. 284); *Cassidy Dep.* at 189:15-190:5 (*Grube Decl.* Ex. 28) (ECF No. 264). OneLink also argues that PRTC's paragraph 22 does not create a factual dispute, as the record evidence does not support PRTC's assertion that OneLink's Board of Directors never discussed the need to be an intervenor ("The testimony cited by PRTC does not create a fact dispute because Governor Pataki testified that he could not recall, not that it did not happen"). DRPSAMF ¶ 22; *Pataki Dep.* 42:11-18 (*Eloranto Decl.* Ex. 1). The Court upholds OneLink's denial of PRTC's paragraph 22 as unsupported and excludes the statement from the record.

[111]   PRTC's paragraph 23 stated: "OneLink did not rely on advice of counsel to determine whether it had a claim under the Cable Act." PSMAF ¶ 23. OneLink denied the statement as unsupported, arguing that it "obviously relied on its lawyers to provide legal counsel regarding its claims and to prepare and file documents in the proceedings at issue, including in federal court with regard to the Cable Act." DRPSAMF ¶ 22. Reviewing the evidence in the light most favorable to OneLink, the Court affirms OneLink's denial and excludes PRTC's paragraph 23 from the record. PRTC's use of Mr. Cassidy's statement to assert that OneLink did not rely on counsel to determine whether they had a viable claim under the Cable Act fails to account for the record evidence of other OneLink Board member's testimony that asserts otherwise. *Id.* (citing *Pataki Dep.* 23:25-24:5, 24:23-25:10; *Cassidy Dep.* 57:3-16, 88:16-23, 89:3-13, 189:15-191:20, 192:8-18, 192:21-193:18, 194:20-195:10). Reading Mr. Cassidy's answer that "[w]e knew that [pre-franchise construction] was illegal, and we satisfied ourselves because we knew it was illegal" in the context of his deposition reveals his answer was given for the broader assertion that OneLink's Board did not require legal advice to make the determination that PRTC's pre-franchise building was illegal. *Cassidy Dep.* 90:3-13 (*Eloranto Decl.* Ex. 5) (ECF No. 272). There is no factual dispute.

[112]   PRTC's paragraph 2 states: "OneLink "does not assert, nor will it assert at trial, that OneLink relied on the advice of counsel relating to the merits of, or whether to file, any action, opposition, petition, lawsuit, or other request for relief relating to PRTC's franchise applications." PSAMF ¶ 2. OneLink admitted this statement, contending:

> [OneLink] is not asserting an advice-of-counsel defense, which means that OneLink is not relying on confidential attorney-client advice and communications relating thereto to prove its good faith. Of course, this does not mean that OneLink may not defend the legal arguments that it advanced in the underlying proceedings and that PRTC alleges were frivolous, nor does it prohibit OneLink from citing or referring to the publicly filed briefs and motions from those proceedings.

DRPSAMF ¶ 2. The Court notes that OneLink is not asserting an advice-of-counsel defense.

68

> system to not follow the rules or to be in a position where they can engage in activity that is inappropriate.
>
> . . .
>
> We [OneLink] were concerned about [PRTC] not adequately disclosing [to the TRB] what they were doing. We had some information that they had started building without a license, which my understanding is you're not allowed to do that. We were very worried about conditions and particular cross subsidiaries where the phone revenue could be used to subsidize the cable, which we believe was inappropriate. So the goal was to make sure [PRTC] follow[ed] the rules, didn't jump start ahead of when they would be allowed to start a build out of the operation, and that they—that conditions, appropriate conditions be imposed [on PRTC] to prevent things like cross subsidies that are illegal.[113]

PSAMF ¶ 1; DRPSAMF ¶ 1.

On June 12, 2012, Mr. Dorchester began to question the wisdom of continuing to pursue litigation against PRTC; in considering the impact of a negotiated cap on legal fees that OneLink could incur before it closed its sale to Liberty Global and Searchlight Capital Partners, Mr. Dorchester wrote to OneLink board members: "[it is] up to you folks but I'd rather just save the $450k rather than spend it in a half-effort that cannot hope to succeed."[114]  PSMF ¶ 25; DRPSMF ¶ 25.

---

[113]   PRTC's paragraph 1 originally stated: "OneLink Board member and former New York Governor George Pataki testified that the OneLink Board "always" had the "understand[ing] that ultimately [PRTC was] entitled to a license."  PSAMF ¶ 1.  OneLink admitted the statement, but argued it was not material, asserting OneLink's opposition to PRTC's franchise application was because "PRTC had not complied with the procedures for obtaining that franchise and had otherwise not complied with the law, not because PRTC could never be entitled to a license."  DRPSAMF ¶ 1.  To illustrate this point, OneLink provided the full testimony given by Governor Pataki that PRTC relied on for its statement.  *Pataki Dep* at 31:16-33:4 (*Grube Decl.* Ex. 30) (ECF No. 264).  Viewing the evidence in the light most favorable to OneLink, the Court finds PRTC's statement incomplete and to provide clarity on the issue expands the record to include the full testimony of Governor Pataki.

[114]   PRTC's paragraph 25 originally stated: "In June, 2012, CEO Ron Dorchester began to question the wisdom of continuing the (sic) file sham litigation: 'up to you folks but I'd rather just save the $450k rather than spend it in a half-effort that cannot hope to succeed.'"  PSMF¶ 25.  OneLink denied this statement, contending:

From October 20, 2009, through August 17, 2012, in a number of TRB legal memoranda, the regulatory agency argued that OneLink engaged in a "prolonged campaign" of "abusing the judicial appeals process" in order to "preserve [its] regional monopoly over the sale of cable-TV services" and prevent PRTC from obtaining its cable franchise; in a March 2, 2009 order the TRB described OneLink's actions as "mendacious," and its April 4, 2012 order stated that it wanted to "formally list all [11] legal proceedings and other challenges that OneLink has lodged to no effect. . . . [OneLink's] theories have failed in a variety of forums where they have been filed because, simply, they are unsupported by law, from substantive and procedural

---

[a]s of June 2012, the owners of OneLink had signed an agreement to sell OneLink to two buyers, Liberty Global and Searchlight Capital Partners. The purchase agreement included a negotiated number, defined as a "cap," on the amount of all legal fees that could be incurred by OneLink between (i) a period of time prior to the signing of the agreement and (ii) the closing of the transaction. As long as the total amount of legal fees incurred by OneLink during that period did not exceed the negotiated "cap," the purchase price of the transaction would be unaffected. If, however, the total amount of the legal fees incurred by OneLink during that period on all legal matters (not just the PRTC franchise proceeding) exceeded the "cap," then the purchase price would be adjusted downward to reflect the excess above the cap. As of June 2012, the amount left before the negotiated "cap" would be reached was $450,000. At that time, OneLink was still pursuing appeals relating to its effort to intervene in the PRTC franchise proceeding or, in the alternative, seek a reconsideration of the TRB's grant of the franchise application. . . . Mr. Dorchester in that email communicated to OneLink's Board of Directors that, in his view, it would take more than $450,000 to cover all of OneLink's legal expenses between that point and the closing (including but not limited to legal expenses relating to the PRTC franchise application). Mr. Dorchester understood that the Board of Directors would not allow Mr. Dorchester to exceed the negotiated cap since doing so would reduce the already-negotiated purchase price. As a result, Mr. Dorchester told the Board that OneLink should not spend any more money on lawyers relating to the PRTC franchise application since OneLink would not have enough money to complete the appeals and, if successful, the intervention that would follow and remain below the cap given all of OneLink's other ongoing legal expenditures.

DRPSMF ¶ 25. Viewing the evidence in the light most hospitable to OneLink, the Court finds merit to OneLink's qualifications to Mr. Dorchester's email and amends the record to provide more context to the quoted text. *See Dorchester Dep*. at 116:21-127:3 (*Carson Decl*. Ex. 30) (ECF No. 248); *Gilmer Dep*. at 51:4-52:2, 87:15-88:16 (*Grube Decl*. Ex. 27) (ECF No. 264).

points of view."[115]  PSMF ¶¶ 1, 24, 52, 108, 129, 153, 156; DRPSMF ¶¶ 1, 24, 52, 108, 129, 153, 156; PSAMF ¶ 14; DRPSAMF ¶ 14.

---

[115]    PRTC's paragraphs 1, 24, 52, 108, 129, 153, and 156 from its initial statement of material facts (ECF No. 247), as well as paragraph 14 from its additional statement of material facts (ECF No. 273), contain numerous quotations from legal memoranda and orders written by the TRB.  In the interest of brevity, the Court has summarized PSMF ¶¶ 1, 24, 52, 108, 129, 153, 156 and PSAMF ¶ 14 in the record. For example, in its paragraph 1, PRTC stated:

> As the TRB would later characterize it, "threatened by competition from [PRTC], [OneLink} . . . engaged in a four-year campaign to prevent PRTC from entering the marketplace."

PSMF ¶ 1 (quoting Jan. 25, 2012 TRB Resp. to Pl.'s Mot. for Inj. Relief at 1, *San Juan Cable LLC d/b/a OneLink Commc'ns v. The Telecomm. Regulatory Bd. of P.R.*, 3:09-cv-02152-DRD (ECF No. 248) (*Carson Decl.* Ex. 19)).  Related quotations as statements of material fact from legal memoranda drafted by the TRB are provided in PSMF ¶ 108 and PSAMF ¶ 14.  Statements from orders issued by the TRB are found in PSMF ¶¶ 24, 52, 129, 153, and 156.

OneLink denied PSMF ¶1, maintaining that "[t]his out-of-court statement by the TRB, excerpted from a legal brief by a non party in a different litigation whose interests were aligned with PRTC and against OneLink . . . [and] is inadmissible hearsay to the extent that it is being offered to prove the truth of the matter asserted (Fed. R. Evid. 802).  Inadmissible evidence may not be considered on summary judgment." DRPSMF ¶ 1.  OneLink raised similar objections to PSMF ¶¶ 24, 52, 108, 129, 153, 156 and PSAMF ¶ 14.

Rule 56 allows OneLink to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).  Thus, "inadmissible evidence may not be considered" for summary judgment.  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *see also Asociacion De Periodistas De P.R. v. Mueller*, 680 F.3d 70, 78-79 (1st Cir. 2012) (explaining that only admissible evidence and evidence that could be used at trial may be considered for summary judgment).

At oral argument OneLink agreed with the Court that the TRB's orders and decisions, as well as its reasoning in reaching those decisions, were admissible evidence.  *Tr.* at 81-82.  Additionally, OneLink agreed that findings and determinations by the TRB, such as that OneLink's status as an intervenor was a "tough" or "novel" legal issue, can be considered by this Court.  *Id.* at 83-84.  As applied to the TRB's order and the judicial opinions in this case, this is most certainly correct.  *See* FED. R. EVID. 803(8); *Olsen v. Correiro*, 189 F.3d 52, 63 (1st Cir. 1999).

The Court agrees with OneLink that the TRB statements quoted in PSMF ¶¶ 1, 108 and PSAMF ¶ 14 are inadmissible hearsay if offered for the truth of the matter asserted.  Once the TRB stepped out of its role as adjudicator and into a role as advocate, its written arguments are not admissible for their truth under Rule 803(8)(A).

Nevertheless, these statements are admissible to show OneLink's knowledge that the TRB believed that OneLink's petitioning was abusing the judicial process with the intent to delay PRTC's franchise application approval in order to preserve its monopoly.  *See* PSMF ¶¶ 1,108 and PSAMF ¶ 14.

The TRB's agency findings and orders in PSMF ¶¶ 24, 52, 129, 153, and 156 are admissible for the truth of the matters under Federal Rule of Evidence 803(8)(A).  *See Davignon v. Hodgson*, 524 F.3d 91, 112-13 (1st Cir. 2008) (affirming the trial court decision to admit a state labor commission's decision).  The weight the Court affords this evidence is discussed in Sections IV(C)(1) and (E)(3), *infra*.

## II.    THE PARTIES' POSITIONS

### A.    Plaintiff's Motion for Partial Summary Judgment

PRTC argues that summary judgment is proper because OneLink's conduct at issue was "nothing more than sham petitioning through which OneLink purchased the delay of PRTC's entry into [the Puerto Rico cable market]," and is thus not protected under the affirmative defense of *Noerr-Pennington*[116] immunity.  *Pl.'s Mot.* at 1.  Specifically, PRTC claims that OneLink filed "eighteen separate sham petitions, complaints, and lawsuits" with the TRB, "the Puerto Rico Court of First Instance, Court of Appeals, and Supreme Court, the United States District Court, and the First Circuit Court of Appeals, as well as the Puerto Rico Office of Monopolistic Affairs, the United States Department of Justice, and the Federal Communications Commission. . . . [with a] win/loss record [that] stood at an almost impossible zero and eighteen." *Id.*

PRTC argues OneLink pursued this course of action with the "sole criteria" of using "the petitioning process to delay the competitive impact of PRTC's provision of IPTV." *Id.* at 2.  PRTC further adds, "[t]o protect against this danger, courts have long held that when a party's petitions or litigations are a sham, designed to misuse the governmental process, that conduct is not shielded from antitrust liability under *Noerr*." *Id.* at 2-3.  PRTC argues that "the sham exception to *Noerr* applies to three types of conduct: (1) a petition or litigation that is objectively baseless and brought with the subjective intent to injure a competitor through the process itself; (2) a

---

[116]    *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965).

pattern of petitions and litigations brought without regard to their merit and for the purpose of injuring a rival; and (3) fraud on a tribunal or regulatory body.  OneLink's petitioning qualifies as sham under both of the first two categories."  *Id.* at 3.

### 1.    Pattern of Sham Petitioning

PRTC argues that OneLink's pattern of petitions and litigation constituted sham petitioning.  *Id.* at 8-14.  PRTC cites this Court's ruling on OneLink's motion to dismiss (ECF No. 30), which held "[t]he question in pattern cases is not whether the suits have merit, but whether they were instituted as part of or pursuant to a pattern, without regard to the merits."  *P.R. Tel. Co. v. San Juan Cable, LLC.*, 885 F. Supp. 2d 534, 537 (D.P.R. 2012).   Regarding what constitutes a pattern of baseless, repetitive claims, PRTC cites caselaw that found as few as nine proceedings as a pattern, as well as caselaw that would support a "0 and 18 record" as suggesting a "policy of starting legal proceedings without regard to the merits and for the purpose of [violating the law]. . . ."   *Pl.'s Mot.* at 10 (internal citation omitted).  PRTC puts forth a number of other indicia, in addition to OneLink's ".000 batting average," that support the conclusion that the petitions were brought without regard to merit, including: (1) all of OneLink's petitions were objectively baseless, (2) OneLink filed three separate motions to intervene though intervenor status would not provide any additional rights or benefits in PRTC's franchise proceedings, (3) OneLink admitted to the TRB that it lacked standing to intervene, (4) OneLink sued PRTC to stop a test of the IPTV system though OneLink would not have been harmed by the test, (5) OneLink funded a lawsuit by another party against PRTC where the outcome would

have no impact on OneLink, and (6) OneLink submitted complaints to agencies that lacked jurisdiction to enforce the alleged violated laws.  *Id.* at 10-14.

### 2.   Objectively Baseless

PRTC subsequently argues that a second, independent basis for nullifying *Noerr-Pennington* immunity is finding that petitions are objectively baseless.  *Id.* at 14-15.  Citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) (*PRE*), PRTC outlines a two-part test for determining whether a single petition is protected under *Noerr-Pennington*.  *Id.* at 15.  First, a court must determine whether a lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Id.* (citing *PRE*, 508 U.S. at 60).  Second, a petition is unprotected by *Noerr-Pennington* immunity when it "conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon."  *Id.*  PRTC maintains that each of OneLink's petitions and lawsuits was, as a matter of law, objectively baseless. *Id.* at 16.

### a.   OneLink's Intervention Petitions

PRTC argues that on three separate occasions, "OneLink pursued petitions and litigation in a purported attempt to intervene in the TRB's consideration of PRTC's franchise application" that were objectively baseless.  *Id.* at 17.  PRTC contends no reasonable litigant in OneLink's position could have expected to succeed on a request to intervene in the first two TRB franchise proceedings, as

74

administrative rules and caselaw governing intervention into franchise proceedings clearly indicated OneLink had no right in intervene. *Id.* at 22-27. PRTC also maintains that when asserting a right to intervene OneLink did not request an extension or modification of the law, but instead mischaracterized and ignored existing law. *Id.* Furthermore, PRTC submits that intervention would have provided OneLink no benefit or favorable outcome as the TRB had accorded OneLink the opportunity to participate in the first proceeding and OneLink expected similar treatment without intervention in the second proceeding. *Id.* at 27-29. As such, PRTC argues OneLink lacked probable cause to seek intervention when it already had the rights of an intervenor without the title. *Id.* at 27. Regarding OneLink's third motion to intervene – filed before PRTC's franchise agreement was approved, but after its second application was approved – PRTC claims that because OneLink had recently lost the identical issue before the Puerto Rico Supreme Court after its second petition to intervene, no reasonable litigant could have believed the intervention request would be granted, and thus was objectively baseless. *Id.* at 31.

### b.    OneLink's Cross-Subsidy Mandamus Petition

Next, PRTC argues OneLink's petition for rulemaking regarding cross-subsidization and its subsequent mandamus petition and appeals were objectively baseless. *Id.* at 31-32. Specifically, PRTC contends that because, (1) the TRB has no administrative duty to promulgate cross-subsidy regulations prior to considering a franchise application, (2) the TRB has broad, discretionary powers to carry out and enforce the law, and (3) the plain meaning of Puerto Rico law, a reasonable party

75

could not have expected to succeed in forcing the TRB to promulgate new cross-subsidy regulations. *Id.* at 31-36.

### c. OneLink's Illegal Build-Out Petitioning

PRTC claims that OneLink's first Cable Act lawsuit against PRTC and the TRB, raising illegal construction and operation claims, was objectively baseless. *Id.* at 37-39. PRTC asserts that, because the First Circuit found that OneLink lacked a private right of action and standing to bring suit, it constitutes sham petition and is not protected by *Noerr* immunity. *Id.* at 39. Additionally, PRTC argues that OneLink's § 1983 suit – which also alleged Cable Act violations – was objectively baseless because OneLink knew or reasonably should have known it had no standing to file the lawsuit based on the First Circuit's previous holding. *Id.* at 40-41. Moreover, PRTC maintains the § 1983 claim was objectively baseless because though OneLink argued before this Court that the TRB's November, 2011 Order granting PRTC's franchise application "deprived[ed] Plaintiffs [OneLink and Choice] of their federally protected [] property rights, thus violating Plaintiffs' due process rights under the U.S. Constitution," the Puerto Rico Supreme Court ruled in June, 2010 that as "an incumbent cable company with a non-exclusive franchise, [OneLink] had no property rights affected by PRTC's franchise." *Id.* at 47 (citation omitted).

Additionally, PRTC asserts OneLink's state court lawsuit and appeals alleging that PRTC violated the Puerto Rico Telecommunications Act by illegally building a cable system were objectively baseless. *Id.* at 41-42. Specifically, PRTC argues that OneLink knew or should have known that the TRB had jurisdiction over the claim

76

and had not yet acted, and thus OneLink had not yet exhausted its administrative remedies.  *Id.* at 42.  Finally, regarding the illegal build-out petitioning, PRTC argues OneLink's agreement to fund Choice Cable's complaint with the TRB was objectively baseless and a sham, as OneLink was not harmed by the conduct that formed the bases of the Choice Cable complaint and there was no possible "favorable outcome" for OneLink.  *Id.* at 45.

### d.    OneLink's Petitions to Federal and State Agencies

PRTC maintains that OneLink's petitions to the U.S. Attorney Office for the District of Puerto Rico, the Federal Communications Commission (FCC), and the Puerto Rico Department of Justice Office of Monopolistic Affairs (OMA) were objectively baseless.  *Id.* at 42-43.   Regarding the petition to the OMA, PRTC argues that OneLink knew that the TRB had "primary jurisdiction" on the matter and the TRB had not yet acted, while OneLink's complaints to the U.S. Attorney's Office and FCC were objectively baseless because "federal telecommunications law is clear" that PRTC's upgrade to its plant prior to the provision of IPTV service did not constitute "provid[ing] cable service without a franchise" under the Cable Act.  *Id.* at 44.

### e.    OneLink's Petition for Automatic Stay of TRB's Grant of Franchise

Upon the TRB's approval of PRTC's franchise agreement, OneLink filed a petition in opposition to the franchise and a notice of automatic stay of the franchise order and agreement.  *Id.* at 47.   PRTC claims these petitions took positions that ignored and mischaracterized Puerto Rican law; for example, it says that under the plain meaning of the Puerto Rico Administrative Procedure Act (APA), only an entity

already recognized as a party may secure an automatic stay of a franchise award. *Id.* at 48-49. As such, PRTC argues "a reasonable party would have known that an attempt to secure an automatic stay of a franchise award by ignoring clear law and relying on reconsideration procedures that do not apply to cable franchises would not meet with success." *Id.* at 50.

### f.   OneLink's Petition for Reconsideration of TRB's Grant of Franchise

PRTC claims OneLink's petition for reconsideration, and subsequent appeal of the TRB's approval of the franchise agreement was a sham, contending that OneLink was well aware that a third-party may participate in an adjudicative process – such as a petition for reconsideration – only after being recognized as an intervenor. *Id.* at 51. Thus, PRTC argues OneLink's petition and appeal for reconsideration was objectively baseless because OneLink knew or should have known it had no realistic expectation of success where the TRB had not been allowed intervention. *Id.* at 52.

### g.   OneLink's Petition to Recuse Commissioner Torres

On January 20, 2011, following PRTC's submission of its supplemental franchise application, OneLink filed a motion to recuse TRB President Sandra Torres because she had been an employee of PRTC and received a pension from the company. *Id.* at 52. President Torres submitted the matter to the Puerto Rico Governmental Ethics Office, which eventually found that she did not need to recuse herself for the proceeding. *Id.* OneLink subsequently raised the issue of recusal again in a November, 2011 motion. *Id.* at 54. PRTC argues these recusal efforts were

objectively baseless because OneLink made no effort to comply with the specific procedures under Puerto Rico law for seeking to disqualify a commissioner. *Id.*

### 3.     Subjective Motive and Intent

At the outset of its motion, PRTC provided a chronology of events that it argues show OneLink's subjective motive and intent to use the governmental process as an anticompetitive weapon. *Id.* at 4-8. PRTC argues OneLink feared a potential "price war" would result from PRTC's entry into the Puerto Rican cable market. *Id.* at 5. Additionally, PRTC contends OneLink feared PRTC's entry into the market might lower OneLink's potential sales price, asserting that OneLink worried investors and ratings-agencies would question the impact of PRTC's entry into the Puerto Rico cable market on OneLink. *Id.* at 6-7.

## B.     Defendant's Opposition and Cross Motion for Summary Judgment

OneLink argues that there is nothing unlawful about a competitor seeking to protect its interests through judicial and executive relief, and that in fact the First Amendment immunizes such action. *Def.'s Opp'n and Cross Mot.* at 1. OneLink asserts that the undisputed facts show it only engaged in zealous advocacy while advancing reasonable legal arguments with the hope and intention of success. *Id.*

### 1.     Objective Reasonableness

#### a.     Intervention Motions in the PRTC Franchise Application Proceedings

OneLink submits that six of the eighteen proceedings counted by PRTC were only filings in or appeals from the single action of OneLink's attempt to intervene in

79

PRTC's second franchise application. *Id.* at 9. OneLink argues all these filings were reasonable and none was objectively baseless. *Id.*

First, OneLink counts as a "substantial victory" the TRB's denial of PRTC's first franchise application. *Id.* at 10 n.2. Next, OneLink argues that it had strong legal arguments supporting its right to intervene, which is conclusively illustrated by the courts' treatment of the claim. *Id.* at 9. OneLink argues that because the Puerto Rico courts "granted discretionary review, issued stays, held oral arguments, refused expedition, ruled that OneLink had presented a novel question, and then wrote lengthy opinions to 'clarify' the law," it is evident that the law regarding intervention was sufficiently "unsettled" that it forecloses the argument that its filings were objectively baseless. *Id.* at 10. OneLink also argues that the Puerto Rico Supreme Court's decision, *San Antonio Maritime v. Puerto Rican Cement Co.*, 153 D.P.R. 374 (2001), and subsequent interpretations of the decision by courts and scholars, supports its argument that the franchise granting proceeding was akin to an adjudicative proceeding and thus OneLink's intervention claim was appropriate and not objectively baseless. *Id.* at 12-16. OneLink also refutes PRTC's argument that it had nothing to gain through intervention, pointing out that had it received intervenor status, "OneLink stood to gain valuable rights to cross-examine PRTC witnesses, receive timely notice of upcoming proceedings . . . obtain critical documents that would otherwise remain confidential and would assist OneLink in providing experienced input regarding PRTC's application, and seek judicial review of final orders." *Id.* at 17.

Regarding the filings after February 8, 2012, and the TRB's approval of PRTC's franchise, OneLink submits that these petitions are irrelevant to PRTC's antitrust claim, as "[o]ne cannot delay something that has already taken place." *Id.* at 20. Furthermore, OneLink contends the post-franchise approval filings were objectively reasonable, as per the Puerto Rico Supreme Court's June, 2010 ruling, OneLink could seek to intervene after approval of the franchise application. *Id.* at 21.

### b.    OneLink's Mandamus Action

OneLink argues that its February 25, 2009 mandamus suit was objectively reasonable, noting that the TRB had a clear legal duty to decide the intervention request and OneLink had a right to a decision. *Id.* at 18. Moreover, OneLink argues this suit was successful, since five days after its filing, the TRB issued an order denying intervention, achieving what OneLink sought – a decision on the motion to intervene. *Id.* Regarding the motion to intervene following approval of PRTC's second franchise application, OneLink argues that the Puerto Rico regulations governing franchise proceedings suggest that non-final decisions may be challenged, and that given this procedural uncertainty its conduct was clearly reasonable. *Id.*

### c.    Motion to Recuse Commissioner Torres

OneLink asserts that it had a powerful basis to seek recusal of Commissioner Torres and that its recusal request was reasonable, as "any objective person might question the impartiality of a commissioner who worked for, was receiving a pension from, and had made favorable public statements regarding the franchise applicant in the proceeding before her." *Id.* at 23. Moreover, OneLink argues that the fact that

Commissioner Torres responded to OneLink's motion by seeking advice on the issue from the Puerto Rico Government Ethics Office supports a conclusion that OneLink's argument was not objectively baseless when made. *Id*. at 25.

### d.   OneLink's Lawsuits regarding PRTC's Pre-Franchise Construction

OneLink asserts that it brought only three suits against PRTC between 2008 and 2012, all challenging PRTC's "build-out" of its cable system before franchise approval. *Id*. at 25. As for the first federal Cable Act build-out suit, OneLink argues it was successful, as this Court found it satisfied the burden of showing "a substantial likelihood of success on the merits" sufficient to warrant preliminary injunctive relief. *Id*. at 26. OneLink contends that as a result, PRTC withdrew its application for the build-out, which under *Noerr* immunity should be recognized as a success because OneLink achieved its desired outcome. *Id*.

Regarding the second federal Cable Act build-out suit, OneLink argues the litigation was objectively reasonable despite the fact that it was unsuccessful, contending: (1) OneLink's earlier suit had pursued precisely the same theory and this Court held that OneLink demonstrated "a strong likelihood of success on the merits" in the suit, as well as that neither the TRB or PRTC had argued OneLink lacked standing in the first Cable Act case; (2) the First Circuit found that OneLink's case presented an issue of "first impression" at the "federal appellate level," and an argument on a question of first impression cannot be objectively baseless; and (3) OneLink sued to enforce two FCC orders under an argument recognized by six other Circuit Courts, that the First Circuit's precedent on the issue reflected an extreme

minority view, and in rejecting OneLink's position, the First Circuit recognized it had a "good faith argument for . . . reversal of existing law." *Id.* at 27-29.

In seeking relief for PRTC's build-out in state court, OneLink argues its suit was reasonable because Puerto Rico law did not grant exclusive jurisdiction to the TRB. *Id.* at 30.  Particularly, OneLink argues against the PRTC's contention that the Puerto Rico Telecommunications Act (Law 213) grants the TRB exclusive jurisdiction over claims asserting pre-franchise construction. *Id.* OneLink contends that Law 213 recognizes two forms of primary jurisdiction – concurrent and exclusive – and that because clear statutory specification as to which form of jurisdiction applies to TRB proceedings is absent, it is clearly not objectively baseless for OneLink to seek judicial relief. *Id.* at 30-31.

Regarding Choice's 2011 complaint with the TRB concerning PRTC's pre-franchise construction (which PRTC alleges OneLink paid for in part), OneLink argues that this petition was objectively reasonable. *Id.* at 31.   In support of this claim, OneLink notes: (1) Puerto Rico courts had ruled that unlawful construction claims fall within the TRB's jurisdiction, (2) that PRTC had already been cited for unlawful construction by the TRB in denying the first franchise application, and (3) just five days after Choice filed its complaint, the TRB cited PRTC again for unlawful construction. *Id.* at 31-32.  Finally, OneLink contends it did not pay for any part of Choice's complaint. *Id.* at 32.

OneLink also submits that the three agencies it contacted regarding PRTC's pre-franchise construction – the U.S. Attorney's Office, FCC, and OMA – indisputably

had enforcement authority over PRTC's activities, and thus OneLink's actions were objectively reasonable. *Id.* at 32-33.

### e.   OneLink's Mandamus Action to Compel the TRB to Promulgate Cross-Subsidy Regulations

OneLink argues its mandamus action to compel the TRB to promulgate cross-subsidy regulations was objectively reasonable because TRB regulations regarding the cross-subsidization require that "the Board shall adopt the regulations needed to implement the requirements of this section." *Id.* at 34.  OneLink explains that it had legitimate fears PRTC planned to engage in cross-subsidy practices, that its arguments were reasonable, that the Puerto Rico Legislature contemplated some regulations would be needed to address the cross-subsidy issue, and that the TRB was obliged to promulgate these regulations. *Id.*

### f.   OneLink's § 1983 Suit against the TRB

Regarding its November, 2011 § 1983 suit against the TRB, OneLink contends the litigation was an objectively reasonable challenge to what it viewed as "biased, arbitrary decision making by the TRB." *Id.* at 35.  Specifically, OneLink asserts that: (1) the § 1983 suit was partly successful and so cannot be a sham, as OneLink's movement for preliminary relief led to a stipulated settlement under which the TRB would not execute a franchise agreement until January 31, 2012; (2) its claims were not objectively baseless, as the Cable Act portion of the suit was not foreclosed by the First Circuit's earlier ruling that OneLink had no cause of action because the later suit invoked a different section of the Cable Act that contained an express cause of action; and (3) OneLink's Due Process claim under § 1983 was not baseless, even

84

conceding that the Puerto Rico Supreme Court held that OneLink had "no property rights affected by PRTC's franchise," federal caselaw, in OneLink's view, has long recognized protected property interests in this context.[117]

### g.    The TRB's Characterizations of OneLink's Conduct

Lastly, regarding PRTC's quoting of TRB orders and memoranda as evidence of sham petitioning, OneLink notes that the TRB was its adversary in half of the proceedings at issue and that near the end of the franchise proceedings the relationship between the two "was strained at best, and hostile at worst." *Id.* at 38. OneLink argues that quoting the TRB's position on its actions is no more probative than quoting PRTC's position. *Id.* Moreover, because many of these statements were made in litigation filings against OneLink, they are inadmissible hearsay to the extent they are invoked for the truth of the TRB's opinions. *Id.*

### 2.    Pattern of Sham Petitioning

### a.    Counting the Number of Petitions for purposes of Sham Petitioning

OneLink argues that in order to qualify under the pattern theory of sham petitioning, the number of proceedings must be "voluminous," citing caselaw that required fourteen, twenty-nine, or nine petitions to constitute a sufficient volume. *Id.* at 39-40.   OneLink asserts PRTC's counting that OneLink pursued 18 different

---

[117]    If its constitutional claim did lack merit, OneLink puts forth that an "allegation that a single claim is objectively baseless does not bring [OneLink's] filing of the entire complaint within the sham exception. . . .   Rather, a suit is not a sham if 'at least one claim . . . has objective merit." *Def.'s Opp'n and Cross Mot* at 36 (internal quotes and citations omitted).

proceedings is "contrived, unsupported by legal authority, and should be rejected." *Id.* at 40.

First, OneLink argues that this Court has already ruled that "appeals from one proceeding constitute action within the same litigation" and not separate proceedings under the pattern theory, while also asserting that "pleadings filed *in a single* action do not count as separate proceedings either." *Id.* (emphasis in original). OneLink counts the six motions filed in the second franchise application proceeding as only one proceeding, while also combining its petition to the TRB to adopt cross-subsidy regulations and its subsequent mandamus action, reducing the number to 12 proceedings. *Id.* Next, OneLink asserts that three of the remaining proceedings were merely communications to regulators (e.g., the U.S. Attorney's Office, FCC, and OMA) and do not constitute the "institution of legal proceedings," as the letters did not trigger any proceedings and were only appeals to the regulators' policy discretion outside an "adjudicatory" context. *Id.* at 41. This reduces the number to nine proceedings. *Id.* Third, OneLink asserts that the proceeding filed by Choice should not be considered in the Court's analysis, contending that OneLink did not fund that proceeding and that TRB took no action on it. *Id.*

OneLink argues that this leaves only eight proceedings, a number that courts have ruled is not enough to constitute a pattern of sham petitioning. *Id.* at 42. Moreover, OneLink contends eight is "an overstatement," as the two franchise application proceedings were instituted by PRTC, and OneLink sought only to participate in them, while three of the remaining proceeding were filed against the

86

TRB, not the PRTC.  *Id*.  OneLink concludes that this leaves only three suits that it filed against PRTC – the pre-franchise construction suits – one of which was successful and none concerned the franchise application.  *Id*.

## b.    Objectively Reasonable Petitions

Even if a pattern of sham petitioning is found, OneLink contends PRTC must also prove that the proceedings were instituted pursuant to "a policy of starting proceedings without regard to the merits."  *Id*.  OneLink argues that though PRTC need not prove that every proceeding was objectively baseless, it must nevertheless prove that the pattern of petitioning was baseless as a whole – that most of the suits, evaluated prospectively, were baseless.  *Id*. at 42-43.  OneLink asserts that because not one of its claims were objectively baseless, there is no evidence of a pattern of sham litigation.  *Id*. at 44.

Second, OneLink asserts its success on a non-negligible number of cases defeats a claim of sham litigation as a matter of law.  *Id*.  As OneLink argues that it instituted only six or eight cases, and fully or partially succeeded in half of them, that a 50 percent win-loss percentage defeats PRTC's argument as a matter of law.  *Id*. at 45.  In the alternative, if the Court were to count 18 distinct proceedings, OneLink contends its four victories give a win-loss record better than any court ruling that upheld allegations of sham under the pattern theory.  *Id*.

Third, OneLink argues that testimony shows that its decision-makers did care about the merits of the suits.  *Id*.  OneLink maintains that all five members of OneLink's Board of Directors testified that they sought a fair and level playing field,

and believed that PRTC planned to engage in illegal cross-subsidization and that PRTC's application contained multiple deficiencies. *Id.* at 45-46. Moreover, OneLink argues that the "delay" theory advanced by PRTC cannot win the day because the petitions that OneLink filed would not – absent success on the merits – have delayed PRTC's market entry. *Id.* at 46.

Fourth, OneLink argues PRTC's evidence of subjective bad faith shows nothing more than a zealous but legitimate effort to protect OneLink's economic self-interest. *Id.* at 47. OneLink asserts any evidence of its economic motive to combat PRTC as a competitive threat is irrelevant, as *Noerr-Pennington* immunity "presupposes that the motive and intent of the petitioning party is anticompetitive, to restrain competition and protect its economic self-interest." *Id.* at 48. OneLink argues that instead the sham question turns on whether OneLink filed the suits "without regard to the merits" simply to harass PRTC, as opposed to in the hope of obtaining the requested judicial relief, and thus PRTC's economic motive evidence is not probative and irrelevant. *Id.* at 49.

Furthermore, OneLink disputes PRTC's assertion that OneLink's desire for intervener status would have no practical effect, and instead puts forth a number of procedural rights that would have been gained from intervener status, such as: (1) the ability to immediately file a motion to reconsider upon franchise approval, (2) greater ability to cross-examine PRTC's witnesses, (3) the obligation of the TRB to act on OneLink's motions as a formal party, (4) the right to notice of the TRB's orders or proceedings, and (5) the entitlement to access to confidential documents submitted

88

by PRTC. *Id.* at 50-51. OneLink also repudiates PRTC's assertion that OneLink had these rights in the first franchise proceeding, arguing OneLink would not have been allowed to appeal the TRB's order had the application been approved, and it was giving only limited cross-examination abilities. *Id.* at 51-52. Moreover, OneLink contends it had no guarantee that it would be given these limited entitlements again in the second franchise proceeding, and it in fact was not offered any cross-examination rights in the August, 2011 hearings. *Id.* at 52.

As a final point, OneLink argues that even if it did fund Choice's suit, though OneLink would be liable if the suit was objectively baseless, there is no evidence that OneLink was acting without regards to the merits. *Id.* at 53-54.

### 3.   Subjective Intent

OneLink argues that even if the Court finds that its petitions were shams under either the objectively baseless or pattern theory, PRTC must also prove that OneLink's subjective intent was not to win its suits, but rather for the litigation process to delay PRTC's market entry. *Id.* at 55. OneLink contends PRTC has offered no evidence that OneLink had the requisite subjective intent; that is, PRTC failed to present evidence of a subjective intent to abuse the governmental process, as opposed to the intent to succeed in the suits. *Id.*

### C.   PRTC's Opposition to OneLink's Cross-Motion for Summary Judgment and Reply in Support of its Motion for Partial Summary Judgment

#### 1.   Pattern of Sham Petitioning

##### a.   The Number of Lawsuits indicates a Pattern of Sham Petitioning

PRTC contends there is no "magic number" to determine whether there is a sufficient number of petitions filed to constitute a pattern of sham petitioning, but offers caselaw that supports that as few as seven cases may constitute a pattern.[118] *Pl.'s Opp'n and Reply* at 9.

PRTC's next asserts that the ex parte franchise proceedings before the TRB count towards the pattern theory tally, disputing OneLink's contention that the franchise proceedings do not count because OneLink did not initiate the franchise proceeding. *Id.* at 10-11. PRTC puts forth that the question is whether the suits were brought "for the purpose of injuring a market rival." *Id.* at 11. Moreover, PRTC dismisses OneLink's argument that the six motions filed in connection with PRTC's franchise application combine into one instance of petitioning activity under the sham pattern analysis. *Id.* PRTC instead offers that any petition in a proceedings that is not incidental to the prosecution of the underlying petition or complaint constitutes a separate instance of petitioning activity. *Id.* at 12. PRTC further contends that OneLink's petitions requesting investigations of PRTC by the U.S. Attorney's Office, FCC, and OMA do constitute "proceedings" under a pattern of sham petitioning, while also disputing the "legislative versus judicial" distinction relied on by OneLink in arguing that a petition is not counted for the sham pattern exception if the movant seeks regulators' policy discretion outside an adjudicatory context. *Id.* at 13-15.

---

[118]    On January 29, 2016, PRTC filed a Notice of Supplemental Authority to give the Court notice of *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015), issued by the Third Circuit on November 12, 2015. *Pl.'s Notice of Suppl. Authority* (ECF No. 311). In *Hanover*, the Third Circuit determined four petitions qualified as a pattern of sham petitions. *Hanover*, 806 F.3d at 181.

In addition, PRTC submits that there is "clear evidence" that OneLink funded Choice's complaint to the TRB, and disputes OneLink's contention that the complaint filed by Choice should not count towards a pattern of sham petitioning. *Id.* at 16-17. Moreover, PRTC contends that the fact Choice withdrew its complaint before the TRB could take action and that OneLink had a "non-reaction" to this news is "highly probative of the sham nature of the claim." *Id.* at 17.

Finally, PRTC maintains that "[b]ased on closer scrutiny of OneLink's four-year record of petition and litigation, OneLink filed at least twenty-four meritless petitions and complaints," six more than the eighteen petitions PRTC identified in its motion for partial summary judgment. *Id.* at 17.

### b.    OneLink's Win/Loss Record

PRTC argues that OneLink relies on "contorted definitions unsupported by law of what constitutes a 'winning lawsuit' in the sham context" in making its contention that it won four petitions, and that though OneLink contends it won its first intervention request because the TRB rejected PRTC's first franchise application, PRTC urges that this should not count as a win under a pattern of sham petitioning as OneLink provides no authority for this proposition. *Id.* at 18-19.

Regarding OneLink's first complaint for violation of the Cable Act, PRTC argues there are a number of reasons the suit was not successful. *Id.* at 20.  First, PRTC submits that if OneLink received its requested relief then it would make no sense for OneLink to pursue a second federal lawsuit, and PRTC concludes that OneLink either did not actually obtain the relief it sought or that its pursuit of the

litigation was fraud. *Id.* Second, PRTC charges that both of OneLink's federal lawsuits were based on fraudulent allegations, an "altogether separate basis for finding a sham." *Id.* Finally, PRTC argues that the Court should not sanction this type of conduct even if it does accept that OneLink's suit was a victory, as PRTC only halted its TRB-approved test to avoid further delay and damages and OneLink should not be "rewarded for extortion." *Id.* PRTC also submits that OneLink's § 1983 suit was in fact not a victory, as it only resulted in the TRB agreeing to delay its approval of PRTC's franchise agreement for two months, after which the TRB approved the application and OneLink renewed its petition. *Id.* at 21-22.

Finally, in support of its "0-for-24" win/loss record, PRTC suggests that OneLink's petitions filed after the TRB's February, 2012 approval of the franchise agreement are part of the pattern of sham litigation. *Id.* at 23. In support of this proposition, PRTC contends, inter alia, that these petitions still imposed costs on PRTC, did in fact chill PRTC's inclination to roll-out its IPTV service, and caused the TRB to find it necessary to render an order in April, 2012, clarifying that PRTC was free to commence the provision of IPTV. *Id.*

### c.     Regard to the Merits

PRTC argues that "[b]eyond sheer volume" of petitions, there are a number of other indicia of subjective intent to file petitions without regard to merit. *Id.* at 24. For example, PRTC asserts that OneLink's "overwhelming record of failure" of "zero and twenty-four . . . demonstrates its abuse of the administrative and judicial process . . . and is conclusive evidence of a strategy of bad-faith litigation brought without

regard to the merits." *Id.* at 26.   In addition, PRTC argues that the numerous tribunal's involved throughout the litigation between PRTC and OneLink have repeatedly "castigated OneLink for its endless pattern of 'baseless' petitioning." *Id.* PRTC further rebuffs OneLink's claim that "'the TRB's position on OneLink's conduct' is not 'probative' because [TRB and OneLink] had a 'strained' and 'hostile' relationship," and asks the Court to take judicial notice of TRB's many telling "appraisals" of the meritless nature of OneLink's litigation. *Id.* at 27.

Additionally, PRTC insists that "clear evidence" shows OneLink funded Choice's complaint to the TRB, contending that third party financing of legal proceedings is another indicia of bad-faith sham litigation, while also insisting further evidence of bad faith sham petitioning by OneLink can be found in its "repeated dishonest statements and representations to Puerto Rico tribunals." *Id.* at 28-31. Also, PRTC contends OneLink's attempts to intervene with the TRB franchise proceedings was "perverse" conduct; "after filing six different petitions and appeals (as well as motions for reconsideration) between 2008 and 2011, when provided the opportunity to argue why it should be allowed to intervene after PRTC's franchise application was approved, OneLink waived its opportunity and chose not to continue with the proceedings." *Id.* at 31-32.

Lastly, PRTC argues that OneLink has avoided having to provide any discovery regarding privileged documents by asserting the position that it did not rely on advice from counsel "relating to the merits of, or whether to file, any action, opposition, petition, lawsuit, or other request for relief relating to PRTC's franchise

applications, the provision of IPTV services by PRTC, or any Board action or inaction related thereto." *Id.* at 33. PRTC contends that because of this "tactical decision" the only remaining admissible evidence regarding OneLink's bases for the merits to file the petitions at issue is testimony of the current and former Board members and management who made the decisions to pursue the petitions. *Id.* PRTC argues the evidence is clear that OneLink did not rely on counsel to know whether its pattern of litigation had merits and that the "collective amnesia" of its board members regarding their basis for "years of petitioning" demonstrates OneLink's disregard for the merits of its litigation." *Id.* at 34-46.

### 2. OneLink's Petitions were Objectively Baseless

#### a. PRTC's Expert Testimony Regarding OneLink's Sham Petitioning

PRTC encourages the Court to credit the testimony of PRTC's three experts on "Puerto Rico administrative law and federal telecommunications law regarding whether a reasonable litigant would have sought to intervene in PRTC's franchise proceeding or filed its federal lawsuits under the Cable Act." *Id.* at 47. PRTC contends that courts have "repeatedly" allowed expert testimony regarding the merits and objective reasonableness of a party's petitioning where the context for decision-making involves "highly technical and complex regulatory environments." *Id.*

#### b. OneLink's Intervention Petitions

PRTC submits that OneLink's argument that it stood to gain valuable rights as an intervenor in the TRB franchise application process is "squarely contradicted by the record," and cites testimony and other evidence to assert that: (1) OneLink

cross-examined PRTC's witnesses in the first franchise hearing and expected the same treatment in the second; (2) OneLink's dispute that it needed access to confidential documents is unsubstantiated; (3) OneLink lacked the information or specialized knowledge to provide experienced input regarding PRTC's application; (4) OneLink's claim that it needed to be able to seek judicial review is repudiated by the volume of appeals it filed; and (5) OneLink received timely notice of upcoming proceedings without intervenor status and appeared at all TRB hearings   *Id.* at 50-52.   PRTC further argues that OneLink's appeal of the TRB decision to deny intervention was objectively baseless, as the record shows that the TRB's decision was reasonable and entitled to substantial deference by the courts and thus "no reasonable litigant could realistically expect success on the merits." *Id.* at 52-53.

Finally, PRTC contends that OneLink's intervention appeals were objectively baseless despite their "judicial treatment," *Id.* at 53-55, and reasserts that a number of OneLink's additional petitions were objectively baseless, including: (1) petitions filed to the TRB after PRTC's franchise agreement was approved in 2012; (2) the recusal motions for Commissioner Torres; (3) the buildout lawsuits; (4) the payment for Choice's lawsuit; (5) the cross-subsidy litigation; and (6) the § 1983 action. *Id*. at 54-59.

### D.    Defendant's Reply Brief in Support of its Cross-Motion for Summary Judgment

#### 1.    PRTC Bears the Burden of Proof

OneLink refutes PRTC's assertion that OneLink carries the burden of proof to show that its petitioning did not constitute a sham and exceeded the boundaries of

the First Amendment.  *Def.'s Reply* at 4.  OneLink argues that the law is clear that PRTC must show that OneLink's petitioning, which is protected under the *Noerr-Pennington* doctrine, falls within the narrow sham exception to that immunity and that the burden on plaintiffs alleging sham is "heavy."  *Id.* at 4-5.

### 2.    Objective Reasonableness

#### a.    Objectively Baseless Petitions must be Sanctionable

OneLink contends a suit is objectively reasonable if it was supported by a "good faith argument for the extension, modification, or reversal of existing law," which is the test for whether a party may  be sanctioned under Federal Rule of Civil Procedure 11.  *Id.* at 5 (quoting *PRE*, 508 U.S. at 65 (quoting FED. R. CIV. P. 11)).  OneLink submits that "[t]hus, to be objectively baseless, a suit must be *sanctionable*," and more specifically that "unless a suit lacked Rule 11's 'good faith' and thus *could* have supported imposition of sanctions, *PRE* plainly holds that the suit is not 'objectively baseless' for purposes of the sham exception."   *Id.* at 5-6 (emphasis provided by OneLink).

#### b.    Objectively Reasonable as a Matter of Law

OneLink claims that PRTC had "no real response" to the arguments in its cross-motion that its petitions were objectively reasonable and that PRTC never purported to address why half (12 of the 24 counted by PRTC) were not objectively baseless.  *Id.* at 6.

### i.      Second Intervention Petition

OneLink asserts PRTC failed to address the fact that the Supreme Court of Puerto Rico granted "discretionary review, held oral arguments, issued a stay, and wrote a lengthy opinion resting of legislative history" to address the issue of the right to intervene, in addition to PRTC not explaining why it and the TRB told the Puerto Rico appellate courts the intervention dispute presented "a novel issue of great public importance" that had "never been taken up by the courts in this country." *Id.* at 6-7. Additionally, OneLink notes that PRTC admitted a number of occasions when OneLink would have benefitted from intervener status, such as when it was denied the right to cross-examine witnesses, to hear testimony, or to promptly move for reconsideration of the grant of the franchise. *Id.* at 8.

### ii.      Recusal Motions

OneLink reasserts that Commissioner Torres should have plainly recused herself from the franchise proceedings and that PRTC neither disputes the authorities provided by OneLink supporting her recusal nor provides contrary authority. *Id.*

### iii.      Illegal Buildout Petitions

Regarding its first Cable Act complaint, OneLink argues PRTC cannot deny this Court found a "substantial likelihood of success on the merits," causing PRTC to moot the case, creating a "clear victory" for OneLink. *Id.* Next, OneLink characterizes PRTC's argument as "the height of *chutzpah*" that OneLink did not obtain the relief it sought because it "file[d] a second federal lawsuit after this Court

dismissed its first." *Id.* at 9 (emphasis in original).  OneLink asserts they filed the second suit because two days after the first was dismissed as moot, this Court found PRTC continued its illegal refranchise construction.  *Id.*  Regarding its second Cable Act suit, OneLink notes that PRTC did not deny: (1) no party raised the issue of lack of standing in the first suit, (2) the First Circuit described the issue as one of "first impression," and (3) OneLink raised an argument that numerous other Circuits had accepted.  *Id.* at 10.  As for the state-court construction suit, OneLink alleges that PRTC failed to meaningfully respond to its argument that the TRB lacked "exclusive primary jurisdiction," and regarding Choice's TRB petition, PRTC failed to show the petition was objectively baseless.  *Id.*

### iv.    Cross-Subsidy Petitioning

As to the mandamus petition, OneLink notes the PRTC failed to dispute that Puerto Rico law places a mandatory duty for agencies to regulate and "implement" the governing statute when directed by law.  *Id.* at 10-11.

### v.    Section 1983 Litigation

OneLink contends this Court held that § 1983 was a proper vehicle to examine whether the TRB violated "'core' constitutional values."  *Id.* at 11.

### vi.    Post-Franchise Filings

OneLink notes neither party has offered caselaw regarding OneLink's filing of a petition for reconsideration after PRTC's franchise was approved and that this legal uncertainty proves the reasonableness of OneLink's motion.  *Id.*

### c.   OneLink's reliance on Legal Arguments from its Publically Filed Briefs and Motions

OneLink refutes the position that it cannot cite publicly filed motions or briefs from the underlying ligation without asserting an "advice of counsel" defense and thereby waiving the attorney-client privilege.  *Id.* at 12.  OneLink notes that courts have rebuffed this notion, because to hold otherwise would mean that a defendant relying on *Noerr-Pennington* immunity would lose its attorney-client privilege "whenever a competitor files a lawsuit alleging that some earlier petitioning was a sham and the defendant denies the allegation."  *Id.*  (citation omitted).  Thus, OneLink asserts that because it has not raised advice of counsel as a defense, nor has it invoked confidential attorney-client communications, it may rely on arguments raised in the underlying suits to explain why they were objectively reasonable.  *Id.* at 12-13.

### d.   Expert Testimony on the Law

OneLink disputes PRTC's reliance on expert testimony to show that OneLink's legal theories are frivolous, noting that the First Circuit has held that the Court is fully competent to decide questions of law and that "expert testimony on such purely legal issues is rarely admissible."  *Id.* at 13 (citation omitted).  OneLink cites caselaw that supports the notion that for claims of sham litigation "objective baselessness is not the sort of issue that lends itself to expert testimony."  *Id.* (citation omitted).  OneLink also asserts that the exception for allowing expert testimony on the law for "highly complex and technical matters" is not applicable here.  *Id.* at 14.

### 3.  Pattern of Sham Petitioning

### a.  What Constitutes Litigation or a Proceeding?

Regarding PRTC's "ever-inflating" number of sham petitions, OneLink argues this "casual fluctuation" only highlights the "contrived, manipulated" nature of how PRTC counts what constitutes a proceeding.  *Id.* at 16-17.  Specifically, OneLink contends that PRTC counts as proceedings (1) "a dozen filings in a single case"; (2) "informal letters . . . to regulators, none of which triggered any 'proceedings' against PRTC"; and (3) a petition "filed by a third party that . . . raised no new issues and triggered no new proceedings." *Id.* at 17.  Additionally, OneLink repeats its assertion that there is ample authority that holds cases not initiated by the antitrust defendant or directed against the antitrust plaintiff did not count as a proceeding, nor do multiple filings that result from circumstances beyond the party's control. *Id.* at 22.

### i.  Motions in a single case

OneLink disputes PRTC's counting of twelve distinct proceedings stemming from the motions filed with the TRB for PRTC's second franchise application. *Id.* at 17.  First, OneLink argues a "proceeding" is a case from "its initiation to its final resolution on appeal," and that same logic should apply to the motions here.  Also, OneLink refutes PRTC's "separate and distinct relief" theory, as nearly every motion seeks separate and distinct relief and it would "swallow the *PRE* rule entirely." *Id.* OneLink asserts that "no court has ever held that filings in a single agency proceeding count as district 'proceeding' under the pattern theory" because a lawsuit is "one collective act of petition" and it is wrong "to conside[r] each filing independently." *Id.*

100

at 18 (citation omitted). Finally, OneLink again presses the argument that its mandamus action for cross-subsidy regulations "was in effect an appeal from TRB inaction" and represents only a single "proceeding" as it addresses the same underling legal issue. *Id.* at 19.

### ii.     Letters to U.S. Attorney, FCC, and OMA

OneLink asserts that its "informal" communications with the government cannot count as the initiation of distinct proceedings, maintaining that: (1) caselaw does not treat similar types of communications as proceedings, (2) the communications cannot be treated as initiation of proceedings if the government never initiates proceedings, and (3) under the adjudicatory-political distinction the letters are broadly protected as "conduct in the political arena" as opposed to conduct before an adjudicatory body. *Id.* at 20-21.

### iii.     The Choice Petition

OneLink argues the Choice petition filed with the TRB should not be counted for purposes of the pattern theory analysis. *Id.* at 22. OneLink contends that, unlike the caselaw cited by PRTC, Choice was not a "straw plaintiff," as Choice paid for at least a portion of (or as OneLink asserts, all of) its own petition and had control over its filing. *Id.* Also, as Choice's petition asserted the "same underlying legal" issue as OneLink's motion already before the TRB, it did not count as a separate proceeding. *Id.* Lastly, no proceeding resulted from Choice's filing, as it was filed only days before PRTC's application was granted and Choice withdrew the petition before any substantive proceedings. *Id.*

### b. Regard to the Merits

#### i. Objective Reasonableness and Sham Petitioning

OneLink contends that the caselaw is clear regarding the pattern sham petitioning and the requirement that individual suits in the pattern must be baseless, refuting PRTC's insistence that the sham pattern theory has no objective component. *Id*. at 23-24.  Specifically, OneLink argues that "[w]hile the analysis in a pattern case may focus on the pattern as a whole rather than on individual suits, a showing that *all or most* of the suits in the pattern were objectively reasonable must defeat the sham claim as a matter of law."  *Id*. at 24.

#### ii. OneLink's Success in its Petitioning

OneLink reasserts that it won four of the suits at issue under the sham pattern analysis and thus defeats PRTC's pattern of sham petition argument.  *Id*. at 26. Moreover, OneLink puts forth that "[u]ltimately, especially when viewed as a whole, OneLink had substantial success in exposing PRTC's unlawful construction and cross-subsidization."  *Id* at 27-28.  OneLink also notes the *PRE* Court's contention that courts must "resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation."  *Id*. at 28 (citing *PRE*, 508 U.S. at 61 n.5). OneLink contends that the proceedings it lost were objectively reasonable, and that in short "*winning* suits *precludes* a claim of sham, but *losing* suits is not itself *evidence* of sham."  *Id*. (emphasis provided by OneLink).

### iii.   Lack of Motive to bring Baseless Suits

OneLink argues that PRTC has failed to show how OneLink's petitioning would have delayed PRTC's franchise approval, and in fact OneLink's petitions would have caused delay only if that had succeeded.  *Id.* at 28-29.  OneLink asserts that sham exists only if the party intends to harm a rival through the *process* of litigation. *Id.* (emphasis provided by OneLink).  For example, OneLink argues its pre-franchise construction suits would have impacted the franchise proceeds only if they had been successful, as well as for the cross-subsidy litigation, the Choice petition, and the letters to regulators.  *Id.* at 29.

### iv.   Testimony of OneLink's Decision-makers

OneLink submits that PRTC must provide affirmative evidence to show that OneLink filed its suits without regard to the merits and solely to cause delay, and that PRTC fails to meet this burden with its reliance on OneLink's non-lawyer Board members' inability to recall details about OneLink's legal arguments.  *Id.* at 30-31. OneLink asserts that it is well established in the First Circuit and elsewhere that "mere lack of recollection does not suffice to create an issue of fact," nor can the inference drawn from the lack of recollection "substitute for the requisite clear and affirmative evidence of bad faith." *Id.* at 31 (citing *I.V. Servs. Of Am. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 55 (1st Cir. 1999)).

### v.   Hodge-podge of Irrelevant Evidence

OneLink concludes that "[b]ecause PRTC's claim of sham litigation 'without regard to the merits' fails for three independent reasons – because OneLink's

petitions were (i) objectively reasonable, (ii) in part successful, and (iii) only consistent with a desire to win on the merits – the rest of the 'evidence' is thus irrelevant." *Id.* at 32.  OneLink lists and subsequently opposes a variety of evidence put forth by PRTC, such as: (1) "no court *ever* admonished OneLink," (2) the allegations that OneLink made misrepresentations are "farcical," (3) the reasons behind OneLink's decision not to participate in the August, 2012 hearing on intervention were legitimate, and (4) the "out-of-court snippets" from OneLink directors and officers lack any probative value.  *Id.* at 32-35 (emphasis added by OneLink).

### E.    PRTC's Surreply

PRTC submits that in the First Circuit the party asserting an affirmative defense to antitrust liability "bears the burden of establishing its applicability."  *Pl.'s Surreply* at 3 (citing *Torres-Vargas v. Santiago-Cummings*, 149 F.3d 29, 35-36 (1st Cir. 1998)).  PRTC contends that for OneLink to succeed on its motion for summary judgment, it has the burden of showing that no reasonable jury "could find other than in its favor" on its affirmative defense (i.e., no reasonable jury could find for PRTC and that OneLink's petition falls outside the protection of the *Noerr* doctrine).  *Id.* at 3-4 (citing *Am. Steel Erectors, Inc. v. Local Union No. 7*, 536 F.3d 68, 75 (1st Cir. 2008)).  PRTC concludes that, drawing all reasonable inferences in its favor, there is sufficient evidence for a jury to conclude that OneLink is not entitled to immunity under *Noerr.  Id.* at 4.

Additionally, PRTC refutes OneLink's assertion that its communications with the U.S. Attorney's Office, FCC, and OMA were informal letters and not petitions. *Id.* at 5.  PRTC notes that the letters consisted of multiple submissions of extensive briefings and exhibits, OneLink had meetings with each agency, and the OMA issued a subpoena to PRTC that resulted in an objection by PRTC, a response from the OMA staying the subpoena, and a petition from OneLink seeking another meeting with the OMA.  *Id.*

PRTC also contends that, having chosen to assert privilege to protect from discovery the advice it received regarding the petitions at issue in this case, OneLink has waived its right to assert an advice of counsel defense.  *Id.* at 6.  PRTC contends it does not argue OneLink cannot argue the merits of the law underlying its petitions, only that it is precluded from asserting it was acting under the advice of counsel.  *Id.* at 7.

Finally, PRTC concluded its surreply by raising a number of arguments, including that OneLink: (1) mischaracterized the Supreme Court of Puerto Rico's rules regarding certiorari, (2) failed to defend funding the Choice petition, (3) filed petitions that imposed delay and cost on PRTC, (4) raised arguments regarding Rule 11 sanctions that do not further its cause, (5) asserted flawed arguments regarding illegal construction, (6) raised new arguments regarding recusal that are contradicted by fact and law, and (7) incorrectly asserted that PRTC misconstrued caselaw.  *Id.* at 7-10.

## III.    LEGAL PRINCIPLES ON SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).   In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than

significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Where, as here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assur. Co.,* 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.,* 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of New Hampshire v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010) *aff'd,* 638 F.3d 6 (1st Cir. 2011). The presence of cross-motions for summary judgment "does not alter or dilute" the summary judgment standard. *Id.* (citing *Kunelius v. Town of Stow,* 588 F.3d 1, 8 (1st Cir. 2009)).

## IV. DISCUSSION

### A. "Sham" Petitioning Exception under *Noerr-Pennington*

In *Noerr*, the Supreme Court explained that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961). This is because "valid governmental action" does not fall within the purview of the Sherman Act, and "under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government" as long as it is

constitutional. *Id.* at 136. Furthermore, the *Noerr* Court declared: "We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.*; *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose").

In 1972, the Supreme Court extended the *Noerr-Pennington* analysis to the judicial branch and state administrative agencies.[119] *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). The scope of *Noerr-Pennington* immunity "depends . . . on the source, context, and nature of the anticompetitive restraint at issue." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). In the context of legislative or political activity, *Noerr-Pennington* sweeps broadly; however, "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."[120] *California Motor Transport*, 404 U.S. at 513.

*Noerr-Pennington* immunity is not absolute. The *Noerr* Court cautioned that "[t]here may be situations in which a publicity campaign, ostensibly directed toward

---

[119]    "The same philosophy [of attempts to influence the legislative or executive branch of government] governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

[120]    As described by one district court, "when a court of law is the object of the challenged petitioning, the sham exception is given a much broader compass." *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 532 (M.D. La. 2001).

influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Noerr*, 365 U.S. at 144; *see also Allied Tube*, 486 U.S. at 500 n.4 (regarding sham petitioning as "private action that is not genuinely aimed at procuring favorable government action," as opposed to "a valid effort to influence government action"). In his earlier opinion in this case, Judge Gelpi described a "sham" as "[e]ssentially . . . when an action is commenced without a genuine belief it will end with a favorable result, but rather with the intention of delaying or interfering with another." *First Opinion and Order* at 3.

A "sham" in the context of a single litigation proceeding carries a two-part, sequential definition set out in *PRE*, 508 U.S. at 60. First, it must be a lawsuit that is:

> objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.

*PRE*, 508 U.S. at 60. The *PRE* Court found that "the existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation. . . . Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.* at 62-63 (internal citations and quotation marks omitted). Furthermore, "[a] winning lawsuit by definition [is] a reasonable effort at petitioning

for redress and therefore not a sham." *Id.* at 60 n.5; *see also Allied Tube*, 486 U.S. at 502 (reasoning that a successful "effort to influence governmental action . . . certainly cannot be characterized as a sham"). However, when the antitrust defendant has lost the underlying litigation:

> a court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation. The court must remember that even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*PRE*, 508 U.S. at 60 n.5 (internal punctuation omitted). Moreover, "the legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is 'not at all affected by any anticompetitive purpose [the actor] may have had.'" *Id.* at 59 (quoting *Noerr*, 365 U.S. at 140).

Second, if it is determined that a lawsuit was objectively baseless, a court must set out to "examine the litigant's subjective motivation" and examine whether "the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon . . . ." *Id.* at 60-61 (emphasis in original) (internal citations and quotation marks omitted); *see also City of Columbia v. Omni Outdoor Adver., Inc*, 499 U.S. 356, 380 (1991) ("A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay"). Therefore, to defeat *Noerr* immunity for a single lawsuit, a

plaintiff must establish "both the objective and the subjective components of a sham." *PRE*, 508 U.S. at 61.

Sham litigation may also be "evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973). Said another way:

> [o]ne claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, viz., effectively barring respondents from access to the agencies and courts. Insofar as the administrative and judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'

*California Motor Transport*, 404 U.S. at 513. The Fourth Circuit held that when applying *California Motor Transport* "[o]f course, the subjective motive of the litigant and the objective merits of the suits are relevant, but other signs of bad-faith litigation . . . may also be probative of an abuse of the adjudicatory process." *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 364 (4th Cir. 2013). In applying this "holistic review" to patterns of lawsuits circuit courts have also looked at a defendant's filing success — i.e. win/loss percentage — as "circumstantial evidence of the defendant's subjective motivations." *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015). *Compare Waugh Chapel*, 728 F.3d at 365 (finding sham where only one of fourteen proceedings was successful), and *Hanover*, 806 F.3d at 182 (finding "[d]efendants' meager record on the merits [of four actions] supports . . . allegation that the filings were brought

not to redress any grievances") with *USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL–CIO*, 31 F.3d 800, 811 (9th Cir. 1994) (finding no sham where fifteen of twenty-nine lawsuits were successful), and *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) (finding no sham where defendant "won seven of the seventeen suits" and each of the ten remaining cases "had a plausible argument on which it could have prevailed"). Furthermore, the Third Circuit held "[i]f more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing 'willy-nilly without regard to success.' . . . A high percentage of meritless or objectively baseless proceedings, on the other hand, will tend to support a finding that the filings were not brought to redress any actual grievances." *Hanover*, 806 F.3d at 181 (internal citations omitted).

Four Circuit Courts have reconciled *California Motor Transport* and *PRE* by concluding that they apply to different situations: *PRE* to a single sham petition, *California Motor Transport* to a series of sham petitions. *See Hanover*, 806 F.3d at 180; *Waugh Chapel*, 728 F.3d at 363-64; *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000); *USS–POSCO,* 31 F.3d at 811. In reconciling these two cases, Judge Kozinski explained:

> [*PRE*] provides a strict two-step analysis to assess whether a single action constitutes sham petitioning. This inquiry is essentially *retrospective*: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham.
>
> . . .

> *California Motor Transport* . . . recognized that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade. When dealing with a series of lawsuits, the question is not whether any one of them has merit— some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is *prospective*: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?

*USS–POSCO,* at 810–11 (emphasis added) (internal citations omitted).  The First Circuit has yet to interpret the principles of pattern sham petitioning under *California Motor Transport* and its interplay with *PRE*.  Absent direct guidance from the First Circuit, this Court adopts the Second, Third, Fourth, and Ninth Circuit approaches to reconciling *California Motor Transport* and *PRE*.[121]

## B.   OneLink's First Motion for Summary Judgment

In order to succeed on its monopolization claim a plaintiff must show, (1) "the [defendant's] possession [of] monopoly power in the relevant market," (2) that the defendant engaged in the "willful acquisition or maintenance of that power as

---

[121]    In Judge Gelpí's August 10, 2012 Order, the Court observed that it "will follow the lead of the Second and Ninth Circuits that have also read these cases together and held the objectively baseless requirement not to apply to allegations of a pattern of proceedings." *First Opinion and Order* at 4. Judge Gelpí made a similar comment in the Court's September 13, 2012 Order.  *Second Opinion and Order* at 3 ("The Second and Ninth Circuits have held [the *PRE* two-part definition of sham] applies when determining if one action constitutes a sham, but does not apply when the challenged proceedings constitute a pattern of repetitive litigation").  These Orders predate *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354 (4th Cir. 2013) (decided Aug. 26, 2013) and *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015) (decided Nov. 12, 2015).  The *Waugh Chapel* and *Hanover* Courts held that when applying *California Motor Transport*, the subjective motive of the litigant and the objective merits of the suits are relevant to pattern sham litigation.  *Waugh Chapel*, 728 F.3d at 364; *Hanover,* 806 F.3d at 180.  This Court adopts the approach of the Third and Fourth Circuits and incorporates the subjective motive of the litigant and the objective merits of the suits into its pattern sham litigation analysis.

distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" (i.e., exclusionary conduct such as sham petitioning), *Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), and (3) "that there is a causal connection between the illegal practice and the [plaintiff's] injury." *Sullivan v. National Football League*, 34 F.3d 1091, 1103 (1st Cir. 1993) (citing *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 532-33, n.26 (1983)).  OneLink's first motion for summary judgment, filed on October 11, 2013, addressed the causation element of PRTC's claim.  *Def.'s First Mot. for Summ. J.*  PRTC's motion for partial summary judgment, filed December 23, 2013, and OneLink's cross-motion for summary judgment, filed February 14, 2014, addressed the exclusionary conduct element of PRTC's claim.  *See Pl.'s Mot.*; *Def.'s Opp'n and Cross Mot.*

In its first order on summary judgment, the Court viewed "the causation element as inherently intertwined with whether or not OneLink is entitled to *Noerr-Pennington* immunity." *First Order on Summ. J.* at 57.  Subsequently, the Court found that "when the Puerto Rico courts issued stays at [OneLink's] request, those events triggered immunity for OneLink under *Noerr-Pennington*." *Id.* at 54.  As a result, the Court held that:

> (1) [on] March 3, 2009, the Puerto Rico Court of Appeals issued an order staying the TRB's consideration of PRTC's franchise application until March 31, 2009; and (2) [on] May 20, 2009, the Puerto Rico Supreme Court issued an order staying the TRB's consideration of PRTC's franchise application until October 26, 2010. . . . *Noerr-Pennington* bars all of PRTC's claims for damages arising from these stays, and may not present any evidence at trial of harm that resulted from these stays, including any incidental effects.

114

*Id.* at 55-56.  The Court also concluded that "*Noerr-Pennington* bars all of PRTC's claims for damages arising from OneLink's Cable Act Complaint and motion for a TRO filed on February 10, 2009 in federal court, as . . . OneLink had demonstrated a 'strong likelihood of success on the merits' of its motion on February 18, 2009, and the case was dismissed as moot on February 24, 2009. . . .  In other words, OneLink was successful in its efforts to influence the Court."  *Id.* at 56.

Additionally, the Court "reviewed six periods of time, between February, 2008 and April 4, 2012, to determine whether during any of them there is a genuine dispute of material fact as to whether OneLink committed 'sham' litigation."  *Id.* at 53-54. These time periods were:

1) February, 2008 and November, 2008 (when PRTC submitted its first application for a video franchise and was subsequently denied by the TRB);
2) December 11, 2008, and March 3, 2009 (when PRTC submitted its second application for a video franchise and OneLink subsequently filed four motions with the TRB);
3) April 7, 2009, and May 1, 2009 (when OneLink filed three motions with the TRB);
4) January 20, 2011, and April 6, 2011 (when OneLink filed a Motion to Recuse President Torres);
5) November 29, 2011, and January 31, 2012 (when OneLink filed its Section 1983 suit in federal court against the TRB); and
6) February 1, 2012, and April 4, 2012 (when the TRB approved PRTC's franchise agreement and OneLink filed three more motions).

*Id.* at 56-62.  For time periods 1 and 4, the Court concluded that PRTC had not presented evidence to establish a trialworthy issue that OneLink initiated any "sham" litigation during this period that delayed the process in any way.  *Id.* However, for time periods 2, 3, 5, and 6, the Court concluded that a reasonable jury

could find that those petitions were filed with the intent to stall and delay PRTC's entrance into the market, rather than seeking a favorable outcome from the TRB. *Id.*

The conclusions from OneLink's first motion for summary judgment are relevant, and in some cases determinative, to this Order. Specifically, OneLink's Cable Act Complaint and motion for a TRO, as well as the Puerto Rico Court of Appeals and Puerto Rico Supreme Court stays, are immune under *Noerr-Pennington. PRE*, 508 U.S. at 60 n.5 ("A winning lawsuit by definition [is] a reasonable effort at petitioning for redress and therefore not a sham"). However, though relevant and helpful, the Court's conclusions as to the six time periods in its first Order are not determinative. The parties have introduced additional record evidence pertaining to those time periods in their motions that must first be addressed before a final determination can be made on *Noerr-Pennington* immunity.

### C. Evidentiary Issues

#### 1. Statements made by the TRB

OneLink argues that statements made by the TRB in its motions and orders should be excluded from the record as inadmissible hearsay, while noting that the TRB was an adversary of OneLink in half of the proceedings at issue, the relationship between OneLink and the TRB was "strained at best, and hostile at worst," and that quoting the TRB's position on OneLink's conduct is "thus no more probative than quoting PRTC's position." *Def.'s Opp'n and Cross Mot.* at 38. PRTC responds to OneLink by citing *Waugh Chapel* for the assertion that a tribunal's "'appraisal of the merits of the litigation aids the sham exception inquiry,' and is among the various

factors that demonstrate 'indicia of bad-faith litigation,' i.e., petitioning brought without regard to the merits." *Pl.'s Opp'n and Reply* at 26 (citing *Waugh Chapel*, 728 F.3d at 365-66).

As the Court observed, the TRB's agency findings and orders are admissible for the truth of the matters under Federal Rule of Evidence 803(8)(A). *See* footnote 115, *supra*; *Davignon,* 524 F.3d at 112-13 (affirming the trial court decision to admit a state labor commission's decision). But PRTC asks for more. It asks that the TRB's arguments presented in judicial proceedings in which the TRB was advocating for its own orders also be admitted for the truth of the matter argued. Once the TRB slipped from its role as adjudicator to advocate, its written advocacy is no longer admissible under Rule 803(8)(A) because it was not acting as an investigator.

Here, the TRB's adjudicatory view of the merits of OneLink's litigation is an appropriate factor for this Court to consider. *Waugh Chapel*, 728 F.3d at 366 (noting that "a state court's appraisal of the merits of litigation aids the sham exception inquiry"). But as the *Waugh Chapel* Court pointed out, the state resolution of the merits of litigation under state law is a different issue than the federal question of a litigant's First Amendment right to petition the courts and "[i]t would make little sense to cede that federal question to state law proceedings that involve issues that are distinct from our inquiry under *California Motor*." *Id.*

As previously discussed, *see* footnote 115, *supra*, however, advocacy statements by the TRB regarding OneLink's alleged anti-competitive behavior may not be admitted for their truth because they constitute inadmissible hearsay. The

117

statements are admissible only to show OneLink's knowledge that the TRB believed that OneLink's petitioning was abusing the judicial process with the intent to delay PRTC's franchise application approval in order to preserve its monopoly.

### 2.   Expert Testimony

OneLink argues that the expert opinions offered by PRTC as evidence of objective baselessness is "not the sort of issue that lends itself to expert testimony" and that this Court is fully competent to decide questions of law without the aid of experts. *Def.'s Opp'n and Cross Mot.* at 9 n.1; *Def.'s Reply* at 22. PRTC asserts that courts have repeatedly allowed expert witness testimony regarding the merits and objective reasonableness of a party's petitioning "where the context for decision-making involves highly technical and complex regulatory environments." *Pl.'s Mot.* at 47.

The Court declines to admit the testimony of any experts regarding questions of law and objective reasonableness. As previously discussed, *see* footnote 3, *supra*, the First Circuit has explicitly held that such testimony is prohibited, subject to exceptions not applicable here. *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (quoting *United States v. Newman*, 49 F.3d 1, 7 (1st Cir. 1995)). "[I]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Id.* "[T]he judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial." *Id.* at 100. *See also VIM, Inc. v. Somerset Hotel Ass'n,* 19 F. Supp. 2d 422, 427 n.4 (W.D. Pa. 1998) ("objective baselessness is not the sort of issue that lends itself to expert testimony under Fed. R. Evid. 702"); *In re Fresh*

*Del Monte Pineapples Anti–Trust Litig.*, No. 04–MD–1628, 2009 WL 3241401, at *13 (S.D.N.Y. Sep. 30, 2009) (reasoning that the expert testimony on sham litigation and patent misuse was "inadmissible and unnecessary").

PRTC cited three cases to support its proposition that "courts have repeatedly allowed expert witness testimony regarding the merits and objective reasonableness . . . particularly where the context for decision-making involves highly technical and complex regulatory environments." *Pl.'s Opp'n and Reply* at 47 n.9 (citing *In re Flonase Antitrust Litig.*, 884 F. Supp. 2d 184, 192 (E.D. Pa. 2012); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07-Civ-7343, 2009 U.S. Dist. LEXIS 77206, at *18 (S.D.N.Y. Aug. 28, 2009); *In re Wellbutrin SR Antitrust Litig.*, Nos. 04-5525, 04-5898, 05-396, 2010 WL 8425189, at *3 (E.D. Pa. Mar. 31, 2010)).

This caselaw is not persuasive. The expert testimony relied on by these cases involved factual disputes in pharmaceutical litigation. The *In re Flonase* Court, for example, allowed expert testimony from a former lawyer at the Office of General Counsel at the Federal Drug Administration on the "regulatory policy and practice" of the FDA. *In re Flonase*, 884 F. Supp. 2d at 198. The *In re Flonase* Court refused to allow the expert to testify that citizen petitions in that case were "appropriate" because this testimony would "confuse the jury in its consideration of the *PRE* test." *Id.* at 197. However, the *In re Flonase* Court allowed the lawyer to testify about whether the citizen petitions in that case had "regulatory merit," presenting policy positions that the FDA "could well have adopted" and that the petitions succeeded in influencing the FDA's standards. *Id.* at 196. This decision seems to hinge more on

119

the rarified world of FDA regulatory enforcement than the issues presented in this case.  The *Louisiana Wholesale Drug* case involved the same former FDA lawyer as *In re Flonase*.  2009 U.S. Dist. LEXIS 77206, at *17-19.  In *Louisiana Wholesale Drug*, the expert testified that she had researched the FDA files to determine whether the agency had ever addressed the question of "a loading dose" and opined that it had not.  *Id.*  This is not the same type of expert opinion testimony being offered here.

Indeed, the *In re Wellbutrin* Court actually excluded expert testimony offered for its conclusions of law as to whether the defendant had an objectively reasonable basis under *PRE* to file its lawsuits.  *In re Wellbutrin SR Antitrust Litig.,* 2010 WL 8425189, at *6.

### 3.   Advice of Counsel and Attorney-Client Privilege

OneLink argues that because (1) it has not raised advice of counsel as a defense, and (2) that it has not invoked confidential attorney-client communications, it may rely on the arguments raised in the underlying motions and briefs to explain why the litigation was objectively reasonable.  *Def.'s Reply* at 12-13.  PRTC counters that, having chosen to assert privilege to protect from discovery the advice OneLink received regarding the petitions at issue in this case, OneLink has waived its right to assert an advice of counsel defense.  *Pl.'s Surreply* at 6.  PRTC contends it does not assert that OneLink cannot argue the merits of the law underling its petitions, only that it is precluded from asserting it was acting under the advice of counsel.  *Id.* at 7.

A defendant asserting *Noerr-Pennington* immunity is not raising an advice of counsel defense or waiving the privilege.  *In re Burlington N., Inc.*, 822 F.2d 518, 533

(5th Cir. 1987); *see also Rock River Commc'n, Inc. v. Universal Music Grp., Inc.*, No. 11-57168, 2014 U.S. App. LEXIS 1334, at *353-54 (9th Cir. Jan. 22, 2014) ("*Noerr-Pennington* defense does not necessarily place the attorney-client communications at issue," and so, "unlike an advice-of-counsel defense, does not implicitly waive privilege"). OneLink may rely on the arguments it raised in the underlying suits to explain why they were objectively reasonable.[122]

### 4.   Evidentiary Burden

PRTC argues that because OneLink is asserting the affirmative defense of *Noerr-Pennington* immunity, it "bears the burden of establishing its applicability." *Pl.s' Surreply* at 3 (citing *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35-36 (1st Cir. 1998)). PRTC asserts that in order to be entitled to summary judgment, OneLink has the burden of proof to "provide evidence sufficient for the court to hold that no reasonable trier of fact could find other than in its favor." *Id.* (citing *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers,* 536 F.3d 68, 77 (1st Cir. 2008)). OneLink answers that it is PRTC that carriers the burden to present sufficient evidence that OneLink "exceeded the First Amendment's boundaries" and argues that the law is clear that "the burden rests with the party alleging sham." *Def.'s Reply* at 4.

---

[122]   PRTC is correct, however, that if OneLink were to raise an advice of counsel defense, the nature of the advice is put at issue and the subject matter of the advice would typically lose attorney-client privilege protection. *In re Keeper of Records*, 348 F.3d 16, 24 (1st Cir. 2003) ("Implying a subject matter waiver in such a case ensures fairness because it disables litigants from using the attorney-client privilege as both a sword and a shield").

The usual rule "honored . . . by most jurisdictions, is to place the burden of proving affirmative defenses on the party asserting them." *U.S. Liab. Ins. Co. v. Selman*, 70 F.3d 684, 691 (1st Cir. 1995).  However, the First Circuit caselaw relied upon by PRTC, though addressing Sherman Act claims and affirmative defenses, does not address *Noerr-Pennington* immunity. *See Am. Steel Erectors*, 536 F.3d at 75 (defendant raised "affirmative defenses against Plaintiffs' Sherman Act claims").

The First Circuit's sister circuits have made clear that the burden of proof rests with the anti-trust plaintiff to prove that the action of the defendant comes within the sham exception of *Noerr-Pennington* immunity.  *See* USS-POSCO, 31 F.3d at 811; *MCI Commc'ns v. Am. Tel. & Tel Co.*, 708 F.2d 1081, 1155 (7th Cir. 1983); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992); *Westmac, Inc. v. Smith*, 797 F.2d 313, 318 (6th Cir. 1986); *accord In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 311 (E.D. Pa. 2011).  Indeed, as the Fourth Circuit discussed, in his concurring opinion in *California Motor Transport*, Justice Stewart imposed the burden of proof on the plaintiff asserting sham petitioning.  *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 791 F.2d 288, 292 (4th Cir. 1986) (citing *California Motor Transport,* 404 U.S. at 518 (the plaintiffs "are entitled to prove that the real intent of the [defendants] was not to invoke the processes of the administrative agencies and courts, but to discourage and ultimately to prevent the [plaintiffs] from invoking those processes")).

Consistent with this precedent, the Court concludes that the burden rests with PRTC, the antitrust plaintiff, to prove that the actions of OneLink fall within the sham exception to *Noerr-Pennington*.

122

**D.     What constitutes a "Litigation" or a "Proceeding" under *Noerr-Pennington*?**

As a threshold issue, before the Court can assess if a lawsuit is objectively baseless or part of a pattern of sham petitioning, it first must determine what is considered a "litigation" or a "proceeding" under *PRE* and *California Motor Transport*.

This Court previously ruled "that appeals from one proceeding constitute action within the same litigation." *Second Opinion and Order* at 4-5; *see also Luxpro Corp. v. Apple, Inc.*, No. C 10-03058 JSW, 2011 WL 1086027, at *5 n.1 (N.D. Cal. Mar. 24, 2011) ("The Court is not aware of any cases . . . that support the notion that the Court should count appeals as a separate proceeding").  OneLink argues that the Court should adopt this same logic to petitions and motions filed in a single action, such as PRTC's second franchise application, as "almost all litigation involves extensive motion practice, and one suit does not become two, three, or four simply because prosecuting it required multiple filings." *Def.'s Opp'n and Cross Mot.* at 40. PRTC argues otherwise, asserting petitions filed within a single proceeding "are only disregarded for purposes of the pattern exception when they are 'incidental' to the prosecution of the proceeding," and thus petitions in a proceeding that are not incidental constitute separate instances of petitioning activity. *Pl.'s Opp'n and Reply* at 11-12.

The Court finds no support for PRTC's argument regarding "incidental" proceedings and concludes that petitions and motions filed within the same litigation or proceeding (i.e., lawsuit or administrative action such as a franchise application)

123

are not counted as separate proceedings for analysis under *PRE* or *California Motor Transport*.  Generally, the caselaw addressing the sham pattern theory has assessed the number of lawsuits filed, not motions or petitions filed within a lawsuit.  *See USS-POSCO*, 31 F.3d at 811 ("twenty-nine lawsuits"); *Livingston Downs Racing Ass'n*, 192 F. Supp. at 539 ("nine lawsuits"); *Waugh Chapel*, 728 F.3d at 365 ("fourteen suits").  More narrowly, the Eastern District of Pennsylvania determined that two separate filings offered by a movant to be considered jointly "together comprise[d] a single instance of petitioning."  *In re Flonase Antitrust Litigation*, 795 F. Supp. 2d at 312 n.14 (citing *PRE*, 508 U.S. at 60 for the general proposition of "considering a lawsuit as one collective act of petitioning, as opposed to considering each filing independently").  The Southern District of Florida found in conducting the objectively baseless analysis under *PRE* that six separate lawsuits "should be treated as one suit for purposes of this analysis because they all involved the same patent and the same underlying legal issue."  *In re Terazosin Hydrochloride Antitrust Litigation*, 335 F. Supp. 2d 1336, 1360 (S.D. Fla. 2004).

This approach makes sense.  For example, in the matter of PRTC's second TRB application, seven motions were filed by OneLink between January 30, 2009, and April 27, 2009, regarding PRTC's second franchise: (1) January 30, 2009 Motion to Vacate or Stay Confidentiality Determinations and Enforce Board Confidentiality Procedures; (2) Feb. 25, 2009 Urgent Motion to Dismiss PRTC's Application; (3) February 11, 2009 Urgent Motion for an Extension of Time to File Comments for the Establishment of a Reply Comment Cycle, and for a Revised Hearing Schedule; (4)

March 2, 2009 Motion of OneLink for an Order Requiring PRTC to Report the Results of the Beta-Testing it Conducted Pursuant to the Board's 12/17/08 Resolution and Order; (5) April 7, 2009 Emergency Motion to Show Cause; (6) April 23, 2009 Opposition to PRTC's Motion to File Reply Comments; and (7) April 27, 2009 Motion to Set Aside Public Hearing.   All seven motions in one form or another address OneLink's motion for intervention and its ability to gain access to, challenge, and give comments on PRTC's second franchise application and its associated materials.

Regarding the letters OneLink sent to the U.S. Attorney's Office, FCC, and OMA, PRTC asserts, and OneLink agrees, that these letters count as "petitions in the *Noerr* context." *Def.'s Reply* at 20 n.6.  The Court concurs.  *See Friends of Rockland Shelter Animals, Inc. v. Mullen*, 313 F.Supp.2d 339, 343 (S.D.N.Y. 2004) ("[Defendant's] letter to County Executive Vanderhoef is an attempt to influence the government within the meaning of the *Noerr–Pennington* doctrine").   OneLink argues, however, that the relevant question "is not whether they are *petitions* under *Noerr* but rather whether they count as *distinct proceedings* under the 'pattern' sham *exception* to *Noerr*."   *Id.* (emphasis provided by OneLink).  OneLink notes that the Southern District of California counted only two lawsuits and excluded three communications to regulators in the context of assessing how many proceedings to include under the *California Motor Transport* sham pattern analysis. *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 958 n.16 (S.D. Cal. 1996).  The Court is not convinced by OneLink, as it fails to consider that *Gen-Probe* provides no analysis regarding the content of or requests made in the three letters other than that the

125

defendant "published or sought action based upon the same allegations" of its two lawsuits. *Id.* In contrast, the letters OneLink sent to the OMA initiated an investigation into PRTC's possible violations of the Puerto Rico Telecommunications Act, resulting in service of a subpoena on PRTC. Moreover, the communications with the U.S. Attorney's Office and the FCC included legal briefing, exhibits, and resulted in follow up meetings with these agencies.

Additionally, OneLink relies on the Ninth Circuit's decision in *Kottle v. Northwest Kidney Ctrs.* for the argument that appeals to regulators' policy discretion outside an "adjudicatory" context are not susceptible to the sham exception at all. *Def.'s Opp'n and Cross Mot.* at 41 (citing 146 F.3d 1056, 1059, 1062 (9th Cir. 1998)) ("Only when administrative officials must follow rules is it meaningful to ask whether a petition before an agency was 'objectively baseless,' or whether there has been a pattern of petitioning without regard to the 'merits' of the petitions"). However, this "legislative verses judicial" distinction has been explicitly rejected by numerous courts, including the District of Massachusetts, which explained that "if the sham exception applied only to adjudicative processes, then any act of advocacy before a legislative or quasi-legislative body would be shrouded in carte blanche immunity regardless of purpose or sufficiency – even if the activity was utterly baseless, an abuse of process, and motivated solely to stifle competition." *In re Prograf Antitrust Litig.*, No. 1:11-md-2242-RWZ, 2012 WL 293850, at *5 (D. Mass. Feb. 1, 2012) ("Such a result is inconsistent with the reason underlying the doctrine espoused in *Noerr* and reiterated in subsequent Supreme Court cases").

126

The Court is unpersuaded by OneLink's arguments under *Gen-Probe* and *Kottle* and determines that the letters to the regulators may count as litigation under *PRE* and *California Motor Transport*.

Finally, the Court determines that the complaint filed by Choice with the TRB regarding PRTC's pre-franchise construction is not a lawsuit under *PRE* or *California Motor Transport*. The record shows that though OneLink was prepared to pay for Choice's complaint, Choice eventually paid for the complaint itself. *See* footnote 100, *supra*.

### E.    Sham Petitioning under *PRE*

The Court first assesses under *PRE* whether the sham exception to *Noerr-Pennington* applies to any of the litigation or proceedings filed by OneLink. This is a two-part analysis, evaluating first whether the litigation was objectively baseless, and second, only if the challenged litigation is found to be objectively meritless, an assessment of the litigant's subjective intent. *PRE*, 508 U.S. at 60. Additionally, this analysis will aid the Court in its subsequent assessment of OneLink's actions under the sham pattern exception. *Waugh Chapel,* 728 F.3d at 364 ("Of course, the subjective motive of the litigant and the objective merits of the suits are relevant" under *California Motor Transport*).

#### 1.    Successful Lawsuits

The *PRE* Court held that "[a] winning lawsuit by definition [is] a reasonable effort at petitioning for redress and therefore not a sham." *PRE*, 508 U.S. at 60 n.5;

*see also Allied Tube*, 486 U.S. at 502 (reasoning that a successful "effort to influence governmental action . . . certainly cannot be characterized as a sham").

As discussed, in its previous order the Court concluded that "*Noerr-Pennington* bars all of PRTC's claims for damages arising from OneLink's Cable Act Complaint and motion for a TRO filed on February 10, 2009 in federal court, as . . . OneLink had demonstrated a 'strong likelihood of success on the merits' of its motion on February 18, 2009, and the case was dismissed as moot on February 24, 2009. . . .   In other words, OneLink was successful in its efforts to influence the Court." *First Order on Summ. J.* at 56.  PRTC has provided no additional evidence contradicting the Court's previous determination.  OneLink's first Cable Act suit was objectively reasonable and immune under *Noerr-Pennington.*

Likewise, in reviewing PRTC's first franchise application in 2008, the Court concluded that "PRTC has not presented evidence to establish a trialworthy issue that OneLink initiated any 'sham' litigation during this period that delayed the process in any way.  Although OneLink submitted comments to the TRB as an interested party, this act was within its right and is not sufficient to show any objectively baseless litigation on the part of OneLink." *Id.* at 57-58.  The record submitted by PRTC in its motion for summary judgment fails to refute this conclusion.  Though OneLink's motion for intervention was denied, the TRB rejected PRTC's application on grounds urged by OneLink – i.e., cross-subsidization and inadequacies of the application.  OneLink was successful in its efforts to influence the

TRB and as such OneLink's petitioning in PRTC's first franchise application was objectively reasonable and immune under *Noerr-Pennington*.

OneLink argues it was successful in two additional lawsuits: (1) its intervention mandamus (because the TRB was forced to issue the prompt ruling that OneLink sought), and (2) the § 1983 lawsuit (because the TRB settled the suit in terms favorable to OneLink). *Def.'s Opp'n and Cross Mot.* at 45. OneLink contends that these suits resulted in favorable outcomes and were a success for *Noerr-Pennington* purposes. *Id.* at 29, 35. PRTC disagrees, arguing OneLink's mandamus petition was based on fraud and thus a sham, *Pl.'s Opp'n and Reply* at 18-19, while the § 1983 suit actually failed because the court granted TRB and PRTC's joint motion to dismiss. *Id.* at 21 n.4.

The Southern District of Florida's *In re Terazosin* discussion provides guidance on this issue. Addressing patent infringement claims and alleged anti-competitive behavior, the district court found that in seven separate lawsuits the sham defendant "obtained the relief it sought or additional information, and [voluntarily] dismissed the lawsuits. By definition, [the defendant] 'won' seven of these lawsuits because they were 'reasonable efforts at petitioning for redress.'" *In re Terazosin*, 355 F. Supp. 2d. at 1357-58 (citing *PRE*, 508 U.S. at 61). Moreover, the district court could not "agree with Plaintiffs that a plaintiff who has filed suit and receives the relief sought (e.g., monetary compensation, a change in conduct, etc.) could only have been deemed to have 'won' under *PRE* if it continued to litigate the case and received a favorable judgment from the court." *Id.* at 1358 n.13.

The record shows that OneLink sued the TRB for mandamus because OneLink claimed it had not gained access to certain confidential documents it hoped to have before a scheduled franchise application hearing and requested that the court order the TRB to resolve its motion to intervene. Shortly after the mandamus litigation was filed, the TRB issued an order denying intervention and stated that "[g]iven . . . that OneLink went before the [trial court] through a petition for a writ of mandamus, we are forced to decide this issue within a limited period of time." *See* Section I(B)(2), *supra*. Thus, OneLink received redress and the relief it sought: OneLink's mandamus petition requested that the TRB resolve its motion to intervene and as the TRB stated, OneLink's petition forced it to decide the issue of intervention. OneLink's mandamus petition was objectively reasonable because it was successful and is immune under *Noerr-Pennington*.

Lastly, as part of its § 1983 and Cable Act suit against the TRB, OneLink sought a TRO to stay the order approving PRTC's franchise application. The record supports that the TRB agreed to delay approval of the franchise agreement with PRTC until January 31, 2012, and to provide OneLink with notice before approving the franchise agreement. In exchange, OneLink and Choice withdrew their request for a TRO. *See* Section I(B)(6)(b), *supra*. OneLink received the relief it sought in its § 1983 suit from its agreement with the TRB: a stay in approval of PRTC's franchise application. Moreover, as this Court has found, the issuance of a stay triggers immunity under *Noerr-Pennington*. *First Order on Summ. J.* at 53-56. Again,

130

because it was successful, OneLink's § 1983 suit was objectively reasonable and immune under *Noerr-Pennington*.

In sum, the Court concludes that OneLink is immune under *Noerr-Pennington,* and thus entitled to summary judgment as a matter of law for its first Cable Act suit, petition for mandamus, § 1983 suit, and involvement in PRTC's first franchise application, as these petitions do not constitute "sham" litigation.

### 2.    Unsuccessful Lawsuits

OneLink does not dispute that it was unsuccessful in the following actions: (1) its first motion to intervene in PRTC's second franchise application; (2) its second motion to intervene in PRTC's second franchise application; (3) its motions to recuse TRB President Torres; (4) its cross-subsidization rulemaking petitions; (5) its second Cable Act complaint; (6) its Puerto Rico Telecommunications Act complaint; and (7) its regulatory agency petitions.  However, as previously discussed:

> when the antitrust defendant has lost the underlying litigation, a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'   The court must remember that '[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.'

*PRE*, 508 U.S. at 60 n.5.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail."  *PRE*, 508 U.S. at 60.  "[T]he existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation. . . .  Probable

131

cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.* at 62-63 (internal citations and quotation marks omitted).

### a. OneLink's First Motion to Intervene in PRTC's Second Franchise Application

The record shows that OneLink appealed the TRB's rejection of its second request for intervention to the Puerto Rico Court of Appeals and secured a stay pending appeal. Subsequently, the TRB filed an emergency motion to the Puerto Rico Court of Appeals for oral argument and stated that the dispute was of a highly technical nature involving important principles of federal and state public policy that had never been addressed by the Puerto Rico courts. The Court of Appeals granted oral argument and eventually denied the appeal, holding that OneLink had no right to intervene. Next, the Supreme Court of Puerto Rico granted certiorari for OneLink's appeal and issued a stay pending resolution. The TRB filed an emergency application with the Puerto Rico Supreme Court seeking oral argument and argued that it was a "novel" case with significant repercussions for the telecommunications industry and for administrative practices in Puerto Rico. Similarly, PRTC argued the appeal raised fundamental questions of "a highly technical matter of considerable public interest that for the first time has been submitted" to the Puerto Rico Supreme Court and that oral argument was needed because of the gray area in the law. The Supreme Court of Puerto Rico affirmed the judgment issued by the Court of Appeals. The Supreme Court of Puerto Rico found that "never before have we made a declaration as to whether the nature of the adjudicative proceeding, and thus, the

132

right to intervene is also present at the initial point when it is explained whether or not the requested franchise or license has been granted." *See* Section I(B)(2), *supra*.

The treatment afforded OneLink's argument by the Puerto Rico Court of Appeals and the Puerto Rico Supreme Court, in addition to PRTC and the TRB statements regarding the issue being "novel" and "for the first time submitted," demonstrates that the law was "unsettled" and that OneLink had probable cause to believe that its claim "may be held valid upon adjudication." *PRE*, 508 U.S. at 62-63, 65. Moreover, the Court previously found that the stays during the pendency of OneLink's appeals were successful efforts to influence the courts and subject to immunity under *Noerr-Pennington*. *First Order on Summ. J.* at 53-56. Therefore, OneLink's first motion to intervene in PRTC's second franchise application was objectively reasonable and immune under *Noerr-Pennington*.

The Court also notes that, though not required for the objective baselessness analysis, OneLink demonstrated in the record that it had ample reason to seek intervenor status: (1) it was denied the right to cross-examine witnesses and the ability to hear all the testimony at the August 8, 2011 hearing; (2) it could not move to reconsider the TRB's approval of the franchise, or to appeal the TRB's denial of its motion to reconsider; and (3) the TRB did not respond to all of its filings. *See generally*, Section I(B), *supra*.

### b. OneLink's Second Motion to Intervene in PRTC's Second Franchise Application

As the Court found, on November 8, 2011, the TRB approved PRTC's franchise application. On November 15, 2011, OneLink moved for a second time to intervene

in PRTC's second franchise application. On February 1, 2012, the TRB approved PRTC's franchise agreement. On April 4, 2012, citing the Puerto Rico Supreme Court's June 9, 2010 decision denying OneLink's request for intervention,[123] the TRB determined that it is only when the franchise agreement is final that a non-party can move for intervention requesting the decision be reconsidered, not when the TRB ruled that the PRTC application complied with the legal requirements for awarding a franchise (i.e., November 8, 2011). *See* Section I(B)(4), *supra*. OneLink argues its second motion to intervene was reasonable because, inter alia, the June 9, 2010 Puerto Rico Supreme Court ruling "did not say whether the intervention right would arise after the grant of the franchise application or only after the signing of the franchise agreement." *Def.'s Opp'n and Cross Mot.* at 19.

The Puerto Rico Supreme Court's June 9, 2010 ruling refers to the granting of the franchise "application," not the franchise agreement:

> The [U.A.P.A. sec. 5.4] provision [] triggers the adjudicative process once the Board decides to grant or deny PRTC's *application* for a Cable TV franchise. It is at this time that OneLink, PRTC or any other party with standing and a legitimate and substantial interest may move to intervene. . . . A public hearing is not an adjudicative hearing. It is merely a mechanism that allows the Board to make a better-informed determination to either grant or deny PRTC's Cable TV franchise *application.*

*Puerto Rico Tel. Co. v Telecommunications Regulatory Board of Puerto Rico*, 2010 TSPR 89, ¶ 25, 179 D.P.R. 177 (2010) (emphasis added). Additionally, the TRB's November 8, 2011 order explicitly states that "[t]he franchise requested by [PRTC] is

---

[123]    *Puerto Rico Tel. Co. v Telecommunications Regulatory Board of Puerto Rico*, 179 D.P.R. 177, 2010 WL 2553881, 2010 TSPR 89, P.R. Offic. Trans. (2010).

granted with the conditions listed below."  Nov. 8, 2011 Resolution & Order at 8, *In re: PRTC h/n/c ClaroTV*, JRT-2008-CCG-0002 (*Carson Decl.* Ex. 77) (ECF No. 248).

The plain reading of the Puerto Rico Supreme Court's June 9, 2010 ruling is that the adjudicative process is triggered by the granting of the franchise application. Coupled with the TRB's November 8, 2011 order that explicitly granted the franchise requested by PRTC, this shows  the "unsettled condition of the law" and demonstrates that OneLink had probable cause to file its motion for intervention, as well as any post-February, 2012 filings with the TRB or appeal to the Puerto Rico courts regarding the motion for intervention.  *PRE*, 508 U.S. at 65.  Thus, OneLink's second motion to intervene in PRTC's second franchise application (and its associated motions and appeals) was objectively reasonable and immune under *Noerr-Pennington*.

### c.    Motions to Recuse Sandra Torres

The Court previously determined that:

> [R]egarding the time period between January 20, 2011 and April 6, 2011, when OneLink filed a Motion to Recuse President Torres . . . that PRTC has not presented sufficient evidence to establish a trialworthy issue that OneLink initiated any "sham" litigation during this period that delayed the process in any way.  It would be different had PRTC presented evidence that the TRB had delayed scheduling the hearing until it had received a response from the OGE, or that OneLink advocated for such a position, but that is only pure speculation absent any evidence.

*First Order on Summ. J.* at 59-60.  Moreover, it is evident from the record that OneLink had probable cause to seek the recusal of Commissioner Torres.  Puerto Rico law states in relevant part:

(s) *Conflict of interest.*— Means that situation in which the personal or financial interest of the public servant or persons related to him/her, is, or could reasonably be in conflict with the public interest.

3 L.P.R.A. § 1802.  Additionally:

(a) The members of the Board shall be citizens of the United States of America and residents of Puerto Rico, and shall have broad, recognized experience in the telecommunications industry. *The members shall not have a direct or indirect interest in, nor any contractual relationship with the telecommunications companies subject to the jurisdiction of the Board, or in entities in or outside of Puerto Rico affiliated to, or having interests in said telecommunications companies. . . .*  The activities of the members during and after the expiration of their terms shall be subject to the restrictions provided in the Government Ethics Act, §§ 1801 et seq. of Title 3.

27 L.P.R.A. § 267b (emphasis added).   Before Sandra Torres became a TRB Commissioner, she was employed by PRTC for over thirty years, during which time she served as Secretary of PRTC's Board of Directors.  While a TRB Commissioner, Sandra Torres and her husband held pensions with PRTC.  *See* Section I(B)(3), *supra*. Though the Ethics Office opinion later found Commissioner Torres was not required to recuse herself, considering the length of time she was employed by PRTC, and that she was on the Board of Directors, a plain reading of Puerto Rico law would lead an objective litigant to conclude that seeking recusal of Sandra Torres would be reasonably calculated to elicit a favorable outcome.  *PRE*, 508 U.S. at 60.

Moreover, OneLink's November 16, 2011 Motion for Vote of No Confidence and Disqualification of Commissioner Sandra Torres pertained to events surrounding the November 8, 2011 TRB order that reconsidered, revoked, and replaced the November 2, 2011 TRB order, separate grounds from OneLink's earlier motion to recuse.  The Ethics Office's first opinion did not address the issue surrounding OneLink's second

motion to recuse (i.e., the change in TRB commissioners and subsequent revocation of the November 2, 2011 TRB order).  PRTC has failed to address this difference.  As such, considering the circumstances surrounding the November 16, 2011 motion to recuse, a plain reading of Puerto Rico law would again lead an objective litigant to conclude that seeking recusal of Sandra Torres would be reasonably calculated to elicit a favorable outcome.  *PRE*, 508 U.S. at 60.  Therefore, OneLink's motions to recuse Commissioner Torres were objectively reasonable and immune under *Noerr-Pennington*.

### d.    Cross-Subsidization Rulemaking Petitions

OneLink filed a Petition for Rulemaking Regarding Cross-Subsidization with the TRB, seeking promulgation of rules prohibiting cross-subsidization before PRTC's second franchise application was considered.  When the TRB did not take action on its Petition for Rulemaking, OneLink filed a mandamus petition in the Puerto Rico Court of First Instance.  The Court of First Instance denied OneLink's mandamus request, holding that the TRB did not have the administrative duty to promulgate cross-subsidy rules.  The Puerto Rico Court of Appeals affirmed the Court of First Instance's opinion, stating "we do not find any principle in the law that imposes an administrative duty on the Board to regulate the prohibition of cross-subsidies.  On the contrary . . . the full analysis . . . and the legislative intent underlying [the telecommunications laws] suggest without a doubt that the regulation of the matter in dispute falls within the discretion of the Board."  *See* Section I(B)(5), *supra*.

The Puerto Rico Telecommunications Act states:

> (a) The Board *shall adopt*, promulgate, amend, and revoke rules, orders, and regulations *as it deems necessary and proper* according to the exercise of its powers, and the performance of its duties. When adopting, amending, or revoking rules or regulations, the Board shall be subject to the provisions of the Uniform Administrative Procedure Act, §§ 2101 et seq. of Title 3.

27 L.P.R.A. § 267f(a) (emphasis added). This Puerto Rico Telecommunications Act also states that:

> (q) Within one hundred and eighty (180) days after the approval of this act, the Board *shall adopt* the regulations *needed* to implement the requirements of this section.

27 L.P.R.A. § 269c(q) (emphasis added). Section 269c contains prohibitions related to cross-subsidies. *See* 27 L.P.R.A. § 269c(k)-(m). "No telecommunications company shall use the income generated by noncompetitive services to subsidize the offering or rendering of competitive services." *Id.* § 269c(k). OneLink argues that the parties had a "reasonable disagreement" regarding TRB's duty to adopt cross-subsidy regulations. *Def.'s Opp'n and Cross Mot.* at 34. In response, the PRTC cites the general provision authorizing the TRB to "adopt, promulgate, amend, and revoke rules . . . as it deems necessary and proper" as granting broad discretion requiring no administrative duty to promulgate cross-subsidization rules (the view adopted by the Court of First Instance and the Court of Appeals). *See* 27 L.P.R.A. § 267f(a). OneLink argues that this analysis ignores the more specific provision concerning regulations to prevent cross-subsidization; that "the Board shall adopt the regulations needed to implement the requirements of this section." 27 L.P.R.A. § 269c(q). OneLink argues that because Section 269c(q), unlike Section § 269f(a), does not refer to regulations the TRB "deems necessary and proper," that it "had a reasonable argument that the

138

Legislature contemplated that some regulations would be 'needed' to address the cross-subsidy issue and that the TRB was obliged to regulate on that subject." *Def.'s Opp'n and Cross Mot.* at 34 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion")).

The Puerto Rico Court of First Instance and the Court of Appeals rejected OneLink's argument. However, "a court must 'resist the understandable temptation to engage in post hoc reasoning. . . [and] remember that '[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.'" *PRE*, 508 U.S. at 60 n.5 (quoting *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 422 (1978)). In addressing a suit brought under the Civil Rights Act of 1964, the Supreme Court held in *Christiansburg Garment Co* that:

> . . . it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim [of discrimination], no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

434 U.S. at 422.  As OneLink notes, courts have found on numerous occasions that statutory language requires agencies to promulgate regulations;[124] the language in 27 L.P.R.A. § 269c(q) that "the Board shall adopt the regulations needed to implement the requirements of this section" can be read to support OneLink's position.  Despite its ultimate failure, OneLink's argument for mandatory cross-subsidization regulation is not legally frivolous, and an objective litigant could have perceived its argument for this extension of Puerto Rico law as having some likelihood of success.  *PRE*, 508 U.S. at 65.

Even if OneLink's arguments were objectively baseless, in order for its actions to have constituted sham litigation under *PRE*, the Court must also find OneLink had the subjective intent "to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon . . . ."  *Id.* at 60-61 (emphasis in original) (internal citations and quotation marks omitted).  The record indicates that concern over cross-subsidization was a reason for the denial of PRTC's first franchise application.  Moreover, cross-subsidization persisted as an issue before the TRB until its November 2, 2011 order that found deficiencies in PRTC's second franchise application regarding cross-subsidization.  OneLink had ample motivation

---

[124]    *See Massachusetts v. EPA*, 549 U.S. 497, 532-33 (2007) (holding that EPA cannot "avoid its statutory obligation" to regulate); *see also, e.g., In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (issuing mandamus where statute "commands [agency] to establish some sort of compliance standards"); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1193 (10th Cir. 1999) (holding that Secretary "must be ordered to comply with his statutory duty to publish a final regulation regarding designation of the critical habitat for the silvery minnow"); *Iowa v. Block*, 771 F.2d 347, 352 (8th Cir. 1985) (granting relief to enforce "clear duty of the Secretary to promulgate regulations which carry out the intent of Congress").

in seeking cross-subsidization rulemaking from the TRB.  Moreover, OneLink filed its initial motion for cross-subsidy rulemaking on July 22, 2009, its mandamus petition on November 4, 2009, and ultimately its motion for reconsideration of the Court of Appeals' decision denying mandamus was issued on August 5, 2010.  This all took place during the period the Puerto Rico Supreme Court stayed PRTC's second franchise application (May 20, 2009 to October 26, 2010).  This cuts against the inference that OneLink was attempting to interfere through the use of governmental process, as PRTC's franchise application was stayed during the entire pendency of the motion for rulemaking and the mandamus petition.

The Court concludes that OneLink's motion for rulemaking on cross-subsidies and mandamus petition are immune under *Noerr-Pennington*.

### e.    OneLink's Second Cable Act Complaint

On March 25, 2009, OneLink moved to re-open its Cable Act case, but instead of re-opening the case, the Court requested that OneLink file a new case challenging PRTC's alleged illegal pre-franchise construction.  *See* Section I(B)(6)(a), *supra*.  This Court later dismissed the complaint in part due to lack of standing under the Cable Act.[125]  OneLink appealed to the First Circuit, arguing there was a private right of action to enforce section 541(b)(1) of the Cable Act.  On July 15, 2010, the First Circuit affirmed this Court's decision, recognizing the issue of whether "a cable operator [has] an implied private right of action to enforce section 541(b)(1) of the [Cable Act] had not been answered at the federal appellate level," and ultimately found "[a]s a matter

---

[125]    *San Juan Cable LLC v. Puerto Rico Tel. Co.*, 623 F. Supp. 2d 189 (D.P.R. 2009).

of first impression" that OneLink lacked standing to bring its claim under the Cable Act.[126]  At issue on appeal also was whether OneLink could enforce two FCC orders that OneLink asserted were being violated by PRTC.  *Id.*  The First Circuit held that, "holding fast to circuit precedent, we reiterate that a private cable operator lacks standing to enforce either of the two FCC orders at issue here."  *Id.* at 28.

OneLink's second Cable Act suit was objectively reasonable.  OneLink pursued its second suit on the same theory as its first.  As discussed, OneLink's first suit (during which neither PRTC nor the TRB argued that OneLink lacked standing) was found to have demonstrated "a strong likelihood of success on the merits."  This Court requested that OneLink file a new case challenging PRTC's alleged illegal pre-franchise construction instead of reopening the first case.  A reasonable litigant could have perceived some likelihood of success.  *PRE*, 605 U.S. at 65.  Moreover, applying *PRE*, courts have found a question of first impression lends itself to objective reasonableness.  *See Kaiser*, 552 F.3d at 1046; *In re Terazosin*, 335 F. Supp. 2d at 1359-60; *Arminak & Associates, Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1209 (C.D. Cal. 2011).

As for OneLink's argument that it had standing to enforce the two FCC orders, even if its claim were to be found objectively baseless, "[p]laintiffs do not need to show a realistic expectation of success on all of [the] arguments in each petition and its lawsuit.  Rather, conduct is not a sham if 'at least one claim in the [petition] has objective merit.'"  *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d at 311-12 (quoting

---

[126]     *San Juan Cable LLC v. Puerto Rico Tel. Co.*, 612 F.3d 25, 27-28 (1st Cir. 2010).

*Dentsply Int'l, Inc. v. New Tech. Co.*, No. 96-cv-272, 1996 WL 756766, at *2 (D. Del. Dec. 19, 1996)).   Moreover, OneLink argued to the First Circuit that a number of other circuit courts have found private cable operators have standing to enforce the FCC orders; the First Circuit acknowledged this contention.   *San Juan Cable*, 612 F.3d at 34 (citing *Hawaiian Tel. Co. v. PUC of Haw.*, 827 F.2d 1264, 1270-72, n.19 (9th Cir. 1987) ("For substantially the same reasons discussed . . . the Fourth, Fifth, and Eighth Circuits, as well as the federal court for the District of Washington, have expressly or implicitly rejected the analysis of [the First Circuit]"); *see also Alltel Tenn., Inc. v. Tenn. Pub. Serv. Comm'n*, 913 F.2d 305, 308 (6th Cir. 1990). Considering the precedent in the majority in the other circuit courts, OneLink had a good faith argument for overturning existing law and a reasonable litigant could have perceived some likelihood of success.   *PRE*, 605 U.S. at 65.

The Court finds that OneLink's second Cable Act complaint was objectively reasonable and immune under *Noerr-Pennington*.

### f.   **Puerto Rico Telecommunications Act Complaint**

On July 15, 2009, OneLink filed a state court lawsuit alleging that PRTC violated the Puerto Rico Telecommunications Act by illegally building a cable system and requested a preliminary injunction.   The Puerto Rico Court of First Instance dismissed OneLink's lawsuit for lack of jurisdiction and failure to exhaust its administrative remedies.   OneLink's subsequent appeal was unsuccessful, with the Court of Appeals affirming the decision of the Court of First Instance, agreeing that

OneLink failed to exhaust its administrative remedies.  On August 20, 2010, the Supreme Court denied the petition for certiorari.  *See* Section I(B)(6)(c), *supra*.

The Puerto Rico Telecommunications Act holds:

(a) The Board shall have *primary jurisdiction* over all telecommunications services and over all those persons [who] render these services in the Commonwealth of Puerto Rico, and over any person with a direct or indirect interest in said services or companies.

27 L.P.R.A. §267e(a).  In its decision dismissing OneLink's lawsuit for lack of jurisdiction, the Court of First Instance explained that Puerto Rico law acknowledges two "branches" of primary jurisdiction—exclusive primary jurisdiction and concurrent primary jurisdiction.[127]   OneLink argues that whether the TRB had exclusive or primary jurisdiction was uncertain when it filed its lawsuit, as elsewhere in the Puerto Rico Telecommunications Act the TRB is granted "*primary and exclusive* jurisdiction for adjudicating any damages and losses claim caused by any natural or juridical person to a user, *except for claims between telecommunications and cable companies*, as a result of violations of the provisions of this chapter."  27 L.P.R.A. § 269j-1 (emphasis added).  OneLink insists that by expressly giving the TRB "primary and exclusive" jurisdiction over damages claims by telecommunication service users "but exempting injunctive claims by cable companies like OneLink, the Act indicated that the TRB's jurisdiction over the latter was not exclusive."  *Def.'s Opp'n and Cross Mot.* at 30-31 (citing *Russello*, 464 U.S. at 23) ("Where Congress includes particular language in one section of a statute but omits it in another section

---

[127]     Aug. 26, 2009 Op. at 7-8, *San Juan Cable v. P.R. Tel. Co. et al.*, DPE-2009-865 (*Carson Decl. Ex. 107*) (ECF No. 248) (citing *Rivera Ortiz v. Mun. de Guaynabo*, 141 D.P.R. 257, 267 (1996)).

of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

The textual ambiguity in the Puerto Rico Telecommunications Act and lack of authority on the issue suggest that OneLink could have perceived a likelihood of success on its claim. *PRE*, 508 U.S. at 65. Using "primary and exclusive jurisdiction" in section 269j-1 but only "primary jurisdiction" in section 267e(a) supports a reasonable argument that the Puerto Rico Legislature may not have intended to grant exclusive primary jurisdiction in section 267e(a). Moreover, OneLink filed its Puerto Rico Telecommunications Act lawsuit on July 15, 2009, which was ultimately resolved on August 20, 2010, when the Supreme Court denied certiorari. As was the case with OneLink's cross-subsidy petitions, this petitioning took place during the period the Puerto Rico Supreme Court stayed PRTC's second franchise application (May 20, 2009 to October 26, 2010). This cuts against the inference that OneLink was attempting to interfere through the use of governmental process, as PRTC's franchise application was stayed during the entire pendency of the Puerto Rico Telecommunications Act lawsuit.

OneLink's Puerto Rico Telecommunications Act lawsuit was objectively reasonable and immune under *Noerr-Pennington*.

### g.     The Letters to Regulators

On June 11, 2009, after OneLink lost its second federal Cable Act suit in this Court, OneLink petitioned the U.S. Attorney for the District of Puerto Rico claiming that PRTC's construction of a cable system without a franchise was a violation of the

Cable Act.  The letter to the U.S. Attorney's Office stated that PRTC had committed "serious, repeated and longstanding violations of federal law" and urged an investigation of PRTC.  After a meeting with the U.S. Attorney's Office, OneLink sent another letter on June 22, 2009, to further explain and evidence PRTC's activities and seek the U.S. Attorney's Office to "utilize its greater resources and authority" to prevent any further illegal construction.  On July 13, 2009, OneLink submitted to the FCC the June 11, 2009 and June 22, 2009 letters it had sent the U.S. Attorney's Office.  Additionally, sometime on or before October 29, 2009, OneLink's representatives petitioned the Puerto Rico Department of Justice Office of Monopolistic Affairs (OMA) to investigate PRTC for violation of the Puerto Rico Telecommunications Act.  The OMA initiated an investigation into PRTC's possible violations of the Puerto Rico Telecommunications Act and served a subpoena on PRTC.  The OMA never pursued an administrative proceeding in response to OneLink's petitioning of it to investigate PRTC.  *See* Section I(B)(7), *supra*.

PRTC contends that OneLink's petitioning of the OMA was objectively baseless because the TRB holds primary jurisdiction regarding regulation of the telecommunications field in Puerto Rico under 27 L.P.R.A. § 267e(a).  *Pl.'s Mot.* at 43.  Likewise, PRTC asserts OneLink's petitions with the U.S. Attorney's Office and the FCC contending that PRTC's pre-franchise construction was in violation of federal law were objectively baseless because "PRTC's upgrades to its plant prior to the provision of IPTV service did not constitute "provid[ing] cable service without a franchise" under the Cable Act."  *Id*. at 44.

OneLink counters PRTC's contention regarding the legality of its pre-franchise construction by citing this Court's February 18, 2009 decision that addressed this issue, *Def.'s Opp'n and Cross Mot.* at 32, finding PRTC's argument "far-fetched" and that it was not "exempt from complying with the Cable Act's franchise requirement where, as in the present case, such company intends to upgrade existing facilities in order to make the provision of cable services viable," and held that "there has been a violation of Section 621 of the Cable Act, 47 U.S.C. § 541(b)(1), which states that a cable operator cannot provide cable services without a franchise.  Given this violation, the court finds that plaintiff OneLink has a strong likelihood of success on the merits. *San Juan Cable LLC v. Telecommunications Regulatory Bd. of Puerto Rico,* 598 F. Supp. 2d 233, 237-38 n.2 (D.P.R. 2009).  As to the petitions with the OMA, OneLink asserts that, regardless of the TRB's jurisdiction over the regulation of the telecommunications field in Puerto Rico, the OMA had jurisdiction to enforce unfair trade practices in Puerto Rico under 10 L.P.R.A. § 259(c).  *Def.'s Opp'n and Cross Mot.* at 32.  Moreover, OneLink asserts that the OMA's initiation of an investigation into PRTC's misconduct and service of a subpoena on PRTC are dispositive that OneLink's petitions were not objectively baseless. *Id.*

OneLink's petitions to the U.S. Attorney's Office, the FCC and the OMA were objectively reasonable.  The OMA has jurisdiction to enforce unfair trade practices in Puerto Rico; this jurisdiction is not trumped by the TRB's authority over matters relating to telecommunications.  As OneLink notes, "it is hardly unusual for corporate misconduct to violate more than one statute at the same time." *Def.'s Opp'n and*

*Cross Mot.* at 32.  Moreover, the OMA's investigatory actions and subpoena suggest that it found merit in OneLink's petitions.  Similarly, the FCC has jurisdiction over violation of the Cable Act, and the U.S. Attorney's office has a responsibility to prosecute these violations "[u]pon request" of the FCC.  47 U.S.C. § 401(c).  Finally, the decision of *Gen-Probe* provides guidance.  That court found that because communications with regulators included the same allegations made in court proceedings, which were found to be objectively reasonable, those communications could not support a claim of objectively baseless conduct.  *Gen-Probe,* 926 F. Supp. at 958 n.16.  Similarly, the communications with the U.S. Attorney's Office, the FCC and the OMA all were based on federal or state court filings that this Court found to be objectively reasonable.  Indeed, this Court found that there had been a violation of the Cable Act and OneLink had a strong likelihood of success on the merits in its Cable Act complaint.

OneLink's petitions to the U.S. Attorney's Office, the FCC and the OMA were objectively reasonable and immune under *Noerr-Pennington*.

### 3.    Subjective Motive and Intent

Only if it is determined that a lawsuit was objectively baseless, under *PRE* a court must set out to "examine the litigant's subjective motivation" and examine whether "the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor . . . through the use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *PRE*, 508 U.S. at 60-61 (internal citations and quotation marks omitted).

Additionally, the Fourth Circuit held that when applying *California Motor Transport* "[o]f course, the subjective motive of the litigant and the objective merits of the suits are relevant, but other signs of bad-faith litigation . . . may also be probative of an abuse of the adjudicatory process." *Waugh Chapel*, 728 F.3d at 364.  Thus, though the Court found that none of OneLink's lawsuits or petitions were objectively baseless, and as such, the Court is not required to assess whether PRTC has provided any admissible evidence of subjective bad-faith for the analysis under *PRE*, this analysis is relevant to the Court's assessment of a pattern of sham petitioning under *California Motor Transport*.

The record makes clear that OneLink was worried about PRTC's entry into the Puerto Rico cable market.  The examples are legion: the overview provided by Mr. Pilar in 2008 on IPTV informed OneLink that "IPTV should spark a price war between the cable operators and PRTC";  OneLink's CEO ordered an analysis of the potential impact of PRTC's entry into IPTV which included a "Doomsday" scenario; OneLink sought other Puerto Rico cable providers to challenge PRTC's entry into the market and at one point it appears was prepared to pay, but did not end up paying for, these third parties to file petitions; and OneLink viewed its legal costs during the first franchise proceedings as a good investment.  Additionally, OneLink's owners recognized that PRTC's entry into video could negatively impact the sales price of OneLink.  This became a reality during OneLink's sale in 2012.  *See* Section I(B)(8), *supra*.  OneLink also had knowledge that the TRB considered its actions to be an

149

abuse of the judicial appeals process, a means to preserve its regional cable television monopoly, and its lawsuits and petitions to be unsupported by law.  *Id.*

However, "the legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is 'not at all affected by any anticompetitive purpose [the actor] may have had.'"  *PRE*, 508 U.S. at 59 (quoting *Noerr*, 365 U.S. at 140); *see also Pennington*, 381 U.S. at 669 (an "anticompetitive purpose [does] not illegalize the conduct there involved").  It would make no difference even if OneLink admitted all of its actions were spurred by an anticompetitive purpose to exclude PRTC from the cable market; the Court found that none of OneLink's litigation and petitions were objectively baseless, as either the petitioning was successful or an objective litigant could have concluded that the suit was reasonably calculated to elicit a favorable outcome.[128]

Moreover, there is ample evidence in the record that OneLink had genuine concerns that PRTC was engaged in illegal activities.  All five members of OneLink's Board of Directors testified that: (i) they believed that PRTC had failed to comply with the law, specifically by constructing its network without a franchise and in engaging in conduct that suggested it would illegally cross-subsidize its video business with its regulated phone business; (ii) they wanted a fair and level playing field; and (iii) PRTC's application contained multiple deficiencies.  OneLink Board member and former New York Governor George Pataki testified regarding OneLink's

---

[128]    The TRB's conclusions that OneLink's actions constituted abuse of the judicial process and were unsupported by law are unpersuasive, as they were made without the guidance of *PRE* or *California Motor Transport*.

opposition to PRTC's franchise application that the goal in pursuing intervention "was very simple and that was to make PRTC play by the rules. . . . [W]e [understood] that ultimately [PRTC was] entitled to a license but we [were] not going to allow them to shortcut the system to not follow the rules or to be in a position where they [could] engage in activity that is inappropriate." *See* Section I(B)(8), *supra*.  Additionally, the record shows that OneLink's concerns were valid: PRTC's first franchise application was rejected in part due to cross-subsidization, this Court found that PRTC had engaged in illegal pre-franchise construction, and on November 2, 2011, the TRB issued an order that found PRTC had been engaged in illegal pre-franchise construction and that it was still concerned about cross-subsidization, conditioning the application's approval on remedying these issues to put PRTC "on an equal footing with respect to the rest of the cable TV industry."  *See* Section I(B)(4), *supra*.

## F.    **Pattern Sham Petitioning under *California Motor Transport***

PRTC's failure to prove sham petitioning under *PRE* is not fatal to its anti-trust claims against OneLink.  Sham litigation may also be "evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims."  *Otter Tail Power Co.*, 410 U.S. at 380; *California Motor Transport*, 404 U.S. at 513.  In applying a "holistic review" to patterns of lawsuits, circuit courts have looked at a defendant's filing success as "circumstantial evidence of the defendant's subjective motivations." *Hanover,* 806 F.3d at 180.  *Compare Waugh Chapel*, 728 F.3d at 365 (finding sham where only one of fourteen proceedings was successful), and *Hanover*, 806 F.3d at 182 (finding "[d]efendants' meager record on the merits [of four lawsuits] supports . . .

allegation that the filings were brought not to redress any grievances") with *USS–POSCO,* 31 F.3d at 811 (finding no sham where fifteen of twenty-nine lawsuits were successful), and *Kaiser*, 552 F.3d at 1046 (finding no sham where defendant "won seven of the seventeen suits" and each of the ten remaining cases "had a plausible argument on which it could have prevailed").

Additionally, the Fourth Circuit held that when applying *California Motor Transport* "[o]f course, the subjective motive of the litigant and the objective merits of the suits are relevant, but other signs of bad-faith litigation . . . may also be probative of an abuse of the adjudicatory process." *Waugh Chapel,* 728 F.3d at 364. Furthermore, the Third Circuit held "[i]f more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing 'willy-nilly without regard to success.' . . . A high percentage of meritless or objectively baseless proceedings, on the other hand, will tend to support a finding that the filings were not brought to redress any actual grievances." *Hanover*, 806 F.3d at 181 (internal citations omitted).

PRTC alleged that OneLink's petitioning success rate was zero wins and twenty-four losses. *Pl.'s Opp'n and Reply* at 18. OneLink asserts it participated in only eight proceedings, in which four it was successful. *Def.'s Opp'n and Cross Mot.* at 42-43. By the Court's count, OneLink participated in thirteen lawsuits or proceedings for purposes of analysis under *California Motor Transport*: (1) the first intervention request; (2) the second intervention request; (3) the first Cable Act complaint; (4) the mandamus action regarding intervention; (5) the second Cable Act

complaint; (6) the petition to the U.S. Attorney's Office; (7) the petition to the FCC; (8) the petition to the OMA; (9) the Puerto Rico Telecommunications Act suit; (10) the mandamus action on cross-subsidization; (11) the recusal motions for Commissioner Torres; (12) the third motion for intervention; and (13) the § 1983 suit.  Of these, OneLink was successful in four: (1) the first intervention request; (2) the first Cable Act complaint; (3) the mandamus action regarding intervention; and (4) the § 1983 suit.  That is a 4 for 13 record.  While not as successful as the defendants in *Kaiser* and *USS–POSCO*, OneLink boasts a higher winning percentage than the defendants in *Waugh Chapel* and *Hanover*.  Additionally, all of OneLink's petitions were objectively reasonable, and the record is devoid of any bad-faith evidence that OneLink was using the governmental process, not the outcome of that process, as a means to delay PRTC's entry into the market or drive up litigation costs.  "If more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing 'willy-nilly without regard to success.'" *Hanover*, 806 F.3d at 181.

The Court concludes that OneLink did not engage in a series of sham petitions and its litigation filings are immune from Sherman Act violations under *Noerr-Pennington* and *California Motor Transport*.

## V.   CONCLUSION

The Court DENIES Plaintiff's Motion for Partial Summary Judgment (ECF No. 246) and GRANTS Defendant's Cross Motion for Summary Judgment (ECF No. 261).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 25th day of July, 2016